UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH INTERNATIONAL,<br><br>Plaintiff,<br><br>-against-<br><br>XL CAPITAL ASSURANCE INC. AND XLCA ADMIN LLC, AS TRUSTEE FOR PORTFOLIO CDS TRUST 138, PORTFOLIO CDS TRUST 153, PORTFOLIO CDS TRUST 164, PORTFOLIO CDS 165, PORTFOLIO CDS TRUST 170, PORTFOLIO CDS TRUST 172 AND PORTFOLIO CDS TRUST 186,<br><br>Defendants. | 08 CV 2893<br><br>**ANSWER AND COUNTERCLAIMS** |
| XL CAPITAL ASSURANCE INC. AND XLCA ADMIN LLC, AS TRUSTEE FOR PORTFOLIO CDS TRUST 138, PORTFOLIO CDS TRUST 153, PORTFOLIO CDS TRUST 164, PORTFOLIO CDS 165, PORTFOLIO CDS TRUST 170, PORTFOLIO CDS TRUST 172 AND PORTFOLIO CDS TRUST 186,<br><br>Counterclaimants,<br><br>-against-<br><br>MERRILL LYNCH INTERNATIONAL AND MERRILL LYNCH & CO.,<br><br>Counterclaim Defendants. | |

<u>**ANSWER**</u>

Defendants XL Capital Assurance Inc. ("XLCA") and XLCA Admin LLC as trustee

("Trustee") for Portfolio CDS Trust 138, Portfolio CDS Trust 153, Portfolio CDS Trust 164,

Portfolio CDS Trust 165, Portfolio CDS Trust 170, Portfolio CDS Trust 172 and Portfolio CDS

Trust 186 (collectively, the "Trusts"), by their attorneys, Quinn Emanuel Urquhart Oliver &

Hedges, LLP, respectfully submit their Answer to the Complaint.

## NATURE OF THE ACTION

1.  This action arises out of defendants' efforts to avoid their financial obligations under seven binding and enforceable credit default swaps ("the CDSs" or "swaps") with an aggregate notional amount of approximately $3.1 billion.  These swaps were entered into between MLI and each of the Trusts (through the Trustee).

**ANSWER:**

Defendants admit that, through the Trustee, the Trusts entered into certain credit default swaps

("CDSs") with Merrill Lynch International ("MLI"). Defendants deny all other allegations set

forth in paragraph 1 of the Complaint.

2.  A credit default swap is a very common contractual arrangement used in the securities and banking industries to provide the buyer under the arrangement — in these cases MLI — with protection upon the occurrence of specified credit events affecting an obligation referenced in the contract.  The seller under such arrangement provides the protection.  In these cases, the sellers are the Trusts, the referenced obligations are seven different collateralized debt obligations ("CDOs") and the specified credit events are losses occurring on such referenced obligations as the result of non-payment of interest or principal payable under them.

**ANSWER:**

Defendants admit that, through the Trustee, the Trusts entered into certain CDSs with MLI.

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

all other allegations set forth in paragraph 2 of the Complaint.

3.  Each seller's obligations are guaranteed under, and as provided in, a Financial Guarantee Insurance Policy (the "Guarantee") issued by XLCA, an affiliate of each of the Trusts and the Trustee.  The Guarantee is an insurance policy also commonly used in the securities and banking industries to provide the insured, in these cases MLI, with a right to claim under such policy if a specified event occurs, in these cases on-payment of each Trust's obligations to MLI under its CDS.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 3 of the Complaint, except admit that XLCA has issued

certain Financial Guaranty Insurance Policies and refer to those documents for an accurate

description of the contents thereof.

4.   Apparently in light of the current dramatic downturn and deterioration in the credit markets, defendants are having "sellers' remorse" and are seeking to avoid their potential obligations of up to approximately $3.1 billion under the credit default swaps at issue. Specifically, after entering into seven binding and valid CDS contracts and accepting substantial premium payments from MLI, defendants improperly issued notices purporting to terminate the seven CDSs with MLI without any basis and under a pretext based entirely on rank speculation.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 4 of the Complaint.

5.   MLI has performed under the CDSs; has made substantial premium payments thereunder; and has not engaged in any conduct permitting defendants to repudiate their contractual undertakings.  MLI is entitled to the benefit of its bargain and the certainty that defendants will remain obligated for the approximately $3.1 billion notional amount of credit protection purchased by MLI.  By this action, MLI seeks this Court's assistance in enforcing defendants' obligations and ensuring that it obtains the benefits of its bargains.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 5 of the Complaint.

## THE PARTIES

6.    Plaintiff MLI is a company organized under the laws of England and Wales with its principal place of business in London.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 6 of the Complaint.

7.   Defendant XLCA is a New York domiciled stock insurance company with its principal place of business at 1221 Avenue of the Americas, New York, New York.  XLCA is a subsidiary of Security Capital Assurance Ltd. ("SCA").

**ANSWER:**

Defendants admit the allegations set forth in paragraph 7 of the Complaint.

8.   Defendant XLCA Admin LLC, as trustee for the seven Trusts, is a limited liability company organized under the laws of New York with its principal place of business at 1221

Avenue of the Americas, New York, New York 10020.  The member or members of XLCA Admin LLC are citizens of New York.

**ANSWER:**

Defendants admit the allegations set forth in paragraph 8 of the Complaint.

9.   Portfolio CDS Trust 138 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle" specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called West Trade Funding CDO II Ltd. executed on January 25, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 138 is a trust organized under the laws of New York with

its principal place of business in New York and that Portfolio Trust 138 was created for the

purpose of being the counterparty to MLI in a credit default swap related to notes issued by West

Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC.  Defendants deny all other

allegations set forth in paragraph 9 of the Complaint

10. Portfolio CDS Trust 153 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle" specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called Silver Marlin CDO I Ltd. executed on April 11, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 153 is a trust organized under the laws of New York with

its principal place of business in New York and that Portfolio Trust 153 was created for the

purpose of being the counterparty to MLI in a credit default swap related to notes issued by

Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC.  Defendants deny all other allegations

set forth in paragraph 10 of the Complaint.

11. Portfolio CDS Trust 164 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle" specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called Tazlina Funding CDO II, Ltd. executed on June 4, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 164 is a trust organized under the laws of New York with

its principal place of business in New York and that Portfolio Trust 164 was created for the

purpose of being the counterparty to MLI in a credit default swap related to notes issued by

Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC.  Defendants deny all other

allegations set forth in paragraph 11 of the Complaint.

     12. Portfolio CDS Trust 165 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle" specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called West Trade Funding CDO III, Ltd. executed on May 25, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 165 is a trust organized under the laws of New York with

its principal place of business in New York and that Portfolio Trust 165 was created for the

purpose of being the counterparty to MLI in a credit default swap related to notes issued by West

Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC. Defendants deny all other

allegations set forth in paragraph 12 of the Complaint.

     13. Portfolio CDS Trust 170 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle" specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called Jupiter High-Grade CDO VI, Ltd. executed on June 15, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 170 is a trust organized under the laws of New York with

its principal place of business in New York and that Portfolio Trust 170 was created for the

purpose of being the counterparty to MLI in a credit default swap related to notes issued by

Jupiter High-Grade CDO VI Ltd. and Jupiter High-Grade CDO VI LLC.  Defendants deny all

other allegations set forth in paragraph 13 of the Complaint.

     14. Portfolio CDS Trust 172 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle"

specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called Robeco High Grade CDO I, Ltd. executed on June 29, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 172 is a trust organized under the laws of New York with its principal place of business in New York and that Portfolio Trust 172 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Robeco High Grade CDO I Ltd. and Robeco High Grade CDO I LLC. Defendants deny all other allegations set forth in paragraph 14 of the Complaint.

15. Portfolio CDS Trust 186 is a trust organized under the laws of New York that was created, and is controlled, by XLCA as a special purpose so-called "pass-through vehicle" specifically to act as a counterparty to MLI in connection with the credit default swap relating to a collateralized debt obligation security called Biltmore CDO 2007-1, Ltd. executed on August 10, 2007.

**ANSWER:**

Defendants admit that Portfolio Trust 186 is a trust organized under the laws of New York with its principal place of business in New York and that Portfolio Trust 186 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Biltmore CDO 2007-1 Ltd. and Biltmore CDO 2007-1 LLC. Defendants deny all other allegations set forth in paragraph 15 of the Complaint.

## JURISDICTION

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). This action is between a citizen of a state and a citizen or subject of a foreign state and involves and amount-in-controversy that exceeds the sum or value of $75,000, exclusive of interests and costs.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 16 of the Complaint.

## FACTUAL BACKGROUND

17. On January 25, 2007, the parties entered into a credit default swap that was effective that same date. Pursuant to the CDS, defendants are obligated to provide MLI with credit protection for exposure in connection with $375,000,000 principal amount of Class A-2 Second Priority Senior Secured Floating Rate Notes issued by West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC (the "West Trade II Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 17 of the Complaint.

Defendants deny the allegations set forth in the second sentence of paragraph 17 of the Complaint.

18. MLI has fully performed according to the terms of the contract relating to the West Trade II Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 18 of the Complaint.

19. On April 11, 2007, the parties entered into a credit default swap effective as of March 29, 2007. Pursuant to the CDS Contract, defendants are obligated to provide MLI with credit protection for exposure in connection with $437,500,00 principal amount of Class A-2 Second Priority Senior Secured Floating Rate Notes issued by Silver Marlin CDO I, Ltd. and Silver Marlin CDO I LLC (the "Silver Marlin Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 19 of the Complaint.

Defendants deny the allegations set forth in the second sentence of paragraph 19 of the Complaint.

20.  MLI has fully performed according to the terms of the contract relating to the Silver Marlin Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 20 of the Complaint.

21. On May 25, 2007, the parties entered into a credit default swap effective as of May 10, 2007. Pursuant to the CDS Contract, defendants are obligated to provide MLI with credit protection for exposure in connection with $625,000,000 principal amount of Class A-2 Second Priority Senior Secured Floating Rate Notes issued by West Trade Funding CDO III, Ltd. and West Trade Funding CDO III LLC (the "West Trade III Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 21 of the Complaint,

except that Defendants deny that the credit default swap relating to West Trade Funding CDO

III, Ltd. was executed on May 25, 2007.  Defendants deny the allegations set forth in the second

sentence of paragraph 21 of the Complaint.

      22. MLI has fully performed according to the terms of the contract relating to the West
Trade III Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 22 of the Complaint.

      23. On June 4, 2007, the parties entered into a credit default swap effective as of May 10,
2007. Pursuant to the CDS Contract, defendants are obligated to provide MLI with credit
protection for exposure in connection with $450,000,000 principal amount of Class A-2 Second
Priority Senior Secured Floating Rate Notes issued by Tazlina Funding CDO II, Ltd. and Tazlina
Funding CDO II LLC (the "Tazlina Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 23 of the Complaint.

Defendants deny the allegations set forth in the second sentence of paragraph 23 of the

Complaint.

      24. MLI has fully performed according to the terms of the contract relating to the West
Trade III Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 24 of the Complaint.

      25. On June 15, 2007, the parties entered into a credit default swap effective as of May 3,
2007. Pursuant to the CDS Contract, defendants are obligated to provide MLI with credit
protection for exposure in connection with $525,000,000 principal amount of Class A-2 Second
Priority Senior Secured Floating Rate Notes issued by Jupiter High-Grade CDO VI, Ltd. and
Jupiter High-Grade CDO VI, LLC (the "Jupiter Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 25 of the Complaint.

Defendants deny the allegations set forth in the second sentence of paragraph 25 of the Complaint.

26. MLI has fully performed according to the terms of the contract relating to the Jupiter Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 26 of the Complaint.

27. On June 29, 2007, the parties entered into a credit default swap effective as of June 1, 2007. Pursuant to the CDS Contract, defendants are obligated to provide MLI with credit protection for exposure in connection with $385,000,000 principal amount of Class A-2 Second Priority Senior Secured Floating Rate Notes issued by Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC (the "Robeco Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 27 of the Complaint.

Defendants deny the allegations set forth in the second sentence of paragraph 27 of the Complaint.

28. MLI has fully performed according to the terms of the contract relating to the Robeco Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 28 of the Complaint.

29. On August 10, 2007, the parties entered into a credit default swap effective on that date. Pursuant to the CDS Contract, defendants are obligated to provide MLI with credit protection for exposure in connection with $375,000,000 principal amount of Class A-2 Second Priority Senior Secured Floating Rate Notes issued by Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC (the "Biltmore Transaction").

**ANSWER:**

Defendants admit the allegations set forth in the first sentence of paragraph 29 of the Complaint, except that Defendants deny that the Effective Date of the Biltmore CDO 2007-1 credit default

swap was August 10, 2007.  Defendants deny the allegations set forth in the second sentence of

paragraph 29 of the Complaint.

30. MLI has fully performed according to the terms of the contract relating to the Biltmore Transaction.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 30 of the Complaint.

31. In a transparent attempt to avoid both the Trust's obligations under the CDSs and its obligations under the Guarantees, on February 22, 2008, XLCA, as attorney in fact for the Trusts, sent six notices to MLI asserting that in light of MLI's "repudiation of its contractual obligations," it was purporting to be "exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement." The six CDSs were: the West Trade II Transaction; the Silver Marlin Transaction; the Tazlina Transaction; the West Trade III Transaction; the Robeco Transaction; and the Biltmore Transaction.

**ANSWER:**

Defendants admit that, on February 22, 2008, XLCA sent six notices to MLI that contained the

language in quotation marks. Defendants admit that the following transactions were terminated:

the West Trade II Transaction; the Silver Marlin Transaction; the Tazlina Transaction; the West

Trade III Transaction; the Robeco Transaction; and the Biltmore Transaction. Defendants deny

all other allegations set forth in paragraph 31 of the Complaint.

32. That same day XLCA, as attorney-in-fact for the Portfolio CDS Trust 170, sent a notice demanding that MLI confirm that it had not entered into any other agreements with regard to the voting rights in the Jupiter Transaction.

**ANSWER:**

Defendants deny allegations set forth in paragraph 32 of the Complaint, except admit that

XLCA, as attorney-in-fact for Porfolio CDS Trust 170, sent a notice to MLI on February 22,

2008 requesting confirmation of certain information regarding the Jupiter Transaction.

33. The asserted basis for defendants' assertion as to MLI's purported "repudiation of its contractual obligations" is that "[u]nder the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise Voting Rights Solely in accordance with the written instructions of [each corresponding defendant] Trust."

**<u>ANSWER</u>:**

Defendants admit that the February 22, 2008 notices sent by XLCA to MLI contained the

language in quotation marks. Defendants deny all other allegations set forth in paragraph 33 of

the Complaint.

34. Section 6 of each of the CDS Contracts provides, in relevant part, that the Trusts may terminate the CDS upon, "the failure of Party A [MLI] to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B [the corresponding defendant Trust]."

**<u>ANSWER</u>:**

Defendants deny the allegations set forth in paragraph 34 of the Complaint and refer to the

relevant transactional documents for a fair and accurate statement of their contents.

35. MLI has never failed to exercise Voting Rights solely in accordance with the written instructions of any of the Trusts.

**<u>ANSWER</u>:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 35 of the Complaint.

36. Instead, XLCA speculates that because "publicly available information from Standard & Poor's website" reveals that "MBIA or its affiliates...[has] provided credit protection" on the senior most tranches of the CDOs at issue here and that "MBIA also [has] represented that it is the 'sole controlling party' in all of the CDOs in which it participates," that MLI has therefore "agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA." XLCA speculates that MLI's purported "failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation."

**<u>ANSWER</u>:**

Defendants admit that the February 22, 2008 notices sent by XLCA to MLI contained the

language in quotation marks. Defendants deny all other allegations set forth in paragraph 36 of

the Complaint.

37. In its notices, XLCA failed to describe any facts supporting the occurrence of any events giving it the right to terminate the CDSs. On February 29, 2008, MLI responded to the February 22 notices stating that MLI had "neither failed to exercise Voting Rights as directed by [the relevant] Trust...nor exercised any Retained Rights without the consent of [the relevant] Trust. In fact, your notice purporting to designate and Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force."

**ANSWER:**

Defendants admit that, on February 29, 2008, XLCA received a letter from MLI that contained

the language in quotation marks. Defendants deny all other allegations set forth in paragraph 37

of the Complaint.

38. MLI's February 29, 2008 responses further advised XLCA that "[w]ith respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law."

**ANSWER:**

Defendants admit that, on February 29, 2008, XLCA received a letter from MLI that contained

the language in quotation marks. Defendants deny all other allegations set forth in paragraph 38

of the Complaint.

39. On March 6, 2008, XLCA as attorney-in-fact for Portfolio Trust 170 sent another notice to MLI reciting the contents of its February 22, 2008 letter and acknowledging that it had no information that MLI had entered into any other agreement in connection with the Jupiter Transaction. However, XLCA asserted that because it had not received confirmation from MLI that it had not "enter[ed] into any similar understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes of Class A-1 Notes," it "deem[ed] MLI's failure to provide the requested confirmation within three days as evidence of it having accorded Voting Rights under the Jupiter VI Transactions to a third party in repudiation of its contractual commitment to the Trust." In the notice, XLCA declared that it "consider[ed] MLI's repudiation of its contractual obligations to the Trust to be final and [that] it [was] exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement."

**ANSWER:**

Defendants admit that, on March 6, 2008, XLCA sent MLI a letter that contained the language in

quotation marks. Defendants deny all other allegations set forth in paragraph 39 of the

Complaint.

    40. In a letter dated March 7, 2008, the Trusts, through counsel, responded to MLI's February 29, 2008 letters, asserting that "a party may terminate a bilateral contract immediately upon the other party's repudiation of its obligations, which divests the repudiating party of its ability to ensure compliance with the contract in the future, even if no breach of such obligations has yet occurred." Yet like the previous letters, nothing in the March 7 letter provides any factual basis for XLCA's conclusion that "MLI repudiated its obligations to exercise Voting Rights 'solely' in accordance with the instructions of XLCA by entering into the conflicting agreements with MBIA."

**ANSWER:**

Defendants admit that, on March 7, 2008, XLCA sent MLI a letter that contained the language in

quotation marks.  Defendants deny all other allegations set forth in paragraph 40 of the

Complaint.

    41. On March 10, 2008, MLI responded to the March 7 letter again assuring XLCA, among other things, that "MLI can now and will at all times going forward exercise Voting Rights in accordance with the express terms of our contracts.  Contrary to your letter, MLI has not entered into any contract that 'divests [MLI] of its ability to ensure compliance with [its contracts with XLCA] in the future.' Nor has MLI 'contractually relinquished its ability' to vote as directed by XLCA." MLI continued that "MLI has performed all of its contractual obligations, including the payment of substantial premiums to XLCA, and has reiterated its ability and intent to perform all of its contractual obligations, continent or otherwise, going forward."

**ANSWER:**

Defendants admit that, on March 10, 2008, XLCA received a letter from MLI that contained the

language in quotation marks. Defendants deny all other allegations set forth in paragraph 41 of

the Complaint.

    42. On March 13, 2008, XLCA's parent SCA disclosed its fourth quarter and full year 2007 results in a press release which was publicly disseminated and filed as an exhibit to a Form 8-K filing with the United States Securities and Exchange Commission. Notwithstanding MLI's March 10 response and the absence of support for XLCA's position, a section of SCA's press release was headed "Termination of Seven CDS Contracts." SCA there stated that "the company issued notices termination seven Credit Default Swap ("CDS") contracts with a certain

counterparty ... on the basis of the counterparty's repudiation of certain contractual obligation under each of the agreements. The Company has been advised by the counterparty that it disputed the effectiveness of the terminations." SCA conceded that "[t]he notional amount of the CDS contracts at December 31, 2007 aggregated $3.1 billion before reinsurance ($3.0 billion after reinsurance)." The counterparty referred to in that press release was MLI.

**ANSWER:**

Defendants admit the allegations set forth in the first and last sentences and further admit that the

press release contained the language in quotation marks. Defendants deny all other allegations

set forth in paragraph 42 of the Complaint.

43. MLI has fully performed according to the terms of the CDSs and has made substantial premium payments thereunder.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 43 of the complaint.

44. MLI has never failed to exercise Voting Rights solely in accordance with the written instructions of any of the Trusts.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 44 of the Complaint.

45. MLI has not entered into any other agreements which would prevent it from complying with its obligations under the CDSs.

**ANSWER:**

Defendants deny the allegations set forth in paragraph 45 of the Complaint.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Declaratory Judgment as to West Trade Funding CDO II, Ltd. and West Trade Funding CDO II, LLC)

46. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to Paragraphs 1-45 of the Complaint.

47. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 138 and the Guarantee from XLCA relating to the West Trade II Transaction is binding and enforceable against Portfolio CDS 138 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 138 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 138 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the West Trade II Transaction.

**ANSWER:**

Paragraph 47 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 47 does contain such allegations, they are denied.

48. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 48 of the Complaint.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment as to Silver Marlin CDO I, Ltd. and Silver Marlin CDO I, LLC)

49. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to Paragraphs 1-48 of the Complaint.

50. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 153 and the Guarantee from XLCA relating to the Silver Marlin Transaction is binding and enforceable against Portfolio CDS 153 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 153 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 153 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the Silver Marlin Transaction.

**ANSWER:**

Paragraph 50 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 50 does contain such allegations, they are denied.

51. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 50 of the Complaint.

### THIRD CLAIM FOR RELIEF

### (Declaratory Judgment as to West Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC)

52. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to Paragraphs 1-51 of the Complaint.

53. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 165 and the Guarantee from XLCA relating to the West Trade III Transaction is binding and enforceable against Portfolio CDS 165 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 165 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 165 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the West Trade III Transaction.

**ANSWER:**

Paragraph 53 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 53 does contain such allegations, they are denied.

54. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 54 of the Complaint.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Judgment as to Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC)

55. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to Paragraphs 1-54 of the Complaint.

56. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 164 and the Guarantee from XLCA relating to the Tazlina Transaction is binding and enforceable against Portfolio CDS 164 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 164 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 164 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the Tazlina Transaction.

**ANSWER:**

Paragraph 56 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 56 does contain such allegations, they are denied.

57. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 57 of the Complaint.


## FIFTH CLAIM FOR RELIEF

### (Declaratory Judgment as to Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO II, LLC)

58. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to Paragraphs 1-57 of the Complaint.

59. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 170 and the Guarantee from XLCA relating to the Jupiter Transaction is binding and enforceable against Portfolio CDS 170 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 170 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 170 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the Jupiter Transaction.

**<u>ANSWER</u>:**

Paragraph 59 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 59 does contain such allegations, they are denied.

60. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**<u>ANSWER</u>:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 60 of the Complaint.

### SIXTH CLAIM FOR RELIEF

### (Declaratory Judgment as to Robeco High Grade CDO, I Ltd. and Robeco High Grade CDO I, LLC)

61. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**<u>ANSWER</u>:**

Defendants incorporate by reference their responses to Paragraphs 1-60 of the Complaint.

62. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 172 and the Guarantee from XLCA relating to the Robeco Transaction is binding and enforceable against Portfolio CDS Trust 172 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 172 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 172 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the Robeco Transaction.

**ANSWER:**

Paragraph 62 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 62 does contain such allegations, they are denied.

> 63. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 63 of the Complaint.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment as to Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC)

> 64. MLI incorporates by reference each of the above allegations in this Complaint as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to Paragraphs 1-63 of the Complaint.

> 65. Pursuant to 28 U.S.C. § 2201(a), MLI seeks a declaration of this Court (a) that its CDS with Portfolio CDS Trust 186 and the Guarantee from XLCA relating to the Biltmore Transaction is binding and enforceable against Portfolio CDS 186 and XLCA; (b) that MLI has not repudiated its contractual obligations to Portfolio CDS Trust 186 or to XLCA relating to Voting Rights and (c) that Portfolio CDS Trust 186 and XLCA are contractually obligated to provide credit protection to MLI in accordance with the terms of the contracts relating to the Biltmore Transaction.

**ANSWER:**

Paragraph 65 does not contain any factual allegations to which a responsive pleading is required.

To the extent Paragraph 65 does contain such allegations, they are denied.

> 66. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations set forth in paragraph 66 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Anticipatory Breach)

Each and every allegation and claim in the Complaint is barred because of MLI's

anticipatory breach and repudiation of the CDSs.

### Second Affirmative Defense
### (Breach)

Each and every allegation and claim in the Complaint is barred because any obligation on

the part of Defendants to perform is excused because of MLI's breaches of the CDSs.

### Third Affirmative Defense
### (No Breach of Duty)

Each and every allegation and claim in the Complaint is barred because Defendants have

not breached any duty owed to MLI.

### Fourth Affirmative Defense
### (Unclean Hands)

Each and every allegation in the Complaint is barred by the doctrine of unclean hands.

### Fifth Affirmative Defense
### (Estoppel)

Each and every allegation in the Complaint is barred by the doctrine of estoppel.

### Sixth Affirmative Defense
### (Fraud and Misrepresentation)

Each and every allegation in the Complaint is barred because the alleged CDSs are

unenforceable and/or void because of Plaintiff's fraud and/or misrepresentations to Defendants.

### Seventh Affirmative Defense
### (Unilateral or Mutual Mistake)

Each and every allegation in the Complaint is barred because the alleged CDSs are

unenforceable as they resulted from unilateral or mutual mistake.

WHEREFORE, Defendants deny that Plaintiffs are entitled to any of the relief that they seek and pray for: entry of judgment in its favor dismissing the Complaint with prejudice; granting Defendants their costs and expenses, including reasonable attorneys' fees, incurred in this action; and granting Defendants such other and further relief as is deemed just and proper.

## COUNTERCLAIMS

Defendants and counterclaimants, XL Capital Assurance Inc. ("XL Capital Assurance") and XCLA Admin LLC ("XLCA Admin") as trustee for Portfolio CDS Trust 164, Portfolio CDS Trust 186, Portfolio CDS Trust 165, Portfolio CDS Trust 172, Portfolio CDS Trust 153, Portfolio CDS Trust 138, Portfolio CDS Trust 170 (collectively "XLCA Trusts," and with XL Capital Assurance and XL Admin, "XLCA"), by their attorneys, Quinn Emanuel Urquhart Oliver & Hedges LLP, for their counterclaims against plaintiff and counterclaim defendant Merrill Lynch International ("MLI") and counterclaim defendant Merrill Lynch & Co. ("Merrill Lynch"), allege as follows:

## NATURE OF THE ACTION

1.      In attempting to offload subprime mortgage and other liabilities related to troubled collateralized debt obligations ("CDOs"), Merrill Lynch agreed to provide third parties with control rights over seven of its CDOs, even though those same control rights had already been exclusively committed to XLCA.  XLCA brings these counterclaims as a result of MLI's and Merrill Lynch's anticipatory repudiation and breach of the credit default swaps and other agreements that the parties entered into between January and August 2007 related to these CDOs.

2.      Under the credit default swaps at issue, XLCA had agreed to protect MLI against certain credit defaults on $3.1 billion in notes issued by seven Merrill Lynch CDOs.  As a fundamental condition to entering into these swap agreements, XLCA required that MLI provide XLCA with full control rights under each of the CDOs for which XLCA was providing protection.  In response to XLCA's condition, MLI agreed as part of the swap agreement terms

to exercise all voting and consent rights for each CDO's "Controlling Class" of notes "solely in accordance with the written instructions" of XLCA.

3.     CDO control rights were a fundamental part of the consideration that XLCA obtained under its agreements with MLI.  Only by securing sole control over those rights was XLCA able to ensure that it would be in the best position to protect its financial exposure under the swap agreements through such things as choosing if and when the CDO would liquidate collateral, accelerate maturities or remove a trustee or collateral manager if the CDO's underlying collateral deteriorated triggering an event of default.  The control rights also entitled XLCA to take other important actions to protect its interests, such as directing the CDO trustee to institute proceedings to protect CDO assets or deciding whether to approve agreements the CDO issuer proposed entering into with a collateral manager, collateral administrator or bank.

4.     By the time XLCA and MLI executed the last of their agreements, Merrill Lynch was in the midst of a dismal 2007 third quarter for which it would report a near-$8 billion write-down in its CDO and subprime mortgage businesses.  Desperate to get more CDO liabilities off its books before these disastrous results were announced, Merrill Lynch undertook a rushed campaign to find parties willing to hedge or provide protection on its remaining CDO positions.

5.     In the last two months of the third quarter, Merrill Lynch aggressively marketed to potential counterparties up and down Wall Street over $20 billion in positions that it was holding in at least two dozen CDOs.  Among the CDO risks that Merrill Lynch was seeking to unload were additional positions in the seven CDOs for which XLCA had provided protection and been promised full control rights.   As a result of its aggressive efforts, Merrill Lynch found one or more third parties — including bond insurer MBIA Inc. ("MBIA") — that were willing to

provide the protection Merrill Lynch was seeking on these seven CDOs (among others).  But, like XLCA, those third parties conditioned their willingness to provide that protection on Merrill Lynch providing ***them*** with full control rights under the CDOs.

6.       Determined to get these CDO risks off its books at all costs before the third quarter of 2007 closed, Merrill Lynch made the decision to blatantly ignore the prior commitments made to XLCA.  Thus, notwithstanding, and in disregard of, its prior contractual obligations to XLCA, Merrill Lynch entered into agreements in which it promised the control rights under the seven CDOs to these third parties in order to secure their agreements to provide Merrill Lynch with the additional protections that it was desperate to find.  Merrill Lynch never disclosed the existence of these agreements to XLCA and, moreover, has endeavored up to this day to keep their terms hidden.

7.       By conveying these CDO control rights to MBIA and perhaps others, MLI repudiated its contractual obligations under its agreements with XLCA.  Under both well settled New York common law and the specific terms of the parties' credit default swap agreements, MLI's repudiation triggered XLCA's rights to terminate those agreements.  In February and March 2008, XLCA issued notices terminating the seven credit default swaps that MLI repudiated.

8.       In response to XLCA's terminations, MLI initiated this suit seeking to enforce its agreements with XLCA.  XLCA brings these counterclaims seeking a declaration that its terminations were effective and that XLCA has no further obligations to MLI under the agreements at issue.  XLCA further seeks damages for MLI's breaches of the agreements by refusing to tender payments that MLI was obligated to pay to XLCA under the agreements' terms following their termination.  While the ultimate amount of damages will be shown at trial,

XLCA estimates the payments to which it is entitled to be no less than $28 million before interest.

## THE PARTIES

9.      Defendant and counterclaimant XL Capital Assurance is organized under the laws of New York with its principal place of business in New York.  XL Capital Assurance is an indirect wholly owned subsidiary of Security Capital Assurance Ltd.

10.      Defendant and counterclaimant XLCA Admin is a limited liability company organized under the laws of New York with its principal place of business in New York.  XLCA Admin is an indirect and wholly owned subsidiary of Security Capital Assurance Ltd.

11.      Defendant and counterclaimant Portfolio Trust 138 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 138 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC.

12.      Defendant and counterclaimant Portfolio Trust 153 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 153 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC.

13.      Defendant and counterclaimant Portfolio Trust 164 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 164 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC.

14.     Defendant and counterclaimant Portfolio Trust 165 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 165 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by West Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC.

15.     Defendant and counterclaimant Portfolio Trust 170 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 170 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Jupiter High-Grade CDO VI Ltd. and Jupiter High-Grade CDO VI LLC.

16.     Defendant and counterclaimant Portfolio Trust 172 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 172 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Robeco High Grade CDO I Ltd. and Robeco High Grade CDO I LLC.

17.     Defendant and counterclaimant Portfolio Trust 186 is a trust organized under the laws of New York with its principal place of business in New York.  Portfolio Trust 186 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Biltmore CDO 2007-1 Ltd. and Biltmore CDO 2007-1 LLC.

18.     Plaintiff and counter-defendant MLI is organized under the laws of England and Wales with its principal place of business located in the United Kingdom.  Merrill Lynch International is a subsidiary of Merrill Lynch.

19.     Counter-defendant Merrill Lynch is organized under the laws of Delaware with its principal place of business in New York.

## JURISDICTION

20.     This Court has supplemental jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the underlying civil action over which the Court has original jurisdiction.

## BACKGROUND

21.     Merrill Lynch is one of the largest financial institutions in the world and, for at least the last couple years, has been the world's leading underwriter of CDOs — the now-infamous investment vehicles at the heart of the massive meltdown in the subprime residential mortgage sector.

22.     A CDO (short for "collateralized debt obligation") is an entity formed for the purpose of issuing notes that are backed by a pool of bonds, loans or other assets, referred to as the CDO's "collateral." This collateral, which is often ultimately secured by or otherwise derived from residential mortgages, generates a stream of cash flows in the form of interest payments and return of principal which are, in turn, used to repay the CDO's noteholders on their investment in the notes. To the extent that particular investments in a CDO's collateral portfolio default on their principal and interest payments, the CDO's cash flows are diminished and there are fewer funds available to repay the CDO's noteholders.

23.     The notes issued by CDOs are structured into layers or "tranches" that correspond to the noteholders' respective rights to receive payment from the CDO's cash flows or, in the case of a sale of the CDO's collateral, the proceeds of that sale. The noteholders in the senior-most tranches of a CDO — referred to as the "super senior" tranches — are usually entitled to first payment from the cash flows generated by the CDO (or, in the case of a sale of collateral, the proceeds of the sale) and are thus the last to have the return on their investment

impaired if there is any shortfall in the interest or principal payments generated by a CDO's collateral. They are thus the lowest risk notes in the CDO structure and are typically rated AAA/Aaa by Standard & Poor's and Moody's at the time the CDO is formed.

24.     Correspondingly, the noteholders in the CDO's junior-most tranche are generally the first to absorb the losses and have the return on their investment impaired if there are defaults in the CDO collateral. Once the junior-most tranche has been fully impaired, the noteholders in the next highest tranche begin to absorb CDO losses, and so on.

25.     XL Capital Assurance is a financial guarantor whose products and services have included offering the holders of fixed-income securities, such as CDO notes, with financial guarantees on the payments they are entitled to receive under those securities.

26.     Between December 2006 and August 2007, XLCA and MLI, a Merrill Lynch subsidiary, entered into eight transactions in which XLCA agreed to provide MLI with financial guarantees on obligations related to Merrill Lynch CDOs. The last seven of those transactions, executed beginning in January 2007, are at issue in this suit.

27.     In each of the seven transactions at issue here, XLCA agreed to provide MLI with a guarantee against any shortfalls in the interest or principal payments due to the noteholders in the second-highest tranche of a Merrill Lynch CDO. The notes in these tranches were referred to in the CDO indentures — which are the contracts that set forth the rights and obligations of the CDO's issuers, noteholders and trustee — as the "Class A-2 Second Priority Senior Secured Floating Rate Notes" or the "Class A-2 Notes." The only notes senior to the Class A-2 Notes in the CDO structures were referred to in the CDO indentures as the "Class A-1 First Priority Senior Secured Floating Rate Notes" or the "Class A-1 Notes." While the Class A-

2 Notes were subordinated to the Class A-1 Notes, both tranches were rated AAA/Aaa by Standard & Poor's and Moody's and were considered "super senior" obligations.

28.    From the outset, a central part of the negotiation of these seven transactions concerned XLCA's ability to secure CDO control rights over both the Class A-2 Notes and the Class A-1 Notes.  Typically, a financial guarantor of CDO obligations, or any other type of CDO hedge counterparty, obtains the contractual right, as part of its guarantee or hedging arrangement, to exercise the voting and consent rights pertaining to the CDO notes that are the subject of the guarantee or hedge.  Thus, in the case of the seven guarantees with MLI, that typical arrangement would have resulted in XLCA obtaining the right to exercise voting and consent rights solely on behalf of the holders of the respective CDOs' Class A-2 Notes.

29.    However, including in a meeting held between XLCA and MLI on or about November 6, 2006, XLCA informed MLI that XLCA would not be willing to provide MLI with financial guarantees if the only rights it received were those that pertained to the Class A-2 Notes, as XLCA considered those rights insufficient to adequately protect XLCA's exposure under the guarantees.

30.    The reason for XLCA's concern with being relegated to having only the rights accorded to the holders of the Class A-2 Notes was that the CDO indentures and related agreements reserved a number of important rights to the "Controlling Class" of notes, which was defined by the indentures to include solely the Class A-1 Notes (as long as any such notes remained outstanding).  As one of the CDO offering circulars described:  "the Class A-1 Noteholder will have the right to approve many actions which the Issuer or the Collateral Manager proposes to take, to remove and replace that Collateral Manager and to determine

whether or not the Collateral will be liquidated following an Event of Default and other

important matters."

        31.    Indeed, the specific rights reserved to the holders of the Class A-1 Notes

as the "Controlling Class" were expansive and generally included, among others, the right to:

- direct the CDO trustee to institute proceedings to enforce any right, remedy or power conferred on the trustee;

- approve any agreement that the CDO issuer or co-issuer proposed to enter into on behalf of the CDO with a collateral manager, collateral administrator or bank;

- veto the selection of any proposed CDO trustee following the prior trustee's resignation or removal; and

- direct that the CDO collateral manager be removed for cause.

These rights expanded even further when the CDO's collateral was impaired or at risk, as

evidence by the occurrence of a specified "Event of Default" under the indenture.  In such cases,

the rights reserved to the "Controlling Class" permitted it to take aggressive steps to protect its

interests in the CDO against further deterioration.  These expanded rights generally included,

among others, the rights to:

- direct the CDO trustee to sell all or a portion of the CDO's collateral in a liquidation and distribute the proceeds of the sale to the noteholders based on the priority of their positions in the CDO tranche structure;

- direct the CDO trustee to declare an acceleration where all of the principal and interest on all of the CDO's notes would become immediately due and owing;

- direct the CDO trustee (or issuer) to remove the collateral manager (to the extent the Event of Default related to collateral defaults);

- direct the CDO trustee to institute proceedings to collect any amounts still payable on the CDO's notes;

- direct the CDO trustee to institute proceedings against the CDO issuer or co-issuer for the payment of any principal or interest shortfall;

- direct the CDO trustee to institute proceedings for the foreclosure of the indenture with respect to the collateral;

- direct the CDO trustee to exercise rights under the Uniform Commercial Code to protect security interests in the collateral;

- direct the CDO trustee to institute proceedings to compel performance of any covenant or warranty under the indenture;

- direct the CDO trustee to file or prove any claim in any bankruptcy proceeding relating to the CDO issuer or co-issuer;

- direct the CDO trustee to exercise any other rights or remedies that are available to it at law or in equity; and

- remove the trustee without cause, veto any successor trustee proposed by the CDO issuer, and select a replacement trustee to the extent the CDO issuer failed to promptly appoint a successor.

32.     In light of the fundamental importance of these "Controlling Class" rights to XLCA's ability to protect itself against losses under any proposed guarantee, XLCA insisted, as a condition of entering into each of the Class A-2 Notes guarantees, that MLI provide it with the ability to exercise voting and consent rights that were accorded under the relevant CDO indenture to **both** the holders of the Class A-2 Notes **and** the holders of the Class A-1 Notes.

33.     At the meeting held on or about November 6, 2006, MLI agreed to XLCA's condition that it be provided with voting and consent rights pertaining to the Class A-1 Notes (in addition to voting and consent rights pertaining to the Class A-2 Notes) — and thus the ability to exercise all rights accorded to the "Controlling Class" under the CDOs.  This agreement was reflected in an e-mail sent from MLI on November 7, 2006, in which it summarized the central terms the parties had discussed, including that "***XL will have all controlling class voting rights***."

34.     On the basis of MLI's agreement to provide XLCA with the full control rights it had requested, between January and August 2007, XLCA and MLI executed transactions in which XLCA agreed to guarantee obligations related to the Class A-2 Notes on seven Merrill Lynch CDOs.

35.    Each of these transactions followed a typical structure in which XLCA creating a single-purpose "pass through" trust (an "XLCA Trust") that entered into a credit default swap with MLI that was intended to reflect the terms of the agreement between the parties.  A credit default swap is a common form of financial instrument — much like an insurance policy — in which one of the counterparties agrees to assume certain credit risks in exchange for consideration provided by the other counterparty, which generally includes a stream of payments and other consideration.

36.    In this case, each of the credit default swaps reflected the XLCA Trust's agreement to make payments to MLI in the event that the reference CDO failed to make scheduled interest or principal payments on their Class A-2 Notes.  The credit default swaps also included terms related to MLI's agreement to make regular fixed payments to the XLCA Trust as well as MLI's obligation to follow the XLCA Trust's direction with respect to voting and consent rights.

37.    In each transaction, XL Capital Assurance also issued a Financial Guaranty Insurance Policy to MLI under which XL Capital Assurance guaranteed payment to MLI of all obligations incurred by the specific XLCA Trust under each credit default swap. (Since the XLCA Trusts were formed with minimal capital funding, it was expected that XL Capital Assurance would ultimately be financially responsible for satisfying any amounts due to MLI under the swap agreements.)

38.    Similarly, in each transaction, Merrill Lynch executed a Guarantee of Merrill Lynch & Co., Inc. under which it unconditionally guaranteed payment to the XLCA Trust of all obligations incurred by MLI under each credit default swap.

39.    XLCA and MLI executed these agreements for the first two Class A-2 Notes guarantees on or about January 25, 2007 and April 11, 2007.  In the January 25, 2007 transaction, counterclaimant Portfolio CDS Trust 138 entered into a credit default swap with MLI referencing $375 million in Class A-2 Notes issued by West Trade Funding CDO II, Ltd. and West Trade Funding CDO II, LLC (the "West Trade II Swap").  On or about January 25, 2007, Merrill Lynch executed a guarantee of MLI's obligations under the West Trade II Swap (the "West Trade II Guarantee").  In the April 11, 2007 transaction, counterclaimant Portfolio CDS Trust 153 entered into a credit default swap with MLI referencing $437.5 million in Class A-2 Notes issued by Silver Marlin CDO I, Ltd. and Silver Marlin CDO I, LLC (the "Silver Marlin I Swap").  On or about April 13, 2007, Merrill Lynch executed a guarantee of MLI's obligations under the Silver Marlin I Swap (the "Silver Marlin I Guarantee").

40.    While the West Trade II Swap and Silver Marlin I Swap accurately reflected the parties' agreement with respect to the financial terms of the guarantee arrangements, they did not accurately reflect the terms that the parties had negotiated and agreed upon in November 2006 with respect to XLCA's control rights.  Instead, the parties mistakenly included standard control language copied from a prior credit default swap agreement that did not reflect the non-standard control rights that XLCA had negotiated.

41.    Specifically, the West Trade II Swap and Silver Marlin I Swap each stated that MLI would be required to exercise "Voting Rights … solely in accordance with the written instructions" of the particular XLCA Trusts that were counterparties to those agreements.  "Voting Rights" was, in turn, defined as "the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to the Reference Obligation" — with the "Reference Obligation" including only the Class A-2 Notes.

42.     XLCA did not notice the mistaken omission of any reference to the Class A-1 Notes from the "Voting Rights" definition at the time the West Trade II Swap and Silver Marlin I Swap were executed nor was there any discussion between XLCA and MLI about the issue at the time.  However, the error was discovered by XLCA toward the end of May 2007 during the negotiation of one of the parties' subsequent Class A-2 Notes guarantee transactions.

43.     On or about May 31, 2007, after identifying the error, counsel for XLCA contacted the MLI executive who had been responsible for negotiating the West Trade II Swap and the Silver Marlin I Swap.  The counsel for XLCA alerted the MLI executive to the error in the prior swap agreements with respect to XLCA's control rights and requested that he confirm MLI's understanding of the parties' arrangements.  The MLI executive confirmed that MLI had agreed to provide XLCA with full control rights under both the West Trade II Swap and the Silver Marlin I Swap and that the omission of any reference in the swap agreements' "Voting Rights" provision to the Class A-1 Notes had been a mistake.  The MLI executive also represented that MLI would be willing to both revise the "Voting Rights" language in future agreements with XLCA and issue amendments to the West Trade II Swap and the Silver Marlin I Swap to correct the error, although those amendments were never issued.

44.     Between June and August 2007, the parties executed agreements on the five remaining guarantee transactions at issue in this action:

- On or about June 4, 2007, counterclaimant Portfolio CDS Trust 164 entered into a credit default swap with MLI referencing $450 million in Class A-2 Notes issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC (the "Tazlina II Swap"), and Merrill Lynch executed a guarantee of MLI's obligations under that swap (the "Tazlina II Guarantee");

- On or about June 4, 2007, counterclaimant Portfolio CDS Trust 165 entered into a credit default swap with MLI referencing $625 million in Class A-2 Notes issued by West Trade Funding CDO III, Ltd. and West Trade Funding CDO III, LLC (the "West Trade III Swap"), and Merrill Lynch executed a guarantee of MLI's obligations under that swap (the "West Trade III Guarantee");

- On or about June 15, 2007, counterclaimant Portfolio CDS Trust 170 entered into a credit default swap with MLI referencing $525 million in Class A-2 Notes issued by Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC (the "Jupiter VI Swap"), and Merrill Lynch executed a guarantee of MLI's obligations under that swap (the "Jupiter VI Guarantee");

- On or about June 29, 2007, counterclaimant Portfolio CDS Trust 172 entered into a credit default swap with MLI referencing $385 million in Class A-2 Notes issued by Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC (the "Robeco I Swap"), and Merrill Lynch executed a guarantee of MLI's obligations under that swap (the "Robeco I Guarantee"); and

- On or about August 10, 2007, counterclaimant Portfolio CDS Trust 186 entered into a credit default swap with MLI referencing $350 million in Class A-2 Notes issued by Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC (the "Biltmore Swap"), and Merrill Lynch executed a guarantee of MLI's obligations under that swap (the "Biltmore Guarantee");

45.    In each of those five transactions, the "Voting Rights" definition was modified from what had been included in the West Trade II Swap and Silver Marlin I Swap to expressly reference the Class A-1 Notes.  Specifically, "Voting Rights" was defined to include

"the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, (i) *100% of the outstanding principal amount of the Class A-1 Notes (as defined in the Indenture)* and (ii) the Reference Obligation [*i.e.*, the Class A-2 Notes]."

46.     By the time the last of these transactions was executed, Merrill Lynch was in the midst of a financially dismal 2007 third quarter.  On October 24, 2007, Merrill Lynch reported its third quarter earnings which included its first quarterly loss in six years.  That loss was the result of a massive $7.9 billion write-down of values in its CDO and subprime mortgage businesses.  Merrill Lynch Chairman and CEO Stanley O'Neal attributed the write-down to Merrill Lynch having retained too much "super senior" liability in the CDOs it had underwritten in 2007:

> As the market for these [CDO] securities began to deteriorate during the first quarter [of 2007], we began substantially reducing our warehouse risk by constructing CDOs and retaining the highest parts of the capital structure, which we expected then to be more resistant to market disruptions in terms of both liquidity and price.  We sold and hedged our exposures to the lower-rated tranches of these securities, but our hedging of the higher-rated tranches was not sufficiently aggressive, nor was it fast enough.  Despite the fact that nearly all of our remaining CDO exposure is super senior, it turned out that both our assessment of the potential risk and our mitigation strategies were inadequate.  By the end of August it became apparent that we were in the midst of an unprecedented event — a complete withdrawal of liquidity from the market for these securities.

47.     Mr. O'Neal went on to explain that Merrill Lynch had worked during the third quarter to decrease its CDO exposures:  "During the quarter and throughout the year, we've substantially reduced our net [CDO] exposures and continue to work to do more."  In fact, Mr. O'Neal understated the extent of the Merrill Lynch's effort.  The reality was that Merrill Lynch had launched a desperate campaign during the third quarter to offload or hedge its super senior CDO positions in order to remove these risks from its balance sheet and improve the appearance of its financial condition before the quarter close.

48.    As part of that campaign, Merrill Lynch aggressively marketed its super senior CDO positions up and down Wall Street looking for any counterparties willing to take on additional CDO risk.  For example, Merrill Lynch approached XLCA around the beginning of August 2007 with a list of *two dozen* super senior CDO positions with more than ***$20 billion*** in potential notional exposures that it was looking to unload through a trade with XLCA.  The Merrill Lynch salesperson implored that XLCA could:  "Pick as many trades from the … attached spreadsheet that you'd like.  We put them all in a basket … and you write me the protection ….  Pick your size, it's a very nice deal for XL and a ***big help for ML***."  Among the dozens of super senior CDO positions on the list that Merrill Lynch was looking to unload were the Class A-1 Notes issued by the seven Merrill Lynch CDOs that are the subject of this litigation.  XLCA told Merrill Lynch that it was not interested in providing additional protection on any of the listed Merrill Lynch CDO positions.

49.    Desperate to get these CDO liabilities off its books during the third quarter, Merrill Lynch found one or more third parties by the end of September 2007, including MBIA, that were willing to provide it with guarantees or hedges on super senior CDO positions.  The CDO positions that Merrill Lynch was successful in offloading included the Class A-1 Notes on the seven CDOs that are at issue in this suit.  But, like XLCA, the third parties providing protection conditioned their willingness to do so on Merrill Lynch providing ***them*** with full control rights under the CDOs.

50.    In each of these transactions, Merrill Lynch committed to provide these third parties with the voting and consent rights that pertained to the Class A-1 Notes that were the subject of the guarantee or hedge.  As the Class A-1 Notes was the "Controlling Class" under each CDO's indenture, this amounted to Merrill Lynch's commitment to provide these third

parties with full control rights under the CDOs at issue, notwithstanding the prior contractual commitments that had been made to XLCA.

51.    Merrill Lynch's agreement to provide control rights to these third parties was in blatant and knowing derogation of MLI's prior contractual agreements to exercise such rights "solely in accordance with the written instructions" of the XLCA Trusts.

52.    MLI did not notify XLCA of these transactions and, in fact, has taken affirmative steps to keep their existence and terms hidden from XLCA.

53.    Nonetheless, by the end of January 2008, XLCA had become aware through publicly available information that Merrill Lynch had committed to provide third parties with control rights on CDOs at issue in this action in repudiation of MLI's obligations to XLCA. This information included, among others, records publicly available through Standard & Poor's that listed MBIA as the "Bond Insurance Provider" on six of the CDOs at issue here along with unequivocal statements by MBIA's Head of Insured Portfolio Investment during a January 31, 2008 earnings call that MBIA is the "sole controlling party within our [CDO] deals."

54.    Merrill Lynch's repudiation of MLI's contractual obligations to XLCA entitled XLCA, as a matter of New York common law, to terminate its credit default swap agreements with MLI, thereby excusing XLCA from any future performance under those agreements.  Separately and independently, under the terms of the credit default swaps themselves, XLCA was entitled to terminate the agreements immediately upon the occurrence of any "Additional Termination Event" which  was defined to include "the failure by [MLI] to exercise any Voting Rights … solely in accordance with the written instructions of [the XLCA Trust]."

55.     Based on the public information that made clear that MBIA had been provided with control rights over six of the CDOs for which XLCA had been promised those same rights, on February 22, 2008, XLCA issued notices to MLI terminating the following six credit default swaps:  the West Trade II Swap; the Silver Marlin I Swap; the Tazlina II Swap; the West Trade III Swap; the Robeco I Swap; and the Biltmore Swap.   These termination notices each stated:

> According to publicly available information obtained from Standard & Poor's website, subsequent to entering into the Swap Agreements [with the XLCA Trust], MBIA Inc. or its affiliates (collectively, "MBIA") provided credit protection on notes issued pursuant to the [CDO] Indenture and, as represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt obligations ("CDO") notes.  In public statements made on January 31, 2008, MBIA also represented that it is the "sole controlling party" in all of the CDOs in which it participates.  In combination with the information from the websites of Standard & Poor's and MBIA, these recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.
>
> By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the [XLCA] Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust.  MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under [the terms of the swap agreements] because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event ….

XLCA further informed MLI that it was designating February 22, 2008 as the "Early Termination Date" under the swap agreements, which is the date upon which the terminations became effective.

56.     Since XLCA was not aware of publicly available information indicating that MLI had repudiated the parties' only other Class A-2 Notes transaction — the Jupiter VI Swap — XLCA did not issue a termination notice for that agreement on February 22, 2008.  Instead, on that date, XLCA sent a letter to MLI requesting assurances that MLI had not also repudiated its contractual obligations under the Jupiter VI Swap.  That letter stated:

Information recently came to the attention of XL Capital Assurance ("XLCA") indicating that MLI repudiated its contractual obligations under numerous credit derivative transactions with trusts for which XLCA is attorney-in-fact…. The information that came to the attention of XLCA did not involve the Jupiter VI Transaction…. In light of MLI's repudiation of its voting right obligations with respect to other transactions, XLCA hereby requests that MLI confirm that it did not, at any time, enter into any understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture…. In order that XLCA may proceed accordingly on behalf of the [XLCA] Trust, it requests that MLI provide the requested confirmation within 3 days of the date hereof. XLCA reserves the right to treat any failure by MLI to provide the requested confirmation within the time requested as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party in repudiation of its contractual commitment to the Trust.

57.    MLI responded to XLCA's six termination notices on February 29, 2008 by disputing the effectiveness of the terminations but, at the same time, conspicuously refusing to deny that MBIA had, in fact, been accorded the control rights that had previously been committed to XLCA. Rather, MLI stated that it would not address the substance of any contracts with MBIA because it "cannot comment on the substance of any trade with a counterparty other than you," although it did not suggest that it was precluded from doing so by any contractual confidentiality provisions or any specific Merrill Lynch policy. Indeed, neither restriction is likely given that confidentiality provisions are not standard in guarantee transactions and MLI had no apparent compunction in filing the instant lawsuit commenting publicly on the substance of its trades with XLCA.

58.    With regard to the Jupiter VI Swap, MLI never responded to XLCA's February 22, 2008 letter requesting that MLI provide assurances that it had not repudiated its obligations to XLCA under that agreement. Therefore, 14 days later, on March 6, 2008, XLCA issued a notice to MLI terminating the Jupiter VI Swap. That notice stated:

In our writing of February 22, 2008 … we requested that MLI confirm that it did not, at any time, enter into any … understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture…. As of this writing, XLCA has not

> received the requested confirmation and deems MLI's silence as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party…. MLI's repudiation of its contractual obligations to the [XLCA] Trust entitles the Trust to exercise its termination rights under [the terms of the Jupiter VI Swap] because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event ….

XLCA also notified MLI in that same notice that it was designating March 6, 2008 as the Early Termination Date for the Jupiter VI Swap.

59.    Under the terms of the seven terminated swap agreements, upon a termination following an Additional Termination Event, MLI is required to pay the XLCA Trusts amounts referred to under the agreements as the "Accrued Fixed and Additional Amounts" and the "Termination Make-Whole Amount." On March 7, 2008, XLCA provided notice to MLI that

> the amounts contemplated by these provisions are currently due and owing from MLI to XLCA in respect of the [terminated] Trades. Based on XLCA's current calculations, it has determined the amounts due from MLI to be no less than $28,00,000. Please confirm by March 11, 2008 that MLI agrees to satisfy its payment obligation of these amounts and any others that are due under these provisions and the date on which it will do so.

MLI has neither responded to XLCA's demand for payment of the "Accrued Fixed and Additional Amounts" and the "Termination Make-Whole Amount" nor submitted full payment of those amounts to XLCA.

60.    On March 27, 2008, XLCA sent a notice to Merrill Lynch demanding that it make payment of the "Accrued Fixed and Additional Amounts" and the "Termination Make-Whole Amount" under its guarantee agreements with the XLCA Trusts, which require it to "unconditionally guarantee … the due and punctual payment of any and all amounts payable by Merrill Lynch International" under the terminated swap agreements.

61.     On March 28, 2008, Merrill Lynch responded to that notice stating that it did not intend to make the demanded payments under its guarantee agreements with the XLCA Trusts and disputed its obligation to do so.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment )

62.     XLCA repeats the allegations contained in paragraphs 1 through 61 as if fully set forth herein.

West Trade II Swap

63.     An actual, present and justiciable controversy exists between the parties concerning the termination of the West Trade II Swap.

64.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that: (a) MLI repudiated its obligations under the West Trade II Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 138; (b) Portfolio CDS Trust 138 terminated the West Trade II Swap effective February 22, 2008, when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 138's obligations to provide credit protection to MLI under the West Trade II Swap ceased following the February 22, 2008 termination.

Silver Marlin I Swap

65.     An actual, present and justiciable controversy exists between the parties concerning the termination of the Silver Marlin I Swap.

66.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that: (a) MLI repudiated its obligations under the Silver Marlin I Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 153; (b) Portfolio CDS Trust 153 terminated the Silver Marlin I Swap effective February

22, 2008, when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 153's obligations to provide credit protection to MLI under the Silver Marlin I Swap ceased following the February 22, 2008 termination.

Tazlina II Swap

67.     An actual, present and justiciable controversy exists between the parties concerning the termination of the Tazlina II Swap.

68.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that:  (a) MLI repudiated its obligations under the Tazlina II Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 164; (b) Portfolio CDS Trust 164 terminated the Tazlina II Swap effective February 22, 2008, when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 164's obligations to provide credit protection to MLI under the Tazlina II Swap ceased following the February 22, 2008 termination.

West Trade III Swap

69.     An actual, present and justiciable controversy exists between the parties concerning the termination of the West Trade III Swap.

70.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that:  (a) MLI repudiated its obligations under the West Trade III Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 165; (b) Portfolio CDS Trust 165 terminated the West Trade III Swap effective February 22, 2008, when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 165's obligations to provide credit protection to MLI under the West Trade III Swap ceased following the February 22, 2008 termination.

Jupiter VI Swap

71.     An actual, present and justiciable controversy exists between the parties concerning the termination of the Jupiter VI Swap.

72.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that: (a) MLI repudiated its obligations under the Jupiter VI Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 170; (b) Portfolio CDS Trust 170 terminated the Jupiter VI Swap effective March 6, 2008, when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 170's obligations to provide credit protection to MLI under the Jupiter VI Swap ceased following the March 6, 2008 termination.

Robeco I Swap

73.     An actual, present and justiciable controversy exists between the parties concerning the termination of the Robeco I Swap.

74.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that: (a) MLI repudiated its obligations under the Robeco I Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 172; (b) Portfolio CDS Trust 172 terminated the Robeco I Swap effective February 22, 2008, when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 172's obligations to provide credit protection to MLI under the Robeco I Swap ceased following the February 22, 2008 termination.

Biltmore Swap

75.     An actual, present and justiciable controversy exists between the parties concerning the termination of the Biltmore Swap.

76.     Pursuant to 28 U.S.C. § 2201(a), XLCA seeks a declaration from this Court that: (a) MLI repudiated its obligations under the Biltmore Swap, including to exercise

44

Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 186;

(b) Portfolio CDS Trust 186 terminated the Biltmore Swap effective February 22, 2008, when it

declared MLI's repudiation final; and (c) Portfolio CDS Trust 186's obligations to provide credit

protection to MLI under the Biltmore Swap ceased following the February 22, 2008 termination.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against MLI)

77.    XLCA repeats the allegations contained in paragraphs 1 through 76 as if

fully set forth herein.

West Trade II Swap

78.    Under the West Trade II Swap, MLI agreed to exercise Voting Rights for

the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust

138.

79.    MLI repudiated its obligations under the West Trade II Swap, including by

subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1

Notes in accordance with the instructions of one or more third parties.

80.    MLI's repudiation entitled Portfolio CDS Trust 138 to terminate the West

Trade II Swap because, among other reasons, the repudiation was an Additional Termination

Event.  Portfolio CDS Trust 138 terminated the West Trade II Swap on February 22, 2008.

81.    Under the West Trade II Swap, MLI was obligated to pay "the Accrued

Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS

Trust 138 "upon a termination … following an Additional Termination Event."

82.    MLI has breached the West Trade II Swap by failing to make payment to

Portfolio CDS Trust 138 of the Accrued Fixed and Additional Amounts and the Termination

Make-Whole Amount.

83.     Portfolio CDS Trust 138 has performed all material obligations under the West Trade II Swap.

Silver Marlin I Swap

84.     Under the Silver Marlin I Swap, MLI agreed to exercise Voting Rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 153.

85.     MLI repudiated its obligations under the Silver Marlin I Swap, including by subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1 Notes in accordance with the instructions of one or more third parties.

86.     MLI's repudiation entitled Portfolio CDS Trust 153 to terminate the Silver Marlin I Swap because, among other reasons, the repudiation was an Additional Termination Event.  Portfolio CDS Trust 138 terminated the Silver Marlin I Swap on February 22, 2008.

87.     Under the Silver Marlin I Swap, MLI was obligated to pay "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS Trust 153 "upon a termination … following an Additional Termination Event."

88.     MLI has breached the Silver Marlin I Swap by failing to make payment to Portfolio CDS Trust 153 of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount.

89.     Portfolio CDS Trust 153 has performed all material obligations under the Silver Marlin I Swap.

Tazlina II Swap

90.     Under the Tazlina II Swap, MLI agreed to exercise Voting Rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 164.

91.    MLI repudiated its obligations under the Tazlina II Swap, including by subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1 Notes in accordance with the instructions of one or more third parties.

92.    MLI's repudiation entitled Portfolio CDS Trust 164 to terminate the Tazlina II Swap because, among other reasons, the repudiation was an Additional Termination Event.  Portfolio CDS Trust 164 terminated the Tazlina II Swap on February 22, 2008.

93.    Under the Tazlina II Swap, MLI was obligated to pay "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS Trust 164 "upon a termination … following an Additional Termination Event."

94.    MLI has breached the Tazlina II Swap by failing to make payment to Portfolio CDS Trust 164 of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount.

95.    Portfolio CDS Trust 164 has performed all material obligations under the Tazlina II Swap.

West Trade III Swap

96.    Under the West Trade III Swap, MLI agreed to exercise Voting Rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 165.

97.    MLI repudiated its obligations under the West Trade III Swap, including by subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1 Notes in accordance with the instructions of one or more third parties.

98.    MLI's repudiation entitled Portfolio CDS Trust 165 to terminate the West Trade III Swap because, among other reasons, the repudiation was an Additional Termination Event. Portfolio CDS Trust 165 terminated the West Trade III Swap on February 22, 2008.

99.    Under the West Trade III Swap, MLI was obligated to pay "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS Trust 165 "upon a termination … following an Additional Termination Event."

100.    MLI has breached the West Trade III Swap by failing to make payment to Portfolio CDS Trust 165 of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount.

101.    Portfolio CDS Trust 165 has performed all material obligations under the West Trade III Swap.

Jupiter VI Swap

102.    Under the Jupiter VI Swap, MLI agreed to exercise Voting Rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 170.

103.    MLI repudiated its obligations under the Jupiter VI Swap, including by subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1 Notes in accordance with the instructions of one or more third parties.

104.    MLI's repudiation entitled Portfolio CDS Trust 170 to terminate the Jupiter VI Swap because, among other reasons, the repudiation was an Additional Termination Event. Portfolio CDS Trust 170 terminated the Jupiter VI Swap on March 6, 2008.

105.    Under the Jupiter VI Swap, MLI was obligated to pay "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS Trust 170 "upon a termination … following an Additional Termination Event."

106.    MLI has breached the Jupiter VI Swap by failing to make payment to Portfolio CDS Trust 170 of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount.

107.    Portfolio CDS Trust 170 has performed all material obligations under the Jupiter VI Swap.

Robeco I Swap

108.    Under the Robeco I Swap, MLI agreed to exercise Voting Rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 172.

109.    MLI repudiated its obligations under the Robeco I Swap, including by subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1 Notes in accordance with the instructions of one or more third parties.

110.    MLI's repudiation entitled Portfolio CDS Trust 170 to terminate the Robeco I Swap because, among other reasons, the repudiation was an Additional Termination Event.  Portfolio CDS Trust 172 terminated the Robeco I Swap on February 22, 2008.

111.    Under the Robeco I Swap, MLI was obligated to pay "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS Trust 172 "upon a termination … following an Additional Termination Event."

112.    MLI has breached the Robeco I Swap by failing to make payment to Portfolio CDS Trust 172 of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount.

113.    Portfolio CDS Trust 172 has performed all material obligations under the Robeco I Swap.

Biltmore Swap

114.    Under the Biltmore Swap, MLI agreed to exercise Voting Rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 186.

115.    MLI repudiated its obligations under the Biltmore Swap, including by subsequently entering into contractual commitments to exercise Voting Rights for the Class A-1 Notes in accordance with the instructions of one or more third parties.

116.    MLI's repudiation entitled Portfolio CDS Trust 186 to terminate the Biltmore Swap because, among other reasons, the repudiation was an Additional Termination Event.  Portfolio CDS Trust 186 terminated the Biltmore Swap on February 22, 2008.

117.    Under the Biltmore Swap, MLI was obligated to pay "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" to Portfolio CDS Trust 186 "upon a termination … following an Additional Termination Event."

118.    MLI has breached the Biltmore Swap by failing to make payment to Portfolio CDS Trust 186 of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount.

119.    Portfolio CDS Trust 186 has performed all material obligations under the Robeco I Swap.

**THIRD CAUSE OF ACTION**
**(Breach of Contract Against Merrill Lynch)**

120.    XLCA repeats the allegations contained in paragraphs 1 through 119 as if fully set forth herein.

West Trade II Guarantee

121.    Under the West Trade II Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 138 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [West Trade II Swap]."

122.    MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the West Trade II Swap.

123.    Portfolio CDS Trust 138 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the West Trade II Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 138.

124.    Merrill Lynch has breached the West Trade II Guarantee by failing to make payment to Portfolio CDS Trust 138 in response to its demand.

Silver Marlin I Guarantee

125.    Under the Silver Marlin I Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 153 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [Silver Marlin I Swap]."

126.    MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the Silver Marlin I Swap.

127.    Portfolio CDS Trust 153 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the Silver Marlin I Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 153.

128.     Merrill Lynch has breached the Silver Marlin I Guarantee by failing to make payment to Portfolio CDS Trust 153 in response to its demand.

Tazlina II Guarantee

129.     Under the Tazlina II Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 164 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [Tazlina II Swap]."

130.     MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the Tazlina II Swap.

131.     Portfolio CDS Trust 164 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the Tazlina II Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 164.

132.     Merrill Lynch has breached the Tazlina II Guarantee by failing to make payment to Portfolio CDS Trust 164 in response to its demand.

West Trade III Guarantee

133.     Under the West Trade III Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 165 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [West Trade III Swap]."

134.     MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the West Trade III Swap.

135.     Portfolio CDS Trust 165 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the West Trade III Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 165.

136.     Merrill Lynch has breached the West Trade III Guarantee by failing to make payment to Portfolio CDS Trust 165 in response to its demand.

Jupiter VI Guarantee

137.     Under the Jupiter VI Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 170 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [Jupiter VI Swap]."

138.     MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the Jupiter VI Swap.

139.     Portfolio CDS Trust 170 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the Jupiter VI Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 170.

140.     Merrill Lynch has breached the Jupiter VI Guarantee by failing to make payment to Portfolio CDS Trust 170 in response to its demand.

Robeco I Guarantee

141.     Under the Robeco I Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 172 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [Robeco I Swap]."

142.     MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the Robeco I Swap.

143.     Portfolio CDS Trust 172 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the Robeco I Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 172.

144.    Merrill Lynch has breached the Robeco I Guarantee by failing to make payment to Portfolio CDS Trust 172 in response to its demand.

Biltmore Guarantee

145.    Under the Biltmore Guarantee, Merrill Lynch unconditionally guaranteed "to Portfolio CDS Trust 186 … the due and punctual payment of any all amounts payable by Merrill Lynch International … under the terms of the [Biltmore Swap]."

146.    MLI has failed to make due and punctual payment of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the Biltmore Swap.

147.    Portfolio CDS Trust 186 made demand on Merrill Lynch on March 27, 2008 that it satisfy its obligations under the Biltmore Guarantee to pay the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount to Portfolio CDS Trust 186.

148.    Merrill Lynch has breached the Biltmore Guarantee by failing to make payment to Portfolio CDS Trust 186 in response to its demand.

## FOURTH CAUSE OF ACTION
### (Reformation Against MLI)

149.    XLCA repeats the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

West Trade II Swap

150.    In negotiating the West Trade II Swap, XLCA and MLI reached final agreement that MLI would exercise voting and consent rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 138.  It was the intention of the parties that this agreement be reflected in the West Trade II Swap.

151.    By error of the scrivener and mutual mistake of the parties, the West Trade II Swap does not accurately reflect the agreement of the parties that MLI would exercise voting

and consent rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 138.

Silver Marlin I Swap

152.    In negotiating the Silver Marlin I Swap, XLCA and MLI reached final agreement that MLI would exercise voting and consent rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 153.  It was the intention of the parties that this agreement be reflected in the Silver Marlin I Swap.

153.    By error of the scrivener and mutual mistake of the parties, the Silver Marlin I Swap does not accurately reflect the agreement of the parties that MLI would exercise voting and consent rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 153.


WHEREFORE, XLCA respectfully requests that the Court enter judgment in its favor as follows:

1.    Declaring (a) MLI repudiated its obligations under the West Trade II Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 138; (b) Portfolio CDS Trust 138 terminated the West Trade II Swap effective February 22, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 138's obligations to provide credit protection to MLI under the West Trade II Swap ceased following the February 22, 2008 termination;

2.    Declaring (a) MLI repudiated its obligations under the Silver Marlin I Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 153; (b) Portfolio CDS Trust 153 terminated the Silver Marlin I Swap

effective February 22, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 153's obligations to provide credit protection to MLI under the Silver Marlin I Swap ceased following the February 22, 2008 termination;

       3.     Declaring (a) MLI repudiated its obligations under the Tazlina II Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 164; (b) Portfolio CDS Trust 164 terminated the Tazlina II Swap effective February 22, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 164's obligations to provide credit protection to MLI under the Tazlina II Swap ceased following the February 22, 2008 termination;

       4.     Declaring (a) MLI repudiated its obligations under the West Trade III Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 165; (b) Portfolio CDS Trust 165 terminated the West Trade III Swap effective February 22, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 165's obligations to provide credit protection to MLI under the West Trade III Swap ceased following the February 22, 2008 termination;

       5.     Declaring (a) MLI repudiated its obligations under the Jupiter VI Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 170; (b) Portfolio CDS Trust 170 terminated the Jupiter VI Swap effective March 6, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 170's obligations to provide credit protection to MLI under the Jupiter VI Swap ceased following the March 6, 2008 termination;

       6.     Declaring (a) MLI repudiated its obligations under the Robeco I Swap, including to exercise Voting Rights "solely in accordance with the written instructions of"

Portfolio CDS Trust 172; (b) Portfolio CDS Trust 172 terminated the Robeco I Swap effective February 22, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 172's obligations to provide credit protection to MLI under the Robeco I Swap ceased following the February 22, 2008 termination;

7.    Declaring (a) MLI repudiated its obligations under the Biltmore Swap, including to exercise Voting Rights "solely in accordance with the written instructions of" Portfolio CDS Trust 186; (b) Portfolio CDS Trust 186 terminated the Biltmore Swap effective February 22, 2008 when it declared MLI's repudiation final; and (c) Portfolio CDS Trust 186's obligations to provide credit protection to MLI under the Biltmore Swap ceased following the February 22, 2008 termination;

8.    Awarding damages against MLI in the amount of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the West Trade II Swap, Silver Marlin I Swap, Tazlina II Swap, West Trade III Swap, Jupiter VI Swap, Robeco I Swap, and Biltmore Swap, along with interest;

9.    Awarding damages against Merrill Lynch in the amount of the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount under the West Trade II Swap, Silver Marlin I Swap, Tazlina II Swap, West Trade III Swap, Jupiter VI Swap, Robeco I Swap, and Biltmore Swap, along with interest;

10.    Reforming the terms of the West Trade II Swap to reflect the agreement of the parties that MLI would exercise voting and consent rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 138;

11.    Reforming the terms of the Silver Marlin I Swap to reflect the agreement of the parties that MLI would exercise voting and consent rights for the Class A-1 Notes solely in accordance with the written instructions of Portfolio CDS Trust 153;

12.    Awarding XLCA its costs and expenses in this action, including reasonable attorneys' fees; and

13.    Awarding such other relief as the Court deems just and proper.

DATED:    New York, New York
March 31, 2008

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By: _____
Peter E. Calamari
Jonathan E. Pickhardt
Brendan N. Snodgrass

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorney for defendants and counterclaimants*

61200/2443552.4

58

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan Pickhardt, hereby certify that on March 31, 2008 the attached

document was electronically filed with the Clerk of the Court using CM/ECF which will send

notification to the registered attorney(s) of record that the document has been filed and is

available for viewing and downloading .

I further certify that on March 31, 2008, the attached document was electronically

mailed to the following person(s):

Jay B. Kasner, Esq.
Scott D. Musoff, Esq.
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036


*/s/ Jonathan Pickhardt*
Peter E. Calamari
Jonathan E. Pickhardt
Brendan N. Snodgrass
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue
New York, NY 10010