UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MERRILL LYNCH INTERNATIONAL,

              Plaintiff,

    -vs-

XL CAPITAL ASSURANCE INC., et al.,

              Defendants.

              :     08 CV 2893 (JSR)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

XL CAPITAL ASSURANCE INC., et al.,

              Counterclaimants,

    - vs -

MERRILL LYNCH INTERNATIONAL AND
MERRILL LYNCH & CO., INC.,

              Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
(A) PLAINTIFF MERRILL LYNCH INTERNATIONAL'S MOTION FOR
SUMMARY JUDGMENT AND (B) COUNTERCLAIM DEFENDANTS
MERRILL LYNCH INTERNATIONAL'S AND MERRILL LYNCH & CO.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jay B. Kasner (jkasner@skadden.com)
Scott D. Musoff (smusoff@skadden.com)
Jeffrey S. Lichtman (jlichtma@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Plaintiff and Counterclaim
  Defendant Merrill Lynch International and
  Counterclaim Defendant
  Merrill Lynch & Co., Inc.

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 3

    A.    The Parties ........................................................................................ 3

        1.    Plaintiff and Counterclaim Defendants ............................................ 3

        2.    Defendants and Counterclaim Plaintiffs ........................................... 3

    B.    The Contracts Between MLI and Defendants ..................................... 4

    C.    Ratings Downgrades of XLCA After Entering into the XL Swaps ........... 6

    D.    Defendants Attempt to Terminate the XL Swaps .................................. 7

        1.    Defendants purport to terminate six of seven XL Swaps ................. 7

        2.    XLCA improperly demands assurance with regard to the
            Jupiter XL Swap ......................................................................... 8

    E.    MLI Assures XLCA That It Has Not Repudiated Any of the Seven
        Contracts ......................................................................................... 8

    F.    XLCA Ignores MLI's Assurances ..................................................... 8

        1.    XLCA seeks to terminate the Jupiter XL Swap ............................. 8

        2.    XLCA rejects MLI's assurances in the other six XL Swaps ........... 9

    G.    MLI Again Reassures XLCA ........................................................... 9

    H.    SCA Publicly Announces Termination of XL Swaps ............................ 10

    I.    The MBIA Contracts ........................................................................ 10

    J.    Procedural History ........................................................................... 11

ARGUMENT .............................................................................................................. 12

    DEFENDANTS' PURPORTED TERMINATION OF THE XL SWAPS
    WAS IMPROPER ................................................................................................ 12

I.     SUMMARY JUDGMENT ON PLAINTIFFS' COMPLAINT IS
      WARRANTED ..................................................................................................... 12

    A.    Summary Judgment Is Proper Where The Contractual Language Is
         Unambiguous .............................................................................................. 12

    B.    MLI Did Not Breach Any of the Seven XL Swaps with Defendants
         Because No Instructions Ever Were Given, Let Alone Not
         Followed .................................................................................................... 13

    C.    MLI Did Not Repudiate the XL Swaps and Remains Fully Able to
         Perform According to Their Terms ............................................................. 14

         1.    Anticipatory Repudiation Requires Action Which Renders
              Performance Impossible ................................................................. 14

         2.    The MBIA Swaps in No Way Impede MLI's Performance
              Under the Six XL Swaps ................................................................ 15

         3.    MLI has Not Entered into Any MBIA Swap in Connection
              with the Jupiter CDO .................................................................... 16

II.    DEFENDANTS' FIRST, SECOND AND THIRD COUNTERCLAIMS
      SHOULD BE DISMISSED ................................................................................. 18

CONCLUSION ........................................................................................................ 19

# TABLE OF AUTHORITIES

## CASES

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
    150 F.3d 132, 137 (2d Cir. 1998) ................................................. 12

*Cauff, Lippman & Co. v. The Apogee Finance Group, Inc.*,
    807 F. Supp. 1007, 1022 (S.D.N.Y. 1992) .................................... 13

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*,
    747 N.Y.S.2d 468, 475 (1st Dep't 2002) ............................... 14, 15

*Consumers Power Co. v. Nuclear Fuel Services, Inc.*,
    509 F. Supp. 201, 211 (W.D.N.Y 1981)........................................ 13

*Continental Energy Corp. v. Cornell Partners, L.P.*, 04 Civ. 260 (GEL),
    2005 U.S. Dist. LEXIS 38120, *12 (S.D.N.Y. Dec. 28, 2005) ............. 1, 18

*Enron Power Marketing, Inc. v. Nevada Power Co. (In re Enron Corp.)*,
    No. 03 Civ. 9318 (BSJ), 2004 U.S. Dist. LEXIS 20351 (S.D.N.Y. Oct.
    12, 2004)............................................................................. 16

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
    110 F.3d 6, 9 (2d Cir. 1997) ........................................................ 16

*Nowak v. Ironworkers Local 6 Pension Fund*,
    81 F.3d 1182, 1192 (2d Cir. 1996) ............................................... 12

*Rachmani Corp. v. 9 East 96th Street Apartment Corp.*,
    629 N.Y.S.2d 382, 385-86 (1st Dep't 1995) ......................... 14, 15

*River Terrace Assoc., LLC v. Bank of New York*,
    804 N.Y.S.2d 728, 729 (1st Dep't 2005) ...................................... 16

*Scott-Macon Sec. Inc, v. Zoltek Co.*,
    04 Civ. 2124 (MBM), 04 Civ. 4896 (MBM), 2005 U.S. Dist. LEXIS
    9034, at *44 (S.D.N.Y. May 11, 2005), *aff'd per curium in part,*
    *vacated in part on other grounds,* 06-2711-cv, 2007 U.S. App. LEXIS
    23356 (2d Cir. Oct. 4, 2007)....................................................... 16

*Seiden Associates, Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425, 428 (2d Cir. 1992) ................................................ 13

*Streets of London, Inc. v. Londontown Corp.*, No. 94 Civ. 7205 (JSR),
    1997 U.S. Dist. LEXIS 3786, *2-3 (S.D.N.Y. Mar. 28, 1997), *aff'd*
    *mem.,* 162 F.3d 1148 (2d Cir. 1998)................................. 1, 3, 14

*Westerbeke Corp. v. Daihatsu Motor Co. Ltd.*,
    304 F.3d 200, 206 n.3 (2d Cir. 2002) ........................................................................ 13

## OTHER

Fed. R. Civ. P. 56 ................................................................................................ 12, 18, 19

Plaintiff Merrill Lynch International ("MLI") respectfully submits this memorandum of law in support of its motion for summary judgment. This memorandum is also submitted by Counterclaim Defendants MLI and Merrill Lynch & Co., Inc. ("ML&Co.") in support of their motion for partial summary judgment on the first, second and third counterclaims for relief.[1]

## PRELIMINARY STATEMENT

Although the financial instruments in this case appear to be exotic, the issues are not. At its core, this action is a simple contract case. The fundamental and sole issue in this litigation is whether Defendants' purported notices of termination of seven contracts were premature and invalid. Applying hornbook caselaw -- as this Court did in *Streets of London, Inc. v. Londontown Corp.*, No. 94 Civ. 7205 (JSR), 1997 U.S. Dist. LEXIS 3786 at *2-3 (S.D.N.Y. Mar. 28, 1997), *aff'd mem.*, 162 F.3d 1148 (2d Cir. 1998) -- the undisputed facts and the face of the unambiguous contractual agreements at issue easily reveal that Defendants' purported terminations were and are improper. Specifically, between January 25, 2007 and August 10, 2007, MLI and Defendants entered into seven credit default swap contracts ("XL Swaps"), under which Defendants essentially provided insurance to MLI against the risk that certain notes underlying collateralized debt obligations ("CDOs") would fail to make certain interest or principal payments owed to MLI. Accordingly, MLI paid insurance premiums to Defendants and

---

[1] Defendants' first, second and third counterclaims are essentially a mirror image of MLI's complaint, predicated upon a determination that the XL Swaps have been validly terminated. Because, for the reasons set forth herein, Defendants' purported terminations of the XL Swaps were improper and of no effect and the first, second and third counterclaims must similarly be dismissed pursuant to Fed. R. Civ. P. 56. *See Continental Energy Corp. v. Cornell Partners, L.P.*, 04 Civ. 260 (GEL), 2005 U.S. Dist. LEXIS 38120, *12 (S.D.N.Y. Dec. 28, 2005). The fourth counterclaim seeks reformation of two of the seven XL Swaps. (*See* Counterclaims ¶ 150-153.)

Defendants in return agreed to pay MLI if the underlying notes defaulted on their payments.

The notes underlying the CDOs possess certain voting rights over certain matters, including whether or not to accelerate certain payments after an event of default in order to protect the noteholder's economic interests. Each XL Swap contains a termination provision allowing Defendants to terminate the particular XL Swap to which they are a party if MLI fails "to exercise any Voting Rights . . . solely in accordance with the written instructions of" Defendants. Here, Defendants' wrongful attempt to terminate the XL Swaps was based on this provision. Specifically, Defendants' purported termination of the XL Swaps is premised on MLI's alleged failure "to exercise Voting Rights solely in accordance with the written instructions of" Defendants. Defendants base the existence of this alleged failure on their false belief that MLI agreed to exercise voting rights in accordance with a different insurer's instructions in connection with other swaps.

In light of the undisputed provisions of the XL Swaps and the following three undisputed facts, the motions must be granted:

- Defendants have never delivered any instructions to MLI to exercise voting rights, let alone any written instructions that were not followed by MLI.

- Although MLI did purchase additional insurance covering a different tranche for six of the seven CDOs underlying the XL Swaps, the additional insurance, by its plain terms, in no way restricts MLI's ability to exercise voting rights "solely in accordance with [Defendants'] written instructions."

- As to the seventh CDO -- Jupiter High-Grade CDO VI Ltd. and Jupiter High-Grade CDO VI LLC (collectively, "Jupiter") -- MLI did not purchase any additional insurance that would, in any way, implicate MLI voting rights.

2

That is the end of the story.

Accordingly, as a matter of law, MLI has neither performed any "'action which renders performance impossible'" under its contracts with Defendants, nor has it demonstrated "'a clear determination not to continue with performance.'" *See Streets of London*, 1997 U.S. Dist. LEXIS 3786, at *2 (citation omitted). Thus, summary judgment should be granted in favor of Plaintiff MLI. Counterclaim Defendants MLI and ML&Co. respectfully submit that partial summary judgment should also be granted in their favor, resulting in this Court's dismissal with prejudice of Defendants' first, second and third causes of action set forth in the Counterclaims.

## BACKGROUND[2]

### A.    **The Parties**

#### 1.    **Plaintiff and Counterclaim Defendants**

Plaintiff and Counterclaim Defendant MLI is a company organized under the laws of England and Wales with its principal place of business in London, England. (Gambino Decl. ¶ 2; 56.1 ¶ 1.) Counterclaim Defendant ML&Co. is a company organized under the laws of Delaware with its principal place of business in New York, New York. (Gambino Decl. ¶ 2; 56.1 ¶ 2.)

#### 2.    **Defendants and Counterclaim Plaintiffs**

Defendant XL Capital Assurance, Inc. ("XLCA") is a New York domiciled stock insurance company. (CC ¶ 9; 56.1 ¶ 3.) XLCA is a subsidiary of

---

[2]    The undisputed facts set forth herein are drawn from the Complaint, the Answer (hereinafter "Ans. ¶ __") and Counterclaims (hereinafter "CC ¶__") and the accompanying declarations of Joseph Gambino (hereinafter, "Gambino Decl. ¶__") and Scott D. Musoff (hereinafter, "Musoff Decl. ¶__"). For ease of reference, where possible, references are also noted to the concurrently-filed Local Civil Rule 56.1 Statement of Material Facts on Motion for Summary Judgment (hereinafter, "56.1 ¶__").

Security Capital Assurance, Ltd. ("SCA"), a public company the shares of which are listed for trading on the New York Stock Exchange. (CC ¶ 10; 56.1 ¶ 5; Musoff Decl. Ex. 6 at 11.)

Defendant XLCA Admin, LLC ("XLCA Admin") is the trustee for seven Trusts that were each created for the express purpose of serving as a counterparty to MLI in each XL Swap.[3] (*See* CC, first unnumbered paragraph and ¶¶ 11-17; 56.1 ¶ 5.) XLCA Admin is a limited liability company organized under the laws of New York with its principal place of business in New York. (CC ¶ 10; 56.1 ¶ 4.) The member or members of XLCA Admin are all citizens of New York. (Ans. ¶ 8; 56.1 ¶ 4.)

XLCA is a monoline financial guaranty insurance company; its only business is to provide "credit enhancement for the obligations of debt issuers." (Musoff Decl. Ex. 9.) Its parent, SCA, through its subsidiaries, provides credit enhancement and protection products to the public finance and structured finance markets both in the United States and internationally. (*See id.*)

**B.**    **The Contracts Between MLI and Defendants**

Between January 25, 2007 and August 10, 2007, MLI entered into seven credit default swap agreements with Defendants. These seven swaps had an aggregate notional amount of approximately $3.1 billion. (Gambino Decl. ¶ 4 Exs. 1A-G; *See* CC ¶¶ 26, 34, 39, 43-44; 56.1 ¶ 28.) A credit default swap ("CDS") is similar to an insurance contract in that the buyer of protection pays a periodic fee (similar to an insurance

---

[3]    The respective trust for each transaction is Portfolio CDS Trust 138 (West Trade II), Portfolio CDS Trust 153 (Silver Marlin), Portfolio CDS Trust 164 (Tazlina), Portfolio CDS Trust 165 (West Trade III), Portfolio CDS Trust 170 (Jupiter), Portfolio CDS Trust 172 (Robeco) and Portfolio CDS Trust 186 (Biltmore). (*See* Gambino Decl. ¶ 4 Exs. 1A-G.)

premium) to the seller of protection so that the buyer will be protected in the event of any losses should the insured security experience a default (or similar credit event). (*See* Musoff Decl. Ex. 7.) Here, the insured securities, which are referred to in the agreements as "reference entities," were certain notes entitling MLI to payments from seven CDOs. (*See* Gambino Decl. ¶ 4 Exs. 1A-G.)[4]

A CDO is a security for which cash flows are generated by an underlying pool of debt instruments such as bonds, notes or loans. (*See* CC ¶ 22.) The right to receive payments from the CDO is "tranched," i.e., divided into parts, usually ranging from highly-rated "super senior" or AAA tranches to lower-rated "mezzanine" or BB tranches to equity tranches which are not rated. (*See* CC ¶ 23.) The holders of the various CDO tranches are entitled to payments based on the seniority of their position in the CDO. (*See* CC ¶¶ 23-24.) The super senior tranche typically is the least risky because it has first priority in receiving payments of interest and principal flowing from the underlying pool of collateral, whereas the equity tranche is the most risky because it is last in line. (*See* CC ¶ 23.)

In connection with the seven CDOs at issue, Merrill Lynch owned both the A-1 and A-2 "super senior" tranches. (*See* CC ¶ 27.) MLI bought insurance/protection from XLCA to protect MLI's investment in the A-2 tranches (the "A-2 Notes"). (*See id.*; 56.1 ¶¶ 21-28.) Thus, for each of the XL Swaps, Defendants agreed to provide insurance for the A-2 Notes. (Gambino Decl. ¶ 4 Exs. 1A-G; 56.1 ¶¶ 21-28.)

---

[4]    The seven credit default swaps at issue here are: (i) West Trade II XL Swap; (ii) Silver Marlin XL Swap; (iii) Tazlina XL Swap; (iv) West Trade III XL Swap; (v) Jupiter XL Swap; (vi) Robeco XL Swap; and (vii) Biltmore XL Swap. (56.1 ¶¶ 21-27.)

Various executed documents memorialize the XL Swaps, including an ISDA Master Agreement,[5] a schedule to the ISDA Master Agreement (the "Schedule"), a financial guaranty insurance policy from XLCA (the "Policy"), and a confirmation (the "Confirmation"). (Gambino Decl. ¶ 3; 56.1 ¶ 20.) Section 6 of each Confirmation of the XL Swaps ("XL Confirmations") contains a termination provision, which in pertinent part provides for an "Additional Termination Event" in the event of "the failure by Party A [i.e., MLI] to exercise any Voting Rights . . . solely in accordance with the written instructions of Party B [i.e., the respective Portfolio CDS Trust]." (Gambino Decl. ¶ 4 Exs. 1A-G; 56.1 ¶ 29.)

**C.    Ratings Downgrades of XLCA
       After Entering into the XL Swaps**

In the first quarter of 2008, the ratings agencies of Fitch, Inc. ("Fitch"), Standard & Poor's ("S&P") and Moody's Investor Service ("Moody's") all took actions with regard to Defendant XLCA and related entities. Specifically, on January 23, 2008, Fitch downgraded the Insurer Financial Strength rating of XLCA and related entities to 'A' from 'AAA.' (*See* Musoff Decl. Ex. 10; 56.1 ¶ 43.) These downgrades followed SCA's announcement that it had determined not to raise new capital to strengthen its financial position. (Musoff Decl. Ex. 10; 56.1 ¶ 44.) On January 31, 2008, S&P placed, "the 'AAA' financial strength, financial enhancement and issuer credit ratings of [XLCA], and [related entities]. . . . on CreditWatch with negative implications." (Musoff Decl. Ex. 10; 56.1 ¶ 39.) Then, on February 7, 2008, Moody's downgraded the insurance financial

---

[5]    ISDA refers to the International Swaps and Derivatives Association, Inc. One of its primary functions was to develop the base document for virtually every credit derivative transaction. (*See* Musoff Decl. Ex. 8.)

strength rating of XLCA and related entities to "A3" from "Aaa." (Musoff Decl. Ex. 10; 56.1 ¶ 41.)

## D.    Defendants Attempt to Terminate the XL Swaps

### 1.    Defendants purport to terminate six of seven XL Swaps

Shortly after the downgrades referenced above, Defendant XLCA sent Merrill Lynch notices purporting to terminate six of the seven XL Swaps.[6] (Musoff Decl. Exs. 1 A-F; 56.1 ¶ 46.) Defendants asserted that publicly available information on Standard & Poor's website indicated that MLI had entered into agreements with MBIA and, based on MBIA's website, Defendants concluded that MLI necessarily had sold to MBIA the voting rights with respect to each CDO, thus giving control to MBIA. (*Id.*; 56.1 ¶ 50.) In each notice, XLCA also contended (in part) that MLI "agree[d] to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA." (*Id.*.) According to XLCA, in part:

> By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights ... because, among other reasons, *MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust* is an Additional Termination Event [according to the contract].

(*Id.*) (emphasis added). As discussed below, however, MLI's agreements with MBIA did not give Defendants the right to terminate the six XL Swaps. (*See infra* at 10-11.)

---

[6]    These notices concerned the West Trade II XL Swap, Silver Marlin XL Swap. Tazlina XL Swap, West Trade III XL Swap, Robeco XL Swap, and Biltmore XL Swap. (Musoff Decl. Exs. 1A-F; 56.1 ¶ 46.)

**2.    XLCA improperly demands assurance with regard to the Jupiter XL Swap**

Although Defendants conceded in the February 22, 2008 notices that "the information that came to the attention of XLCA did not involve the Jupiter VI Transaction," Defendants included among their purported February 22 termination notices a demand that MLI provide it with assurance *within three days* that it had not entered into "any understanding or agreement to follow the instructions of any third party with respect to the voting or any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture." (Musoff Decl. Ex. 1G; 56.1 ¶¶ 48, 49, 51, 52.)

**E.    MLI Assures XLCA That It Has Not Repudiated Any of the Seven Contracts**

On February 29, 2008, MLI voluntarily responded to the six February 22 purported termination notices and, in part, assured Defendants that it did not fail "to exercise any voting rights as directed by" Defendants.  Specifically, MLI also assured Defendants that it had not entered into any agreements that would preclude MLI "from exercising Voting Rights solely in accordance with [the XL Swaps.]" (Musoff Decl. Exs. 2A-F; 56.1 ¶¶ 53, 54.)

**F.    XLCA Ignores MLI's Assurances**

**1.    XLCA seeks to terminate the Jupiter XL Swap**

On March 6, 2008, Defendants sent another notice to MLI reciting the contents of their February 22, 2008 letter, again admitting that they had no information that MLI had entered into any other agreement in connection with the Jupiter Transaction.  (Musoff Decl. Ex. 3; 56.1 ¶¶55, 56.)  Defendants asserted that, because they had not received confirmation from MLI that it had not "enter[ed] into any similar understanding or agreement to follow the instructions of any third party with respect to

the voting of any or all of the Class A-2 Notes of Class A-1 Notes," XLCA "deem[ed] Merrill Lynch's failure to provide the requested confirmation within three days as evidence of its having accorded Voting Rights under the Jupiter VI Transactions to a third party in repudiation of its contractual commitment to the Trust." (*Id.*; 56.1 ¶ 57.) Further, in the notice, Defendants declared that they "consider[ed] MLI's repudiation of its contractual obligations to the Trust to be final and [they were] exercising [their] rights to terminate the Swap Agreements pursuant to Section 6 of the of the Master Agreement." (*Id.*; 56.1 ¶ 58.)

### 2.    XLCA rejects MLI's assurances in the other six XL Swaps

In a letter dated March 7, 2008, the Trusts, through counsel, responded to MLI's February 29, 2008 letters and asserted that "a party may terminate a bilateral contract immediately upon the other party's repudiation of its obligations, which divests the repudiating party of its ability to ensure compliance with the contract in the future, even if no breach of such obligations has yet occurred." (Musoff Decl. Ex. 4; 56.1 ¶ 60.) The March 7 letter does not provide any factual basis for the assertion that "MLI repudiated its obligations to exercise Voting Rights 'solely' in accordance with the instructions of XLCA by entering into the conflicting agreements with MBIA." (*Id.*)

### G.    MLI Again Reassures XLCA

On March 10, 2008, MLI responded to the March 7 letter, again assuring, among other things, that:

> MLI can now and will at all times going forward exercise Voting Rights in accordance with the express terms of our contracts.  Contrary to your letter, MLI has not entered into any contract that "divests [MLI] of its ability to ensure compliance with [its contracts with XLCA] in the future." Nor has MLI "contractually relinquished its ability" to vote as directed by XLCA.

(Musoff Decl. Ex. 5; 56.1 ¶ 61, 62.)  The letter further explained that "MLI has performed all of its contractual obligations, including the payment of substantial premiums to XLCA, and has reiterated its ability and intent to perform all of its contractual obligations, contingent or otherwise, going forward."  (*Id.*; 56.1 ¶ 63.)

## H.     SCA Publicly Announces Termination of XL Swaps

SCA disclosed on March 13, 2008 a net loss of "$1,197.9 million" for the quarter and "$1,224.5 million" for the year ended December 31, 2007.  (Musoff Decl. Ex 6; 56.1 ¶ 64.)  In that same filing with the Securities and Exchange Commission, SCA disclosed that "the Company issued notices terminating seven Credit Default Swap ("CDS") contracts with a certain counterparty. . . on the basis of the counterparty's repudiation of certain contractual obligations under each of the agreements.  The Company has been advised by the counterparty that it disputed the effectiveness of the terminations." (Musoff Decl. Ex. 6; 56.1 ¶ 65.)

## I.     The MBIA Contracts

As MLI confirmed, it had not entered into any other agreement which in any way, shape, or form impaired MLI's ability to perform under the XL Swaps.  Rather, in connection with six of the seven underlying CDOs, MLI had entered into an agreement with another monoline insurer to purchase protection on the A-1, not A-2, tranche of the respective CDOs.  (56.1 ¶¶ 31-36.)  Specifically, on August 29, 2007, MLI executed six credit default swaps with non-party LaCrosse Financial Products, LLC ("LaCrosse") as the seller and MBIA Insurance Corporation as the financial guarantor (the "MBIA Swaps").  (*See* Gambino Decl. ¶ 4 Exs. 2A-F.)  With the exception of Jupiter, the reference entities for the MBIA Swaps consist of the same CDOs that underlie the XL Swaps: West Trade II, Silver Marlin, West Trade III, Tazlina, Robeco and Biltmore.

LaCrosse/MBIA agreed to sell protection on the Class A-1 portion of those six CDOs. (*Id.*; 56.1 ¶¶ 31-36.)

Far from the characterizations proffered by Defendants, these transactions protected, rather than divested, MLI's ability to exercise its voting rights in connection with the CDOs. Specifically, while the MBIA swaps provide that MLI shall "exercise all voting rights . . . only at the directions of [MBIA] given in writing" (Gambino Decl. ¶ 4 Exs. 2A-F), such obligation is made subject to "[certain] qualifications." (*Id.*) As relevant here, each of the MBIA Swaps contain a termination provision. (56.1 ¶¶ 37, 38.) The termination provisions each explicitly contemplate that MLI might have other agreements, such as the ones with Defendants, which include terms that might conflict with MLI following MBIA's instructions. The termination provision in each of the swaps specifically states:

> Seller [i.e., MBIA] acknowledges that Buyer [i.e., MLI] may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(56.1 ¶ 38.) The MBIA Swaps expressly protect MLI's ability to vote as "solely in accordance with the written instructions" of XLCA by granting MBIA the right to terminate the agreement should MLI not vote in accordance with MBIA's instructions.

## J.    **Procedural History**

Following Defendants' purported termination of the contracts at issue, MLI commenced this action on March 19, 2008. Defendants filed their Answer and

Counterclaims on March 31, 2008.  (CC at 59.)  Defendants' Counterclaims included

three claims for relief that mirror MLI's request for declaratory judgment:  (i) the first

claim seeks a declaratory judgment that MLI repudiated all seven XL Swaps (CC ¶¶ 62-

76); and (ii) the second and third claims are for breach of contract against both MLI and

Merrill Lynch based on the MBIA Swaps.  (CC ¶¶ 77-148.).  These counterclaims

necessarily rely on a finding that MLI repudiated the XL Swaps.  Accordingly, MLI and

ML&Co. move for partial summary judgment on Defendants' first, second, and third

counterclaims.

**ARGUMENT**

**DEFENDANTS' PURPORTED TERMINATION**
**OF THE XL SWAPS WAS IMPROPER**

**I.    SUMMARY JUDGMENT ON PLAINTIFFS'**
**COMPLAINT IS WARRANTED**

**A.    Summary Judgment Is Proper Where**
**The Contractual Language Is Unambiguous**

Summary judgment is appropriate where "there is no genuine issue as to

any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *see, e.g., Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d

132, 137 (2d Cir. 1998).  In a contract dispute, summary judgment is proper "where the

language of the contract is unambiguous."  *Nowak v. Ironworkers Local 6 Pension Fund*,

81 F.3d 1182, 1192 (2d Cir. 1996).  Language is unambiguous when it "has 'a definite

and precise meaning, unattended by danger of misconception in the purport of the

[contract] itself, and concerning which there is no reasonable basis for a difference of

opinion.'"  *Id.* (alteration in original; citation omitted).  "The language of a contract is not

made ambiguous simply because the parties urge different interpretations.  Nor does

12

ambiguity exist where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (alteration in original; quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 161 N.Y.S.2d 90, 93 (N.Y. 1957)).

### B.    MLI Did Not Breach Any of the Seven XL Swaps with Defendants Because No Instructions Ever Were Given, Let Alone Not Followed

"Under New York law, the contract controls as to grounds for termination if those grounds are stated. Where the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with." *Consumers Power Co. v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 211 (W.D.N.Y. 1981). As noted above, in each of the XL Swaps,[7] an "Additional Termination Event" results from MLI's failure "to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of [Defendants]." (56.1 ¶ 29.)

It is undisputed that, as of the date on which MLI filed suit, Defendants have never provided to MLI instructions, written or otherwise, regarding voting in any of the seven XL Swaps. (Gambino Decl. ¶ 6; 56.1 ¶ 66.) Thus, MLI has not even had the *opportunity* to exercise voting rights "solely in accordance with" Defendants' instructions, let alone failed to do so. *See Cauff, Lippman & Co. v. The Apogee Finance Group, Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992) ("Where the performance of either party . . . is conditioned upon the occurrence of some event, the contractual obligation does not arise

---

[7]    Significantly, the XL Swaps contain no covenant providing that MLI *shall* vote as instructed by Defendants, nor do they give any of Defendants the power to directly cast the pertinent votes in each CDO. (*See* Gambino Decl. ¶ 4 Exs. 1A-G.)

if that event does not occur."); *see also Westerbeke Corp. v. Daihatsu Motor Co. Ltd.*,

304 F.3d 200, 206 n.3 (2d Cir. 2002).  Accordingly, no "Additional Termination Event"

has occurred.  Given that it has not been possible for MLI to fail to vote as instructed,

MLI has not breached its contracts with Defendants.

### C.    MLI Did Not Repudiate the XL Swaps and Remains Fully Able to Perform According to Their Terms

#### 1.    Anticipatory Repudiation Requires Action Which Renders Performance Impossible

Defendants claim that MLI repudiated the seven XL Swaps by having

entered into certain credit default swaps with a different monoline insurer to purchase

protection on the A-1 notes of the CDOs that underlie six of the XL Swaps.  (*See* CC ¶¶

1, 7.)  However, as this Court has noted, anticipatory repudiation occurs "only where

there is an overt communication of intention or an action which renders performance

impossible or demonstrates a clear determination not to continue with performance.'"

*Streets of London, Inc.*, 1997 U.S. Dist. LEXIS 3786 at *2 (citations omitted) (quoting

N.Y. U.C.C. § 2-610 official cmt. point 1; citing *Tenavision, Inc. v. Neuman*, 408

N.Y.S.2d 36, 38 (N.Y. 1978)).  Under New York law, a party claiming anticipatory

repudiation must show that the obligor actually has acted in a manner that makes

performance impossible.  *See Streets of London, Inc.*, 1997 U.S. Dist. LEXIS 3786 at *2;

*Rachmani Corp. v. 9 E. 96th St. Apt. Corp.*, 629 N.Y.S.2d 382, 385-86 (1st Dep't 1995)

(because defendants still would have been able to remunerate plaintiff as contemplated by

plaintiff's contract, no anticipatory repudiation had occurred).  Even under the authority

provided by Defendants in their March 7 letter (Musoff Decl. Ex. 4), Defendants must

show that MLI voluntarily disabled itself from performance.  *See Computer Possibilities*

*Unlimited, Inc. v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 475 (1st Dep't 2002) (where party

14

repudiates contract through action, it must "'voluntarily disable[] itself from complying'
with its contractual obligations") (citation omitted).  As MLI neither rendered its
performance under the XL Swaps impossible nor communicated its intent not to continue
with performance, its actions do not meet the above standards.

### 2. The MBIA Swaps in No Way Impede MLI's Performance Under the Six XL Swaps

According to the terms of the MBIA Swaps, MLI did not give MBIA any
rights that interfere with MLI's ability to perform under the XL Swaps.  *See* page 11,
*supra.*  Rather, MBIA expressly acknowledged in the MBIA Swaps that MLI may have
entered into other swaps that could conflict with MLI's following MBIA's instructions.
(56.1¶ 38.)  If MLI does not follow MBIA's instructions with regard to any particular
CDO, MBIA simply would have the right to terminate the swap that provides protection
for that CDO.  (*Id.*)  Thus, the plain terms of the MBIA Swaps contemplate that MLI
might: (i) have existing swap agreements with other monoline insurers; (ii) vote
according to the other monoline insurer's instructions; and, accordingly, (iii) not follow
MBIA's conflicting instructions.  (*Id.*).

Given that MLI has always been and still is clearly able to vote solely in
accordance with Defendants' instructions, and the express terms of the MBIA Swaps do
not preclude MLI from performing under the XL Swaps, Defendants' pretextual
invocation of anticipatory repudiation is both improper and premature.  *See Computer
Possibilities*, 747 N.Y.S.2d at 475; *Rachmani Corp.*, 629 N.Y.S.2d at 385-86.
Accordingly, summary judgment is warranted.

### 3.    MLI has Not Entered into Any MBIA Swap
### in Connection with the Jupiter CDO

Despite admitting in their February 22 letter that the information Defendants had did not involve the Jupiter CDO, Defendants still unreasonably sought assurance that MLI had not agreed to follow the instructions of a third party with regard to the Jupiter CDO. (Musoff Decl. Ex. 1G; 56.1 ¶¶ 48, 49, 51.) Defendants then asserted that they were entitled to terminate the Jupiter XL Swap because MLI did not respond to their demand for assurance within the arbitrarily brief deadline they had set. (Musoff Decl. Ex. 3; 56.1 ¶ 57.) This termination of the Jupiter XL Swap is invalid because, as demonstrated below: (i) Defendants were not entitled to seek assurance; (ii) MLI provided assurance despite the fact that such assurance was not warranted; and (iii) no MBIA or other contract implicating voting rights exists with regard to the Jupiter CDO.

As an initial matter, the Jupiter XL Swap is not the type of contract for which Defendants were entitled to seek assurance. *See River Terrace Assoc., LLC v. Bank of New York*, 804 N.Y.S.2d 728, 729 (1st Dept. 2005) (doctrine of adequate assurance is very limited outside of U.C.C. contracts); *see also Scott-Macon Sec. Inc.* v. *Zoltek Co.*, 04 Civ. 2124 (MBM), 04 Civ. 4896 (MBM), 2005 U.S. Dist. LEXIS 9034, at *44 (S.D.N.Y. May 11, 2005), *aff'd per curiam in part, vacated in part on other grounds*, 06-2711-cv, 2007 U.S. App. LEXIS 23356 (2d Cir. Oct. 4, 2007).

Even if this was the type of contract for which the doctrine of adequate assurance could apply, as a matter of law, absent any indication that MLI did not intend to fulfill its obligations under the Jupiter XL Swap, Defendants had no reasonable basis to demand assurance. *See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 110 F.3d 6, 9 (2d Cir. 1997) (demand for adequate assurance "was designed to

16

provide a remedy for one party's *reasonable* fears that the other party to a contract will

not perform." (emphasis added) (quotations and citations omitted)); *Enron Power Mktg.,*

*Inc. v. Nevada Power Co.* (*In re Enron Corp.*), No. 03 Civ. 9318 (BSJ), 2004 U.S. Dist.

LEXIS 20351, at *8 (S.D.N.Y. Oct. 12, 2004) ("Because the reasonableness of a party's

insecurity is determined by commercial standards, there must be an objective factual

basis for the insecurity, rather than a purely subjective fear that the party will not

perform." (quotation and citations omitted)).

      There was no "objective factual basis" for their insecurity about MLI's

ability to perform, as Defendants implicitly acknowledged; rather, it was based purely on

conjecture and subjective fear. (*See* Musoff Decl. Ex. 1G.) Accordingly, Defendants'

demand for assurance was unreasonable.

      Despite the fact that Defendants' demand for assurance was unwarranted

and improper, MLI did provide assurance. In its February 29 responses (Musoff Decl.

Ex. 2.A-F), MLI expressly affirmed that "nothing in any hedging agreement with any

other counterparty would preclude Merrill Lynch International from exercising Voting

Rights in accordance with our contracts with you." (*Id.*) In its March 10 letter, MLI

reassured Defendants again that "MLI can now and will at all times going forward

exercise Voting Rights in accordance with the express terms of our contracts." (Musoff

Decl. Ex. 5; 56.1 ¶ 62.) In light of the above assurances, written four days after

Defendants' letter of March 6, which purported to terminate the Jupiter XL Swap, such

termination was inappropriate.

      Finally, it is undisputed that MLI did not enter into an agreement that

implicates voting rights with regard to the Jupiter CDO. (Gambino Decl. ¶ 8; 56.1 ¶ 68.)

Given that there is no indication that MLI, at any time, voluntarily rendered itself powerless to perform its duties under the Jupiter XL Swap, it has not repudiated this contract. Accordingly, summary judgment is appropriate.

## II.  DEFENDANTS' FIRST, SECOND AND THIRD COUNTERCLAIMS SHOULD BE DISMISSED

Defendants' first, second and third counterclaims are essentially a mirror image of MLI's complaint, predicated upon a determination that the XL Swaps have been validly terminated. Because, for the reasons set forth herein, Defendants' purported terminations were invalid and the XL Swaps are still in effect, the first, second and third counterclaims must similarly be dismissed pursuant to Fed. R. Civ. P. 56. *See Continental Energy Corp. v. Cornell Partners*, *L.P.*, 04 Civ. 260 (GEL), 2005 U.S. Dist. LEXIS 38120, *12 (S.D.N.Y. Dec. 28, 2005). Defendants-Counterclaimants do not allege that they ever delivered instructions to exercise voting rights to MLI that were not followed. Therefore, as discussed above, Defendants have no right to declare an "Additional Termination Event" and terminate the XL Swaps. Moreover, as discussed above, MLI's entry into the MBIA Swaps do not constitute a repudiation by MLI of the XL Swaps. Accordingly, summary judgment on the first, second and third Counterclaims should be granted in favor of MLI and ML&Co. and such Counterclaims dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff and Counterclaim Defendant MLI respectfully requests that this Court: (a) grant its motion for summary judgment declaring that: (i) MLI has not repudiated its contractual obligations with regard to the XL Swaps; and (ii) Defendants' purported termination of the XL Swaps was improper and without justification and was and is of no force and effect; (b) grant the motion of Counterclaim Defendants MLI and ML&Co. for partial summary judgment to dismiss, with prejudice, Defendants' first, second and third counterclaims; and (c) grant such further relief as this Court may deem proper.

Dated: New York, New York
        April 18, 2008

Respectfully submitted,

_____/s/ Jay B. Kasner_____
Jay B. Kasner (jkasner@skadden.com)
Scott D. Musoff (smusoff@skadden.com)
Jeffrey S. Lichtman (jlichtma@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Plaintiff and Counterclaim
  Defendant Merrill Lynch International and
  Counterclaim Defendant
  Merrill Lynch & Co., Inc.

19