Jay B. Kasner (jkasner@skadden.com)
Scott D. Musoff (smusoff@skadden.com)
Jeffrey S. Lichtman (jlichtma@skadden.com)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Plaintiff and Counterclaim Defendant
 Merrill Lynch International and Counterclaim
 Defendant Merrill Lynch & Co., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MERRILL LYNCH INTERNATIONAL,

          Plaintiff,

    -vs-

XL CAPITAL ASSURANCE INC., et al.,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
XL CAPITAL ASSURANCE INC., et al.,

          Counterclaimants,

    - vs -

MERRILL LYNCH INTERNATIONAL AND
MERRILL LYNCH & CO., INC.,

          Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: 08 CV 2893 (JSR)

**MERRILL LYNCH INTERNATIONAL'S AND
MERRILL LYNCH & CO., INC'S STATEMENT PURSUANT TO LOCAL RULE 56.1**

Pursuant to Rule 56.1 of this Court's Local Civil Rules, Plaintiff and

Counterclaim Defendant Merrill Lynch International ("MLI") and Counterclaim Defendant

Merrill Lynch & Co., Inc. ("ML&Co.") (together "Merrill Lynch") respectfully submit the following statement of material facts as to which there is no genuine issue to be tried.

I.  **The Parties**[1]

1. MLI is organized under the laws of England and Wales with its principal place of business in London. (Declaration of Joseph Gambino, hereinafter "Gambino Decl.," ¶ 2; Complaint ¶ 6; Counterclaims[2] ¶ 18.)

2. ML&Co. is organized under the laws of Delaware with its principal place of business in New York. (Gambino Decl. ¶ 2; CC ¶ 19.)

3. XL Capital Assurance Inc. ("XLCA") is organized under the laws of New York with its principal place of business in New York. XLCA is an indirect wholly owned subsidiary of Security Capital Assurance Ltd. ("SCA"). (Defendants' Answer[3] ¶ 7; CC ¶ 9.) SCA is a publicly owned company, the shares of which are listed on the New York Stock Exchange. (Musoff Decl. Ex. 6 at 11.)

---

[1] The headings are included for reference only and are not submitted as statements of material fact.

[2] Counterclaims of Defendants and Counterclaim Plaintiffs XL Capital Assurance Inc. and XCLA Admin LLC as trustee for Portfolio CDS Trust 138, Portfolio CDS Trust 153, Portfolio CDS Trust 164, Portfolio CDS Trust 165, Portfolio CDS Trust 170, Portfolio CDS Trust 172 and Portfolio CDS Trust 186 filed March 31, 2008 are herein referred to as "CC ¶ __". Allegations from the Counterclaims cited herein are assumed to be not in dispute for purposes of this motion only.

[3] Answer of Defendants and Counterclaimants XL Capital Assurance Inc. and XCLA Admin LLC as trustee for Portfolio CDS Trust 138, Portfolio CDS Trust 153, Portfolio CDS Trust 164, Portfolio CDS Trust 165, Portfolio CDS Trust 170, Portfolio CDS Trust 172 and Portfolio CDS Trust 186 filed March 31, 2008 is herein referred to as "Ans. ¶ __".

4. Defendant XLCA Admin LLC ("XLCA Admin") is a limited liability company organized under the laws of New York with its principal place of business in New York. The member or members of XLCA Admin are citizens of New York. (Ans. ¶ 8; CC ¶ 10.)

5. XLCA Admin is an indirect and wholly owned subsidiary of SCA. (CC ¶ 10.) XLCA Admin is a trustee for Portfolio CDS Trust 138, Portfolio CDS Trust 153, Portfolio CDS Trust 164, Portfolio CDS Trust 165, Portfolio CDS Trust 170, Portfolio CDS Trust 172 and Portfolio CDS Trust 186. (CC at 22.)

6. Portfolio Trust 138 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 138 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC (collectively, "West Trade II"). (*See* Ans. ¶ 9; CC ¶ 11.)

7. Portfolio CDS Trust 138 is synonymous with Portfolio Trust 138. (*See* Ans. ¶ 9; CC ¶ 11.)

8. Portfolio Trust 153 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 153 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC (collectively, "Silver Marlin"). (*See* Ans. ¶ 10; CC ¶ 12.)

9. Portfolio CDS Trust 153 is synonymous with Portfolio Trust 153. (*See* Ans. ¶ 10; CC ¶ 12.)

10. Portfolio Trust 164 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 164 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC (collectively, "Tazlina"). (*See* Ans. ¶ 11; CC ¶ 13.)

11. Portfolio CDS Trust 164 is synonymous with Portfolio Trust 164. (*See* Ans. ¶ 11; CC ¶ 13.)

12. Portfolio Trust 165 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 165 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by West Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC (collectively, "West Trade III"). (*See* Ans. ¶ 12; CC ¶ 14.)

13. Portfolio CDS Trust 165 is synonymous with Portfolio Trust 165. (*See* Ans. ¶ 12; CC ¶ 14.)

14. Portfolio Trust 170 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 170 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC (collectively, "Jupiter"). (*See* Ans. ¶ 13; CC ¶ 15.)

15. Portfolio CDS Trust 170 is synonymous with Portfolio Trust 170. (*See* Ans. ¶ 13; CC ¶ 15.)

16.  Portfolio Trust 172 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 172 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC (collectively, "Robeco"). (*See* Ans. ¶ 14; CC ¶ 16.)

17.  Portfolio CDS Trust 172 is synonymous with Portfolio Trust 172. (*See* Ans. ¶ 14; CC ¶ 16.)

18.  Portfolio Trust 186 is a trust organized under the laws of, and with its principal place of business in, New York. Portfolio Trust 186 was created for the purpose of being the counterparty to MLI in a credit default swap related to notes issued by Biltmore CDO 2007-1 Ltd. and Biltmore CDO 2007-1 LLC (collectively, "Biltmore"). (*See* Ans. ¶ 15; CC ¶ 17.)

19.  Portfolio CDS Trust 186 is synonymous with Portfolio Trust 186. (*See* Ans. ¶ 15; CC ¶ 17.)

## II.  The Seven Credit Default Swap Transactions (the "XL Swaps")

20.  The documents that memorialize the credit default swap transactions at issue include the International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement, the Schedule to the Master Agreement, the Confirmation and the Financial Guaranty Insurance Policy. (Gambino Decl. ¶ 3.)

21.  MLI, Portfolio CDS Trust 138 and XLCA entered into a credit default swap on January 25, 2007 for $375M Class A-2 Second Priority Senior Secured Floating Rate Notes due 2051 issued by West Trade II (the "West Trade II XL Swap"). A true and correct copy of the

Confirmation for this credit default swap as executed by the parties is attached to the Gambino Decl. ¶ 4 Ex. 1A and its content is incorporated by reference herein.

22. MLI, Portfolio CDS Trust 153 and XLCA entered into a credit default swap on April 11, 2007 for $437.5M Class A-2 Second Priority Senior Secured Floating Rate Notes due 2050 issued by Silver Marlin (the "Silver Marlin XL Swap"). A true and correct copy of the Confirmation for this credit default swap as executed by the parties (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 1B and its content is incorporated by reference herein.

23. MLI, Portfolio CDS Trust 164 and XLCA entered into a credit default swap on June 4, 2007 for $450M Class A-2 Second Priority Senior Floating Rate Notes due 2054 issued by Tazlina (the "Tazlina XL Swap"). A true and correct copy of the Confirmation for this credit default swap as executed by the parties (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 1C and its content is incorporated by reference herein.

24. MLI, Portfolio CDS Trust 165 and XLCA entered into a credit default swap on May 25, 2007 for $625M Class A-2 Second Priority Senior Floating Rate Notes due 2053 issued by West Trade III (the "West Trade III XL Swap"). A true and correct copy of the Confirmation for this credit default swap as executed by the parties (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 1D and its content is incorporated by reference herein.

25. MLI, Portfolio CDS Trust 170 and XLCA entered into a credit default swap on June 15, 2007 for $525M Class A-2 Second Priority Senior Secured Floating Rate Notes due

2053 issued by Jupiter (the "Jupiter XL Swap"). A true and correct copy of the Confirmation for this credit default swap as executed by the parties (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 1E and its content is incorporated by reference herein.

26. MLI, Portfolio CDS Trust 172 and XLCA entered into a credit default swap on June 29, 2007 for $385M Class A-2 Second Priority Senior Secured Floating Rate Notes due 2053 issued by Robeco (the "Robeco XL Swap"). A true and correct copy of the Confirmation for this credit default swap as executed by the parties (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 1F and its content is incorporated by reference herein.

27. MLI, Portfolio CDS Trust 186 and XLCA entered into a credit default swap on August 10, 2007 for $350M Class A-2 Second Priority Senior Secured Floating Rate Notes due 2050 issued by Biltmore (the "Biltmore XL Swap"). A true and correct copy of the Confirmation for this credit default swap as executed by the parties (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 1G and its content is incorporated by reference herein.

28. Pursuant to the terms of the swaps referred to above (*see* ¶¶ 21-27) (collectively, the "XL Swaps"), XLCA agreed to protect MLI against certain credit defaults on $3.1 billion notional amount in notes issued by the above seven referenced CDOs. (*See* CC ¶ 2.)

29. Section 6 of each of the seven Confirmations associated with the XL Swaps sets forth "Additional Termination Events," which provides bases for parties to terminate the swap, and provides in pertinent part:

> The following event will constitute an Additional Termination Event, with Party A as the Affected Party:
>
> As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; <u>provided, however,</u> that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

(Gambino Decl. ¶ 4 Exs. 1A-G.) Party A in each of the seven Confirmations associated with the XL Swaps is MLI and Party B is the respective XLCA affiliated trust. (*Id.*)

30. Each of the Schedules for the seven XL Swaps contains a choice of law provision designating New York law. (Gambino Decl. ¶ 9.)

## II. The Six Credit Default Swap Transactions Among MLI, LaCrosse and MBIA (the "MBIA Swaps")

31. MLI, LaCrosse Financial Products, LLC ("LaCrosse") and MBIA Insurance Corporation ("MBIA") entered into a credit default swap on August 29, 2007 for Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Notes due 2051 issued by West Trade II. A true and correct copy of the Confirmation for this credit default swap (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 2A and its content is incorporated by reference herein.

32.　MLI, LaCrosse and MBIA entered into a credit default swap on August 29, 2007 for Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Notes due 2050 issued by Silver Marlin. A true and correct copy of the Confirmation for this credit default swap (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 2B and its content is incorporated by reference herein.

33.　MLI, LaCrosse and MBIA entered into a credit default swap on August 29, 2007 for Class A-1 First Priority Senior Floating Rate Delayed Draw Notes due 2054 issued by Tazlina. A true and correct copy of the Confirmation for this credit default swap (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 2C and its content is incorporated by reference herein.

34.　MLI, LaCrosse and MBIA entered into a credit default swap on August 29, 2007 for Class A-1 First Priority Senior Floating Rate Delayed Draw Notes due 2053 issued by West Trade III. A true and correct copy of the Confirmation for this credit default swap (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 2D and its content is incorporated by reference herein.

35.　MLI, LaCrosse and MBIA entered into a credit default swap on August 29, 2007 for Class A-1 First Priority Senior Secured Delayed Draw Floating Rate Notes due 2053 issued by Robeco. A true and correct copy of the Confirmation for this credit default swap (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 2E and its content is incorporated by reference herein.

36.　MLI, LaCrosse and MBIA entered into a credit default swap on August 29, 2007 for Class A-1 First Priority Senior Secured Floating Rate Notes due 2050 issued by Biltmore. A

true and correct copy of the Confirmation for this credit default swap (irrelevant, confidential portions of which have been redacted) is attached to the Gambino Decl. ¶ 4 Ex. 2F and its content is incorporated by reference herein.

37. Each of the Confirmations associated with each of the respective six MBIA Swaps contains a provision in Section 9 entitled "Seller's Right to Exercise Voting Rights on Reference Obligation" that provides in part:

> (a) Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

(Gambino Decl. ¶ 4 Exs. 2A-F.)

38. Each of the Confirmations associated with each of the respective six MBIA Swaps contains a provision in Section 9 entitled "Seller's Right to Exercise Voting Rights on Reference Obligation" that provides in part:

> (b) The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below.
>
> \* \* \* \* \*
>
> Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

10

(Gambino Decl. ¶ 4 Exs. 2A-F.)

### III. The Purported Termination of the XL Swaps by XLCA

#### A. SCA and certain of its subsidiaries are downgraded

39. On its website, SCA states, in part, "[o]n January 31, 2008, S&P announced ratings actions on certain subsidiaries of SCA, as well as on other bond insurance companies. In its release, S&P commented that the various rating actions announced are the result of their most recent review of all the bond insurance companies' capital plans. The release noted that S&P's review covered the scope of each plan relative to the projected losses for that company, the success each company has had to date in implementing its plan, and S&P's assessment of the likelihood that the companies could implement the remaining components of their plans. The review is part of S&P's ongoing assessment of the potential subprime-related losses that bond insurers might incur and how they are managing their capital positions to handle the losses. S&P noted that further reviews will occur as circumstances warrant." *See* http://www.scafg.com/ratings_update.html.

40. SCA further states, in part, that "S&P's release announced that the "AAA" financial strength, financial enhancement and issuer credit ratings of XL Capital Assurance Inc., XL Financial Assurance Ltd. ("XLFA") and XL Capital Assurance (UK) Ltd. were all placed on CreditWatch with negative implications." *See* http://www.scafg.com/ratings_update.html.

41. SCA states on its website, in part, that "[o]n February 7, 2008, Moody's announced rating actions on SCA, XLCA, XLFA and XLCA-UK, as well as on certain Moody's-rated securities that are guaranteed or "wrapped" by XLCA, XLFA and XLCA-UK. Moody's has downgraded the insurance financial strength rating of XLCA, XLFA and XLCA-UK to "A3"

11

from "Aaa". Moody's has downgraded SCA's senior debt rating to "(P)Baa3" from "(P)Aa3", its subordinated debt rating to "(P)Ba1" from "(P)A1" and its preference shares rating to "Ba2" from "A2". *See* http://www.scafg.com/ratings_update.html.

42.  SCA further states, in part, that "Moody's-rated securities that are guaranteed or "wrapped" by XLCA, XLFA and XLCA-UK were also downgraded to "A3", except those securities with higher public underlying ratings. Moody's release explained that Moody's evaluated SCA along five key rating factors: 1) franchise value and strategy, 2) insurance portfolio characteristics, 3) capital adequacy, 4) profitability, and 5) financial flexibility. The Moody's release noted that the rating actions reflect Moody's assessment of SCA's weakened capitalization and business profile resulting, in part, from its exposures to the U.S. residential mortgage market. Moody's outlook on SCA's ratings is negative. In addition, Moody's noted in the release: "Based on the risks in SCA's portfolio, as assessed by Moody's according to the approach outlined above, capitalization required to cover losses at the Aaa target level would exceed $6 billion. This compares to Moody's estimate of SCA's claims paying resources of $3.6 billion, which Moody's considers to be more consistent with capitalization at the single A rating level." *See* http://www.scafg.com/ratings_update.html.

43.  SCA also states on its website, in part, that "[o]n January 23, 2008, Fitch announced certain ratings actions on Security Capital Assurance Ltd and its operating subsidiaries. Fitch downgraded the Insurer Financial Strength rating of XL Capital Assurance Inc. ("XLCA"), XL Capital Assurance (U.K.) Ltd. and XL Financial Assurance Ltd. ("XLFA") to "A" from "AAA". SCA's Long Term Issuer Rating was downgraded to "BBB" from "AA" and SCA's Fixed/Floating Series A Perpetual Non-cumulative Preference Shares were downgraded to "BBB-" from "AA-."" *See* http://www.scafg.com/ratings_update.html.

44. SCA further states, in part, that "Fitch noted that the downgrades follow SCA's announcement on January 23, 2008 that SCA has determined not to raise new capital at the present time." *See* http://www.scafg.com/ratings_update.html.

45. SCA further states on its website, in part, that "[i]n taking the ratings actions described above, Fitch had the following comments: 'As Fitch announced on Dec. 12, 2007, when it placed SCA on Rating Watch Negative, the company has a modeled capital shortfall of more than $2 billion at the 'AAA' rating threshold. The downgrade places XLCA and XLFA's insurer financial strength (IFS) ratings at a level commensurate with an 'A' rating stress level under Fitch's most recent capital modeling. The downgrade of the IFS ratings to 'A' coupled with the continuation of the Negative Rating Watch, reflects the significant uncertainty with respect to the company's franchise, business model and strategic direction; uncertain capital markets and the impact of SCA's recent decisions on future financial flexibility; the company's future capital strategy; ultimate loss levels in its insured portfolio; and the challenges in the financial guaranty market overall. Fitch expects to resolve the Negative Rating Watch after the agency evaluates these various qualitative factors, as well as the progress SCA makes with respect its ongoing future capital enhancement plans." *See* http://www.scafg.com/ratings_update.html.

### B. XLCA Purports: to (i) Terminate Six of Seven XL Swaps; and (ii) Seek Assurance on the Seventh XL Swap

46. On February 22, 2008, Defendants sent six notices to Merrill Lynch (the "Six February 22 Notices"). True and correct copies of the Six February 22 Notices are attached to the Declaration of Scott D. Musoff ("Musoff Decl.") as Exhibits 1 A-F and their content is incorporated by reference herein.

47. Each of the Six February 22 Notices states, in part, that it was "provid[ing] notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. [Defendants] hereby designate[] February 22, 2008 as the Early Termination Date. (Musoff Decl. Exs. 1A-F.)

48. On February 22, 2008, Defendants sent a notice to Merrill Lynch in connection with the Jupiter CDS (the "Jupiter Notice" and together with the Six February 22 Notices, the "Notices"). A true and correct copy of the Jupiter Notice is attached to the Musoff Decl. as Ex. 1G and its content is incorporated by reference herein.

49. The Jupiter Notice, in part, "requests that MLI confirm that it did not, at any time, enter into any understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture." (Musoff Decl. Ex. 1G.)

50. The Six February 22 Notices state, in part:

> According to publicly available information obtained from Standard & Poor's website, subsequent to entering into the [XL] Swap Agreements, MBIA Inc. or its affiliates (collectively, "MBIA") provided credit protection on notes issued pursuant to the [respective] Indenture and, as represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt obligation ("CDO") notes. In public statements made on January 31, 2008, MBIA also represented that it is the "sole controlling party" in all of the CDOs in which it participates. In combination with the information from the websites of Standard & Poor's and MBIA, these recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.

(Musoff Decl. Exs. 1A-F.)

51. The Jupiter Notice states, in part, that "[t]he information that came to the attention of XLCA did not involve the Jupiter VI Transaction." (Musoff Decl. Ex. 1G.)

52. The Jupiter Notice also states, in part:

In light of MLI's repudiation of its voting right obligations with respect to other transactions, XLCA hereby requests that MLI confirm that it did not, at any time, enter into any understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture. . . . In order that XLCA may proceed accordingly on behalf of the Trust, it requests that MLI provide the requested confirmation within 3 days of the date hereof.

(Musoff Decl. Ex. 1G.)

53. On February 29, 2008, MLI sent six letters to Defendant XLCA Admin (the "February 29 Letters"). True and correct copies of the Six February 22 Notices are attached to the Musoff Decl. as Exs. 2 A-F and their content is incorporated by reference herein.

54. Each of the February 29 Letters states, in part, that "Merrill Lynch has neither failed to exercise Voting Rights as directed by [the relevant Trust] nor exercised any Retained Rights without the consent of [the relevant Trust]. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force." (Musoff Decl. Exs. 2A-F.)

55. On March 6, 2008, Defendant XLCA sent a notice to Merrill Lynch (the "March 6 Notice"). A true and correct copy of the March 6 Notice is attached to the Musoff Decl. as Ex. 3 and its content is incorporated by reference herein.

56. The March 6 Notice states, in part, that "we informed you of information that recently came to the attention of XL Capital Assurance ("XLCA") indicating that MLI repudiated its contractual obligations under numerous credit derivative transactions with trusts for which XLCA is attorney-in-fact by entering into conflicting contractual agreements granting control over the subject voting rights to MBIA, Inc. While this information did not involve the Jupiter VI transaction, we requested that MLI confirm that it did not, at any time, enter into any similar understanding or agreement." (Musoff Decl. Ex. 3.)

57. The March 6 Notice also states, in part that: "[a]s of this writing, XLCA has not received the requested confirmation and deems MLI's silence as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party." (Musoff Decl. Ex. 3.)

58. The March 6 Notice also states, in part: "[t]he Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement." (Musoff Decl. Ex. 3.)

59. On March 7, 2008, the Trusts, through counsel, sent a letter to ML&Co. (the "March 7 Letter"). A true and correct copy of the March 7 Letter is attached to the Musoff Decl. as Ex. 4 and its content is incorporated by reference herein.

60. The March 7 Letter states, in part: "a party may terminate a bilateral contract immediately upon the other party's repudiation of its obligations, which can be demonstrated by any subsequent agreement that divests the repudiating party of its ability to ensure compliance with the contract in the future, even if no breach of such obligations has yet occurred." (Musoff Decl. Ex. 4.)

61. On March 10, 2008, Merrill Lynch sent a letter to Jonathan Pickhardt, Esq., counsel to the Trusts (the "March 10 Letter"). A true and correct copy of the March 10 Letter is attached to the Musoff Decl. as Ex. 5 and its content is incorporated by reference herein.

62. The March 10 Letter states, in part: "MLI can now and will at all times going forward exercise Voting Rights in accordance with the express terms of our contracts. Contrary to your letter, MLI has not entered into any contract that 'divests [MLI] of its ability to ensure compliance with [its contracts with XLCA] in the future.' Nor has MLI 'contractually relinquished its ability' to vote as directed by XLCA." (Musoff Decl Ex. 5.)

63. The March 10 Letter also states, in part: "MLI has performed all of its contractual obligations, including the payment of substantial premiums to XLCA, and has reiterated its ability and intent to perform all of its contractual obligations, contingent or otherwise, going forward." (Musoff Decl Ex. 5.)

64. On March 13, 2008, XLCA's and Trustee's parent SCA disclosed its fourth quarter and full year 2007 results in a press release which was publicly disseminated and filed as an exhibit to a Form 8-K filing with the United States Securities and Exchange Commission. (Musoff Decl. Ex. 6.) In this press release, SCA announced a net loss of "$1,197.9 million" for the quarter and "$1,224.5 million" for the year. (Musoff Decl. Ex. 6.)

65. A section of SCA's press release is titled 'Termination of Seven CDS Contracts' wherein SCA states, in part, that "the Company issued notices terminating seven Credit Default Swap ("CDS") contracts with a certain counterparty. . . . on the basis of the counterparty's repudiation of certain contractual obligations under each of the agreements. The Company has been advised by the counterparty that it disputed the effectiveness of the terminations." (Musoff

Decl. Ex. 6.) SCA concedes that "[t]he notional amount of the CDS contracts at December 31, 2007 aggregated $3.1 billion before reinsurance ($3.0 billion after reinsurance)." (*Id.*)

66.   MLI has never received from any or all of the Defendants any instructions to exercise any Voting Rights in connection with any of the XL Swaps. (Gambino Decl. ¶ 6.)

67.   MLI has never failed to exercise any Voting Rights in connection with any of the XL Swaps solely in accordance with the written instructions of any or all of the Defendants. (Gambino Decl. ¶ 7.)

68. MLI has not entered into any credit default swap or other agreement with any other party that could in any way implicate MLI's exercise of Voting Rights relating to the Jupiter CDO. (Gambino Decl. ¶ 8.)

Dated: New York, New York
April 18, 2008

/s/ Jay B. Kasner
Jay B. Kasner (jkasner@skadden.com)
Scott D. Musoff (smusoff@skadden.com)
Jeffrey S. Lichtman (jlichtma@skadden.com)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Plaintiff and Counterclaim
 Defendant Merrill Lynch International and
 Counterclaim Defendant
 Merrill Lynch & Co., Inc.