Jay B. Kasner (jkasner@skadden.com)
Scott D. Musoff (smusoff@skadden.com)
Jeffrey S. Lichtman (jlichtma@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Plaintiff and Counterclaim
  Defendant Merrill Lynch International and
  Counterclaim Defendant Merrill Lynch & Co., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MERRILL LYNCH INTERNATIONAL,                     :

                       Plaintiff,               :

          -vs-                                   :

                                                 :    08 CV 2893 (JSR)
XL CAPITAL ASSURANCE INC., et al.,

                                                 :    DECLARATION OF
                       Defendants.                    SCOTT D. MUSOFF
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
XL CAPITAL ASSURANCE INC., et al.,

                                                 :
                       Counterclaimants,

                                                 :
          - vs -

                                                 :
MERRILL LYNCH INTERNATIONAL AND
MERRILL LYNCH & CO., INC.,                        :

                       Counterclaim Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


          SCOTT D. MUSOFF, under penalty of perjury, declares as follows:

          1.      I am a member of the Bar of this Court and of the firm Skadden, Arps, Slate,

Meagher & Flom LLP, attorneys for Plaintiff and Counterclaim Defendant Merrill Lynch

International ("MLI") and Counterclaim Defendant Merrill Lynch & Co., Inc. ("ML&Co.")

(together "Merrill Lynch").  I submit this declaration in support of Merrill Lynch's Motion for

Summary Judgment, and to transmit true and correct copies of the following documents:

Exhibit:

1.    Letters dated February 22, 2008 from XLCA to MLI:

    A.    Letter dated February 22, 2008 with regard to the West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC ("West Trade II XL Swap") Credit Default Swap ("CDS").

    B.    Letter dated February 22, 2008 with regard to the Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC CDS ("Silver Marlin XL Swap").

    C.    Letter dated February 22, 2008 with regard to the Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC CDS ("Tazlina XL Swap").

    D.    Letter dated February 22, 2008 with regard to the West Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC CDS ("West Trade III XL Swap").

    E.    Letter dated February 22, 2008 with regard to the Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC CDS ("Robeco XL Swap").

    F.    Letter dated February 22, 2008 with regard to the Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC CDS ("Biltmore XL Swap").

    G.    Letter dated February 22, 2008 with regard to the Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC CDS ("Jupiter XL Swap").

2.    Six Letters dated February 29, 2008 from MLI to XLCA Admin responding to the

February 22, 2008 letters:

    A.    Letter dated February 29, 2008 with regard to the West Trade II XL Swap.

    B.    Letter dated February 29, 2008 with regard to the Silver Marlin XL Swap.

    C.    Letter dated February 29, 2008 with regard to the Tazlina XL Swap.

    D.    Letter dated February 29, 2008 with regard to the West Trade III XL Swap.

    E.    Letter dated February 29, 2008 with regard to the Robeco XL Swap.

    F.    Letter dated February 29, 2008 with regard to the Biltmore XL Swap.

Exhibit:

3.    Letter dated March 6, 2008, which purports to terminate the Jupiter XL Swap.

4.    Letter dated March 7, 2008 responding to the February 29, 2008 letters.

5.    Letter dated March 10, 2008, responding to the March 7, 2008 letter.

6.    Security Capital Assurance Ltd.'s ("SCA") 8-K filed March 13, 2008.

7.    International Swaps and Derivatives Association, Inc.'s "Product Descriptions and Frequently Asked Questions" (Question #24) (http://www.isda.org/educat/faqs.html/#24).

8.    Allen & Overy, "An Introduction to the Documentation of OTC Derivatives" at 1-2 (May 2002) (http://www.isda.org/educat/pdf/documentation_of_derivatives.pdf).

9.    SCA, "About Us" (http://www.scafg.com/secondary.asp?pageID=2&print=1).

10.    SCA, "Ratings Update" (http://www.scafg.com/ratings_update.html).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2008.

_____
SCOTT D. MUSOFF

# Exhibit 1A

02/22/2008 12:13 FAX  2124783579                                           ☑012/015

To:       Merrill Lynch International ("MLI" or "Party A")
          2 King Edward Street
          London EC1A 1HQ
          Attention: Manager, Fixed Income Settlements
          Facsimile: +44 207 867 2004
          Telephone: +44 207 867 3769

          Merrill Lynch & Co.
          4 World Financial Center
          18th Floor
          New York, NY 10080
          Attention: Global Credit Derivatives
          Facsimile: (212) 449-9054
          Telephone: (212) 449-9001

From:     XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 138 (the
          "Trust" or "Party B")

Date:     February 22, 2008

Re:       Credit Derivative Transaction relating to West Trade Funding CDO II Ltd. —
          Reference 06ML82006A

Reference is made to (i) the ISDA Master Agreement dated as of January 25, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of January 25, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date of January 25, 2007 (the "Confirmation") (collectively, the "Swap Agreements").  Capitalized terms used but not defined herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall have the meanings given to such terms in the indenture dated as of December 7, 2006 among West Trade Funding CDO II Ltd., as issuer, West Trade Funding CDO II LLC, as co-issuer, and Wells Fargo Bank, National Association, as trustee (the "West Trade II Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise Voting Rights solely in the accordance with the written instructions of the Trust.  It was the intent and agreement of the parties that the Voting Rights include, but not be limited to, the right to vote or direct the voting of, or to withhold instructions or consents with respect to, 100% of the outstanding principal amount of the Class A-1 Notes.

According to publicly available information obtained from Standard & Poor's website, subsequent to entering into the Swap Agreements, MBIA Inc. or its affiliates (collectively, "MBIA") provided credit protection on notes issued pursuant to the West Trade II Indenture and, as represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt obligation ("CDO") notes.  In public statements made on January 31, 2008, MBIA also represented that it is the "sole controlling party" in all of the CDOs in which it participates.  In combination with the information from the websites of Standard & Poor's and MBIA, these

02/22/2008 12:13 FAX   2124783579                                    @013/015

recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates February 22, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies available to it in law or in equity with respect to MLI's conduct in connection with the Swap Agreements, including without limitation MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the West Trade II Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 138

By: _____
Name:  Susan Comparato
Title:  General Counsel

# Exhibit 1B

02/22/2008 12:13 FAX  2124783579                                      ☑010/015

To:         Merrill Lynch International ("MLI" or "Party A")
2 King Edward Street
London EC1A 1HQ
Attention: Manager, Fixed Income Settlements
Facsimile: +44 207 867 2004
Telephone: +44 207 867 3769

Merrill Lynch & Co.
4 World Financial Center
18th Floor
New York, NY 10080
Attention: Global Credit Derivatives
Facsimile: (212) 449-9054
Telephone: (212) 449-9001

From:     XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 153 (the "Trust" or "Party B")

Date:     February 22, 2008

Re:      Credit Derivative Transaction relating to Silver Marlin CDO I Ltd. — Reference 07ML39487A

Reference is made to (i) the ISDA Master Agreement dated as of April 11, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of April 11, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date of March 26, 2007 (the "Confirmation") (collectively, the "Swap Agreements"). Capitalized terms used but not defined herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall have the meanings given to such terms in the indenture dated as of March 29, 2007 among Silver Marlin CDO I Ltd., as issuer, Silver Marlin CDO I LLC, as co-issuer, and Wells Fargo Bank, National Association, as trustee (the "Silver Marlin Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise Voting Rights solely in the accordance with the written instructions of the Trust. It was the intent and agreement of the parties that the Voting Rights include, but not be limited to, the right to vote or direct the voting of, or to withhold instructions or consents with respect to, 100% of the outstanding principal amount of the Class A-1 Notes.

According to publicly available information obtained from Standard & Poor's website, subsequent to entering into the Swap Agreements, MBIA Inc. or its affiliates (collectively, "MBIA") provided credit protection on notes issued pursuant to the Silver Marlin Indenture and, as represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt obligation ("CDO") notes. In public statements made on January 31, 2008, MBIA also represented that it is the "sole controlling party" in all of the CDOs in which it participates. In combination with the information from the websites of Standard & Poor's and MBIA, these

recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates February 22, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies available to it in law or in equity with respect to MLI's conduct in connection with the Swap Agreements, including without limitation MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the Silver Marlin Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 153

By: _____
Name: Susan Comparato
Title: General Counsel

# Exhibit 1C

02/22/2008 12:11 FAX  2124783579                                    ☒ 002/015

To:        Merrill Lynch International ("MLI" or "Party A")
           2 King Edward Street
           London EC1A 1HQ
           Attention: Manager, Fixed Income Settlements
           Facsimile: +44 207 867 2004
           Telephone: +44 207 867 3769

           Merrill Lynch & Co.
           4 World Financial Center
           18th Floor
           New York, NY 10080
           Attention: Global Credit Derivatives
           Facsimile: (212) 449-9054
           Telephone: (212) 449-9001

From:      XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 164 (the
           "Trust" or "Party B")

Date:      February 22, 2008

Re:        Credit Derivative Transaction relating to Tazlina Funding CDO II. Ltd. —
           Reference 07ML61441A


Reference is made to (i) the ISDA Master Agreement dated as of May 30, 2007 (the "Master
Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of May 30, 2007 (the
"Schedule"); and (iii) the Confirmation having a trade date of May 30, 2007 (the
"Confirmation") (collectively, the "Swap Agreements").  Capitalized terms used but not defined
herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall
have the meanings given to such terms in the indenture dated as of May 10, 2007 among Tazlina
Funding CDO II, Ltd., as issuer, Tazlina Funding CDO II, LLC, as co-issuer, and Wells Fargo
Bank, National Association, as trustee (the "Tazlina II Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise
Voting Rights solely in the accordance with the written instructions of the Trust. The Voting
Rights include, but are not limited to, the right to vote or direct the voting of, or to withhold
instructions or consents with respect to, 100% of the outstanding principal amount of the Class
A-1 Notes.

According to publicly available information obtained from Standard & Poor's website,
subsequent to entering into the Swap Agreements, MBIA Inc. or its affiliates (collectively,
"MBIA") provided credit protection on notes issued pursuant to the Tazlina II Indenture and, as
represented on MBIA's website. MBIA always wraps the senior most class of collateralized debt
obligation ("CDO") notes. In public statements made on January 31, 2008, MBIA also
represented that it is the "sole controlling party" in all of the CDOs in which it participates. In
combination with the information from the websites of Standard & Poor's and MBIA, these

recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates February 22, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies available to it in law or in equity with respect to MLI's conduct in connection with the Swap Agreements, including without limitation MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the Tazlina II Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 164

By: _____
Name: Susan Comparato
Title: General Counsel

# Exhibit 1D

02/22/2008 12:12 FAX  2124783579                                    ☎006/015

| | |
|---|---|
| To: | Merrill Lynch International ("MLI" or "Party A") |
| | 2 King Edward Street |
| | London EC1A 1HQ |
| | Attention: Manager, Fixed Income Settlements |
| | Facsimile: +44 207 867 2004 |
| | Telephone: +44 207 867 3769 |
| | |
| | Merrill Lynch & Co. |
| | 4 World Financial Center |
| | 18th Floor |
| | New York, NY 10080 |
| | Attention: Global Credit Derivatives |
| | Facsimile: (212) 449-9054 |
| | Telephone: (212) 449-9001 |
| | |
| From: | XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 165 (the "Trust" or "Party B") |
| | |
| Date: | February 22, 2008 |
| | |
| Re: | Credit Derivative Transaction relating to West Trade Funding CDO III Ltd. — Reference 07ML61446A |

Reference is made to (i) the ISDA Master Agreement dated as of June 4, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of June 4, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date of June 4, 2007 (the "Confirmation") (collectively, the "Swap Agreements"). Capitalized terms used but not defined herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall have the meanings given to such terms in the indenture dated as of June 4, 2007 among West Trade Funding CDO III Ltd., as issuer, West Trade Funding CDO III LLC, as co-issuer, and Wells Fargo Bank, National Association, as trustee (the "West Trade III Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise Voting Rights solely in the accordance with the written instructions of the Trust. The Voting Rights include, but are not limited to, the right to vote or direct the voting of, or to withhold instructions or consents with respect to, 100% of the outstanding principal amount of the Class A-1 Notes.

According to publicly available information obtained from Standard & Poor's website, subsequent to entering into the Swap Agreements, MBIA Inc. or its affiliates (collectively, "MBIA") provided credit protection on notes issued pursuant to the West Trade III Indenture and, as represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt obligation ("CDO") notes. In public statements made on January 31, 2008, MBIA also represented that it is the "sole controlling party" in all of the CDOs in which it participates. In combination with the information from the websites of Standard & Poor's and

02/22/2008 12:12 FAX  2124783579                                                    ☑007/015

MBIA, these recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates February 22, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies available to it in law or in equity with respect to MLI's conduct in connection with the Swap Agreements, including without limitation MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the West Trade III Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 165

By: _____
Name:  Susan Comparato
Title:  General Counsel

o1203/2393705.1

# Exhibit 1E

02/22/2008 12:12 FAX  2124783579                                              ☒008·015

To:     Merrill Lynch International ("MLI" or "Party A")
        2 King Edward Street
        London EC1A 1HQ
        Attention: Manager, Fixed Income Settlements
        Facsimile: +44 207 867 2004
        Telephone: +44 207 867 3769

        Merrill Lynch & Co.
        4 World Financial Center
        18th Floor
        New York, NY 10080
        Attention: Global Credit Derivatives
        Facsimile: (212) 449-9054
        Telephone: (212) 449-9001

From:   XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 172 (the
        "Trust" or "Party B")

Date:   February 22, 2008

Re:     Credit Derivative Transaction relating to Robeco High Grade CDO I, Ltd. —
        Reference 07ML64592A

Reference is made to (i) the ISDA Master Agreement dated as of June 29, 2007 (the "Master
Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of June 29, 2007 (the
"Schedule"); and (iii) the Confirmation having a trade date of June 29, 2007 (the
"Confirmation") (collectively, the "Swap Agreements").  Capitalized terms used but not defined
herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall
have the meanings given to such terms in the indenture dated as of June 1, 2007 among Robeco
High Grade CDO I, Ltd., as issuer, Robeco High Grade CDO I, LLC, as co-issuer, and LaSalle
Bank National Association, as trustee (the "Robeco Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise
Voting Rights solely in the accordance with the written instructions of the Trust.  The Voting
Rights include, but are not limited to, the right to vote or direct the voting of, or to withhold
instructions or consents with respect to, 100% of the outstanding principal amount of the Class
A-1 Notes.

According to publicly available information obtained from Standard & Poor's website,
subsequent to entering into the Swap Agreements, MBIA Inc. or its affiliates (collectively,
"MBIA") provided credit protection on notes issued pursuant to the Robeco Indenture and, as
represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt
obligation ("CDO") notes.  In public statements made on January 31, 2008, MBIA also
represented that it is the "sole controlling party" in all of the CDOs in which it participates.  In
combination with the information from the websites of Standard & Poor's and MBIA, these

recent public statements by MBIA evidence that MLI agreed to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates February 22, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies available to it in law or in equity with respect to MLI's conduct in connection with the Swap Agreements, including without limitation MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the Robeco Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 172

By: _____
Name: Susan Comparato
Title: General Counsel

# Exhibit 1F

To:          Merrill Lynch International ("MLI" or "Party A")
2 King Edward Street
London EC1A 1HQ
Attention: Manager, Fixed Income Settlements
Facsimile: +44 207 867 2004
Telephone: +44 207 867 3769

Merrill Lynch & Co.
4 World Financial Center
18th Floor
New York, NY 10080
Attention: Global Credit Derivatives
Facsimile: (212) 449-9054
Telephone: (212) 449-9001

From:     XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 186 (the "Trust" or "Party B")

Date:      February 22, 2008

Re:        Credit Derivative Transaction relating to Biltmore CDO 2007-1, Ltd. — Reference 07ML103267A

Reference is made to (i) the ISDA Master Agreement dated as of August 10, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of August 10, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date of August 10, 2007 (the "Confirmation") (collectively, the "Swap Agreements"). Capitalized terms used but not defined herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall have the meanings given to such terms in the indenture dated as of July 26, 2007 among Biltmore CDO 2007-1, Ltd., as issuer, Biltmore CDO 2007-1, LLC, as co-issuer, and LaSalle Bank National Association, as trustee (the "Biltmore Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise Voting Rights solely in the accordance with the written instructions of the Trust. The Voting Rights include, but are not limited to, the right to vote or direct the voting of, or to withhold instructions or consents with respect to, 100% of the outstanding principal amount of the Class A-1 Notes.

According to publicly available information obtained from Standard & Poor's website, subsequent to entering into the Swap Agreements, MBIA Inc. or its affiliates (collectively, "MBIA") provided credit protection on notes issued pursuant to the Biltmore Indenture and, as represented on MBIA's website, MBIA always wraps the senior most class of collateralized debt obligation ("CDO") notes. In public statements made on January 31, 2008, MBIA also represented that it is the "sole controlling party" in all of the CDOs in which it participates. In combination with the information from the websites of Standard & Poor's and MBIA, these

61200/2360732.1

02/22/2008 12:12 FAX  2124783579                                    ℓ005/015

recent public statements by MBIA evidence that MLI agreed to exercise voting rights with
respect to the outstanding principal amount of the Class A-1 Notes in accordance with the
instructions of MBIA.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the
Class A-1 Notes in accordance with the instructions of MBIA, MLI repudiated its contractual
obligations to the Trust, including its commitment to exercise the Voting Rights solely in
accordance with the written instructions of the Trust. MLI's repudiation of its contractual
obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the
Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely
in accordance with the written instructions of the Trust is an Additional Termination Event under
Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual
obligations to the Trust to be final and it is exercising its rights to terminate the Swap
Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates
February 22, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to
that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies
available to it in law or in equity with respect to MLI's conduct in connection with the Swap
Agreements, including without limitation MLI's failure to disclose material information
regarding the collateral underlying the notes issued pursuant to the Biltmore Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 186

By: _____
Name: Susan Comparato
Title: General Counsel

( I268/2390732 )

# Exhibit 1G

02/22/2008 12:13 FAX  2124783579                                              ☒014/015

*Via Facsimile and Hand Delivery*

February 22, 2008

Merrill Lynch International
2 King Edward Street
London EC1A 1HQ
Attention: Manager, Fixed Income Settlements
Facsimile: +44 207 867 2004
Telephone: +44 207 867 3769

Merrill Lynch & Co.
4 World Financial Center
18th Floor
New York, NY 10080
Attention: Global Credit Derivatives
Facsimile: (212) 449-9054
Telephone: (212) 449-9001

Re:          Credit Derivative Transaction relating to Jupiter High-Grade CDO VI, Ltd.

Dear Sir or Madam:

This letter is in regard to the above-referenced credit derivative transaction (the "Jupiter VI Transaction") between Merrill Lynch International ("MLI") and Portfolio CDS Trust 170 (the "Trust"). Reference is made to (i) the ISDA Master Agreement dated as of June 15, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of June 15, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date of June 15, 2007 (the "Confirmation") (collectively, the "Swap Agreements"). Capitalized terms used but not defined herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall have the meanings given to such terms in the indenture dated as of May 3, 2007 among Jupiter High-Grade CDO VI, Ltd., as issuer, Jupiter High-Grade CDO VI, LLC, as co-issuer, and Wells Fargo Bank, National Association, as trustee (the "Jupiter VI Indenture").

Information recently came to the attention of the XL Capital Assurance Inc. ("XLCA") indicating that MLI repudiated its contractual obligations under numerous credit derivative transactions with trusts for which XLCA is attorney-in-fact. These repudiations involved MLI having agreed to follow the instructions of a third party with respect to the voting of certain collateralized debt obligation ("CDO") notes in derogation of its previous agreement to follow the instructions of the trusts affiliated with XLCA with respect to the voting of the same notes. XLCA has issued termination notices to MLI in respect of each of these other transactions.

The information that came to the attention of XLCA did not involve the Jupiter VI Transaction. With respect to the Jupiter VI Transaction, the Reference Obligation is the Class A-2 Notes issued pursuant to the Jupiter VI Indenture. However, the Voting Rights include the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to *both* the

Class A-2 Notes *and* the Class A-1 Notes. *See* Confirmation at § 6. These voting rights were a fundamental term of the Jupiter VI Transaction.

In light of MLI's repudiation of its voting right obligations with respect to other transactions, XLCA hereby requests that MLI confirm that it did not, at any time, enter into any understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture. XLCA, as attorney-in-fact for the Trust, further notifies MLI that it considers any such contractual commitment by MLI to exercise voting rights of the Class A-2 Notes or Class A-1 Notes in accordance with instructions of a third party to have constituted a repudiation of MLI's contractual obligations under the Jupiter VI Transaction to exercise the Voting Rights thereunder "solely in accordance with the written instructions of [the Trust]." Confirmation at § 6. XLCA further considers any repudiation by MLI of its obligations to solely follow the instructions of the Trust with regard to Voting Rights under the Jupiter VI Transaction to be final, entitling the Trust to terminate the Jupiter VI Transaction under Sections 5 and 6 of the Master Agreement.

In order that XLCA may proceed accordingly on behalf of the Trust, it requests that MLI provide the requested confirmation within 3 days of the date hereof. XLCA reserves the right to treat any failure by MLI to provide the requested confirmation within the time requested as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party in repudiation of its contractual commitment to the Trust.

This letter is without prejudice to the Trust's rights and ability to pursue any remedies available to it in law or in equity with respect to other conduct by MLI in connection with the Jupiter Transaction, including without limitation, MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the Jupiter VI Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 170

By: _____
Name: Susan Comparato
Title: General Counsel

61266/2387249 1

# Exhibit 2A

# MERRILL LYNCH INTERNATIONAL

February 29, 2008

**HAND DELIVERY, FAX & EMAIL**

To:    XLCA Admin LLC/as Trustee for Portfolio CDS Trust 138
1221 Avenue of the Americas
New York, New York 10020-1001
Attention: Surveillance (Policy No. CA03540A)

Facsimile No.: (212) 478-3597

Re: **Credit Derivative Transaction relating to West Trade Funding CDO II Ltd.–Reference 06ML82006A**

Reference is made to (i) the ISDA Master Agreement dated as of January 25, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dated as of January 25, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date as of January 25, 2007 (the "Confirmation", the Confirmation, the Schedule and the Master Agreement, collectively, the "Swap Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Swap Agreement or if not defined therein, shall have the meanings give to such terms in the indenture dated as of December 7, 2006 between West Trade Funding CDO II Ltd., as Issuer, West Trade Funding CDO II LLC, as Co-Issuer and Wells Fargo Bank, National Association, as trustee (the "West Trade II Indenture").

We are in receipt of your letter dated February 22, 2008. As referenced in your letter, Section 6 of the Confirmation provides for an Additional Termination Event upon "(ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B  or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B." Merrill Lynch has neither failed to exercise Voting Rights as directed by Portfolio CDS Trust 138 nor exercised any Retained Rights without the consent of Portfolio CDS Trust 138. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force.

With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law.

Nothing in this letter shall be construed as a waiver of any of our rights and remedies under the Swap Agreement or under applicable law and we hereby expressly reserve all such rights and remedies.

Very truly yours,

MERRILL LYNCH INTERNATIONAL

By: _____

Name:

Title:       **Richard Atkinson**
             **Authorised Signatory**

# Exhibit 2B

# MERRILL LYNCH INTERNATIONAL

February 29, 2008

**HAND DELIVERY, FAX & EMAIL**

To:    XLCA Admin LLC/as Trustee for Portfolio CDS Trust 153
        1221 Avenue of the Americas
        New York, New York 10020-1001
        Attention: Surveillance (Policy No. CA03678A)

Facsimile No.:  (212) 478-3597

**Re: Credit Derivative Transaction relating to Silver Marlin CDO I Ltd.-Reference 07ML39487A**

Reference is made to (i) the ISDA Master Agreement dated as of April 11, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dated as of April 11, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date as of April 11, 2007 (the "Confirmation", the Confirmation, the Schedule and the Master Agreement, collectively, the "Swap Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Swap Agreement or if not defined therein, shall have the meanings give to such terms in the indenture dated as of March 29, 2007 between Silver Marlin CDO I Ltd., as Issuer, Silver Marlin CDO I LLC, as Co-Issuer and Wells Fargo Bank, National Association, as trustee (the "Silver Marlin Indenture").

We are in receipt of your letter dated February 22, 2008. As referenced in your letter, Section 6 of the Confirmation provides for an Additional Termination Event upon "(ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B." Merrill Lynch has neither failed to exercise Voting Rights as directed by Portfolio CDS Trust 153 nor exercised any Retained Rights without the consent of Portfolio CDS Trust 153. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force.

With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law.

Nothing in this letter shall be construed as a waiver of any of our rights and remedies under the Swap Agreement or under applicable law and we hereby expressly reserve all such rights and remedies.

Very truly yours,

MERRILL LYNCH INTERNATIONAL

By: _____
Name:
Title:

Richard Atkinson
Authorised Signatory

# Exhibit 2C

# MERRILL LYNCH INTERNATIONAL

February 29, 2008

## HAND DELIVERY, FAX & EMAIL

To:     XLCA Admin LLC/as Trustee for Portfolio CDS Trust 164
1221 Avenue of the Americas
New York, New York 10020-1001
Attention: Surveillance (Policy No. CA03765A)

Facsimile No.:  (212) 478-3597

Re: Credit Derivative Transaction relating to Tazlina Funding CDO II, Ltd.-Reference 07ML61441A

Reference is made to (i) the ISDA Master Agreement dated as of May 30, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dated as of May 30, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date as of May 30, 2007 (the "Confirmation", the Confirmation, the Schedule and the Master Agreement, collectively, the "Swap Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Swap Agreement or if not defined therein, shall have the meanings give to such terms in the indenture dated as of May 10, 2007 between Tazlina Funding CDO II, Ltd., as Issuer, Tazlina Funding CDO II, LLC, as Co-Issuer and Wells Fargo Bank National Association, as trustee (the "Tazlina Indenture").

We are in receipt of your letter dated February 22, 2008. As referenced in your letter, Section 6 of the Confirmation provides for an Additional Termination Event upon "(ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B  or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B." Merrill Lynch has neither failed to exercise Voting Rights as directed by Portfolio CDS Trust 164 nor exercised any Retained Rights without the consent of Portfolio CDS Trust 164. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force.

With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law.

Nothing in this letter shall be construed as a waiver of any of our rights and remedies under the Swap Agreement or under applicable law and we hereby expressly reserve all such rights and remedies.

Very truly yours,

MERRILL LYNCH INTERNATIONAL

By:
Name:
Title:

Richard Atkinson
Authorised Signatory

# Exhibit 2D

# MERRILL LYNCH INTERNATIONAL

February 29, 2008

**HAND DELIVERY, FAX & EMAIL**

To:    XLCA Admin LLC/as Trustee for Portfolio CDS Trust 165
       1221 Avenue of the Americas
       New York, New York 10020-1001
       Attention: Surveillance (Policy No. CA03803A)

Facsimile No.:  (212) 478-3597

Re: **Credit Derivative Transaction relating to West Trade Funding CDO III Ltd.-Reference 07ML61446A**

Reference is made to (i) the ISDA Master Agreement dated as of June 4, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dated as of June 4, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date as of June 4, 2007 (the "Confirmation", the Confirmation, the Schedule and the Master Agreement, collectively, the "Swap Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Swap Agreement or if not defined therein, shall have the meanings give to such terms in the indenture dated as of June 4, 2007 between West Trade Funding CDO III, Ltd., as Issuer, West Trade Funding CDO III LLC, as Co-Issuer and Wells Fargo Bank National Association, as trustee (the "West Trade III Indenture").

We are in receipt of your letter dated February 22, 2008. As referenced in your letter, Section 6 of the Confirmation provides for an Additional Termination Event upon "(ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B  or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B." Merrill Lynch has neither failed to exercise Voting Rights as directed by Portfolio CDS Trust 165 nor exercised any Retained Rights without the consent of Portfolio CDS Trust 165. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force.

With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law.

Nothing in this letter shall be construed as a waiver of any of our rights and remedies under the Swap Agreement or under applicable law and we hereby expressly reserve all such rights and remedies.

Very truly yours,

MERRILL LYNCH INTERNATIONAL

By: _____

Name:
Title:    **Richard Atkinson**
          **Authorised Signatory**

# Exhibit 2E

# MERRILL LYNCH INTERNATIONAL

February 29, 2008

## HAND DELIVERY, FAX & EMAIL

To:    XLCA Admin LLC/as Trustee for Portfolio CDS Trust 172
        1221 Avenue of the Americas
        New York, New York 10020-1001
        Attention: Surveillance (Policy No. CA03865A)

Facsimile No.: (212) 478-3597

### Re: Credit Derivative Transaction relating to Robeco High Grade CDO I, Ltd.–Reference 07ML64592A

Reference is made to (i) the ISDA Master Agreement dated as of June 29, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dated as of June 29, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date as of June 29, 2007 (the "Confirmation", the Confirmation, the Schedule and the Master Agreement, collectively, the "Swap Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Swap Agreement or if not defined therein, shall have the meanings give to such terms in the indenture dated as of June 1, 2007 between Robeco High Grade CDO I, Ltd., as Issuer, Robeco High Grade CDO I, LLC, as Co-Issuer and LaSalle Bank National Association, as trustee (the "Robeco Indenture").

We are in receipt of your letter dated February 22, 2008. As referenced in your letter, Section 6 of the Confirmation provides for an Additional Termination Event upon "(ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B." Merrill Lynch has neither failed to exercise Voting Rights as directed by Portfolio CDS Trust 172 nor exercised any Retained Rights without the consent of Portfolio CDS Trust 172. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force.

With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law.

Nothing in this letter shall be construed as a waiver of any of our rights and remedies under the Swap Agreement or under applicable law and we hereby expressly reserve all such rights and remedies.

Very truly yours,

MERRILL LYNCH INTERNATIONAL

By: _____

Name:

Title:      **Richard Atkinson**
            **Authorised Signatory**

# Exhibit 2F

# MERRILL LYNCH INTERNATIONAL

February 29, 2008

**HAND DELIVERY, FAX & EMAIL**

To:    XLCA Admin LLC/as Trustee for Portfolio CDS Trust 186
       1221 Avenue of the Americas
       New York, New York 10020-1001
       Attention: Surveillance (Policy No. CA03963A)

Facsimile No.:   (212) 478-3597

**Re: Credit Derivative Transaction relating to Biltmore CDO 2007-1-Reference
07ML103267A**

Reference is made to (i) the ISDA Master Agreement dated as of August 10, 2007 (the "Master Agreement"); (ii) the Schedule to the ISDA Master Agreement dated as of August 10, 2007 (the "Schedule"); and (iii) the Confirmation having a trade date as of August 10, 2007 (the "Confirmation", the Confirmation, the Schedule and the Master Agreement, collectively, the "Swap Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Swap Agreement or if not defined therein, shall have the meanings give to such terms in the indenture dated as of July 26, 2007 between Biltmore CDO 2007-1, Ltd., as Issuer, Biltmore CDO 2007-1, LLC, as Co-Issuer and LaSalle Bank National Association, as trustee (the "Biltmore Indenture").

We are in receipt of your letter dated February 22, 2008. As referenced in your letter, Section 6 of the Confirmation provides for an Additional Termination Event upon "(ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B." Merrill Lynch has neither failed to exercise Voting Rights as directed by Portfolio CDS Trust 186 nor exercised any Retained Rights without the consent of Portfolio CDS Trust 186. In fact, your notice purporting to designate an Early Termination Date does not actually allege that either such action has occurred. As no actions that would give rise to an Additional Termination Event have occurred, your notice is ineffective and without force.

With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you. Accordingly, your conclusion that Merrill Lynch has repudiated its contracts with you is incorrect as a matter of fact and law.

Nothing in this letter shall be construed as a waiver of any of our rights and remedies under the Swap Agreement or under applicable law and we hereby expressly reserve all such rights and remedies.

Very truly yours,

MERRILL LYNCH INTERNATIONAL

By: _____

Name:

Title:

**Richard Atkinson
Authorised Signatory**

# Exhibit 3

To:        Merrill Lynch International ("MLI" or "Party A")
           2 King Edward Street
           London EC1A 1HQ
           Attention: Manager, Fixed Income Settlements
           Facsimile: +44 207 867 2004
           Telephone: +44 207 867 3769

           Merrill Lynch & Co.
           4 World Financial Center
           18th Floor
           New York, NY 10080
           Attention: Global Credit Derivatives
           Facsimile: (212) 449-9054
           Telephone: (212) 449-9001

From:      XL Capital Assurance Inc., as attorney-in-fact for Portfolio CDS Trust 170 (the
           "Trust" or "Party B")

Date:      March 6, 2008

Re:        Credit Derivative Transaction relating to Jupiter High-Grade CDO VI, Ltd.


Reference is made to (i) the ISDA Master Agreement dated as of June 15, 2007 (the "Master
Agreement"); (ii) the Schedule to the ISDA Master Agreement dates as of June 15, 2007 (the
"Schedule"); and (iii) the Confirmation having a trade date of June 15, 2007 (the
"Confirmation") (collectively, the "Swap Agreements"). Capitalized terms used but not defined
herein shall have the meaning set forth in the Swap Agreements or if not defined therein, shall
have the meanings given to such terms in the indenture dated as of May 3, 2007 among Jupiter
High-Grade CDO VI, Ltd., as issuer, Jupiter High-Grade CDO VI, LLC, as co-issuer, and Wells
Fargo Bank, National Association, as trustee (the "Jupiter VI Indenture").

Under the Swap Agreements, pursuant to Section 6 of the Confirmation, MLI agreed to exercise
Voting Rights solely in accordance with the written instructions of the Trust. The Voting Rights
include, but are not limited to, the right to vote or direct the voting of, or to withhold instructions
or consents with respect to, 100% of the outstanding principal amount of the Class A-1 Notes.

In our writing of February 22, 2008 we informed you of information that recently came to the
attention of XL Capital Assurance ("XLCA") indicating that MLI repudiated its contractual
obligations under numerous credit derivative transactions with trusts for which XLCA is
attorney-in-fact by entering into conflicting contractual agreements granting control over the
subject voting rights to MBIA, Inc. While this information did not involve the Jupiter VI
transaction, we requested that MLI confirm that it did not, at any time, enter into any similar
understanding or agreement to follow the instructions of any third party with respect to the
voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI
Indenture. We further informed MLI that XLCA would deem MLI's failure to provide the

requested confirmation within three days as evidence of its having accorded Voting Rights under the Jupiter VI Transactions to a third party in repudiation of its contractual commitment to the Trust.

As of this writing, XLCA has not received the requested confirmation and deems MLI's silence as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party.

By agreeing to exercise voting rights with respect to the outstanding principal amount of the Class A-1 Notes and/or Class A-2 Notes in accordance with the instructions of a third party, MLI repudiated its contractual obligations to the Trust, including its commitment to exercise the Voting Rights solely in accordance with the written instructions of the Trust. MLI's repudiation of its contractual obligations to the Trust entitles the Trust to exercise its termination rights under Section 6 of the Master Agreement because, among other reasons, MLI's failure to exercise Voting Rights solely in accordance with the written instructions of the Trust is an Additional Termination Event under Section 5(b)(v) of the Master Agreement and Section 6 of the Confirmation.

The Trust hereby provides notice to MLI that it considers MLI's repudiation of its contractual obligations to the Trust to be final and it is exercising its rights to terminate the Swap Agreements pursuant to Section 6 of the Master Agreement. The Trust hereby designates March 6, 2008 as the Early Termination Date. XL Capital Assurance Inc. hereby consents to that designation.

This notice is without prejudice to the Trust's right and ability to pursue any additional remedies available to it in law or in equity with respect to MLI's conduct in connection with the Swap Agreements, including without limitation MLI's failure to disclose material information regarding the collateral underlying the notes issued pursuant to the Jupiter VI Indenture.

Sincerely,

XL Capital Assurance Inc.,
as attorney-in-fact for Portfolio CDS Trust 170

By: _____
Name:  Susan Comparato
Title:  General Counsel

61200/2415299.1

# Exhibit 4

quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
(212) 849-7115

WRITER'S INTERNET ADDRESS
jonpickhardt@quinnemanuel.com

March 7, 2008

<u>VIA E-MAIL AND HAND DELIVERY</u>

Mr. John McGreevy, Esq.
Director and Senior Counsel
Merrill Lynch & Co.
4 World Financial Center
New York, New York  10080

Re:    **Credit Derivative Transactions relating to Biltmore CDO 2007-1, Ltd., Robeco High
       Grade CDO I, Ltd., Silver Marlin CDO I Ltd., Tazlina Funding CDO II, Ltd., West
       Trade Funding CDO II Ltd., West Trade Funding CDO III Ltd., and Jupiter High-
       Grade CDO VI, Ltd.**

Dear Mr. McGreevy:

Our firm has been retained by XL Capital Assurance Inc. ("XLCA") in connection with the
above referenced transactions (the "Trades") between XLCA and Merrill Lynch International
("MLI").  We write in response to the correspondence from Mr. Richard Atkinson on behalf of
Merrill Lynch International ("MLI"), dated February 29, 2008, concerning XLCA's February 22,
2008 notices terminating the credit derivative transactions relating to Biltmore CDO 2007-1,
Ltd., Robeco High Grade CDO I, Ltd., Silver Marlin CDO I Ltd., Tazlina Funding CDO II, Ltd.,
West Trade Funding CDO II Ltd., and West Trade Funding CDO III Ltd. (the "February 22
Terminated Trades").

As you are aware, XLCA terminated the February 22 Terminated Trades on the basis of publicly
available information indicating that, despite MLI having agreed under the Trades to "exercise
any Voting Rights ... solely in accordance with the written instructions of [an XLCA affiliated
trust]," it subsequently entered into contracts with MBIA, Inc. ("MBIA") under which it agreed
to exercise certain Voting Rights under the February 22 Terminated Trades in accordance with
the instructions of MBIA.  Most notably, Mr. Atkinson's letters do not deny that MLI entered
into such conflicting agreements with MBIA.  Instead, Mr. Atkinson's letters assert two other

quinn emanuel urquhart oliver & hedges, llp

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

61200/2427108.1

grounds for challenging the effectiveness of XLCA's terminations. Neither is persuasive or legally sufficient.

First, Mr. Atkinson asserts the legally mistaken position that XLCA's terminations are premature since "Merrill Lynch has neither failed to exercise Voting Rights as directed by [an XLCA affiliated trust] nor exercised any Retained Rights without the consent of [an XLCA affiliated trust]." Under well established New York law, a party may terminate a bilateral contract immediately upon the other party's repudiation of its obligations, which can be demonstrated by any subsequent agreement that divests the repudiating party of its ability to ensure compliance with the contract in the future, even if no breach of such obligations has yet occurred. *See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 77-79 (1st Dep't 2002) (holding that software company's entering into an exclusive distribution agreement with a third party constituted a repudiation of the software company's preexisting contractual obligations to Mobil Oil thereby entitling Mobil Oil to terminate its contract with the software company despite no breach having yet occurred); *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 2005 WL 1863853 (S.D.N.Y. 2005) (describing as a "fundamental tenet of contract law" that "[a] party who ... repudiates a contract cannot enforce it, and the non-breaching party may declare the contract terminated"). MLI repudiated its obligations to exercise Voting Rights "solely" in accordance with the instructions of XLCA by entering into the conflicting agreements with MBIA. MLI's conduct constituted an Additional Termination Event and, on that ground and others, entitled XLCA to immediately exercise termination rights under the agreements, regardless of whether any Voting Rights had yet been exercised.

Second, Mr. Atkinson's letters assert that MLI did not repudiate its contracts with XLCA since "nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with [its] contracts with [XLCA]." Again, MLI ignores the relevant legal standard. The issue is not whether another agreement "would preclude" MLI from ever exercising Voting Rights in accordance with XLCA's instructions but is instead whether MLI entered into agreements with MBIA under which it contractually relinquished its ability to ensure compliance with its obligations to XLCA. *Computer Possibilities*, 301 A.D.2d at 78.

XLCA has therefore concluded, notwithstanding Mr. Atkinson's letters, that XLCA's terminations of the February 22 Terminated Trades were appropriate and effective on February 22, 2008 and so remain. In addition, on the basis of MLI's failure to respond to XLCA's letter of February 22, 2008 requesting confirmation that MLI has not similarly repudiated obligations under its credit default swap agreement with XLCA relating to Jupiter High-Grade CDO VI, Ltd. (the "Jupiter VI Transaction"), XLCA issued a termination notice to MLI in respect of that transaction on March 6, 2008. We believe that termination of the Jupiter VI Transaction to be similarly appropriate and effective.

Pursuant to Section 6 of the Confirmations for the each of the Trades, "[u]pon a termination of the Agreement following an Additional Termination Event . . . [MLI] shall pay [XLCA] the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule)." XLCA hereby provides notice to MLI that the amounts contemplated by these provisions are currently due and owing from MLI to XLCA in respect of the Trades. Based on

XLCA's current calculations, it has determined the amounts due from MLI to be no less than $28,000,000. Please confirm by March 11, 2008 that MLI agrees to satisfy its payment obligation of these amounts and any others that are due under these provisions and the date on which it will do so.

Sincerely,

Jonathan Pickhardt

cc:    Susan Comparato, Esq.

# Exhibit 5



John McGreevy
First Vice President
Global Sales and Trading Counsel Group

Office of General Counsel

4 World Financial Center
12th Floor
New York, New York 10080
212 449 1936 Direct
212 449 0265 Fax
john_mcgreevy@ml.com

March 10, 2008

**Via E-Mail and Hand Delivery**

Mr. Jonathan Pickhardt
Quinn Emanuel
51 Madison Avenue
22nd floor
New York, N.Y. 10010

Re:   **Credit Derivative Transactions relating to Biltmore CDO 2007-1., Robeco High Grade CDO I, Ltd., Silver Marlin CDO I Ltd., Tazlina Funding CDO II, Ltd., West Trade Funding CDO II Ltd., West Trade Funding CDO III Ltd., and Jupiter High-Grade CDO VI, Ltd.**

Dear Mr. Pickhardt:

Thank you for your letter of March 7 regarding the referenced credit derivative transactions between Merrill Lynch International and various affiliates of XL Capital Assurance, Inc. (collectively, "XLCA"). Simply stated, MLI can now and will at all times going forward exercise Voting Rights in accordance with the express terms of our contracts. Contrary to your letter, MLI has not entered into any contract that "divests [MLI] of its ability to ensure compliance with [its contracts with XLCA] in the future." Nor has MLI "contractually relinquished its ability" to vote as directed by XLCA.

To state it directly, MLI has performed all of its contractual obligations, including the payment of substantial premiums to XLCA, and has reiterated its ability and intent to perform all of its contractual obligations, contingent or otherwise, going forward. We trust that XLCA will honor its commitments as well. As stated in MLI's correspondence dated February 29, XLCA's attempts to designate an Early Termination Date are without foundation, force or effect. Please be assured that we will take all steps necessary to enforce XLCA's compliance with its obligations.

Very truly yours,

John McGreevy

c.c. Andrew Berry
Jon Eisenberg

# Exhibit 6



# FORM 8-K

## Security Capital Assurance Ltd - SCA

**Filed: March 14, 2008 (period: March 13, 2008)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

ITEM 2.02  RESULTS OF OPERATIONS AND FINANCIAL CONDITION

ITEM 7.01  REGULATION FD DISCLOSURE

ITEM 9.01  FINANCIAL STATEMENTS AND EXHIBITS.

SIGNATURES

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

---

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): March 13, 2008 (March 13, 2008)

---

**SECURITY CAPITAL ASSURANCE LTD**
(Exact name of registrant as specified in its charter)

---

| Bermuda | 001-32950 | Not applicable |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

A.S. Cooper Building, 26 Reid Street, 4th Floor, Hamilton, Bermuda HM 11
(Address of principal executive offices)

(441) 279-7450
(Registrant's telephone number, including area code)

Not Applicable
(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: Security Capital Ass, 8-K, March 14, 2008

ITEM 2.02 RESULTS OF OPERATIONS AND FINANCIAL CONDITION

See Item 7.01 below

## ITEM 7.01 REGULATION FD DISCLOSURE

On March 13, 2008, Security Capital Assurance Ltd ("SCA") issued a press release announcing its financial results for the three months and year ended December 31, 2007. As described in the press release, SCA will host a conference call for investors to discuss its financial results for the three months and year ended December 31, 2007 on March 14, 2008. A copy of the press release is attached as Exhibit 99.1 to this current report and incorporated by reference herein. SCA utilized certain non-GAAP financial measures in the press release that are detailed at the end of the press release.

This information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act"), except as shall be expressly set forth by specific reference in such a filing.

## ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS.

Exhibit 99.1 Press Release of SCA dated March 13, 2008.

Exhibit 99.1 shall not be deemed filed for purposes of Section 18 of the Exchange Act, nor shall it be deemed incorporated by reference in any filing under the Securities Act, except as shall be expressly set forth by specific reference in a filing.

2

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**SECURITY CAPITAL ASSURANCE LTD**
**(Registrant)**

Date  March 13, 2008

By:  /s/ Michael Rego

Name: Michael Rego

Title:  Executive Vice President

3

Source: Security Capital Ass, 8-K, March 14, 2008

Exhibit 99.1

# SECURITY CAPITAL ASSURANCE

**Security Capital Assurance Ltd**
A.S. Cooper Building
26 Reid Street, 4th Floor
Hamilton HM 11
Bermuda
(441) 279-7450

### SECURITY CAPITAL ASSURANCE REPORTS FOURTH QUARTER
### AND FULL-YEAR 2007 RESULTS

- Fourth quarter 2007 net loss of $1,197.9 million versus net income of $35.8 million in the fourth quarter of 2006. 2007 net loss of $1,224.5 million versus net income of $117.4 million in 2006;
- Total shareholder's equity of $427.1 million, common shareholders' equity $180.5 million, or $2.81 per share;
- Fourth quarter 2007 net operating cash flow of $79.1 million versus $133.8 million in the fourth quarter of 2006. 2007 operating cash flow of $285.5 million versus operating cash flow of $393.5 million in 2006;
- Fourth quarter 2007 non-cash, mark-to-market charge related to credit derivative exposures of $518.8 million;
- Fourth quarter 2007 net case loss reserve provisions associated with collateralized debt obligations of asset-backed securities ("CDO of ABS") of $651.5 million. Fourth quarter 2007 net case loss reserve provisions associated with home equity line of credit ("HELOC") and closed-end second lien ("CES") transactions of $37.2 million;
- SCA's board of directors elected not to declare either a quarterly dividend with respect to our common shares or a semi-annual dividend with respect to our Series A Perpetual Non- Cumulative Preference Shares (the "SCA Series A Preference Shares").

**Hamilton, Bermuda, March 13, 2008** – Security Capital Assurance Ltd (NYSE: SCA) ("SCA" or the "Company") today announced results for the three-month and full-year periods ended December 31, 2007. The net loss in the fourth quarter of 2007 was $1,197.9 million, or $18.67 per share, versus net income of $35.8 million, or $0.56 per share, in the fourth quarter of 2006. For the full-year 2007, the Company reported a net loss of $1,224.5 million, or $19.09 per share, versus net income of $117.4 million, or $2.18 per diluted share, for the full-year 2006. As of December 31, 2007, the Company had total shareholders' equity of $427.1 million and common shareholders' equity of $180.5 million, or $2.81 per share.

"The extraordinary and rapid deterioration in U.S. residential mortgage-related credits led us to incur record levels of case reserves in the fourth quarter of last year," said Paul S. Giordano, SCA's president and chief executive officer. "We are continuing to explore our strategic options to generate or raise capital and improve our ratings. In the interim, we are in the process of realigning our cost structure to reflect the current business conditions and have made the strategic decision to cease writing new business for a period of time to preserve capital."

Source: Security Capital Ass, 8-K, March 14, 2008

For the fourth quarter of 2007, the Company had an operating loss of $678.1 million, or $10.57 per share, compared to operating income of $37.1 million, or $0.58 per share for the fourth quarter of 2006. For the full-year 2007, the operating loss was $530.3 million, or $8.27 per share, compared to operating income of $141.9 million, or $2.64 per share, for the full-year 2006. The fourth quarter and full-year 2007 operating losses were primarily due to the $651.5 million net case loss provision associated with the CDO of ABS portfolio and the $37.2 million net case loss provision that was incurred during the fourth quarter for HELOC and CES transactions. The fourth quarter 2007 net case loss provisions totaling $9.5 million, associated with the Company's third party reinsurance business, also contributed to the operating loss.

Operating income (loss) is a non-GAAP measure that is calculated by taking net income available to common shareholders, as determined in accordance with GAAP, and excluding net realized gains (losses) on investments and net realized and unrealized gains (losses) on derivative financial instruments, after taxes. The reconciliation of non-GAAP measures can be found in the attachments at the end of this release.

The weighted average diluted number of shares used in the "per share" calculations was 64,169,788 for the fourth quarter and 64,150,375 for the year ended December 31, 2007. This compared to weighted average diluted shares of 64,237,292 for the fourth quarter and 53,718,326 for the year ended December 31, 2006. Weighted average diluted shares were higher for the full-year 2007 because SCA was a public company for the entire twelve months of 2007 compared to only five months in 2006.

**Mark-to-Market and Case Loss Provisions.** The net loss during the quarter was primarily due to a $518.8 million, or $8.09 per share, unrealized mark-to-market adjustment on financial guarantee obligations executed in credit derivative form, and additional net case loss provisions of $698.2 million, or $10.88 per share. The unrealized mark-to-market adjustment is attributable to significant changes in the estimated fair value of the Company's credit derivative exposures since the quarter ended September 30, 2007.

The following table summarizes the gross and net case loss provisions that were incurred by the Company during the fourth quarter of 2007:

| ($ in millions) | Q4 2007 Gross Case Loss Provision | | Q4 2007 Net Case Loss Provision | |
|---|---|---|---|---|
| CDO of ABS transactions | $ | 838.6 | $ | 651.5 |
| HELOC and CES transactions | $ | 216.7 | $ | 37.2 |
| 3rd Party Reinsurance transactions | $ | 9.5 | $ | 9.5 |
| **Total** | $ | **1,064.8** | $ | **698.2** |

2

Source: Security Capital Ass, 8-K, March 14, 2008

The gross case loss reserve provisions of $838.6 million, $651.5 million net of reinsurance, are related to thirteen of SCA's high grade multi-sector CDO of ABS transactions. Reinsurance from various subsidiaries of XL Capital Ltd ("XL") and other reinsurers with respect to these CDO of ABS transactions is expected to result in a $187.1 million recoverable. In addition, the Company recorded a gross case loss provision of $216.7 million relating to insured HELOC and CES transactions. Reinsurance from XL and other reinsurers with respect to these HELOC and CES transactions is expected to result in a $179.5 million recoverable, which would reduce this amount to a net loss provision of $37.2 million. The $9.5 million net case loss provision in the Company's third party reinsurance business represents a full-limit loss, and was associated with two related transactions in the international transportation sector.

**Cash Flow from Operations.** For the twelve months ended December 31, 2007, net cash flow from operations was $285.5 million compared to $393.5 million in the comparable twelve month period in 2006. The decline was driven by upfront insurance premiums received, which decreased by approximately $55.4 million for the full-year 2007 compared to the full-year 2006.

**Holding Company Liquidity.** As of December 31, 2007, our holding company parent, Security Capital Assurance Ltd, on a stand alone basis, had total assets of $434.1 million and total liabilities of $7.1 million. Cash and cash equivalents were $23.5 million while investments in subsidiaries were $409.5 million. Common and preference share dividends paid to shareholders were $13.5 million for 2007 versus $1.3 million for 2006. The increase in dividends was primarily due to the issuance of $250 million of the SCA Series A Preference Shares in April of 2007. Common dividends were also higher in 2007 versus 2006 because SCA paid four quarterly dividends in 2007 versus one quarterly dividend in 2006.

**Election Not to Declare Common and Preference Share Dividends.** SCA's board of directors elected not to declare either a quarterly dividend with respect to our common shares or a semi-annual dividend with respect to the SCA Series A Preference Shares. The Company expects that this election by the Company's board of directors will reduce cash outflow by approximately $9.9 million for the period ended March 31, 2008. Any future dividends will be subject to the discretion and approval of the board of directors, applicable law and regulatory requirements.

**Update on Recent Events**

**Ratings Actions.** During the fourth quarter of 2007, developments in the credit and mortgage markets had a material adverse impact on the insured portfolios and business, results of operations, and financial condition throughout the financial guarantee insurance industry, including SCA. As a result, the rating agencies have updated their analyses and ratings models

3

for the industry. Based on their revised analysis, the following actions were taken with respect to SCA and its subsidiaries, XL Capital Assurance Inc. ("XLCA") XL Capital Assurance (UK) Limited ("XLCA-UK") and XL Financial Assurance Ltd. ("XLFA").

On March 4, 2008, Moody's Investors Service ("Moody's") announced that it placed the "A3" (Negative outlook) insurance financial strength ("IFS") ratings of XLCA, XLCA-UK and XLFA on review for downgrade. Previously, on February 7, 2008, Moody's downgraded the IFS ratings of XLCA, XLCA-UK and XLFA from "Aaa" to "A3" (Negative Outlook). On February 25, 2008, Standard & Poor's ("S&P") downgraded the "AAA" financial strength, financial enhancement and issuer credit ratings of XLCA, XLFA and XLCA-UK to "A-" (CreditWatch with negative implications). On January 23, 2008, Fitch Ratings ("Fitch") downgraded the insurer financial strength ratings of XLCA, XLFA and XLCA-UK to "A" (Rating Watch Negative) from "AAA."

The Company's capital position has been determined by the rating agencies to be insufficient to maintain our historic triple-A ratings. We require additional capital, which may not be available or may be available only on unfavorable terms. The IFS ratings downgrades have, and will likely continue to have, material adverse effects on SCA's business, including that, at the current time, the Company has temporarily suspended writing substantially all new business.

**10-K Update.** In the Company's filing with the SEC on February 29, 2008 for an extension of the due date to file our 10-K, the Company indicated that SCA's independent auditors were evaluating whether their opinion on SCA's financial statements would include a "going concern" explanatory paragraph. The Company expects to file its Annual Report on Form 10-K on Monday, March 17, 2008.

SCA expects that the Company's independent auditors' opinion will not contain a going concern explanatory paragraph. The Company also expects that such opinion will be unqualified, but will include an explanatory paragraph highlighting the Company's decision to cease writing new business at the present time.

**Current Strategic Options and Plan.** As previously announced by the Company on March 3, 2008, as a result of recent developments, SCA retained Goldman Sachs & Co. as a financial advisor to assist the Company in evaluating strategic alternatives, including raising new capital, structuring reinsurance solutions and negotiating the commutation or restructuring of certain of SCA's financial guarantee obligations.

SCA has also engaged Rothschild, Inc. to assist the Company with a comprehensive review of all strategic options. The Company has been exploring various strategic options with our

4

Source: Security Capital Ass, 8-K, March 14, 2008

advisors and have been in consultation with our regulators and the rating agencies regarding the various strategies under consideration.

While SCA continues to evaluate the elements of the strategic plan with the Company's advisors and regulators, the key elements of the strategic plan primarily include the following:

- generating capital for rating agency purposes by not writing new business for a period of time pending clarification of SCA's strategic options;
- pursuing the commutation, restructuring or settlement of certain obligations insured or reinsured by us, particularly with the Company's CDO counterparties, in order to mitigate uncertainty around such exposure and generate capital for rating agency purposes;
- exploring the commutation, restructuring or settlement of ceded reinsurance or other arrangements for SCA's benefit to generate capital for rating agency purposes or improve the Company's liquidity position;
- seeking to raise new capital from third parties under more favorable conditions than exist at the present time; and
- examining ways to restructure the Company's business to facilitate the creation or raising of capital by the actions described above or by other means.

There can be no assurance that the Company's current strategic plan will not evolve or change over time, will be successfully implemented or will address the requirements of the rating agencies.

**Termination of Seven CDS Contracts.** On February 22, 2008 and March 6, 2008, the Company issued notices terminating seven Credit Default Swap ("CDS") contracts with a certain counterparty under which the Company had agreed to make payments to the counterparty on the occurrence of certain credit events pertaining to particular CDOs of ABS referenced in the agreements. The Company issued each of the termination notices on the basis of the counterparty's repudiation of certain contractual obligations under each of the agreements. The Company has been advised by the counterparty that it disputes the effectiveness of the terminations. The Company intends to vigorously enforce the terminations. The notional amount of the CDS contracts at December 31, 2007 aggregated $3.1 billion before reinsurance ($3.0 billion after reinsurance). For the year ended December 31, 2007, the Company recorded a charge of $632.3 million relating to these CDS contracts of which $204.9 million represents a net unrealized loss and is reflected in the Company's consolidated statement of operations in the section captioned "Net realized and unrealized losses on credit derivatives" and $427.4

5

Source: Security Capital Ass, 8-K, March 14, 2008

million represents the provision of case basis reserves for losses and loss adjustment expenses and is reflected in the Company's consolidated statement of operations in the section captioned, "Net losses and loss adjustment expenses."

Set forth below is a discussion of SCA's operating results for the three- and twelve-month periods ended December 31, 2007, compared to the same periods in 2006

**Adjusted Gross Premiums.** The Company has temporarily suspended writing substantially all new business. Accordingly, the description of adjusted gross premiums and premiums written is historical and is not indicative the Company's ability to generate similar results in the future.

SCA's adjusted gross premiums ("AGP"), as defined below, in the fourth quarter of 2007 declined 21% to $155.6 million from $197.2 million in the fourth quarter of 2006. During the fourth quarter of 2007, U.S. public finance AGP increased to $66.4 million, compared to $14.4 million in the fourth quarter of 2006. The increase was primarily due to strong premium generation associated with credit enhancing municipal transactions previously insured by other financial guarantors. The Company's top-five public finance transactions insured during the quarter generated AGP of $26.6 million. U.S. structured finance AGP declined by 79% to $23.1 million in the fourth quarter of 2007 from $107.6 million in the fourth quarter of 2006. SCA's structured finance volume declined significantly during the quarter due to general credit market conditions combined with the rating agency rating actions that began during the fourth quarter of 2007. These events led to significantly less liquidity in the structured markets during the fourth quarter of 2007 and continue to impact the market in 2008. Additionally, several large transactions that closed in the fourth quarter of 2006 in the global infrastructure, collateralized debt obligation and specialized risk sectors were not repeated in the fourth quarter of 2007. International AGP decreased 12% to $66.2 million in the fourth quarter of 2007 versus $75.2 million in the fourth quarter of 2006. This decrease was mostly due to the closing of several large transportation infrastructure and utility transactions in key markets abroad during the fourth quarter of 2006 that were not repeated in the fourth quarter of 2007. AGP for the twelve months ended December 31, 2007 was $549.1 million compared to $556.1 million in 2006, representing a decrease of 1% for the year. AGP in the primary insurance segment fell 7% to $478.6 million from $514.1 million while the reinsurance segment's AGP increased 68% to $70.5 million in 2007 up from $41.9 million in 2006. The increase in the reinsurance segment's AGP was primarily associated with international business growth.

AGP is a non-GAAP financial measure of new business production that is calculated by adding the sum of upfront premiums on business written during the period, installment premiums due on business written during the period, and expected future installment premiums on business

6

Source: Security Capital Ass, 8-K, March 14, 2008

written during the period discounted at 7%. Because AGP includes premiums due on future installment business written in the period, it allows management to measure business production for the period and compare such production to the production of prior periods on the same basis. The reconciliation of non-GAAP measures can be found in the attachments at the end of this release. Set forth below is a summary of AGP for the three- and twelve-month periods ended December 31, 2007 and 2006.

**Adjusted Gross Premiums**

| ($ in millions) | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
| | 2007 | 2006 | % Chg | 2007 | 2006 | % Chg |
|---|---|---|---|---|---|---|
| U.S. Public Finance | $ 66.4 | $ 14.4 | 361% | $ 156.4 | $ 142.2 | 10% |
| U.S. Structured Finance | 23.1 | 107.6 | -79% | 175.3 | 208.0 | -16% |
| International | 66.2 | 75.2 | -12% | 217.4 | 205.8 | 6% |
| Total AGP | $ 155.6 | $ 197.2 | -21% | $ 549.1 | $ 556.1 | -1% |

*Numbers may not add due to rounding

**Total Premiums Written and Net Premiums Written.** Total premiums written, which are comprised of gross premiums written and reinsurance premiums assumed, declined 31% to $91.9 million in the fourth quarter of 2007 versus $133.6 million in the fourth quarter of 2006. During 2007, total premiums written were $378.3 million, 8% lower than the premiums written during the year in 2006, which totaled $409.0 million. Total premiums written fell in the fourth quarter of 2007 primarily due to a decrease in "upfront" premium business derived from several large International transactions written during the fourth quarter of 2006, which were not repeated in the fourth quarter of 2007. Upfront premium transactions represented nearly 55% of total premiums written in the fourth quarter of 2007, versus approximately 78% in the fourth quarter of 2006.

Net premiums written, which comprise total premiums written less ceded premiums written, decreased 38% to $74.0 million in the fourth quarter of 2007 compared to $119.4 million in the fourth quarter of 2006. Net premiums written decreased 23% to $306.1 million in the twelve months ended December 31, 2007, compared to $395.9 million of net premiums written in the twelve months ended December 31, 2006.

**Net Premiums Earned.** Net premiums earned increased 29% in the fourth quarter of 2007 to $57.0 million compared to $44.3 million in the fourth quarter of 2006. Net premiums earned include accelerated premiums from refundings ("refunding premiums"). Refunding premiums increased 44% to $2.6 million in the fourth quarter of 2007, compared to $1.8 million in the fourth quarter of 2006. Core net premiums earned, a non-GAAP measure which excludes refunding premiums, increased 28% to $54.3 million in the fourth quarter of 2007 from $42.5

7

Source: Security Capital Ass, 8-K, March 14, 2008

million in the fourth quarter of 2006. The reconciliation of non-GAAP measures can be found in the attachments at the end of this release.

For the full-year ended December 31, 2007, net premiums earned increased 18% to $215.7 million compared to $183.1 million for the full-year ended December 31, 2006. Refunding premiums declined 46% to $14.7 million in 2007 compared to $27.4 million in 2006. There were two large refundings that occurred in the second quarter of 2006 that were not repeated in 2007. Core net premiums earned, which excludes refunding premiums, increased 29% to $201.0 million in 2007 from $155.7 million in the prior full-year period.

The increase in earned premiums was primarily due to the Company's larger back book of business in U.S. Public Finance and certain parts of Structured Finance in 2007 versus 2006. Earned premiums from the reinsurance segment also contributed to the increase in earned premiums. Set forth below is a summary of net premiums earned for the three- and twelvemonth periods ended December 31, 2007 and 2006:

**Net Premiums Earned**

| | Three Months Ended December 31, | | | | Twelve Months Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2007 | | 2006 | % Chg | | 2007 | | 2006 | % Chg |
| ($ in millions) | | | | | | | | | |
| U.S. Public Finance | $ | 16.5 | $ | 6.9 | 139% | $ | 54.5 | $ | 46.4 | 17% |
| U.S. Structured Finance | | 14.8 | | 17.8 | -17% | | 80.2 | | 70.2 | 14% |
| International | | 25.6 | | 19.6 | 31% | | 81.0 | | 66.5 | 22% |
| Total Net Premiums Earned | $ | 57.0 | $ | 44.3 | 29% | $ | 215.7 | $ | 183.1 | 18% |

* Numbers may not add due to rounding

**Net Losses and Loss Adjustment Expenses.** Net losses and loss adjustment expenses were $710.9 million in the fourth quarter of 2007, compared to $3.6 million in the fourth quarter of 2006. The increase was due to case loss provisioning which totaled $1,064.8 million gross, and $698.2 million net of reinsurance. The case loss provisions are associated with thirteen CDO of ABS transactions, five HELOC transactions and one CES transaction that experienced credit deterioration during the fourth quarter of 2007. There were also net case loss provisions associated with the Company's third party reinsurance business which totaled $9.5 million and was associated with two related reinsured international transportation securitizations. This $9.5 million net case loss provision represents a full-limit loss.

For the twelve months ended December 31, 2007, net losses and loss adjustment expenses were $720.5 million as compared to $15.0 million in the comparable 2006 period.

Through December 31, 2007, we paid claims aggregating $7.5 million on our guarantees of obligations supported by three HELOCs, $5.0 million of which relates to transactions for which

8

we have established a case basis reserve at December 31, 2007. For the full-year 2007 and through February 15, 2008, we paid claims aggregating $39.2 million, $28.1 million of which relates to transactions for which we have established a case basis reserve at December 31, 2007. There were no paid claims in 2006

**Operating Expenses.** Net operating expenses in the fourth quarter of 2007 were $22.7 million, a 4% decrease compared to $23.6 million in operating expenses for the same period in 2006. The decrease was primarily due to an $11.1 million reduction in compensation expenses partially offset by higher legal and consulting expenses incurred during the quarter. Operating expenses for the twelve months ended December 31, 2007 were $98.9 million and represented a $19.9 million increase, or 25%, over 2006. The increase in operating expenses is primarily due to SCA being a public holding company for five months in 2006 as compared to a full twelve months in 2007.

Corporate expenses, which are included in operating expenses and are associated with SCA being a public holding company, were $6.4 million in the fourth quarter of 2007 versus $3.6 million in the comparable period in 2006. The increase was associated with higher legal and consulting expenses, which were partially offset by lower executive management compensation costs. Corporate expenses for the full-year 2007 were $18.9 million compared with $6.4 million for the full-year 2006.

**Acquisition Costs.** Acquisition costs were $7.8 million for the fourth quarter of 2007, a $4.6 million increase over the comparable period in 2006. For the year, acquisition costs were $20.0 million, an increase of $3.7 million, or 23%, as compared to 2006. The increase in acquisition costs in the fourth quarter of 2007 was primarily due to the acceleration of previously deferred costs due to the loss provisions established on six HELOC and CES transactions. The increase in the full-year costs was due to the acceleration of previously deferred costs, as well as higher premium taxes resulting from growth in our in-force business. Acquisition costs in the reinsurance segment were $1.8 million higher in the fourth quarter of 2007 versus the fourth quarter of 2006 due to higher earned premiums from reinsurance during the current quarter, and higher associated expense amortization.

**Income Tax Expense.** Income tax expense increased in the fourth quarter of 2007 to $25.6 million versus $0.6 million in the fourth quarter of 2006. For the full year, SCA's income tax expense increased to $16.4 million versus $3.1 million in the prior full year. This increase was primarily due to a full write-down of our net deferred tax asset due to cumulative net operating losses in our XLCA subsidiary.

9

**Net Investment Income.** Net investment income for the fourth quarter of 2007 was $32.7 million, representing an increase of 32% from $24.7 million in the comparable period of 2006. For the year, net investment income was $120.7 million, an increase of $43.0 million, or 55%, as compared to 2006. The increase in full-year investment income was attributable to higher invested asset balances and higher average book yields. Average invested assets increased to $2.6 billion in the fourth quarter of 2007 compared to $2.1 billion in the fourth quarter of 2006. The increase was due to positive operating cash flow, income reinvestment and the investment of $247.0 million of net proceeds associated with the issuance of the SCA Series A Preference Shares in the second quarter of 2007. SCA's average book yield increased to 4.93% in the fourth quarter of 2007 compared to 4.65% in the fourth quarter of 2006 as a result of the investment of operating, financing and investment cash flows at higher interest rates.

**Balance Sheet.** Due to the significant case loss provisioning that occurred during the fourth quarter of 2007, the Company's gross loss reserves, including unallocated loss reserves, increased to $1,253.1 million at year-end 2007, from $178.5 million at the prior year-end. Gross case loss reserves were $1,141.7 million at year-end, versus $85.4 million at the end of 2006, while net case loss reserves were $709.4 million versus $14.5 million, respectively. The difference between gross case loss reserves and net case loss reserves are amounts that the Company expects to recover under various reinsurance contracts. Net unallocated loss reserves totaled $92.9 million at the year-end of 2007 versus $75.4 million at the year-end of 2006.

As of December 31, 2007, total assets were $3.604 billion, up 44% from $2.497 billion in total assets as of December 31, 2006. Book value, as measured by common shareholders' equity, decreased to $180.5 million as of December 31, 2007, from $1.367 billion at the end of 2006. Book value attributable to common shareholders per share was $2.81 as of December 31, 2007, versus $21.31 at December 31, 2006. The Company's total shareholders' equity as of December 31, 2007 was $427.1 million.

SCA's adjusted book value, defined below, was $1.501 billion, or $23.39 per share, as of December 31, 2007, versus $2.448 billion, or $38.17 per share, as of December 31, 2006. Adjusted book value is a non-GAAP financial measure defined as shareholders' equity (book value), plus the after-tax value of deferred premiums, net of prepaid reinsurance premiums and deferred acquisition costs, plus the after-tax net present value of estimated future installment premiums in force discounted at 7%. The reconciliation of non-GAAP measures can be found in the attachments at the end of this release.

10

Source: Security Capital Ass, 8-K, March 14, 2008

Book value and adjusted book value per share as of December 31, 2007, were based on the Company's issued and outstanding shares of 64,169,788. This compares to 64,136,364 shares outstanding as of year end 2006.

**Conference Call Information**

SCA will host an earnings conference call to discuss the Company's fourth quarter and full-year 2007 results on Friday, March 14, 2008 at 8:30 am Eastern Time. The Company will be accepting written questions prior to, and during, the conference call via email at InvestorRelations@scafg.com.

To access the conference call, please dial +1 888-694-4702 (U.S.) or +1 973-582-2741 (International). Please ask to be connected to "SCA's Q4 2007 Earnings Call" and provide the following passcode: 31103493. SCA will also broadcast a live audio webcast of the conference call. The webcast will be available by visiting the "Investor Relations" section of the Company's website located at http://www.scafg.com. Following the earnings conference call, an archive of the call will be available for 30 days by dialing +1 800-642-1687 (U.S.) or +1 706-645-9291 (International). The passcode for replay participants is: 31103493. The audio webcast of the conference call will also be archived for 30 days following the call in the "Investor Relations" section of the Company's website located at http://www.scafg.com.

An unaudited financial supplement relating to the Company's fourth quarter and full-year 2007 results is available on SCA's website located at www.scafg.com.

**About Security Capital Assurance**

Security Capital Assurance Ltd is a Bermuda-domiciled holding company whose common shares are listed on the New York Stock Exchange (NYSE: SCA). For more information please visit www.scafg.com.

**Contact:**
Investors
Frank Constantinople
+1 441-279-7450
frank.constantinople@scafg.com

Media
Michael Gormley
+1 441-279-7450
michael.gormley@scafg.com

Cindy Leggett-Flynn or Michele Loguidice
1 212-333-3810
clf@brunswickgroup.com or
mloguidice@brunswickgroup.com

**FORWARD-LOOKING STATEMENTS**

This release contains statements about future results, plans and events that may constitute "forward-looking" statements within the meaning of the safe harbor provisions of the Private

11

Source: Security Capital Ass, 8-K, March 14, 2008

Securities Litigation Reform Act of 1995. You are cautioned that these statements are not guarantees of future results, plans or events and such statements involve risks and uncertainties that may cause actual results to differ materially from those set forth in these statements. Forward-looking statements are subject to a number of risks and uncertainties, many of which are beyond the Company's control. These factors include, but are not limited to: the outcome of the ongoing rating assessments for SCA and its subsidiaries and for all bond insurers, generally, by Fitch, Moody's and S&P; the outcome of the Company's discussions with Fitch, Moody's and S&P, and the Company's ability to successfully address any capital requirements within required timeframes; the impact of the recent ratings actions on SCA's operating subsidiaries announced on March 4, 2008 by Moody's, February 25, 2008 by S&P, and January 23, 2008 by Fitch, including the downgrades of the IFS ratings of XLCA, XLCA-U.K. and XLFA; higher risk of loss in connection with obligations guaranteed by the Company due to recent deterioration in the credit markets stemming from the poor performance of subprime residential mortgage loans; the suspension of writing substantially all new business and the Company's ability to continue to operate its business in its historic form; the development and implementation of a strategic plan; developments in the world's financial and capital markets that adversely affect the performance of the Company's investments and its access to such markets; the performance of invested assets, losses on credit derivatives or changes in the fair value of credit default swaps; the availability of capital and liquidity; the timing of claims payments and the receipt of reinsurance recoverables; greater frequency or severity of claims and loss activity including in excess of the Company's loss reserves; changes in the Company's reinsurance agreements with certain of its subsidiaries; the impact of provisions in business arrangements and agreements triggered by the ratings downgrades; the impact of other triggers in business arrangements including CDS contracts; changes in regulation, tax laws, legislation or accounting policies or practices; changes in officers; general economic conditions; changes in the availability, cost or quality of reinsurance or retrocessions; possible downgrade of the Company's reinsurers; possible default by the counterparties to the Company's reinsurance arrangements; the Company's ability to compete; changes that may occur in Company operations and ownership as the Company matures; and other additional factors, risks or uncertainties described in Company filings with the Securities and Exchange Commission, including in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, and also disclosed from time to time in subsequent reports on Form 10-Q and Form 8-K. Readers are cautioned not to place undue reliance on forward-looking statements which speak only as of the date they are made. The Company does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements are made.

12

Source: Security Capital Ass, 8-K, March 14, 2008

**SECURITY CAPITAL ASSURANCE LTD**
**CONSOLIDATED**
**STATEMENTS OF OPERATIONS**
(U.S. dollars in thousands, except per share amounts)

| | (unaudited) Three Months Ended December 31, | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2007 | 2006 |
| **Revenues** | | | | |
| Gross premiums written | $ 79,142 | $ 118,516 | $ 321,929 | $ 353,728 |
| Reinsurance premiums assumed | 12,772 | 15,087 | 56,384 | 55,271 |
| Total premiums written | 91,914 | 133,603 | 378,313 | 408,999 |
| Ceded premiums | (17,911) | (14,223) | (72,254) | (13,067) |
| Net premiums written | 74,003 | 119,380 | 306,059 | 395,932 |
| Change in net deferred premium revenue | (17,032) | (75,074) | (90,340) | (212,817) |
| Net premiums earned (net of ceded premiums earned of $15,151, $3,157, $31,117 and $22,957) | 56,971 | 44,306 | 215,719 | 183,115 |
| Net investment income | 32,701 | 24,698 | 120,710 | 77,724 |
| Net realized (losses) gains on investments | (983) | 376 | (2,517) | (16,180) |
| Net realized and unrealized losses on credit derivatives | (518,838) | (1,620) | (690,917) | (8,385) |
| Fee income and other | 130 | 75 | 215 | 2,365 |
| Total revenues | (430,019) | 67,835 | (356,790) | 238,639 |
| **Expenses** | | | | |
| Net losses and loss adjustment expenses | 710,940 | 3,635 | 720,532 | 14,958 |
| Acquisition costs, net | 7,828 | 3,192 | 19,971 | 16,240 |
| Operating expenses | 22,704 | 23,551 | 98,931 | 78,999 |
| Total expenses | 741,472 | 30,378 | 839,434 | 110,197 |
| **(Loss) income before income tax and minority interest** | (1,171,491) | 37,457 | (1,196,224) | 128,442 |
| Income tax expense | 25,563 | 574 | 16,389 | 3,133 |
| **(Loss) income before minority interest** | (1,197,054) | 36,883 | (1,212,613) | 125,309 |
| Minority interest – dividends on redeemable preferred shares | 804 | 1,077 | 3,527 | 7,954 |
| **Net (loss) income** | (1,197,858) | 35,806 | (1,216,140) | 117,355 |
| Dividends on perpetual non-cumulative preference shares | - | - | 8,409 | - |
| **Net (loss) income available to common shareholders** | $ (1,197,858) | $ 35,806 | $ (1,224,549) | $ 117,355 |
| **Net (loss) income per common share:** | | | | |
| Basic | $ (18.67) | $ 0.56 | $ (19.09) | $ 2.19 |
| Diluted | $ (18.67) | $ 0.56 | $ (19.09) | $ 2.18 |
| **Weighted-average shares outstanding:** (Shares in thousands) | | | | |
| Basic | 64,170 | 64,136 | 64,150 | 53,676 |
| Diluted | 64,170 | 64,237 | 64,150 | 53,718 |

13

Source: Security Capital Ass, 8-K, March 14, 2008

**SECURITY CAPITAL ASSURANCE LTD**
**CONSOLIDATED BALANCE SHEETS**
(U.S. dollars in thousands)

| | As of December 31, 2007 | As of December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Investments | | |
| Debt securities available for sale, at fair value | $ 2,381,249 | $ 1,736,462 |
| Short-term investments, at fair value | 49,760 | 221,901 |
| Total investments | 2,431,009 | 1,958,363 |
| | | |
| Cash and cash equivalents | 249,116 | 202,548 |
| Accrued investment income | 21,039 | 16,515 |
| Deferred acquisition costs | 108,117 | 93,809 |
| Prepaid reinsurance premiums | 101,122 | 59,983 |
| Premiums receivable | 24,494 | 12,936 |
| Reinsurance balances recoverable on unpaid losses | 450,733 | 88,616 |
| Intangible assets – acquired licenses | 11,529 | 11,529 |
| Deferred income tax asset | - | 18,182 |
| Derivative assets | 168,364 | 11,976 |
| Other assets | 38,572 | 22,357 |
| Total assets | $ 3,604,095 | $ 2,496,814 |
| | | |
| **LIABILITIES, MINORITY INTEREST AND SHAREHOLDERS' EQUITY** | | |
| Liabilities | | |
| Unpaid losses and loss adjustment expenses | $ 1,253,088 | $ 178,517 |
| Deferred premium revenue | 927,385 | 795,906 |
| Derivative liabilities | 850,126 | 5,117 |
| Reinsurance premiums payable | 36,485 | 13,952 |
| Payable for investments purchased | - | 5,435 |
| Accounts payable, accrued expenses and other liabilities | 70,948 | 77,351 |
| Total liabilities | 3,138,032 | 1,076,278 |
| | | |
| Minority interest – redeemable preferred shares of subsidiary | 39,000 | 54,016 |
| | | |
| Shareholders' Equity | | |
| Series A perpetual non-cumulative preference shares, at par | 3 | - |
| Common shares, at par | 653 | 646 |
| Additional paid-in capital, preference shares | 246,590 | - |
| Additional paid-in capital, common shares | 993,916 | 987,798 |
| Total paid-in capital | 1,241,162 | 988,444 |
| (Accumulated deficit) retained earnings | (831,900) | 397,781 |
| Accumulated other comprehensive income (loss) | 17,801 | (19,705) |
| Total shareholders' equity | 427,063 | 1,366,520 |
| Total liabilities, minority interest and shareholders' equity | $ 3,604,095 | $ 2,496,814 |

14

Source: Security Capital Ass. 8-K, March 14, 2008

**Comment on Regulation G**

This press release contains the presentation of AGP, core net premiums earned, operating income, core income and ABV. These measures are "non-GAAP financial measures" as defined in Regulation G. The reconciliations of total premiums written to AGP; net premiums earned to core net premiums earned; net (loss) income available to common shareholders to operating income and core income, and total shareholders' equity to common shareholders' equity and ABV (the most directly comparable GAAP financial measures) presented at the end of this section are in accordance with Regulation G.

We present our operations in the way we believe will be most meaningful and useful to investors, analysts, rating agencies and others who use our financial information in evaluating our performance. These non-GAAP financial measures are included herein because investors in SCA-insured bonds and other users of our financial information consider such measures important in analyzing our financial performance.

**Adjusted Gross Premiums**

Adjusted gross premiums is a non-GAAP measure of new business production that management uses to evaluate our business because it provides comparability between upfront premiums and installment premiums, unlike U.S. GAAP total premiums written. Because adjusted gross premiums includes premiums due on future installment business written in the period, management believes it provides an additional, useful measure of new business production than only U.S. GAAP total premiums written.

Management uses this measure to review trends in new business written because it views this method as providing comparability between business written on an upfront premium basis and business written on an installment basis. This measure is viewed by management as an essential component of information necessary to assess forward-looking earnings potential, which is substantially dependent on the size of our in-force book of business.

Management also compares our adjusted gross premiums production to industry figures on a quarterly basis and uses this measure to assess employee productivity, as well as our market share and competitive position. Also, AGP is considered among other factors when determining compensation to employees. In addition to presenting total premiums written, we believe that disclosure of adjusted gross premiums enables investors and other users of our financial information to analyze our performance in a manner similar to the way in which management analyzes performance. In this regard, we believe that providing only a GAAP presentation of total premiums written makes it more difficult for users of our financial information to evaluate our underlying business. Also, we believe that analysts, investors and rating agencies who follow us and our subsidiaries include these items in their analyses for the same reasons, and they request that we and our subsidiaries provide this non-GAAP financial information on a regular basis.

**Core Net Premiums Earned**

Core net premiums earned, which is a non-GAAP financial measure, is defined as net premiums earned excluding the impact of refundings, calls and other accelerations. We believe core net premiums earned is a useful measure for management, equity analysts and investors because the presentation of core net premiums excludes the impact of refundings, calls and other accelerations that management cannot control or predict.

**Operating Income (Loss) and Core Income (Loss)**

While operating income (loss) and core income (loss) are not substitutes for net income (loss) computed in accordance with GAAP, they are useful measures of performance used by management, equity analysts and investors. We believe operating income (loss) and core

15

income (loss) enhance the understanding of our results of operations by highlighting the underlying profitability of our business. Operating income (loss) measures net (loss) income available to common shareholders, as determined in accordance with GAAP, excluding net realized gains (losses) on investments and the after-tax impact of net realized and unrealized gains (losses) on derivative financial instruments, and expenses related to XL Capital's secondary offering of SCA's shares. Core income (loss) represents operating income (loss) excluding the after-tax impact of refundings, calls and other accelerations. The definitions of operating income (loss) and core income (loss) used by the Company may differ from definitions of operating earnings and core earnings used by other financial guarantors.

Net realized gains (losses) on investments and the after-tax impact of net realized and unrealized gains and losses on derivative financial instruments (which principally consist of credit derivatives we issue and interest rate swap contracts we guarantee) are excluded from operating income (loss) because they are heavily influenced by, and fluctuate, in part according to, market interest rates, credit spreads and other factors that management cannot control or predict. Although the investment of premiums to generate investment income (loss) and realized gains (losses) on investments is an integral part of our operations, the determination to realize gains (losses) on investments is independent of the underwriting process. In addition, under applicable GAAP accounting requirements, losses can be created as the result of other than temporary declines in value without actual realization. In this regard, certain users of our financial information, including certain rating agencies, evaluate earnings before tax and net gains (losses) on investments to understand the profitability of the recurring sources of income without the effects of these two variables. Furthermore, these users believe that, for many companies, the timing of the realization of gains (losses) on investments is largely opportunistic. In addition, with respect to credit derivatives and guaranteed interest rate swap contracts discussed above, because we generally hold such contracts to maturity and, accordingly, will not realize the periodic effect of the changes in fair value of these instruments, therefore, we exclude such changes from operating income (loss) (similar to other companies in the financial guarantee industry) as the changes in fair value each quarter are not indicative of underlying business performance of our operations. Also, in determining operating income (loss) for the twelve-month period ended December 31, 2007, we excluded from operating income (loss) expenses incurred by the Company in connection with the secondary offering of our common shares by XL Capital as such expenses are not related to the conduct of the Company's business.

**Adjusted Book Value**

Adjusted Book Value ("ABV") represents GAAP book value attributable to common shareholders plus the after-tax effects of deferred premium revenue, net of prepaid reinsurance premiums and deferred acquisition costs, plus the after-tax effect of the net present value of future installment premiums. Since the Company expects these items to affect future results and, in general, they do not require any additional future performance obligation on the Company's part, ABV provides an indication of the Company's value in the absence of any new business activity. While ABV is not a substitute for GAAP book value, the Company believes the presentation of ABV provides another useful measure of the value of the Company for management, equity analysts and investors. The net present value of future installment premiums included in ABV may differ materially from actual future installment premiums collected due to changes in market interest rates, refinancing activity, pre-payment speeds, defaults and other factors that management cannot control or predict.

In summary, we believe that presenting both GAAP and the aforementioned non-GAAP financial measures enable investors and other users of our financial information to analyze our performance in a manner similar to how our management analyzes performance. Also, as stated above, we believe that analysts, investors and rating agencies that follow us (and the financial guarantee insurance industry as a whole) include these items in their analyses for the

16

same reasons previously discussed, and they request that we provide this non-GAAP financial information on a regular basis.

17

.

Source: Security Capital Ass, 8-K, March 14, 2008

## Reconciliation of Total Premiums Written to Adjusted Gross Premiums
### (in millions)

| | Three months ended | | Year ended | |
| --- | --- | --- | --- | --- |
| | 12/31/2007 | 12/31/2006 | 12/31/2007 | 12/31/2006 |
| Total upfront premiums written | $ 50.2 | $ 104.1 | $ 222.9 | $ 278.3 |
| Total installment premiums written | 41.7 | 29.5 | 155.4 | 130.7 |
| Total premiums written | 91.9 | 133.6 | 378.3 | 409.0 |
| Present value of future installments | 63.7 | 63.6 | 170.8 | 147.1 |
| Adjusted gross premiums | $ 155.6 | $ 197.2 | $ 549.1 | $ 556.1 |

## Reconciliation of Net Premiums Earned to Core Net Premiums Earned
### (in millions)

| | Three months ended | | Year ended | |
| --- | --- | --- | --- | --- |
| | 12/31/2007 | 12/31/2006 | 12/31/2007 | 12/31/2006 |
| Net premiums earned | $ 57.0 | $ 44.3 | $ 215.7 | $ 183.1 |
| Earned premium recognized from refundings, calls and other accelerations | (2.6) | (1.8) | (14.7) | (27.4) |
| Core net premiums earned | $ 54.3 | $ 42.5 | $ 201.0 | $ 155.7 |

## Reconciliation of Net (Loss) Income Available to Common Shareholders to Operating (Loss) Income and Core (Loss) Income
### (in millions)

| | Three months ended | | Year ended | |
| --- | --- | --- | --- | --- |
| | 12/31/2007 | 12/31/2006 | 12/31/2007 | 12/31/2006 |
| Net (loss) income available to common shareholders | $ (1,197.9) | $ 35.8 | $ (1,224.5) | $ 117.4 |
| Effect of | | | | |
| Expenses incurred in secondary offering | 0.0 | 0.0 | 0.8 | 0.0 |
| Perpetual non-cumulative preference share dividend | | 0.0 | | 0.0 |
| Net realized losses (gains) on investments | 1.0 | (0.4) | 2.5 | 16.2 |
| Net realized and unrealized losses on credit derivatives | 518.8 | 1.6 | 690.9 | 8.4 |
| Operating income | (678.1) | 37.1 | (530.3) | 141.9 |
| Effect of refundings, calls and other accelerations | (0.8) | (1.7) | (12.0) | (24.5) |
| Core income | $ (678.9) | $ 35.3 | $ (542.3) | $ 117.4 |

## Reconciliation of Total Shareholders' Equity to Common Shareholders' Equity and Adjusted Book Value
### (in millions)

| | As of 12/31/2007 | As of 12/31/2006 |
| --- | --- | --- |
| Total Shareholders' equity | $ 427.1 | $ 1,366.5 |
| Series A perpetual non-cumulative preference shares | (246.6) | 0.0 |
| Common shareholders' equity | 180.5 | 1,366.5 |
| After-tax value of : | | |
| Deferred premium revenue | | |
| Present value of future installment premiums | 825.4 | 708.4 |
| Deferred acquisition costs | 681.4 | 509.8 |
| Prepaid reinsurance premiums | (96.2) | (83.5) |
| Adjusted book value | (90.0) | (53.4) |
| | $ 1,501.1 | $ 2,447.8 |

*Numbers may not add due to rounding.

18

Created by 10KWizard    www.10KWizard.com

Source: Security Capital Ass, 8-K, March 14, 2008

# Exhibit 7

## Product Descriptions and Frequently Asked Questions

The following definitions are provided for educational purposes only. They are not in any way meant to serve as legal or official definitions, nor are they meant to serve as standard market definitions. In practice, terminology can differ across firms and across market segments.

1. What is a derivative?
2. Major derivative categories
3. How do privately negotiated (OTC) derivatives differ from futures?
4. Product description: Forward contracts
5. Definition: Trade date
6. Definition: Notional principal
7. Product description: Forward rate agreements (FRA)
8. Short-term interest rates: Libor
9. What is a swap?
10. Product description: Interest rate swaps
11. Risks associated with interest rate swaps
12. Suppose a client enters into an interest rate swap with a derivatives dealer to protect against rates rising by locking in a fixed rate. Doesn't that mean the dealer expects rates to fall? Otherwise, why would the dealer take on the risk of losing money?
13. The value of an interest rate swap
14. Credit risks associated with swaps
15. What is the actual amount at risk in a swap?
16. Product description: Options
17. How do options differ from swaps and forwards?
18. Credit exposures associated with options
19. Is an option a form of insurance?
20. Product description: Interest rate options
21. Currency derivatives
22. Product description: Cross-currency swaps
23. What is a credit derivative?
24. Product description: Credit default swaps
25. What risks does do the parties to a credit default swap give up and what risks do they take on?
26. Product description: Total return swaps
27. What risks does do the parties to a total return swap give up and what risks do they take on?
28. Why is derivatives documentation (such as the ISDA Master Agreement) important?
29. Definition: Payment netting
30. Definition: Close-out netting
31. What is the status of an individual transaction under the ISDA Master Agreement?

## Product Descriptions and some Frequently Asked Questions

### 1. What is a derivative?
A derivative is a risk-shifting agreement, the value of which is derived from the value of an *underlying asset*. The underlying asset could be a physical commodity, an interest rate, a company's stock, a stock index, a currency, or virtually any other tradable instrument upon which two parties can agree.

### 2. Major derivative categories
Derivatives fall into two categories. One consists of customized, privately negotiated derivatives, which are known generically as *over-the-counter (OTC)* derivatives or, even more generically, as *swaps*. The other category consists of standardized, exchange-traded derivatives, known generically as *futures*. In addition, there are various types of product within each of the two categories as described below.

### 3. How do privately negotiated (OTC) derivatives differ from futures?
First, the terms of a futures contract—including delivery places and dates, volume, technical specifications, and trading and credit procedures—are standardized for each type of contract. For swaps, the same characteristics are subject to negotiation by the parties to the contracts. Second, futures contracts are always traded on an exchange, while swaps are

traded on a bilateral basis. Third, those who engage in futures transactions assume exposure to default by the exchange's clearinghouse; for OTC derivatives, the exposure is to default by the counterparty. Fourth, credit risk mitigation measures, such as regular mark-to-market and margining, are automatically required for futures but optional for swaps. Finally, futures are generally subject to a single regulatory regime in one jurisdiction, while swaps—although usually transacted by regulated firms—are transacted across jurisdictional boundaries and are primarily governed by the contractual relations between the parties. Various products, including futures contracts and exchange-traded options, fall within the generic category of futures, but all have the common characteristics described above. The definitions that follow refer exclusively to privately negotiated (OTC) derivatives.

## 4. Product description: Forward contracts
A forward is a customized, privately negotiated agreement between two parties to exchange an asset or cash flows at a specified future date at a price agreed on the trade date. Entering a forward contract typically does not require the payment of a fee.


Top of Page


## 5. Definition: Trade date
The trade date is the date on which the parties agree to the terms of a contract. The *effective date* is the date on which the parties begin calculating accrued obligations, such as fixed and floating interest payment obligations on an interest rate swap.


## 6. Definition: Notional principal
Notional principal, or notional amount, of a derivative contract is a hypothetical underlying quantity upon which interest rate or other payment obligations are computed.


## 7. Product description: Forward rate agreements (FRA)
A forward rate agreement is a forward contact on a short-term interest rate, usually Libor, in which cash flow obligations at maturity are calculated on a notional amount and based on the difference between a predetermined *forward rate* and the market rate prevailing on that date. The settlement date of an FRA is the date on which cash flow obligations are determined.


## 8. Short-term interest rates: Libor
Libor, which stands for London Interbank Offered Rate, is the interest rate paid on interbank deposits in the international money markets (also called the *Eurocurrency markets*). Because Eurocurrency deposits priced at Libor are almost continually traded in highly liquid markets, Libor is commonly used as a benchmark for short-term interest rates in setting loan and deposit rates and as the floating rate on an interest rate swap.


## 9. What is a swap?
A swap is a privately negotiated agreement between two parties to exchange cash flows at specified intervals (payment dates) during the agreed-upon life of the contract (maturity or tenor). Entering a swap typically does not require the payment of a fee.


## 10. Product description: Interest rate swaps
An interest rate swap is an agreement to exchange interest rate cash flows, calculated on a notional principal amount, at specified intervals (*payment dates*) during the life of the agreement. Each party's payment obligation is computed using a different interest rate. In an interest rate swap, the notional principal is never exchanged. Although there are no standardized swaps, a plain vanilla swap typically refers to a generic interest rate swap in which one party pays a fixed rate and one party pays a floating rate (usually Libor).


Top of Page


## 11. Risks associated with interest rate swaps
Typically, a party entering a swap gives up (or takes on) exposure to a given interest rate. At the same time, each party take on the risk—known as counterparty credit risk—that the other party will default at some time during the life of the contract.


## 12. Suppose a client enters into an interest rate swap with a derivatives dealer to protect against rates rising by locking in a fixed rate. Doesn't that mean the dealer expects rates to fall? Otherwise, why would the dealer take on

the risk of losing money?
The dealer's view on interest rates does not matter. When the dealer assumes a client's risk, the dealer typically lays off—that is, hedges—that risk with an offsetting transaction. Suppose, for example, a dealer enters into a swap in which the client pays a fixed rate to the dealer and the dealer pays a floating rate to the client. The dealer could hedge the risk by entering into an offsetting swap with another client or dealer. Or, it could take a Treasury security position with interest rate exposure that offsets the swap. Or, it could take an offsetting futures position. Over the entire portfolio some risks might be uncovered at various times—which is essential to the existence of a liquid market—but such risks are carefully monitored and controlled by dealers.

## 13. The value of an interest rate swap
The value of an interest rate swap to a counterparty is the net difference between the *present value* of the payments the counterparty expects to receive and the present value of the payments the counterparty expect to make. At the inception of the swap, the value is generally zero to both parties, and becomes positive to one and negative to the other depending on the movement of interest rates. *Present value* is the value of a quantity to be received in the future, adjusted for the time value of money (interest foregone while waiting for the quantity).

## 14. Credit risks associated with swaps
Loss on a swap occurs if two things happen: First, the counterparty must default; and second, the swap must have a positive value to the party that does not default. The amount of the loss depends on the credit exposure of the swap.

## 15. What is the actual amount at risk in a swap?
The *credit exposure* of a swap is the amount that would be lost if default were to occur immediately. Credit exposure is generally equal to the current market value if positive, and zero if current market value is negative. Swap participants also calculate future exposures of swaps, which are potential positive values during the life of the swap; future exposures are used to establish credit charges (expected exposure) and credit limit usage (peak exposure).


Top of Page


## 16. Product description: Options
An option is an agreement that gives the buyer, who pays a fee (*premium*), the right—but not the obligation—to buy or sell a specified amount of an underlying asset at an agreed upon price (*strike or exercise price*) on or until the expiration of the contract (*expiry*). A call option is an option to buy, and a put option is an option to sell.

## 17. How do options differ from swaps and forwards?
In a forward or swap, the parties lock in a price (e.g., a forward price or a fixed swap rate) and are subject to symmetric and offsetting payment obligations. In an option, the buyer purchases protection from changes in a price or rate in one direction while retaining the ability to benefit from movement of the price or rate in the other direction. In other words, the option involves asymmetric cash flow obligations.

## 18. Credit exposures associated with options
For a buyer of an option, the amount at risk is generally the value (premium) of the option at default. For the seller of an option, there is no credit exposure.

## 19. Is an option a form of insurance?
Options differ from insurance in that options do not require one party to suffer an actual loss for payment to occur. In addition, the owner of an option need not have an insurable interest—such as ownership in the underlying asset—in the option.

## 20. Product description: Interest rate options
In an interest rate option, the underlying asset is related to the change in an interest rate. In an interest rate cap, for example, the seller agrees to compensate the buyer for the amount by which an underlying short-term rate exceeds a specified rate on a series of dates during the life of the contract. In an interest rate *floor*, the seller agrees to compensate the buyer for a rate falling below the specified rate during the contract period. A *collar* is a combination of a long (short) cap and short (long) floor, struck at different rates. Finally, a *swap option (swaption)* gives the holder the right—but not the obligation—to enter an interest rate swap at an agreed upon fixed rate until or at some future date.


Top of Page

**21. Currency derivatives**
A *currency forward* is a contract in which the parties agree to exchange cash flows in two different currencies at an agreed upon date in the future. A *cross-currency swap* is essentially an interest rate swap in which each side is denominated in a different currency. And a *currency option* is a contract that gives the buyer the right, but not the obligation, to exchange one currency for another at a predetermined exchange rate on or until the maturity date.

**22. Product description: Cross-currency swaps**
A cross-currency swap is an interest rate swap in which the cash flows are in different currencies. Upon initiation of a cross-currency swap, the counterparties make an initial exchange of notional principals in the two currencies. During the life of the swap, each party pays interest (in the currency of the principal received) to the other. And at the maturity of the swap, the parties make a final exchange of the initial principal amounts, reversing the initial exchange at the same spot rate. A cross-currency swap is sometimes confused with a traditional *FX swap*, which is simply a spot currency transaction that will be reversed at a predetermined date with an offsetting forward transaction; the two are arranged as a single transaction.

**23. What is a credit derivative?**
A credit derivative is a privately negotiated agreement that explicitly shifts credit risk from one party to the other.

**24. Product description: Credit default swaps**
A credit default swap is a credit derivative contract in which one party *(protection buyer)* pays an periodic fee to another party *(protection seller)* in return for compensation for default (or similar *credit event*) by a *reference entity*. The reference entity is not a party to the credit default swap. It is not necessary for the protection buyer to suffer an actual loss to be eligible for compensation if a credit event occurs.

**25. What risks does do the parties to a credit default swap give up and what risks do they take on?**
The protection buyer gives up the risk of default by the reference entity, and takes on the risk of simultaneous default by both the protection seller and the reference credit. The protection seller takes on the default risk of the reference entity, similar to the risk of a direct loan to the reference entity.

Top of Page

**26. Product description: Total return swaps**
A total return swap is a agreement in which one party (total return payer) transfers the total economic performance of a reference obligation to the other party (total return receiver). Total economic performance includes income from interest and fees, gains or losses from market movements, and credit losses.

**27. What risks does do the parties to a total return swap give up and what risks do they take on?**
The total return receiver assumes the entire economic exposure—that is, both market and credit exposure--to the reference asset. The total return payer—often the owner of the reference obligation—gives up economic exposure to the performance of the reference asset and in return takes on counterparty credit exposure to the total return receiver in the event of a default or fall in value of the reference asset.

**28. Why is derivatives documentation (such as the ISDA Master Agreement) important?**
Swaps and related OTC derivatives combine characteristics of loans with characteristics of traded capital market instruments. On the one hand, each swap transaction creates a credit relationship between the counterparties, the terms of which need to be negotiated and documented just as would the terms of a traditional loan. But unlike a loan, the credit exposure is two-way and unknown at the inception of the swap (see above, items 13 – 15). On the other hand, swaps are traded in the market and might involve repeated interaction between two counterparties; renegotiation of credit terms for each transaction would be costly and would act as a drag on trading activity. Consequently, market participants developed the ISDA Master Agreement (click here for a history), which would contain the 'non-economic' terms—such as representations and warranties, events of default, and termination events—leaving counterparties free to negotiate only the 'economic' terms—that is, rate or price, notional amount, maturity, collateral, and so on. Additional benefits of the ISDA Master Agreement include provisions that facilitate payment netting and close-out netting.

**29. Definition: Payment netting**
Payment netting reduces payments due on the same date and in the same currency to a single net payment.

**30. Definition: Close-out netting**

If a counterparty to an ISDA Master Agreement defaults, the close-out netting provisions of the ISDA Master Agreement provide that offsetting credit exposures between the two parties will be combined into a single net payment from one party to the other.

**31. What is the status of an individual transaction under the ISDA Master Agreement?**
In jurisdictions where close-out netting is enforceable, all transactions under the ISDA Master Agreement constitute a 'single agreement' between the two counterparties instead of being separate contracts. The confirmation of a transaction serves as evidence of that transaction, and each transaction is incorporated into the ISDA Master Agreement.

Top of Page

# Exhibit 8

May 2002

# AN INTRODUCTION TO THE DOCUMENTATION OF OTC DERIVATIVES

## "TEN THEMES"

# ALLEN & OVERY

**The Ten Themes:**

- **ISDA's Mission**
- **Master Agreement**
- **Schedule**
- **Confirmations**
- **Definitions**
- **Netting**
- **Collateral/credit support**
- **Opinions**
- **User's Guides**
- **Protocol**


1.    **ISDA's Mission**

ISDA's primary purpose is to encourage the prudent and efficient development of the privately negotiated (or "over-the-counter" (OTC)) derivatives business by, among other things:

- Promoting practices conducive to the efficient conduct of the business, *including the development and maintenance of derivatives documentation*; and

- Promoting the development of sound risk management practices.

ISDA was formed in 1985, after a group of 18 swap dealers and their counsel began work in 1984 to develop standard terms for interest rate swaps.

2.    **Master Agreement**

Market participants that enter into OTC derivatives transactions could, as they used to, document each transaction in a separate, comprehensive agreement. Such an agreement, being independent from any other agreement between them, would necessarily be lengthy. It would not merely set forth the economic terms of the relevant transaction, but would also include terms relating to the general legal and credit relationship between the parties. These types of terms, in addition to the economic terms of the transaction, would have to be negotiated each time the parties entered into a transaction.

It would clearly be far more efficient if the parties could agree upon these "relationship" terms once and for all, so, each time they entered into a transaction, they would only have to negotiate and document the economic terms of the transaction. The parties could achieve this by entering into a framework "master agreement" that sets the ongoing legal and credit relationship between them, and provides that each transaction they enter into will be governed by that master agreement. It would be even more efficient if the parties could document a range of different *types* of transactions under the same master agreement, rather than having to enter into a separate master agreement for each type of transaction.

The ISDA Master Agreement offers participants in the OTC derivatives markets all of these benefits. When two parties negotiate and sign an ISDA Master Agreement, they agree upon the ongoing legal and credit relationship between them. While they can, of course, agree to amend the terms of their agreement at any time, there is no need to negotiate a whole host of issues each time they enter into a new transaction. Also, unlike many other financial master agreements, the ISDA Master Agreement can be used to document a range of different types of transactions (it is "multi-product").

The most widely used agreement in the OTC derivatives markets is currently the 1992 ISDA Master Agreement (Multicurrency-Cross Border).

**3.     Schedule**

A key feature of ISDA's documentation is its "modular architecture". ISDA has published a number of different documents, with a variety of purposes. Essentially, market participants are provided with a number of "building blocks" that they can use as they see fit, and in a highly efficient and flexible manner. This architecture is evident in the structure of the ISDA Master Agreement itself. It consists of two parts: the printed form and the Schedule.

- The printed form makes up the first 18 pages of the agreement. The intention is that parties signing an ISDA Master Agreement do not physically amend the printed form on the agreement itself.

- The Schedule is the part of the agreement that the parties negotiate. It allows the parties to make certain choices, to amend provisions contained in the printed form, and to include any appropriate additional provisions. One of the key choices the parties make in the Schedule is whether the agreement should be governed by the laws of New York state or the laws of England (it is designed to be governed by either).

**4.     Confirmations**

As described above, if two market participants have entered into an ISDA Master Agreement, then, each time they enter into a transaction, they only have to negotiate and document the economic terms of the transaction. Confirmations are the documents in which the parties record those economic terms.

The ISDA Master Agreement itself provides that the agreement includes the Schedule and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming individual transactions. Further, each Confirmation is identified (or should be identified) either in its own terms or through another effective means as a "Confirmation", and states that it supplements, forms a part of, and is subject to, the ISDA Master Agreement between the parties. In this way, the provisions of the agreement govern transactions documented in Confirmations.

The use of Confirmations to document the economic terms of transactions again illustrates the modular architecture of ISDA documentation.

Confirmations come in two forms: long-form and short-form.

- Long-form: a long-form Confirmation itself contains, in full, all the terms necessary to document the economic terms of the transaction.

- Short-form: a short-form Confirmation does not contain all the terms necessary to document the economic terms of the transaction. It relies on, and incorporates, standard terms and provisions that are already contained in another document (or documents), such as a set of ISDA Definitions (see below). This enables the use of shorthand terms in the Confirmation, and avoids the need to set out in full various operational provisions. The terms and provisions contained in that other document should broadly reflect market practice. Therefore, completing a short-form Confirmation should be a quicker task than completing a long-form Confirmation.

Why the distinction? In the past, when a market in a new type of derivatives transaction has developed, ISDA has traditionally published a long-form Confirmation for use in documenting that type of transaction (for example, one long-form Confirmation that is still frequently mentioned, although now superseded, is the 1997 Confirmation of OTC Credit Swap Transaction, prepared for use in documenting a credit default swap, which at the time was a relatively new type of transaction). Then, when a new market has matured, and a consensus has developed among those active in that market, ISDA has traditionally prepared a set of Definitions, together with one or more short-form Confirmations. Until the market has matured and that consensus has developed, it would probably not be productive to try to prepare a standard set of Definitions.

## 5.     Definitions

When used in the ISDA sense, "Definitions" are the various booklets of standard definitions and other terms and provisions published by ISDA for use in documenting different types of derivatives transactions. Generally, and broadly, each set of Definitions provides relevant terms for documenting a particular type of derivatives transaction. For example, the 1993 Commodity Derivatives Definitions are intended for use in documenting cash-settled commodity derivatives, the 1996 Equity Derivatives Definitions are intended for use in documenting equity derivatives, and the 1999 Credit Derivatives Definitions are intended for use in documenting credit default swaps. Even the 2000 Definitions, unlike their predecessors (the 1991 Definitions), are drafted primarily for use in documenting particular types of derivatives transactions: interest rate and currency derivatives.

As described above, short-form Confirmations rely on Definitions. They do this by stating that they incorporate a particular set (or sets) of Definitions. However, while they do a lot of the work for the parties, ISDA Definitions do not take care of everything. The Definitions themselves only provide a framework for documenting a transaction. It is still up to the parties to make various choices and to document the economic terms of the transaction itself in the short-form Confirmation.

The parties are also free, of course, to amend the terms of the relevant Definitions or include additional provisions in the short-form Confirmation itself. While the terms of the Definitions represent the result of an extensive industry consultation process, they will not be appropriate for documenting all transactions without amendment or additional provisions.

Unlike ISDA's sample long-form Confirmations, which are published as standalone documents, ISDA's sample short-form Confirmations are published as part of a set of Definitions. So, if someone is looking for ISDA's sample short-form Confirmation for an equity swap, they will find it at the back of the 1996 Equity Derivatives Definitions.

**6.     Netting**

When people in the ISDA world talk about "netting", they generally mean "close-out netting".

If you and I have two outstanding derivatives transactions between us, at any time one may be profitable to you; the other may be profitable to me. Suppose, before the days arrive when we each (assuming satisfaction of all applicable conditions) have to make payments (for example) to the other, I become bankrupt.

Example:



The danger for you is that my liquidator/bankruptcy trustee, applying the laws of my jurisdiction, will "cherry pick" profitable transactions and disclaim unprofitable transactions, or try to require you to pay me $15 in respect of Transaction 2, while trying to avoid an obligation for me to pay you $10 in respect of Transaction 1. If my liquidator/bankruptcy trustee is successful, you will have to pay my "estate" $15, and join the line of other creditors trying to claim money (in your case, $10) against my estate. Almost inevitably, you will ultimately receive only a tiny fraction of $10, if anything (I am bankrupt).

However, if you can cancel both transactions upon my bankruptcy, and "net" the above values, or reduce your obligation to pay me to the net amount of just $5 ($15 - $10), you will be much better off. In this way, close-out netting, if you can do it, reduces your "exposure", or "credit risk" - i.e., the amount you could lose in these circumstances.

The ISDA Master Agreement provides for such close-out netting. Ensuring the enforceability of the close-out netting provisions of the agreement has been, and remains, a key initiative of ISDA, because of its importance in reducing the credit risk arising from the OTC derivatives business. Close-out netting is viewed by regulators as a means to limit "systemic risk", so banks are rewarded for having legally enforceable netting agreements by the reduction of the amount of capital they need to keep in reserves. However, in many jurisdictions, legal opinions in support of close-out netting are necessary to obtain this benefit. Because of this, and because not all jurisdictions recognise the enforceability of close-out netting, ISDA collects netting opinions (see "Opinions" below).

### 7.    Collateral/credit support

Another way that market participants can reduce their credit risk, or risk of loss if their counterparties fail to perform their obligations, is through the use of collateral (alternatively known as credit support, or margin). In the example above, assuming that we are both solvent, even if close-out netting is enforceable I still have a net exposure to you of $5. In other words, if you fail to perform your obligations, even if I can apply close-out netting, you will owe me $5. If we had agreed to "collateralise" our relationship, in a perfect world you would have provided me with collateral (such as government bonds) worth $5. The idea is that if you fail to perform your obligations, I can keep the collateral worth $5. In this way, I am not at risk of losing anything. My credit risk has (basically) been eliminated.

It might be helpful to compare this situation to a residential mortgage. If a bank lends a homebuyer the money to buy a house, the homebuyer gives the bank a mortgage. The mortgage entitles the bank, if the homebuyer does not make his or her mortgage payments to the bank, to sell the house and keep the proceeds to settle the debt owed to it by the homebuyer.

Participants in the OTC derivatives markets do not always collateralise their relationships, but they are increasingly doing so.

Collateral relationships in the OTC derivatives markets are currently typically documented under one of the following documents:

- 1994 Credit Support Annex (Bilateral Form) - New York law
- 1995 Credit Support Annex (Bilateral Form - Transfer) - English law
- 1995 Credit Support Deed (Bilateral Form - Security Interest) - English law
- 1995 Credit Support Annex (Bilateral Form - Loan and Pledge) - Japanese law

Note, however, that ISDA recently published the 2001 ISDA Margin Provisions, which are intended to replace the above documents, and which it is hoped will be used more and more in the future. All these documents are commonly referred to as ISDA's "credit support documents".

### 8.    Opinions

One of the main benefits ISDA gives to its members is access to the "legal opinions" it has gathered (only ISDA members may rely upon ISDA's legal opinions).

A legal opinion is a document in which a lawyer gives his or her understanding of (or opinion on) the law of a legal jurisdiction as applied to certain assumed facts. For example, where there is a contract between an English company and a French company, and that contract is governed by English law, an English lawyer might give a legal opinion to the French company in which he or she would consider whether the French company would be able to enforce the contract against the English company. Although the legal opinion would only give the English lawyer's *opinion*, it might give the French company some comfort.

In the ISDA world, "opinions" mean either netting opinions or collateral opinions.

- Netting opinions: ISDA has collected netting opinions from lawyers (or "counsel") in 36 jurisdictions around the world. In the netting opinions, counsel considers whether the close-out netting provisions contained in the ISDA Master Agreement would be enforceable by a party against a range of types of entities organised or incorporated in the jurisdiction of counsel's practice.

ICM:5813173

- Collateral opinions: ISDA has collected collateral opinions from counsel in 28 jurisdictions. In the collateral opinions, counsel considers whether the provisions contained in ISDA's credit support documents would be enforceable by a party against a range of types of entities organised or incorporated in the jurisdiction of counsel's practice.

If the ISDA Master Agreement is only designed to be governed by either New York law or English law, why do people care about the laws of other jurisdictions? If a party becomes insolvent, the insolvency laws of the jurisdiction in which it is organised or incorporated will typically apply. If the insolvent party is incorporated in Country X, for example, although the agreement itself is governed by English law, and the solvent party is an English company, the insolvency laws of Country X will typically apply.

As noted above, regulators require legal opinions in support of close-out netting if they are to recognise close-out netting for banks' capital purposes. In addition, they require these legal opinions to be updated annually.

ISDA typically gathers updated netting opinions in November and December of each year, and releases them to ISDA members in the following January. Until now, collateral opinions have not been updated annually, but ISDA has signalled an intention to update the collateral opinions regularly in future.

## 9.    User's Guides

User's Guides are documents published by ISDA to assist market participants' understanding of ISDA documentation. The most well-known User's Guide is the User's Guide to the 1992 ISDA Master Agreements (1993 Edition). Two others are also particularly widely used: the User's Guide to the 1994 ISDA Credit Support Annex (the Credit Support Annex governed by New York law), and the User's Guide to the ISDA Credit Support Documents under English Law.

User's Guides contain explanation of provisions contained in published ISDA documentation, as well as, sometimes, discussion of additional provisions that parties might like to consider including in their documentation.

In addition to the formal "User's Guides", ISDA is increasingly preparing commentaries to accompany new documentation. For example, there is a commentary on each of the three recently published supplements to the 1999 Credit Derivatives Definitions, on the 2001 Cross-Agreement Bridge and on the October 2001 Form of Amendment to the ISDA Master Agreement.

## 10.    Protocol

ISDA has now published four "Protocols" (the EMU Protocol, the EMU Protocol (Greece), the 2001 Credit Support Protocol and the 2001 Euro Protocol). What are Protocols?

If you have a number of contracts with a number of different counterparties, and if you want to amend all of them in a certain way, traditionally you would be forced to negotiate with each counterparty individually (you would negotiate "bilaterally"). If you have a large number of contracts, this could be very time consuming and expensive.

Protocols are an innovative way of enabling parties to amend all of their contracts at once (or "multilaterally"). They offer market participants huge time- and cost-saving benefits.

ICM:5813173

If a party signs up to a Protocol (by delivering an "Adherence Letter" to ISDA), it is agreeing to amend all of its contracts (such as its ISDA Master Agreements) in a particular way. Of course, the agreement of the other party to each contract is required, so the Protocols provide that a contract is only amended if the other party to the contract, by itself signing up to the Protocol, also agrees to amend the contract.

Further, the Protocols include a range of different amendments in various "Annexes". A party can choose which amendments it wishes to make to its contracts by specifying, in its Adherence Letter, which Annexes it wishes to apply. If both parties to a contract sign up to a Protocol, but they have not specified the same Annexes in their Adherence Letters (i.e., there is agreement on some, but not all, of the proposed amendments), the Protocol provides that the contract in question is amended only by those amendments that both parties have agreed to make.

ISDA facilitates this amendment process by receiving Adherence Letters from market participants, checking that the letters have been completed correctly, and, on its website, displaying the letters it has received together with a list of those market participants that have signed up to the Protocol ("Adhering Parties"). The list of Adhering Parties enables Adhering Parties to ascertain with whom they have amended their contracts.

**ALLEN & OVERY**
**May 2002**

*This paper does not constitute legal advice and should not be relied upon as such.*

ICM:581317.3

# Exhibit 9

SCA - ABOUT US

◄ Back    Print

# ABOUT US

**Security Capital Assurance Ltd** (SCA) is a holding company domiciled in Bermuda whose shares are listed on the New York Stock Exchange (NYSE: SCA), and whose operating subsidiaries provide financial guarantee insurance and other credit enhancement for debt obligations in the US and international capital markets. SCA operates through two principal subsidiaries,   **XL Capital Assurance Inc. and XL Financial Assurance Ltd.**

**XL Capital Assurance Inc.** delivers credit enhancement for the obligations of debt issuers in both primary and secondary markets worldwide. It guarantees US municipal bonds, asset-backed securities, collateralized debt obligations (CDO), and debt backed by utilities and selected infrastructure projects. XLCA also provides guarantees for specialized risks, including future flow securitizations, bank deposit insurance, as well as other structured finance products. Go to **XLCA.com**

**XL Financial Assurance Ltd.** provides financial guarantee reinsurance for obligations underwritten by primary financial guarantors. XLFA has reinsurance relationships with all of the primary financial guarantors. Go to **XLFA.com**

Legal Disclaimer    Privacy Notice

4/17/2008

# Exhibit 10



# SECURITY CAPITAL ASSURANCE

## Ratings Update

### Note on Financial Strength and Financial Enhancement Ratings of XLCA and XLFA

The XLCA's insurance financial strength is currently rated "A3" (Under review for possible downgrade) by Moody's Investor Services ("Moody's"), "A-" (CreditWatch with negative implications) by Standard & Poor's ("S&P") and "BB" (Outlook Negative) by Fitch, Inc. ("Fitch"). In addition, XLCA has obtained a financial enhancement rating of "A-" (CreditWatch with negative implications) from S&P. These ratings reflect Moody's, S&P's and Fitch's current assessment of XLCA's creditworthiness and claims-paying ability. XLFA's insurance financial strength is rated "A3" (Under review for possible downgrade) by Moody's, "A-" (CreditWatch with negative implications) by S&P and "BB" (Outlook Negative) by Fitch. In addition, XLFA has obtained a financial enhancement rating of "A-" (CreditWatch with negative implications) from S&P. The ratings of XLFA, XLCA or any other member of the SCA group of companies are not recommendations to buy, sell or hold securities, and are subject to revision or withdrawal at any time by Moody's, Standard & Poor's or Fitch.

### Recent Developments

#### Moody's Investor Sevices

On March 4, 2008, Moody's Investors Service ("Moody's") announced rating actions on Security Capital Assurance Ltd ("SCA"), XL Capital Assurance Inc. ("XLCA"), XL Financial Assurance Ltd ("XLFA") and XL Capital Assurance (U.K.) Limited ("XLCA-UK"), as well as on certain Moody's-rated securities that are guaranteed or "wrapped" by XLCA, XLFA and XLCA-UK. Moody's placed the "A3" insurance financial strength ratings of XLCA, XLFA and XLCA-UK on review for possible downgrade. Moody's placed SCA's "(P)Baa3" senior debt rating, its "(P)Ba1" subordinated debt rating and its "Baa2" preference shares rating on review for possible downgrade. In addition, the "Baa2" rating of XLFA's Twin Reefs Pass-Through Trust was placed on review for possible downgrade. Finally, the "A3" rating of Moody's-rated securities that are guaranteed or "wrapped" by XLCA, XLFA and XLCA-UK, except those securities with higher public underlying ratings of "A3" or higher, were also placed on review for possible downgrade.

In taking the rating actions described above, Moody's noted that: "This rating action was prompted by SCA's recent SEC filing which stated that the company was delaying the filing of its 2007 Form 10-K and that the company's independent auditor is evaluating the need to include a going concern explanatory paragraph in its audit opinion with respect to SCA's audited financial statements for the year ended December 31, 2007." Moody's also noted that: "According to Moody's, the ratings review will focus on developments related to the potential issuance of a going concern explanatory paragraph by SCA's auditor, as well as additional details related to SCA's capital plans and strategic direction."

On February 7, 2008, Moody's announced rating actions on SCA, XLCA, XLFA and XLCA-UK, as well as on certain Moody's-rated securities that are guaranteed or "wrapped" by XLCA, XLFA and XLCA-UK. Moody's has downgraded the insurance financial strength rating of XLCA, XLFA and XLCA-UK to "A3" from "Aaa". Moody's has downgraded SCA's senior debt rating to "(P) Baa3" from "(P)Aa3"; its subordinated debt rating to "(P)Ba1" from "(P)A1" and its preference shares rating to "Ba2" from "A2". In addition, XLFA's Twin Reefs Pass-Through Trust was downgraded to "Baa2" from "Aa2". Finally, the Moody's-rated securities that are guaranteed or "wrapped" by XLCA, XLFA and XLCA-UK were also downgraded to "A3", except those securities with higher public underlying ratings.

Moody's release explained that Moody's evaluated SCA along five key rating factors: 1) franchise value and strategy, 2) insurance portfolio characteristics, 3) capital adequacy, 4) profitability, and 5) financial flexibility. The Moody's release noted that the rating actions reflect Moody's assessment of SCA's weakened capitalization and business profile resulting, in part, from its exposures to the U.S. residential mortgage market. Moody's outlook on SCA's ratings is negative.

In addition, Moody's noted in the release: "Based on the risks in SCA's portfolio, as assessed by Moody's according to the approach outlined above, capitalization required to cover losses at the Aaa target level would exceed $6 billion. This compares to Moody's estimate of SCA's claims paying resources of $3.6 billion, which Moody's considers to be more consistent with capitalization at the single A rating level."

On December 14, 2007, Moody's issued a comment that it has updated its evaluation of U.S. mortgage market stress on the ratings of financial guaranty companies. The announcement reflects the results of the updated analysis outlined most recently in Moody's December 5, 2007 report. The rating announcements result from Moody's reassessment of the financial guaranty insurers' capital adequacy in light of higher expected losses from credit enhancement provided to residential mortgage backed securities ("RMBS") and collateralized debt obligations of asset backed securities ("ABS CDO") that include RMBS, and are also based on Moody's assessment of financial guaranty insurers' current capital positions, their plans for capital strengthening going forward, and other strategic and operational considerations. As a result of these reviews,

the Aaa ratings of XLCA, XLFA and the Moody's rated securities guaranteed by XLCA were placed on review for possible downgrade. As described in the comment, Moody's analysis suggests that the current capitalization of SCA's operating subsidiaries, XLCA and XLFA, is above the Aaa target level, but would fall below the Aaa minimum level under Moody's present stress scenario. The comment notes that Moody's review of SCA's ratings for possible downgrade will focus on the execution of SCA's capital remediation plan and, to the extent SCA is able to rebuild its capital position and adequately address its capital adequacy shortfall, Moody's would likely confirm SCA's ratings at their current levels. Moody's notes, however, that if SCA is unable to resolve the current stress on its capitalization over the period of the review, which Moody's would expect to conclude within the next few months, Moody's believes SCA's ratings would likely be downgraded. The magnitude of any potential downgrade would depend on a number of variables, including capital remediation measures enacted, as well as SCA's prospective strategic plan and business profile.

On November 8, 2007, Moody's issued a comment indicating that it is re-estimating capital adequacy ratios to reflect deterioration in the expected performance of RMBS transactions within the insured portfolios of financial guarantors. At the same time, Moody's is updating an earlier stress test (the results of which were described in a September 25, 2007 report published by Moody's) by determining the impact of higher subprime cumulative loss assumptions on both the financial guarantors' direct RMBS and ABS CDO exposures using granular underlying collateral information as it relates to vintage, originator, and performance to date. Based on an initial analysis of the updated data Moody's noted there is a "moderate risk" of XLCA falling below Moody's Aaa capital adequacy benchmark under a stress scenario.

**Fitch Inc.**
On March 26, 2008, Fitch Ratings ("Fitch") announced certain ratings actions on Security Capital Assurance Ltd ("SCA") and its operating subsidiaries. Fitch downgraded the Insurer Financial Strength ("IFS") rating of XL Capital Assurance Inc., XL Capital Assurance (U.K.) Ltd. and XL Financial Assurance Ltd to "BB" from "A". SCA's Long Term Issuer Rating was downgraded to "B-" from "BBB" and SCA's Fixed/Floating Series A Perpetual Non-cumulative Preference Shares were downgraded to "CCC" from "BBB-". SCA's Twins Reefs Pass-Through Trust Securities were downgraded to "B" from "BBB". In addition, Fitch announced that the Rating Outlook is Negative.

In taking the ratings actions described above, Fitch noted that: "The downgrade of SCA and its financial guaranty subsidiaries centers on Fitch's updated assessment of SCA's capital position, a review by Fitch of the company's current capital enhancement plans, and an update on Fitch's current views of U.S. subprime related risks. The downgrade also reflects what Fitch views as the material erosion in SCA's franchise value and competitive business position following downgrades to well below 'AAA' by each of the three major rating agencies."

Further, Fitch noted in its release that, "[it] believes that SCA's current level of capital and claims paying resources is no longer consistent with [its] guidelines for an investment grade IFS rating" and that "SCA's current claims paying resources fall below the agency's targeted 'AAA', 'AA', 'A' and 'BBB' IFS rating ranges by the following amounts: 'AAA' capital shortfall of $5.6 to $5.9 billion; 'AA' capital shortfall of $3.9 to $4.5 billion; 'A' capital shortfall of $1.3 to $2.5 billion; 'BBB' capital shortfall of $600 million to $1.2 billion." In addition, the release mentioned that "SCA has been aiming to restore the company's financial and capital position, and that SCA's 'suspension of new underwriting is expected to help SCA's capital position as the company will benefit from the amortization or existing insured obligations, some of which exhaust a material amount of targeted capital."

Fitch stated that, going forward, it believed that "it will be very difficult to stabilize the ratings of SCA until the company can both raise external capital and more effectively limit the downside risk from its [structured finance collateralized debt obligations ("SF CDOs")] through reinsurance or other risk mitigation initiatives. Fitch does not anticipate removing the Negative Rating Outlook over the near-to-intermediate-term until the risk of loss on the SF CDOs portfolio can be more definitively quantified."

On January 23, 2008, Fitch announced certain ratings actions on Security Capital Assurance Ltd and its operating subsidiaries. Fitch downgraded the Insurer Financial Strength rating of XL Capital Assurance Inc. ("XLCA"), XL Capital Assurance (U.K.) Ltd. and XL Financial Assurance Ltd. ("XLFA") to "A" from "AAA". SCA's Long Term Issuer Rating was downgraded to "BBB" from "AA" and SCA's Fixed/Floating Series A Perpetual Non-cumulative Preference Shares were downgraded to "BBB" from "AA". SCA's Twins Reefs Pass-Through Trust Securities were downgraded to "BBB" from "AA". In addition, Fitch announced that the ratings remain on Rating Watch Negative. Fitch noted that the downgrades follow SCA's announcement on January 23, 2008 that SCA has determined not to raise new capital at the present time.

In taking the ratings actions described above, Fitch had the following comments:

"As Fitch announced on Dec. 12, 2007, when it placed SCA on Rating Watch Negative, the company has a modeled capital shortfall of more than $2 billion at the 'AAA' rating threshold. The downgrade places XLCA and XLFA's insurer financial strength (IFS) ratings at a level commensurate with an 'A' rating stress level under Fitch's most recent capital modeling.

"The downgrade of the IFS ratings to 'A' coupled with the continuation of the Negative Rating Watch, reflects the significant uncertainty with respect to the company's franchise, business model and strategic direction; uncertain capital markets and the impact of SCA's recent decisions on future financial flexibility; the company's future capital strategy; ultimate loss levels in its insured portfolio; and the challenges in the financial guaranty market overall. Fitch expects to resolve the Negative Rating Watch after the agency evaluates these various qualitative factors, as well as the progress SCA makes with respect its ongoing future capital

SCA - Ratings Update

enhancement plans.

"The downgrade in the holding company debt ratings reflects greater uncertainties surrounding SCA's future earnings and ability to pay dividends on its Fixed/Floating Series A Perpetual Non-cumulative Preference Shares, together with movement to the more typical notching used at the 'A' IFS rating level.

"Fitch notes that when it placed SCA on Rating Watch on Dec. 12, 2007, the agency stated if a downgrade were to occur, it would expect the IFS rating of XLCA and XLFA to be downgraded to the 'AA' rating category, assuming little change to the company's current capital position. However, that view assumed SCA would have likely addressed at least a portion of its capital shortfall. While Fitch believes SCA continues to work towards addressing its capital enhancement plan, to date progress has fallen materially short of Fitch's prior expectations. Fitch will comment on the impact of the downgrade of SCA's IFS rating on the ratings of securities insured by XLCA in a separate release."

On December 12, 2007, following the completion of its capital adequacy analysis as described below, Fitch issued a press release indicating that it was placing XLCA and XLFA on 'Rating Watch Negative" and that its review indicates that SCA's capital adequacy under Fitch's Matrix financial guaranty capital model currently falls below the guidelines for an "AAA" insurer financial strength ('IFS") rating by more than $2 billion due to sharp downgrades by Fitch in a number of SCA's insured structured finance collateralized debt obligation ('SF CDO") exposures. This press release also noted that if within the next four to six weeks, SCA is able to obtain firm capital commitments, and/or put in place reinsurance or other risk mitigation measures that enable SCA to meet capital guidelines, Fitch would expect to affirm SCA's ratings with a "Stable Rating Outlook". If SCA is unable to meet capital guidelines in the noted time frame, Fitch would expect to downgrade SCA's ratings. Assuming little change to SCA's current capital position, based on the results of Fitch's updated capital analysis, Fitch would expect the IFS rating to be downgraded to the "AA" category. On December 12, 2007 and December 13, 2007, SCA issued press releases indicating that it has a plan to address Fitch's additional capital requirements. This plan involves a range of options for increasing SCA's capital position within the time frame indicated by Fitch. Components of the plan include, but are not limited to, the following possible actions: the use of traditional and non-traditional reinsurance; the commutation and restructuring of certain CDO obligations with SCA's counterparties; the receipt of capital credit for certain contractual obligations in favor of SCA; and the raising of additional debt or equity capital from external sources. Although SCA and its subsidiaries are actively working to address such additional capital requirements, none of SCA, XLCA or XLFA can give any assurance as to whether this plan will be successful or whether one or more other rating agencies will require additional capital following the completion of their review of SCA and its subsidiaries.

On November 5, 2007, Fitch issued a press release indicating that it was updating its capital

adequate analysis for the financial guaranty industry in light of recent rating actions by the rating agencies with respect to SF CDOs with exposure to subprime mortgage-backed securities. Fitch's preliminary observation is that there is a "moderate probability" that SCA may experience pressure in its capital cushion under Fitch's updated stress analysis due to relatively high SF CDO exposures relative to its most recently measured capital cushion. Fitch noted that it would consider actions taken by a financial guarantor to mitigate risk or enhance its capital position while Fitch completes its review over the next four to six weeks.

**Standard & Poor's**

On February 25, 2008, Standard & Poor's Ratings Services ("S&P") announced several rating actions on certain subsidiaries of Security Capital Assurance Ltd ("SCA"). S&P's release announced that the financial strength, financial enhancement and issuer credit ratings of XL Capital Assurance Inc. ("XLCA"), XL Financial Assurance Ltd ("XLFA") and XL Capital Assurance (UK) Ltd. ("XLCA-UK") were lowered to "A-" and placed on CreditWatch with negative implications. In addition, the rating of XLFA's Twin Reefs Pass-Through Trust was also lowered to "A-" and placed on CreditWatch with negative implications.

In taking the ratings actions described above, S&P noted that: "The downgrade reflects [its] assessment that [SCA]'s evolving capital plan has meaningful execution and timing risk. In [S&P's] opinion, [SCA]'s ability to access additional capital resources is uncertain. Based on each of [XLCA's, XLFA's and XLCA-UK's] current claims-paying resources and projected theoretical losses generated by Standard & Poor's capital adequacy model, each of [these] companies' margin of safety falls in the 'A' category. The CreditWatch Negative designation reflects the potential that the capital plan will not be successful."

On January 31, 2008, S&P announced ratings actions on certain subsidiaries of SCA, as well as on other bond insurance companies. In its release, S&P commented that the various rating actions announced are the result of their most recent review of all the bond insurance companies' capital plans. The release noted that S&P's review covered the scope of each plan relative to the projected losses for that company, the success each company has had to date in implementing its plan, and S&P's assessment of the likelihood that the companies could implement the remaining components of their plans. The review is part of S&P's ongoing assessment of the potential subprime-related losses that bond insurers might incur and how they are managing their capital positions to handle the losses. S&P noted that further reviews will occur as circumstances warrant.

S&P's release announced that the "AAA" financial strength, financial enhancement and issuer credit ratings of XL Capital Assurance Inc., XL Financial Assurance Ltd. ("XLFA") and XL Capital Assurance (UK) Ltd. were all placed on CreditWatch with negative implications. In addition, the "AA-" rating of XLFA's Twin Reefs Pass-Through Trust was also placed on CreditWatch with negative implications. S&P noted that the negative CreditWatch placement reflects S&P's

SCA - Ratings Update

assessment that there is increased execution risk regarding SCA's ability to successfully implement its capital plan to offset projected losses. S&P noted that SCA has tabled the third-party capital-raising component of its plan due to unfavorable market conditions. S&P believes that successful implementation of the remaining components of the capital plans will be necessary to enable SCA to manage its capital relative to projected losses.

S&P stated that CreditWatch is used in a changing credit situation when a rating change is not yet certain. S&P may place ratings on CreditWatch when an event or deviation from an expected trend has occurred or is expected, when this event or deviation increases the probability of a rating action, and when additional information is necessary for S&P to take a rating action. The greater the likelihood of a rating change, the more likely S&P is to use CreditWatch, with guidelines of at least a one-in-two likelihood of a rating change occurring in the short term, typically within 90 days. S&P notes that, from time to time, events may present such significant uncertainty to an issuer's creditworthiness that a rating is placed on CreditWatch without the need to assess this threshold of potential change.

On December 19, 2007, S&P issued a comment detailing the results the completion of its third in a continuing series of stress tests of monoline financial guarantors with respect to their domestic subprime mortgage exposure. S&P notes that for this review, following unprecedented deterioration in the domestic mortgage market, S&P updated its stress scenario, incorporating a broad vintage period and including a wide group of asset classes as well. S&P's research has led them to the conclusion that the potential for further mortgage market deterioration remains uncertain and will challenge the ability of the insurers to accurately gauge their ongoing additional capital needs in the near term. As a result, S&P is effectively adopting a negative outlook for those firms with significant exposure to domestic subprime mortgages and/or meaningful lower credit quality exposures. The assignment of a negative outlook also reflects S&P's assessment with regard to the strength of a company's capital position when weighed against projected stress case losses as well as the comprehensiveness and degree of completion of projected capitalization strengthening efforts underway.

As a result of the review, the outlook on the financial strength and debt ratings of XL Capital Assurance Inc. ("XLCA"), XL Financial Assurance Ltd. ("XLFA") and Security Capital Assurance Ltd. ("SCA") were revised to negative, while their respective ratings were affirmed. S&P commented that the outlook change was warranted because of the absolute size of stress scenario losses relative to the combined capital cushion of $645 million. There were no adjustments to XLCA and XLFA's Dec. 31, 2006 combined capital cushion. The theoretic stress case scenario total after-tax net loss on residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDO") for XLCA and XLFA was estimated by S&P to be $884.1 million. S&P stated that for those insurers whose theoretic losses exceed their updated capital cushions, any rating action taken will reflect S&P's assessment of the comprehensiveness and degree of completion of projected capitalization strengthening efforts.

SCA - Ratings Update

S&P noted that in order to address the strain on the companies' claims-paying resources due to the current conditions in the RMBS and CDO markets, SCA's management has developed a capital plan that includes the following components: the commutation/restructuring of several CDO transactions; reshaping of the insured portfolio through reinsurance transactions with third parties; and capital infusions from third parties.

On November 26, 2007, Standard & Poor's issued a press release indicating it is preparing another in its series of comments on bond insurers' subprime exposure. Among other things, the release generally described new and updated data that Standard & Poor's is incorporating into its stress modeling in order to test bond insurers' ability to withstand further subprime stress. A credit opinion will be published by Standard & Poor's upon completion of this process.

**Legal Disclaimer    Privacy Notice**