Jay B. Kasner (jkasner@skadden.com)
Scott D. Musoff (smusoff@skadden.com)
Jeffrey S. Lichtman (jlichtma@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Plaintiff and Counterclaim
  Defendant Merrill Lynch International and
  Counterclaim Defendant Merrill Lynch & Co., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MERRILL LYNCH INTERNATIONAL,

     Plaintiff,

  -vs-

XL CAPITAL ASSURANCE INC., et al.,

     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
XL CAPITAL ASSURANCE INC., et al.,

     Counterclaimants,

  - vs -

MERRILL LYNCH INTERNATIONAL AND
MERRILL LYNCH & CO., INC.,

     Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

08 CV 2893 (JSR)

DECLARATION OF
JOSEPH GAMBINO

JOSEPH GAMBINO, under penalty of perjury, declares as follows:

  1.  I am a Vice President in the Global Markets and Investment Banking group at

Merrill, Lynch, Pierce, Fenner & Smith, Inc.  I submit this declaration in support of Merrill

Lynch International's ("MLI") and Merrill Lynch & Co., Inc.'s ("ML&Co.") Motion for Partial Summary Judgment. I have personal knowledge of the matters herein.

2.    MLI is a company organized under the laws of England and Wales with its principal place of business in London. ML&Co. is a Delaware corporation with its principal place of business in New York.

3.    The documents that memorialize a credit default swap transaction are the International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement, the Schedule to the Master Agreement, the Confirmation, and the Financial Guaranty Insurance Policy.

4.    Attached hereto are true and correct copies of the following documents, (confidential portions of which that are not relevant to this dispute have been redacted):

Exhibit:

1.    Confirmations for the Credit Default Swap ("CDS") Agreements with Defendants (the "XL Swaps"):

    A.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 138 and XL Capital Assurance, Inc. relating to Class A-2 notes issued by West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC ("West Trade II").

    B.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 153 and XL Capital Assurance, Inc. relating to Class A-2 notes issued by Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC ("Silver Marlin").

    C.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 164 and XL Capital Assurance, Inc.

relating to Class A-2 notes issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC ("Tazlina").

D.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 165 and XL Capital Assurance, Inc. relating to Class A-2 notes issued by West Trade Funding CDO III, Ltd. and West Trade Funding CDO III, LLC ("West Trade III").

E.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 170 and XL Capital Assurance, Inc. relating to Class A-2 notes issued by Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC ("Jupiter").

F.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 172 and XL Capital Assurance, Inc. relating to Class A-2 notes issued by Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC ("Robeco").

G.    The Confirmation in connection with the CDS entered into between MLI, Portfolio CDS Trust 186 and XL Capital Assurance, Inc. relating to Class A-2 notes issued by Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC ("Biltmore").

2.      Confirmations for the CDS Agreements between MLI and MBIA Insurance Corporation ("MBIA") (the "MBIA Swaps"):

    A.    The Confirmation in connection with the CDS entered into between MLI, LaCrosse Financial Products LLC ("LaCrosse") and MBIA for the LaCrosse West Trade II CDS, which provided protection on Class A-1 notes issued by West Trade II.

    B.    The Confirmation in connection with the CDS entered into between MLI, Lacrosse and MBIA for the LaCrosse Silver Marlin CDS, which provided protection on Class A-1 notes issued by Silver Marlin.

    C.    The Confirmation in connection with the CDS entered into between MLI, Lacrosse and MBIA for the LaCrosse Tazlina CDS, which provided protection on Class A-1 notes issued by Tazlina.

    D.    The Confirmation in connection with the CDS entered into between MLI, Lacrosse and MBIA for the LaCrosse West Trade III CDS, which provided protection on Class A-1 notes issued by West Trade III.

    E.    The Confirmation in connection with the CDS entered into between MLI, Lacrosse and MBIA for the LaCrosse Robeco CDS, which provided protection on Class A-1 notes issued by Robeco.

    F.    The Confirmation in connection with the CDS entered into between MLI, Lacrosse and MBIA for the LaCrosse Biltmore CDS, which provided protection on Class A-1 notes issued by Biltmore.

4

5.      Nothing in any hedging agreement with any counterparty other than XL Capital Assurance, Inc. ("XLCA") would preclude MLI from exercising Voting Rights (as defined in the Confirmation) in accordance with its contracts with XLCA.

6.      MLI has never received from Defendants any instructions to exercise any Voting Rights in connection with any of the XL Swaps.

7.      MLI has never failed to exercise any Voting Rights in connection with any of the XL Swaps solely in accordance with the written instructions of Defendants.

8.      MLI has not entered into any credit default swap or other agreement with any other party that could in any way implicate MLI's exercise of Voting Rights relating to Jupiter.

9.      Each of the Schedules for the seven XL Swaps contains a choice of law provision designating New York law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2008.

_____
JOSEPH GAMBINO

# Exhibit 1A


**Merrill Lynch**

DATE:                          January 25, 2007

TO:                            PORTFOLIO CDS TRUST 138 acting through XLCA
                               Admin LLC, not in its individual capacity but solely as
                               Trustee

ATTENTION:

FROM:                          MERRILL LYNCH INTERNATIONAL

RE:                            Credit Derivative Transaction relating to West Trade
                               Funding CDO II Ltd. – REFERENCE 06ML82006A

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions
of the Credit Derivative Transaction entered into between us on the Trade Date specified below
(the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA
Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions,
as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives
Definitions"), as published by the International Swaps and Derivatives Association, Inc.
("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the
Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement
(Multicurrency-Cross Border) dated as of January 25, 2007, as amended and supplemented from
time to time (the "Agreement"), between you and us. All provisions contained in the Agreement
govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have
the meanings given to such terms in the Indenture dated December 7, 2006 among West Trade
Funding CDO II Ltd. (the "Issuer"), West Trade Funding CDO II LLC (the "Co-Issuer")
and Wells Fargo Bank, National Association (the "Indenture").

The terms of the Transaction to which this Confirmation relates are as follows:

1.      **General Terms:**

        Trade Date:                    January 25, 2007

        Effective Date:                January 25, 2007

        Scheduled Termination Date:    The Stated Maturity of the Reference Obligation plus
                                       the longest settlement period for Modified Cash

Settlement, Cash Settlement, or Physical Settlement, as applicable.

Termination Date:

The earlier of:

(a)   Scheduled Termination Date;

(b)   the date on which the Outstanding Principal Balance of the Reference Obligation equals zero; or

(c)   the Accelerated Maturity Date.

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

Party A Floating Rate Payer:

Merrill Lynch International ("Buyer" or "Party A")

Party B Floating Rate Payer:

Portfolio CDS Trust 138 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company.

Fixed Rate Payer:

Buyer

Calculation Agent:

Buyer

Calculation Agent City:

New York

Business Days:

New York

Business Day Convention:

Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day).

Reference Entities:

West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC.

Reference Obligation:

USD 375,000,000 Class A-2 Second Priority Senior Secured Floating Rate Notes Due 2051 issued by West Trade Funding CDO II Ltd. and West Trade Funding

2

CDO II LLC with Regulation ISIN Number USG95881AB78 and Restricted Global Note CUSIP Number 956316AC7.

The term "USD" shall mean the lawful currency of the United States of America.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| All Guarantees: | Not Applicable |
| Reference Price: | 100% |
| Applicable Percentage: | 100% |

**2.    Fixed Payments:**

Fixed Rate Payer Calculation Amount:

**REDACTED**

Fixed Rate Payer Payment Dates:

The fourth day of every calendar month commencing on April 4, 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction.

Fixed Rate:

Fixed Rate Day Count Fraction:

**REDACTED**

**3.    Floating Payments:**

Party A Floating Rate Payment Amount:

**REDACTED**

**REDACTED**

| | |
|---|---|
| Party A Floating Rate Payment Dates: | Party A shall pay the Additional Amount as soon as reasonably practicable, but in no event later than 3 Business Days after such amounts are received by Party A from Collections, or, if Party A is not a beneficial owner of any part of the Reference Obligation, 3 Business Days after such amounts are received by such beneficial owners from Collections. |

"**Additional Amount**" means, with respect to any Party A Floating Rate Payment Date, an amount equal to any amounts paid under the Policy by the Credit Support Provider and, without duplication of the foregoing, all amounts previously paid by Party B or its Credit Support Provider hereunder that have not previously been reimbursed to Party B by Party A by payment of Additional Amounts hereunder, together with (i) any and all default interest, in the case of a step-up in the interest rate payable on the Reference Obligation following a default thereon, paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, or (ii) in the case of interest accrued on the defaulted payments paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such amounts were paid hereunder until reimbursed in full

4

(after as well as before judgment), at a rate of interest equal to LIBOR plus 0.30% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"**Collections**" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"**Unreimbursed Party A Expenditures**" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in connection with actions taken by Party A with respect to the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation at the direction of

5

Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures. The obligation of Party B to reimburse Party A for Unreimbursed Party A expenditures from Party B Collections shall survive the Physical Settlement Date.

| | |
|---|---|
| Interest Shortfall Cap: | Not Applicable |

Conditions to Settlement:

**Credit Event Notice**     Notifying Parties:
                            Buyer or Seller.

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include (i) the Interest Shortfall (as defined below) (if any) and (ii) the Principal Shortfall (as defined below) (if any).

**Notice of Publicly
Available Information:**
     Public Sources:        Applicable
                            The sources listed
                            in Section 3.7 of the
                            Credit Derivative

6

Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture.

Specified Number:  Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be one.

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event:  The following Credit Events shall apply to this Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, "**Failure to Pay**" means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

"**Scheduled Payment**" means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

7

|                | Grace Period Extension: | Not applicable |
|----------------|------------------------|----------------|
|                | Payment Requirement:   | USD 1,000.     |

Obligation(s):

For the purposes of the table below;
"**Yes**" shall mean that the relevant selection is applicable; and
"**No**" shall mean that the relevant selection is not applicable.

|     | **Obligation Categories** |     | **Obligation Characteristics** |
|-----|---------------------------|-----|-------------------------------|
| No  | Payment                   | No  | Not Subordinated              |
| No  | Borrowed Money            | No  | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender        |
| No  | Bond                      | No  | Not Domestic Currency         |
| No  | Loan                      | No  | Not Domestic Law              |
| No  | Bond or Loan              | No  | Listed                        |
|     |                           | No  | Not Domestic Issuance         |

Excluded Obligations:

None

## 4.    Settlement Terms:

Settlement Method:

Cash Settlement, Modified Cash Settlement or Physical Settlement, as elected by Seller in Seller's sole and absolute discretion; provided, however, that Seller's election of Physical Settlement will not be effective unless the Buyer, after using commercially reasonable efforts, is able to deliver the Deliverable Obligations to the Seller within the Physical Settlement Period. Buyer shall notify Seller promptly (and in any event within five (5) Business Days) in writing upon becoming aware of its inability or impossibility to deliver the Deliverable Obligations. If Buyer so notifies Seller, Cash Settlement or Modified Cash Settlement shall apply, in the sole discretion of Seller. For the avoidance of doubt, notwithstanding Seller's election of Modified Cash

8

|  |  |
|---|---|
| | Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph. |
| Settlement Currency: | USD |

**Terms Relating to Physical Settlement:**

| | |
|---|---|
| Physical Settlement Period: | 30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above. |
| Portfolio: | The product of the Applicable Percentage and USD 375,000,000 in original principal balance of the Reference Obligation |
| Deliverable Obligations: | For the purposes of the table below: "**Yes**" shall mean that the relevant selection is applicable; and "**No**" shall mean that the relevant selection is not applicable. |

| | Deliverable Obligation Categories | | Deliverable Obligation Characteristics |
|---|---|---|---|
| **No** | Payment | **No** | Not Subordinated |
| **No** | Borrowed Money | **No** | Specified Currency – Standard Specified Currencies |
| **Yes** | Reference Obligation(s) Only | **No** | Not Sovereign Lender |
| **No** | Bond | **No** | Not Domestic Currency |
| **No** | Loan | **No** | Not Domestic Law |
| **No** | Bond or Loan | **No** | Listed |

9

|     |                              |
|-----|------------------------------|
| No  | Not Contingent               |
| No  | Not Domestic Issuance        |
| No  | Assignable Loan              |
| No  | Consent Required Loan        |
| No  | Direct Loan Participation    |
|     | Qualifying Participation Seller |
| No  | Transferable                 |
| No  | Maximum Maturity             |
| No  | Accelerated or Matured       |

Excluded Deliverable Obligations:      Not Applicable

Additional Term of Physical Settlement:      "Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:      Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:      Bid

Quotation Amount:      The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:      Exclude Accrued Interest

Cash Settlement Date:      Three (3) Business Days following the calculation of the Final Price.

10

| Cash Settlement Amount: | Notwithstanding anything to the contrary in the 2003 Credit Derivatives Definitions: |
|---|---|
| | The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero. |
| Dealers: | At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation. |

**Terms Relating to Modified Cash Settlement:**

| | Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows: |
|---|---|
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if such acceleration had not occurred). |

11

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the Available Funds attributable to interest proceeds actually paid to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring on July 4, 2051, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the Available Funds attributable to principal proceeds paid to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all

12

proceeds thereof have been distributed in accordance with the Priority of Payments.

5.    **Notice and Account Details:**

Notice and Account Details for XLCA As Designee of Seller:

Receiving Bank:

**REDACTED**

Beneficiary:

\

Notice and Account Details for the Buyer

Merrill Lynch World Headquarters
4 World Financial Center
18th Floor
New York, New York 10080
Attention: Swaps Group

**REDACTED**

Copies to:

Merrill Lynch & Co., Inc.
4 World Financial Center
New York, NY 10080
Attention: Joe Gambino

**REDACTED**

and

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attention: Swaps Legal

**REDACTED**

13

**REDACTED**

6.    **Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously. In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding

14

Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means $375,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby, and each Hedge Counterparty.

Upon a termination of the Agreement following an Additional Termination Event, no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement and Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule).

Termination:

Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the "**Custodian**") then involved in Seller's custodial

15

receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the **"Secondary Market Insurance Policy"**) and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any) and (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance.

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____

Name:

Title:


By: _____

Name:

Title:


Acknowledged and agreed by PORTFOLIO CDS
TRUST 138 acting through XLCA Admin LLC,
not in its individual capacity but solely as Trustee,
as of the date first above written:


By: _____

Name:

Title:


Acknowledged by XL CAPITAL ASSURANCE INC.


By: _____

Name:

Title:

17

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 138 acting through XLCA Admin LLC,
not in its individual capacity but solely as Trustee,
as of the date first above written:

By: _____
      Name:  Mark G. Walsh
      Title:   Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
      Name: Sohail A. Rasul
      Title:  Senior Managing Director

17

# Exhibit 1B

EXECUTION COPY

 **Merrill Lynch**

DATE:                          April 11, 2007

TO:                            PORTFOLIO CDS TRUST 153 acting through XLCA
                               Admin LLC, not in its individual capacity but solely as
                               Trustee

ATTENTION:

FROM:                          MERRILL LYNCH INTERNATIONAL

RE:                            Credit Derivative Transaction relating to Silver Marlin
                               CDO I Ltd. – REFERENCE 07ML39487A

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement (Multicurrency-Cross Border) dated as of April 11, 2007, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have the meanings given to such terms in the Indenture dated March 29, 2007 among Silver Marlin CDO I Ltd. (the "Issuer"), Silver Marlin CDO I LLC (the "Co-Issuer") and Wells Fargo Bank, National Association (the "Indenture"). In the event of any inconsistency between the Indenture and this Confirmation, this Confirmation will govern.

The terms of the Transaction to which this Confirmation relates are as follows:

1.      **General Terms:**

        Trade Date:            March 26, 2007

10368978.8

| | |
|---|---|
| Effective Date: | March 29, 2007 |
| Scheduled Termination Date: | The Stated Maturity of the Reference Obligation plus the longest settlement period for Modified Cash Settlement, Cash Settlement, or Physical Settlement, as applicable. |
| Termination Date: | The earliest of: |

(a)     Scheduled Termination Date;
(b)     the date on which the Outstanding Principal Balance of the Reference Obligation equals zero;
(c)     the Accelerated Maturity Date; or
(d)     the CR Establishment Date (as defined below).

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

| | |
|---|---|
| Party A Floating Rate Payer: | Merrill Lynch International ("Buyer" or "Party A") |
| Party B Floating Rate Payer: | Portfolio CDS Trust 153 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company. |
| Fixed Rate Payer: | Buyer |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Days: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entities: | Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC. |

10368978.8

2

Reference Obligation:

USD437,500,000 Class A-2 Second Priority Senior Secured Floating Rate Notes Due 2050 issued by Silver Marlin CDO I Ltd. and Silver Marlin CDO I LLC with Regulation S ISIN Number USG81341AF94 and Restricted Global Note CUSIP Number 827899 AF 2.

The term "USD" shall mean the lawful currency of the United States of America.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

All Guarantees:                Not Applicable

Reference Price:               100%

Applicable Percentage:         100%

**2.    Fixed Payments:**

Fixed Rate Payer Calculation Amount:                           **REDACTED**

Fixed Rate Payer Payment Dates:

The seventh day of every calendar month commencing on August 7, 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction.

Fixed Rate:                          **REDACTED**

Fixed Rate Day Count Fraction:

**3.    Floating Payments:**

Party A Floating Rate Payment Amount:                          **REDACTED**

10368978.8

3

**REDACTED**

Party A Floating Rate
Payment Dates:

Party A shall pay the Additional Amount as soon as
reasonably practicable, but in no event later than 3
Business Days after such amounts are received by Party
A from Collections, or, if Party A is not a beneficial
owner of any part of the Reference Obligation, 3
Business Days after such amounts are received by such
beneficial owners from Collections.

"**Additional Amount**" means, with respect to any Party
A Floating Rate Payment Date, an amount equal to any
amounts paid under the Policy by the Credit Support
Provider and, without duplication of the foregoing, all
amounts previously paid by Party B or its Credit
Support Provider hereunder that have not previously
been reimbursed to Party B by Party A by payment of
Additional Amounts hereunder, together with (i) any
and all default interest, in the case of a step-up in the
interest rate payable on the Reference Obligation
following a default thereon, paid to Party A, or if Party
A is not the beneficial owner of the Applicable
Percentage of the Outstanding Principal Balance of the
Reference Obligation, the beneficial owners of the
Applicable Percentage of such Reference Obligation,
with respect to the Reference Obligation by the Issuer,
the Co-Issuer or any other Person under the Indenture,
or (ii) in the case of interest accrued on the defaulted
payments paid to Party A, or if Party A is not the
beneficial owner of the Applicable Percentage of the
Outstanding Principal Balance of the Reference
Obligation, the beneficial owners of the Applicable
Percentage of such Reference Obligation, with respect
to the Reference Obligation by the Issuer, the Co-Issuer
or any other Person under the Indenture, interest on any
and all such amounts remaining unreimbursed (to the
extent permitted by law, if in respect of any unpaid

4

amounts representing interest), from the date such amounts were paid hereunder until reimbursed in full (after as well as before judgment), at a rate of interest equal to LIBOR plus 0.27% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"**Collections**" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"**Unreimbursed Party A Expenditures**" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in connection with actions taken by Party A with respect to

5

the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation at the direction of Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures. The obligation of Party B to reimburse Party A for Unreimbursed Party A Expenditures from Party B Collections shall survive the Physical Settlement Date.

**Interest Shortfall Cap:**            Not Applicable

**Conditions to Settlement:**          **Credit Event Notice**    Notifying Parties:
                                                                Buyer or Seller.

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include: (i) the Interest Shortfall (as defined below) (if any); and/or (ii) the Principal Shortfall (as defined below) (if any).

**Notice of Publicly**
**Available Information:**              Applicable
            Public Sources:            The sources listed

in Section 3.7 of the Credit Derivative Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture.

Specified Number: Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be one.

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event: The following Credit Events shall apply to this Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, **"Failure to Pay"** means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

**"Scheduled Payment"** means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in

accordance with the Priority of Payments).

Grace Period
Extension:     Not applicable

Payment
Requirement: USD 1,000.

Obligation(s):                    For the purposes of the table below;
                                  "**Yes**" shall mean that the relevant selection is
                                  applicable; and
                                  "**No**" shall mean that the relevant selection is not
                                  applicable.

|  | **Obligation Categories** |  | **Obligation Characteristics** |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |
|  |  | No | Not Domestic Issuance |

Excluded Obligations:             None

**4.    Settlement Terms:**

Settlement Method:                Cash Settlement, Modified Cash Settlement or Physical
                                  Settlement, as elected by Seller in Seller's sole and
                                  absolute discretion; <u>provided</u>, <u>however</u>, that Seller's
                                  election of Physical Settlement will not be effective
                                  unless the Buyer, after using commercially reasonable
                                  efforts, is able to deliver the Deliverable Obligations to
                                  the Seller within the Physical Settlement Period.  Buyer
                                  shall notify Seller promptly (and in any event within
                                  five (5) Business Days) in writing upon becoming aware
                                  of its inability or impossibility to deliver the Deliverable
                                  Obligations.  If Buyer so notifies Seller, Cash Settlement
                                  or Modified Cash Settlement shall apply, in the sole

discretion of Seller. For the avoidance of doubt, notwithstanding Seller's election of Modified Cash Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph.

Settlement Currency:         USD

**Terms Relating to Physical Settlement:**

Physical Settlement Period:    30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above.

Portfolio:              The product of the Applicable Percentage and USD 437,500,000 in original principal balance of the Reference Obligation

Deliverable Obligations:       For the purposes of the table below;
"**Yes**" shall mean that the relevant selection is applicable; and
"**No**" shall mean that the relevant selection is not applicable.

|  | Deliverable Obligation Categories |  | Deliverable Obligation Characteristics |
|---|---|---|---|
| **No** | Payment | **No** | Not Subordinated |
| **No** | Borrowed Money | **No** | Specified Currency – Standard Specified Currencies |
| **Yes** | Reference Obligation(s) Only | **No** | Not Sovereign Lender |
| **No** | Bond | **No** | Not Domestic Currency |
| **No** | Loan | **No** | Not Domestic Law |

10368978.8

9

|  |  | **No** | Listed |
|--|--|--------|--------|
|  |  | **No** | Not Contingent |
|  |  | **No** | Not Domestic Issuance |
|  |  | **No** | Assignable Loan |
|  |  | **No** | Consent Required Loan |
|  |  | **No** | Direct Loan Participation |
|  |  | **No** | Qualifying Participation Seller |
|  |  | **No** | Transferable |
|  |  | **No** | Maximum Maturity |
|  |  | **No** | Accelerated or Matured |

**No**    Bond or Loan

Excluded Deliverable Obligations:

Not Applicable

Additional Term of Physical Settlement:

"Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:

Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:

Bid

Quotation Amount:

The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:

Exclude Accrued Interest

Cash Settlement Date:

Three (3) Business Days following the calculation of

10368978.8

10

the Final Price.

| | |
|---|---|
| Cash Settlement Amount: | Notwithstanding anything to the contrary in the 2003 Credit Derivatives Definitions: |

The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero.

| | |
|---|---|
| Dealers: | At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation. |

**Terms Relating to Modified Cash Settlement:**

Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows:

| | |
|---|---|
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |

| | |
|---|---|
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if |

such acceleration had not occurred).

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the amounts actually paid to Party A with respect to interest, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring on May 7, 2050, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the amounts paid to Party A with respect to principal, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance with the Priority of Payments.

5.    **Notice and Account Details:**

Notice and Account Details for        Receiving Bank:
XLCA As Designee of Seller:

-

**REDACTED**

Beneficiary:

Notice and Account Details for        Merrill Lynch World Headquarters
the Buyer                              4 World Financial Center
                                       18th Floor
                                       New York, New York 10080
                                       Attention: Swaps Group

**REDACTED**

Copies to:

Merrill Lynch & Co., Inc.
4 World Financial Center
New York, NY 10080
Attention: Joe Gambino

**REDACTED**

and

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY  10080
Attention: Swaps Legal

**REDACTED**

**REDACTED**

## 6.     Additional Transaction Terms

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously.  In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by

Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means USD437,500,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class materially and adversely affected thereby, each Subordinate Security materially and adversely affected thereby, and each Hedge Counterparty.

Upon a termination of the Agreement following an Additional Termination Event, (i) no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement, (ii) Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule) and (iii) Party B shall pay Party A any Physical Settlement Amount, Cash Settlement Amount or Modified Cash Settlement Amount on the Delivery Date, Cash Settlement Date or Modified Cash Settlement Date, as applicable, in respect of a Credit Event for which the Conditions to Settlement have been satisfied prior to the Early Termination Date, provided, if Physical Settlement applies, that Party A Delivers to Party B the Deliverable Obligation.

Termination:

Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate

10368978.8

15

the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below).  Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the "**Custodian**") then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the "**Secondary Market Insurance Policy**") and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any), (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance, (C) Buyer's and Seller's respective rights and obligations under and in respect of the third and fourth paragraphs of this provision shall survive the termination of this Transaction and (D) the date on which Seller and Buyer satisfy their obligations under this paragraph shall be the "**CR Establishment Date**".

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

10368978.8

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 153 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
     Name:    Mark G. Walsh
     Title:    Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
     Name:    Mark T. Dunsheath
     Title:    Managing Director

10368978.8

18

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 153 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
        Name:
        Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
        Name:
        Title:

10368978.8

07ML39487A

18

# Exhibit 1C

EXECUTION COPY

**Merrill Lynch**

DATE:                          June 4, 2007

TO:                            PORTFOLIO CDS TRUST 164 acting through XLCA
                               Admin LLC, not in its individual capacity but solely as
                               Trustee

ATTENTION:

FROM:                          MERRILL LYNCH INTERNATIONAL

RE:                            Credit Derivative Transaction relating to Tazlina
                               Funding CDO II, Ltd. – REFERENCE 07ML61441A

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions
of the Credit Derivative Transaction entered into between us on the Trade Date specified below
(the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA
Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions,
as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives
Definitions"), as published by the International Swaps and Derivatives Association, Inc.
("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the
Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement
(Multicurrency-Cross Border) dated as of June 4, 2007, as amended and supplemented from time
to time (the "Agreement"), between you and us. All provisions contained in the Agreement
govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have
the meanings given to such terms in the Indenture dated May 10, 2007 among Tazlina Funding
CDO II, Ltd. (the "Issuer"), Tazlina Funding CDO II, LLC (the "Co-Issuer") and Wells Fargo
Bank, National Association (the "Indenture"). In the event of any inconsistency between the
Indenture and this Confirmation, this Confirmation will govern.

The terms of the Transaction to which this Confirmation relates are as follows:

1.    **General Terms:**

      Trade Date:              June 4, 2007

10423793.6

| | |
|---|---|
| Effective Date: | May 10, 2007 |
| Scheduled Termination Date: | The Stated Maturity of the Reference Obligation plus the longest settlement period for Modified Cash Settlement, Cash Settlement, or Physical Settlement, as applicable. |
| Termination Date: | The earliest of: |

    (a)    Scheduled Termination Date;

    (b)    the date on which the Outstanding Principal Balance of the Reference Obligation equals zero;

    (c)    the Accelerated Maturity Date; or

    (d)    the CR Establishment Date (as defined below).

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(i) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

| | |
|---|---|
| Party A Floating Rate Payer: | Merrill Lynch International ("Buyer" or "Party A") |
| Party B Floating Rate Payer: | Portfolio CDS Trust 164 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company. |
| Fixed Rate Payer: | Buyer |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Days: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entities: | Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC. |

10423793.6

2

| | |
|---|---|
| Reference Obligation: | USD450,000,000 Class A-2 Second Priority Senior Floating Rate Notes Due 2054 issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC with Regulation S ISIN Number USG8697XAB76 and Restricted Global Note CUSIP Number 878047AB5. |
| | The term "USD" shall mean the lawful currency of the United States of America. |
| | Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction. |
| All Guarantees: | Not Applicable |
| Reference Price: | 100% |
| Applicable Percentage: | 100% |

**2.    Fixed Payments:**

Fixed Rate Payer Calculation Amount:

<b>REDACTED</b>

Fixed Rate Payer Payment Dates:    The ninth day of every calendar month commencing on November 9, 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction.

Fixed Rate:

Fixed Rate Day Count Fraction:

<b>REDACTED</b>

**3.    Floating Payments:**

Party A Floating Rate Payment Amount:

<b>REDACTED</b>

10423793.6

3

REDACTED

| | |
|---|---|
| Party A Floating Rate Payment Dates: | Party A shall pay the Additional Amount as soon as reasonably practicable, but in no event later than 3 Business Days after such amounts are received by Party A from Collections, or, if Party A is not a beneficial owner of any part of the Reference Obligation, 3 Business Days after such amounts are received by such beneficial owners from Collections.<br><br>**"Additional Amount"** means, with respect to any Party A Floating Rate Payment Date, an amount equal to any amounts paid under the Policy by the Credit Support Provider and, without duplication of the foregoing, all amounts previously paid by Party B or its Credit Support Provider hereunder that have not previously been reimbursed to Party B by Party A by payment of Additional Amounts hereunder, together with (i) any and all default interest, in the case of a step-up in the interest rate payable on the Reference Obligation following a default thereon, paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, or (ii) in the case of interest accrued on the defaulted payments paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, interest on any and all such amounts remaining unreimbursed (to the |

extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such amounts were paid hereunder until reimbursed in full (after as well as before judgment), at a rate of interest equal to LIBOR plus 0.32% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"Collections" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"Unreimbursed Party A Expenditures" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in

10423793.6

5

connection with actions taken by Party A with respect to the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation at the direction of Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures. The obligation of Party B to reimburse Party A for Unreimbursed Party A Expenditures from Party B Collections shall survive the Physical Settlement Date.

|  |  |  |
|---|---|---|
| Interest Shortfall Cap: | Not Applicable | |
| Conditions to Settlement: | **Credit Event Notice** | Notifying Parties: Buyer or Seller. |

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include:  (i) the Interest Shortfall (as defined below) (if any); and/or (ii) the Principal Shortfall (as defined below) (if any).

**Notice of Publicly Available Information:**          Applicable

10423793.6

6

<table>
<tr><td>Public Sources:</td><td>The sources listed in Section 3.7 of the Credit Derivative Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture.</td></tr>
<tr><td>Specified Number:</td><td>Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be one.</td></tr>
</table>

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event:                         The following Credit Events shall apply to this Transaction:

                                      Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, "**Failure to Pay**" means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

"**Scheduled Payment**" means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(i) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon

10423793.6

7

exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

Grace Period
Extension:    Not applicable

Payment
Requirement: USD 1,000.

Obligation(s):

For the purposes of the table below;
"Yes" shall mean that the relevant selection is applicable; and
"No" shall mean that the relevant selection is not applicable.

| | Obligation Categories | | Obligation Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |
| | | No | Not Domestic Issuance |

Excluded Obligations:    None

4.    **Settlement Terms:**

Settlement Method:

Cash Settlement, Modified Cash Settlement or Physical Settlement, as elected by Seller in Seller's sole and absolute discretion; provided, however, that Seller's election of Physical Settlement will not be effective unless the Buyer, after using commercially reasonable efforts, is able to deliver the Deliverable Obligations to the Seller within the Physical Settlement Period.  Buyer shall notify Seller promptly (and in any event within five (5) Business Days) in writing upon becoming aware of its inability or impossibility to deliver the Deliverable Obligations.  If Buyer so notifies Seller, Cash Settlement

10423793.6

8

or Modified Cash Settlement shall apply, in the sole discretion of Seller. For the avoidance of doubt, notwithstanding Seller's election of Modified Cash Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph.

| | |
|---|---|
| Settlement Currency: | USD |

**Terms Relating to Physical Settlement:**

| | |
|---|---|
| Physical Settlement Period: | 30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above. |
| Portfolio: | The product of the Applicable Percentage and USD 450,000,000 in original principal balance of the Reference Obligation |
| Deliverable Obligations: | For the purposes of the table below; "Yes" shall mean that the relevant selection is applicable; and "No" shall mean that the relevant selection is not applicable. |

| | Deliverable Obligation Categories | | Deliverable Obligation Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |

| | | | |
|---|---|---|---|
| No | Bond or Loan | No | Listed |
| | | No | Not Contingent |
| | | No | Not Domestic Issuance |
| | | No | Assignable Loan |
| | | No | Consent Required Loan |
| | | No | Direct Loan Participation |
| | | No | Qualifying Participation Seller |
| | | No | Transferable |
| | | No | Maximum Maturity |
| | | No | Accelerated or Matured |

Excluded Deliverable Obligations:      Not Applicable

Additional Term of Physical Settlement:      "Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:      Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:      Bid

Quotation Amount:      The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:      Exclude Accrued Interest

Cash Settlement Date:      Three (3) Business Days following the calculation of the Final Price.

10423793.6

| | |
|---|---|
| Cash Settlement Amount: | Notwithstanding anything to the contrary in the 2003 Credit Derivatives Definitions:

The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero. |
| Dealers: | At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation. |
| **Terms Relating to Modified Cash Settlement:** | Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows: |
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if such acceleration had not occurred). |

10423793.6

11

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"Interest Shortfall" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the amounts actually paid to Party A with respect to interest, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"Principal Shortfall" means, with respect to the Distribution Date occurring on November 9, 2054, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the amounts paid to Party A with respect to principal, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"Accelerated Maturity Date" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance with the Priority of Payments.

10423793.6

12

5.    **Notice and Account Details:**

Notice and Account Details for          Receiving Bank:
XLCA As Designee of Seller:

**REDACTED**

Beneficiary:

Notice and Account Details for          Merrill Lynch World Headquarters
the Buyer                               4 World Financial Center
                                        18th Floor
                                        New York, New York 10080
                                        Attention: Swaps Group

**REDACTED**

Copies to:

Merrill Lynch & Co., Inc.
4 World Financial Center
New York, NY 10080
Attention: Joe Gambino

**REDACTED**

and

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attention: Swaps Legal

**REDACTED**

DEUTSCHE BANK TRUST COMPANY
AMERICAS NEW YORK, NY (FED ABA:
021001033)

**REDACTED**

10423793.6

13

**6.    Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously.  In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents; provided that a party must satisfy the requirements of Section 10.7(f) of the Indenture in order to be entitled to receive Note Valuation Reports and Monthly Reports.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding

10423793.6

14

Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means USD450,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, (i) 100% of the outstanding principal amount of the Class A-1 Notes (as defined in the Indenture) and (ii) the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby, and each Hedge Counterparty.

Upon a termination of the Agreement following an Additional Termination Event, (i) no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement, (ii) Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule) and (iii) Party B shall pay Party A any Physical Settlement Amount, Cash Settlement Amount or Modified Cash Settlement Amount on the Delivery Date, Cash Settlement Date or Modified Cash Settlement Date, as applicable, in respect of a Credit Event for which the Conditions to Settlement have been satisfied prior to the Early Termination Date, provided, if Physical Settlement applies, that Party A Delivers to Party B the Deliverable Obligation.

Termination:

Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate

10423793.6

15

the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the "**Custodian**") then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the "**Secondary Market Insurance Policy**") and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any), (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance, (C) Buyer's and Seller's respective rights and obligations under and in respect of the third and fourth paragraphs of this provision shall survive the termination of this Transaction and (D) the date on which Seller and Buyer satisfy their obligations under this paragraph shall be the "**CR Establishment Date**".

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

10423793.6

16

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

10423793.6

17

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
     Name:
·    Title:

By: _____
     Name:
     Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 164 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
     Name: Mark G. Walsh
     Title:  Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
     Name: Trude Akersveen
     Title:  Managing Director

10423793.6

18

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

JANNY LIN
Authorized Signator.

Acknowledged and agreed by PORTFOLIO CDS
TRUST 164 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
    Name:
    Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name:
    Title:

10423793.6

18

07ML614X1A

# Exhibit 1D

EXECUTION COPY

 **Merrill Lynch**

DATE:                          June 4, 2007

TO:                            PORTFOLIO CDS TRUST 165 acting through XLCA
                               Admin LLC, not in its individual capacity but solely as
                               Trustee

ATTENTION:

FROM:                          MERRILL LYNCH INTERNATIONAL

RE:                            Credit Derivative Transaction relating to West Trade
                               Funding CDO III Ltd. – REFERENCE 07ML61446A

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions
of the Credit Derivative Transaction entered into between us on the Trade Date specified below
(the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA
Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions,
as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives
Definitions"), as published by the International Swaps and Derivatives Association, Inc.
("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the
Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement
(Multicurrency-Cross Border) dated as of June 4, 2007, as amended and supplemented from time
to time (the "Agreement"), between you and us. All provisions contained in the Agreement
govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have
the meanings given to such terms in the Indenture dated June 4, 2007 among West Trade
Funding CDO III Ltd. (the "Issuer"), West Trade Funding CDO III LLC (the "Co-Issuer")
and Wells Fargo Bank, National Association (the "Indenture"). In the event of any inconsistency
between the Indenture and this Confirmation, this Confirmation will govern.

The terms of the Transaction to which this Confirmation relates are as follows:

1.    **General Terms:**

      Trade Date:                June 4, 2007

10425196.5

| | |
|---|---|
| Effective Date: | May 10, 2007 |
| Scheduled Termination Date: | The Stated Maturity of the Reference Obligation plus the longest settlement period for Modified Cash Settlement, Cash Settlement, or Physical Settlement, as applicable. |
| Termination Date: | The earliest of: |

    (a)    Scheduled Termination Date;

    (b)    the date on which the Outstanding Principal Balance of the Reference Obligation equals zero;

    (c)    the Accelerated Maturity Date; or

    (d)    the CR Establishment Date (as defined below).

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

| | |
|---|---|
| Party A Floating Rate Payer: | Merrill Lynch International ("Buyer" or "Party A") |
| Party B Floating Rate Payer: | Portfolio CDS Trust 165 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company. |
| Fixed Rate Payer: | Buyer |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Days: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entities: | West Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC. |

10425196.5

2

Reference Obligation:                USD625,000,000 Class A-2 Second Priority Senior
                                     Floating Rate Notes Due 2053 issued by West Trade
                                     Funding CDO III, Ltd. and West Trade Funding CDO
                                     III LLC with Regulation S ISIN Number
                                     USG9588HAH96 and Restricted Global Note CUSIP
                                     Number 95631QAH2.

                                     The term "USD" shall mean the lawful currency of the
                                     United States of America.

                                     Section 2.30 of the Credit Derivatives Definitions shall
                                     not apply to this Transaction.

All Guarantees:                      Not Applicable

Reference Price:                     100%

Applicable Percentage:               100%

2.    **Fixed Payments:**

Fixed Rate Payer Calculation
Amount:                                                  **REDACTED**

Fixed Rate Payer Payment         The fourth day of every calendar month commencing on
Dates:                           September 4, 2007 and ending on the earlier to occur of
                                 the Termination Date and the last Event Determination
                                 Date to occur under this Transaction.

Fixed Rate:

Fixed Rate Day Count
Fraction:

3.    **Floating Payments:**

Party A Floating Rate Payment
Amount:                                                  **REDACTED**

10425196.5

3

REDACTED

Party A Floating Rate
Payment Dates:

Party A shall pay the Additional Amount as soon as
reasonably practicable, but in no event later than 3
Business Days after such amounts are received by Party
A from Collections, or, if Party A is not a beneficial
owner of any part of the Reference Obligation, 3
Business Days after such amounts are received by such
beneficial owners from Collections.

**"Additional Amount"** means, with respect to any Party
A Floating Rate Payment Date, an amount equal to any
amounts paid under the Policy by the Credit Support
Provider and, without duplication of the foregoing, all
amounts previously paid by Party B or its Credit
Support Provider hereunder that have not previously
been reimbursed to Party B by Party A by payment of
Additional Amounts hereunder, together with (i) any
and all default interest, in the case of a step-up in the
interest rate payable on the Reference Obligation
following a default thereon, paid to Party A, or if Party
A is not the beneficial owner of the Applicable
Percentage of the Outstanding Principal Balance of the
Reference Obligation, the beneficial owners of the
Applicable Percentage of such Reference Obligation,
with respect to the Reference Obligation by the Issuer,
the Co-Issuer or any other Person under the Indenture,
or (ii) in the case of interest accrued on the defaulted
payments paid to Party A, or if Party A is not the
beneficial owner of the Applicable Percentage of the
Outstanding Principal Balance of the Reference
Obligation, the beneficial owners of the Applicable
Percentage of such Reference Obligation, with respect
to the Reference Obligation by the Issuer, the Co-Issuer
or any other Person under the Indenture, interest on any
and all such amounts remaining unreimbursed (to the

extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such amounts were paid hereunder until reimbursed in full (after as well as before judgment), at a rate of interest equal to LIBOR plus 0.31% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"Collections" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"Unreimbursed Party A Expenditures" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in

10425196.5

5

connection with actions taken by Party A with respect to the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation at the direction of Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures.  The obligation of Party B to reimburse Party A for Unreimbursed Party A Expenditures from Party B Collections shall survive the Physical Settlement Date.

| | |
|---|---|
| Interest Shortfall Cap: | Not Applicable |

Conditions to Settlement:    **Credit Event Notice**    Notifying Parties:
                                                        Buyer or Seller.

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include:  (i) the Interest Shortfall (as defined below) (if any); and/or (ii) the Principal Shortfall (as defined below) (if any).

**Notice of Publicly
Available Information:**       Applicable

| Public Sources: | The sources listed in Section 3.7 of the Credit Derivative Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture. |
| Specified Number: | Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be one. |

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event:

The following Credit Events shall apply to this Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, **"Failure to Pay"** means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

**"Scheduled Payment"** means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon

10425196.5

7

exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

Grace Period
Extension:      Not applicable

Payment
Requirement: USD 1,000.

Obligation(s):

For the purposes of the table below;
"**Yes**" shall mean that the relevant selection is applicable; and
"**No**" shall mean that the relevant selection is not applicable.

| | **Obligation Categories** | | **Obligation Characteristics** |
|---|---|---|---|
| **No** | Payment | **No** | Not Subordinated |
| **No** | Borrowed Money | **No** | Specified Currency – Standard Specified Currencies |
| **Yes** | Reference Obligation(s) Only | **No** | Not Sovereign Lender |
| **No** | Bond | **No** | Not Domestic Currency |
| **No** | Loan | **No** | Not Domestic Law |
| **No** | Bond or Loan | **No** | Listed |
| | | **No** | Not Domestic Issuance |

Excluded Obligations:      None

4.    **Settlement Terms:**

Settlement Method:

Cash Settlement, Modified Cash Settlement or Physical Settlement, as elected by Seller in Seller's sole and absolute discretion; provided, however, that Seller's election of Physical Settlement will not be effective unless the Buyer, after using commercially reasonable efforts, is able to deliver the Deliverable Obligations to the Seller within the Physical Settlement Period. Buyer shall notify Seller promptly (and in any event within five (5) Business Days) in writing upon becoming aware of its inability or impossibility to deliver the Deliverable Obligations. If Buyer so notifies Seller, Cash Settlement

10425196.5

or Modified Cash Settlement shall apply, in the sole discretion of Seller. For the avoidance of doubt, notwithstanding Seller's election of Modified Cash Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph.

**Settlement Currency:**     USD

**Terms Relating to Physical Settlement:**

**Physical Settlement Period:**     30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above.

**Portfolio:**     The product of the Applicable Percentage and USD 625,000,000 in original principal balance of the Reference Obligation

**Deliverable Obligations:**     For the purposes of the table below;
"**Yes**" shall mean that the relevant selection is applicable; and
"**No**" shall mean that the relevant selection is not applicable.

| | Deliverable Obligation Categories | | Deliverable Obligation Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |

10425196.5

9

|     |              |     |                                |
|-----|--------------|-----|--------------------------------|
| No  | Bond or Loan | No  | Listed                         |
|     |              | No  | Not Contingent                 |
|     |              | No  | Not Domestic Issuance          |
|     |              | No  | Assignable Loan                |
|     |              | No  | Consent Required Loan          |
|     |              | No  | Direct Loan Participation      |
|     |              | No  | Qualifying Participation Seller|
|     |              | No  | Transferable                   |
|     |              | No  | Maximum Maturity               |
|     |              | No  | Accelerated or Matured         |

Excluded Deliverable Obligations:   Not Applicable

Additional Term of Physical Settlement:   "Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:   Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:   Bid

Quotation Amount:   The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:   Exclude Accrued Interest

Cash Settlement Date:   Three (3) Business Days following the calculation of the Final Price.

10425196.5

10

| | |
|---|---|
| Cash Settlement Amount: | Notwithstanding anything to the contrary in the 2003 Credit Derivatives Definitions: |
| | The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero. |
| Dealers: | At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation. |

**Terms Relating to Modified Cash Settlement:**

|  |  |
|---|---|
| | Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows: |
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if such acceleration had not occurred). |

10425196.5

11

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the amounts actually paid to Party A with respect to interest, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring on March 4, 2053, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the amounts paid to Party A with respect to principal, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance with the Priority of Payments.

5.    **Notice and Account Details:**

Notice and Account Details for          Receiving Bank:
XLCA As Designee of Seller:

                                                          **REDACTED**

                                        Beneficiary:


Notice and Account Details for          Merrill Lynch World Headquarters
the Buyer                               4 World Financial Center
                                        18th Floor
                                        New York, New York 10080
                                        Attention:  Swaps Group

                                              **REDACTED**

                                        Copies to:

                                        Merrill Lynch & Co., Inc.
                                        4 World Financial Center
                                        New York, NY 10080
                                        Attention: Joe Gambino

                                              **REDACTED**

                                        and

                                        GMI Counsel
                                        Merrill Lynch World Headquarters
                                        4 World Financial Center, 12th Floor
                                        New York, NY  10080
                                        Attention:  Swaps Legal


                                              **REDACTED**

**6.    Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously.  In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

10425196.5

14

"Covered Securities" means USD625,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, (i) 100% of the outstanding principal amount of the Class A-1 Notes (as defined in the Indenture) and (ii) the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby, and each Hedge Counterparty.

Upon a termination of the Agreement following an Additional Termination Event, (i) no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement, (ii) Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule) and (iii) Party B shall pay Party A any Physical Settlement Amount, Cash Settlement Amount or Modified Cash Settlement Amount on the Delivery Date, Cash Settlement Date or Modified Cash Settlement Date, as applicable, in respect of a Credit Event for which the Conditions to Settlement have been satisfied prior to the Early Termination Date, provided, if Physical Settlement applies, that Party A Delivers to Party B the Deliverable Obligation.

**Termination:**          Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

10425196.5

15

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the **"Custodian"**) then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the **"Secondary Market Insurance Policy"**) and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any), (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance, (C) Buyer's and Seller's respective rights and obligations under and in respect of the third and fourth paragraphs of this provision shall survive the termination of this Transaction and (D) the date on which Seller and Buyer satisfy their obligations under this paragraph shall be the **"CR Establishment Date"**.

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

10425196.5

Please confirm that the foregoing correctly sets forth the te                nt
by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTER'

By: _____
    Name: _____
    Title:

By: _____
    Name:
    Title:

JANNY LIN
Authorized Signatory

Acknowledged and agreed by PORTFOLIO CDS
TRUST 165 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
    Name:
    Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name:
    Title:

10425196.5

17

07mL61446A

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 165 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
    Name: Mark G. Walsh
    Title: Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name: Trude Akersveen
    Title: Managing Director

10425196.5

17

# Exhibit 1E

EXECUTION COPY

 **Merrill Lynch**

DATE:                                June 15, 2007

TO:                                  PORTFOLIO CDS TRUST 170 acting through XLCA
                                     Admin LLC, not in its individual capacity but solely as
                                     Trustee

ATTENTION:

FROM:                                **MERRILL LYNCH INTERNATIONAL**

RE:                                  Credit Derivative Transaction relating to Jupiter High-
                                     Grade CDO VI, Ltd. – REFERENCE _____

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions
of the Credit Derivative Transaction entered into between us on the Trade Date specified below
(the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA
Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions,
as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives
Definitions"), as published by the International Swaps and Derivatives Association, Inc.
("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the
Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement
(Multicurrency-Cross Border) dated as of June 15, 2007, as amended and supplemented from
time to time (the "Agreement"), between you and us. All provisions contained in the Agreement
govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have
the meanings given to such terms in the Indenture dated May 3, 2007 among Jupiter High-Grade
CDO VI, Ltd. (the "Issuer"), Jupiter High-Grade CDO VI, LLC (the "Co-Issuer") and Wells
Fargo Bank, National Association (the "Indenture"). In the event of any inconsistency between
the Indenture and this Confirmation, this Confirmation will govern.

The terms of the Transaction to which this Confirmation relates are as follows:

1.      **General Terms:**

             Trade Date:                     June 15, 2007

USActive 9024855.3

| | |
|---|---|
| Effective Date: | May 3, 2007 |
| Scheduled Termination Date: | The Stated Maturity of the Reference Obligation plus the longest settlement period for Modified Cash Settlement, Cash Settlement, or Physical Settlement, as applicable. |
| Termination Date: | The earliest of: |

    (a)    Scheduled Termination Date;

    (b)    the date on which the Outstanding Principal Balance of the Reference Obligation equals zero;

    (c)    the Accelerated Maturity Date; or

    (d)    the CR Establishment Date (as defined below).

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(i) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

| | |
|---|---|
| Party A Floating Rate Payer: | Merrill Lynch International ("Buyer" or "Party A") |
| Party B Floating Rate Payer: | Portfolio CDS Trust 170 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company. |
| Fixed Rate Payer: | Buyer |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Days: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entities: | Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC. |

2

| Reference Obligation: | USD525,000,000 Class A-2 Second Priority Senior Secured Floating Rate Notes Due 2053 issued by Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC with Regulation S ISIN Number USG52091AH12 and Restricted Global Note CUSIP Number 48206FAH0. |
|---|---|

The term "USD" shall mean the lawful currency of the United States of America.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| All Guarantees: | Not Applicable |
|---|---|
| Reference Price: | 100% |
| Applicable Percentage: | 100% |

**2.  Fixed Payments:**

Fixed Rate Payer Calculation Amount:

**REDACTED**

Fixed Rate Payer Payment Dates:    The fifth day of each January, April, July and October commencing on October 5, 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction.

Fixed Rate:

**REDACTED**

Fixed Rate Day Count Fraction:

**3.  Floating Payments:**

Party A Floating Rate Payment Amount:

**REDACTED**

3

REDACTED

| Party A Floating Rate Payment Dates: | Party A shall pay the Additional Amount as soon as reasonably practicable, but in no event later than 3 Business Days after such amounts are received by Party A from Collections, or, if Party A is not a beneficial owner of any part of the Reference Obligation, 3 Business Days after such amounts are received by such beneficial owners from Collections. |
|---|---|

**"Additional Amount"** means, with respect to any Party A Floating Rate Payment Date, an amount equal to any amounts paid under the Policy by the Credit Support Provider and, without duplication of the foregoing, all amounts previously paid by Party B or its Credit Support Provider hereunder that have not previously been reimbursed to Party B by Party A by payment of Additional Amounts hereunder, together with (i) any and all default interest, in the case of a step-up in the interest rate payable on the Reference Obligation following a default thereon, paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, or (ii) in the case of interest accrued on the defaulted payments paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, interest on any

4

and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such amounts were paid hereunder until reimbursed in full (after as well as before judgment), at a rate of interest equal to LIBOR plus 0.315% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"**Collections**" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"**Unreimbursed Party A Expenditures**" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or

USActive 9024855.3

nature whatsoever suffered or incurred by Party A in connection with actions taken by Party A with respect to the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation at the direction of Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures.  The obligation of Party B to reimburse Party A for Unreimbursed Party A Expenditures from Party B Collections shall survive the Physical Settlement Date.

| | |
|---|---|
| Interest Shortfall Cap: | Not Applicable |
| Conditions to Settlement: | **Credit Event Notice** |

Notifying Parties:
Buyer or Seller.

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include:  (i) the Interest Shortfall (as defined below) (if any); and/or (ii) the Principal Shortfall (as defined below) (if any).

| | | |
|---|---|---|
| | **Notice of Publicly Available Information:** | Applicable |
| | Public Sources: | The sources listed in Section 3.7 of the Credit Derivative Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture. |
| | Specified Number: | Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be one. |

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event:    The following Credit Events shall apply to this Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, **"Failure to Pay"** means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

**"Scheduled Payment"** means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(i) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount

7

in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

Grace Period
Extension:   Not applicable

Payment
Requirement: USD 1,000.

Obligation(s):

For the purposes of the table below;
"**Yes**" shall mean that the relevant selection is applicable; and
"**No**" shall mean that the relevant selection is not applicable.

| | **Obligation Categories** | | **Obligation Characteristics** |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |
| | | No | Not Domestic Issuance |

Excluded Obligations:

None

**4.**    **Settlement Terms:**

Settlement Method:

Cash Settlement, Modified Cash Settlement or Physical Settlement, as elected by Seller in Seller's sole and absolute discretion; <u>provided, however,</u> that Seller's election of Physical Settlement will not be effective unless the Buyer, after using commercially reasonable efforts, is able to deliver the Deliverable Obligations to the Seller within the Physical Settlement Period. Buyer shall notify Seller promptly (and in any event within five (5) Business Days) in writing upon becoming aware

8

of its inability or impossibility to deliver the Deliverable Obligations. If Buyer so notifies Seller, Cash Settlement or Modified Cash Settlement shall apply, in the sole discretion of Seller. For the avoidance of doubt, notwithstanding Seller's election of Modified Cash Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph.

Settlement Currency:     USD

**Terms Relating to Physical Settlement:**

Physical Settlement Period:     30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above.

Portfolio:     The product of the Applicable Percentage and USD 525,000,000 in original principal balance of the Reference Obligation

Deliverable Obligations:     For the purposes of the table below; "**Yes**" shall mean that the relevant selection is applicable; and "**No**" shall mean that the relevant selection is not applicable.

|  | Deliverable Obligation Categories |  | Deliverable Obligation Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |

9

|     |              |     |                      |
|-----|--------------|-----|----------------------|
| No  | Loan         | No  | Not Domestic Law     |
| No  | Bond or Loan | No  | Listed               |
|     |              | No  | Not Contingent       |
|     |              | No  | Not Domestic Issuance|
|     |              | No  | Assignable Loan      |
|     |              | No  | Consent Required Loan|
|     |              | No  | Direct Loan Participation |
|     |              | No  | Qualifying Participation Seller |
|     |              | No  | Transferable         |
|     |              | No  | Maximum Maturity     |
|     |              | No  | Accelerated or Matured |

Excluded Deliverable Obligations:    Not Applicable

Additional Term of Physical Settlement:    "Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:    Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:    Bid

Quotation Amount:    The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:    Exclude Accrued Interest

USActive 9024855.3

| | |
|---|---|
| Cash Settlement Date: | Three (3) Business Days following the calculation of the Final Price. |
| Cash Settlement Amount: | Notwithstanding anything to the contrary in the 2003 Credit Derivatives Definitions: |
| | The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero. |
| Dealers: | At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation. |

**Terms Relating to Modified Cash Settlement:**

Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows:

| | |
|---|---|
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if |

11

such acceleration had not occurred).

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the amounts actually paid to Party A with respect to interest, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring on October 5, 2053, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the amounts paid to Party A with respect to principal, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance

12

with the Priority of Payments.

5.    **Notice and Account Details:**

Notice and Account Details for          Receiving Bank:
XLCA As Designee of Seller:

                                                                        **REDACTED**

                                        Beneficiary:

Notice and Account Details for          Merrill Lynch World Headquarters
the Buyer                               4 World Financial Center
                                        18th Floor
                                        New York, New York 10080
                                        Attention:  Swaps Group

                                        **REDACTED**

                                        Copies to:

                                        Merrill Lynch & Co., Inc.
                                        4 World Financial Center
                                        New York, NY 10080
                                        Attention: Joe Gambino

                                        **REDACTED**

                                        and

                                        GMI Counsel
                                        Merrill Lynch World Headquarters
                                        4 World Financial Center, 12th Floor
                                        New York, NY  10080
                                        Attention:  Swaps Legal

                                        **REDACTED**

USActive 9024855.3

**6.    Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously.  In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents; provided that Party A shall satisfy the requirements of Section 10.7(f) of the Indenture so it will be entitled to receive Note Valuation Reports and Monthly Reports.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial

14

owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means USD525,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, (i) 100% of the outstanding principal amount of the Class A-1 Notes (as defined in the Indenture) and (ii) the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby, and each Hedge Counterparty.

Upon a termination of the Agreement following an Additional Termination Event, (i) no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement, (ii) Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule) and (iii) Party B shall pay Party A any Physical Settlement Amount, Cash Settlement Amount or Modified Cash Settlement Amount on the Delivery Date, Cash Settlement Date or Modified Cash Settlement Date, as applicable, in respect of a Credit Event for which the Conditions to Settlement have been satisfied prior to the Early Termination Date, provided, if Physical Settlement applies, that Party A Delivers to Party B the Deliverable Obligation.

Termination:                          Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10

15

Business Days notice, to request that Seller terminate the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the **"Custodian"**) then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the **"Secondary Market Insurance Policy"**) and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any), (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance, (C) Buyer's and Seller's respective rights and obligations under and in respect of the third and fourth paragraphs of this provision shall survive the termination of this Transaction and (D) the date on which Seller and Buyer satisfy their obligations under this paragraph shall be the **"CR Establishment Date"**.

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion

delivered to the Buyer in connection with the Policy.

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

17

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Acknowledged and agreed by PORTFOLIO CDS TRUST 170 acting through XLCA Admin LLC, not in its individual capacity but solely as trustee, as of the date first above written:

By: _____
     Name:  Mark G. Walsh
     Title:   Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
     Name:  Trude Akersveen
     Title:   Managing Director

18

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____

Name:
Title:
**Authorized Signatory**

By: _____

Name:
Title:

Acknowledged and agreed by PORTFOLIO CDS TRUST 170 acting through XLCA Admin LLC, not in its individual capacity but solely as trustee, as of the date first above written:

By: _____

Name:
Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____

Name:
Title:

18

07ML61440A-
Jupiter HG CDO

# Exhibit 1F

 **Merrill Lynch**

DATE:                         June 29, 2007

TO:                           PORTFOLIO CDS TRUST 172 acting through XLCA
                              Admin LLC, not in its individual capacity but solely as
                              Trustee

ATTENTION:

FROM:                         MERRILL LYNCH INTERNATIONAL

RE:                           Credit Derivative Transaction relating to Robeco High
                              Grade CDO I, Ltd. – REFERENCE *07ML64592A*

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions
of the Credit Derivative Transaction entered into between us on the Trade Date specified below
(the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA
Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions,
as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives
Definitions"), as published by the International Swaps and Derivatives Association, Inc.
("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the
Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement
(Multicurrency-Cross Border) dated as of June 29, 2007, as amended and supplemented from
time to time (the "Agreement"), between you and us. All provisions contained in the Agreement
govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have
the meanings given to such terms in the Indenture dated as of June 1, 2007 among Robeco High
Grade CDO I, Ltd. (the "Issuer"), Robeco High Grade CDO I, LLC (the "Co-Issuer")
and LaSalle Bank National Association (the "Indenture"). In the event of any inconsistency
between the Indenture and this Confirmation, this Confirmation will govern.

The terms of the Transaction to which this Confirmation relates are as follows:

1.     **General Terms:**

       Trade Date:              June 29, 2007

       Effective Date:          June 1, 2007

| | |
|---|---|
| Scheduled Termination Date: | The Stated Maturity of the Reference Obligation plus the longest settlement period for Modified Cash Settlement, Cash Settlement, or Physical Settlement, as applicable. |
| Termination Date: | The earliest of: |

    (a)    Scheduled Termination Date;

    (b)    the date on which the Outstanding Principal Balance of the Reference Obligation equals zero;

    (c)    the Accelerated Maturity Date; or

    (d)    the CR Establishment Date (as defined below).

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

| | |
|---|---|
| Party A Floating Rate Payer: | Merrill Lynch International ("Buyer" or "Party A") |
| Party B Floating Rate Payer: | Portfolio CDS Trust 172 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company. |
| Fixed Rate Payer: | Buyer |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Days: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entities: | Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC. |
| Reference Obligation: | USD 385,000,000 Class A-2 Second Priority Senior Secured Floating Rate Notes Due 2053 issued by the |

2

Reference Entities with Regulation S ISIN Number USG7610CAF08 and Restricted Global Note CUSIP Number 77029QAF4.

The term "USD" shall mean the lawful currency of the United States of America.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| All Guarantees: | Not Applicable |
| Reference Price: | 100% |
| Applicable Percentage: | 100% |

2.  **Fixed Payments:**

Fixed Rate Payer Calculation Amount:

REDACTED

Fixed Rate Payer Payment Dates:

The 9th day of January, April, July and October of each year, commencing in October, 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction.

Fixed Rate:

Fixed Rate Day Count Fraction:

REDACTED

3.  **Floating Payments:**

Party A Floating Rate Payment Amount:

REDACTED

3

REDACTED

| Party A Floating Rate Payment Dates: | Party A shall pay the Additional Amount as soon as reasonably practicable, but in no event later than 3 Business Days after such amounts are received by Party A from Collections, or, if Party A is not a beneficial owner of any part of the Reference Obligation, 3 Business Days after such amounts are received by such beneficial owners from Collections. |

"**Additional Amount**" means, with respect to any Party A Floating Rate Payment Date, an amount equal to any amounts paid under the Policy by the Credit Support Provider and, without duplication of the foregoing, all amounts previously paid by Party B or its Credit Support Provider hereunder that have not previously been reimbursed to Party B by Party A by payment of Additional Amounts hereunder, together with (i) any and all default interest, in the case of a step-up in the interest rate payable on the Reference Obligation following a default thereon, paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, or (ii) in the case of interest accrued on the defaulted payments paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such

4

amounts were paid hereunder until reimbursed in full (after as well as before judgment), at a rate of interest equal to LIBOR plus 0.29% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"**Collections**" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"**Unreimbursed Party A Expenditures**" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in connection with actions taken by Party A with respect to the Applicable Percentage of the Outstanding Principal

5

Balance of the Reference Obligation at the direction of Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures. The obligation of Party B to reimburse Party A for Unreimbursed Party A Expenditures from Party B Collections shall survive the Physical Settlement Date.

| | |
|---|---|
| Interest Shortfall Cap: | Not Applicable |
| Conditions to Settlement: | **Credit Event Notice** |

                                                                   Notifying Parties: Buyer or Seller.

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include: (i) the Interest Shortfall (as defined below) (if any); and/or (ii) the Principal Shortfall (as defined below) (if any).

**Notice of Publicly**
**Available Information:**        Applicable
           Public Sources:        The sources listed in Section 3.7 of the

6

Credit Derivative Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture.

Specified Number:    Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be one.

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event:    The following Credit Events shall apply to this Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, "**Failure to Pay**" means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

"**Scheduled Payment**" means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in

7

accordance with the Priority of Payments).

Grace Period
Extension:     Not applicable

Payment
Requirement: USD 1,000.

Obligation(s):     For the purposes of the table below;
"Yes" shall mean that the relevant selection is
applicable; and
"No" shall mean that the relevant selection is not
applicable.

| | **Obligation Categories** | | **Obligation Characteristics** |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |
| | | No | Not Domestic Issuance |

Excluded Obligations:     None

**4.     Settlement Terms:**

Settlement Method:     Cash Settlement, Modified Cash Settlement or Physical
Settlement, as elected by Seller in Seller's sole and
absolute discretion; provided, however, that Seller's
election of Physical Settlement will not be effective
unless the Buyer, after using commercially reasonable
efforts, is able to deliver the Deliverable Obligations to
the Seller within the Physical Settlement Period.  Buyer
shall notify Seller promptly (and in any event within
five (5) Business Days) in writing upon becoming aware
of its inability or impossibility to deliver the Deliverable
Obligations.  If Buyer so notifies Seller, Cash Settlement
or Modified Cash Settlement shall apply, in the sole

8

discretion of Seller. For the avoidance of doubt, notwithstanding Seller's election of Modified Cash Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph.

Settlement Currency:     USD

**Terms Relating to Physical Settlement:**

Physical Settlement Period:     30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above.

Portfolio:     The product of the Applicable Percentage and USD 385,000,000 in original principal balance of the Reference Obligation

Deliverable Obligations:     For the purposes of the table below; "**Yes**" shall mean that the relevant selection is applicable; and "**No**" shall mean that the relevant selection is not applicable.

| | Deliverable Obligation Categories | | Deliverable Obligation Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |

9

|        |              |        |                                |
|--------|--------------|--------|--------------------------------|
| **No** | Bond or Loan | **No** | Listed                         |
|        |              | **No** | Not Contingent                 |
|        |              | **No** | Not Domestic Issuance          |
|        |              | **No** | Assignable Loan                |
|        |              | **No** | Consent Required Loan          |
|        |              | **No** | Direct Loan Participation      |
|        |              | **No** | Qualifying Participation Seller |
|        |              | **No** | Transferable                   |
|        |              | **No** | Maximum Maturity               |
|        |              | **No** | Accelerated or Matured         |

Excluded Deliverable Obligations:

Not Applicable

Additional Term of Physical Settlement:

"Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:

Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:

Bid

Quotation Amount:

The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:

Exclude Accrued Interest

Cash Settlement Date:

Three (3) Business Days following the calculation of the Final Price.

10

| | |
|---|---|
| Cash Settlement Amount: | Notwithstanding anything to the contrary in the 2003 Credit Derivatives Definitions: |
| | The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero. |
| Dealers: | At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation. |

**Terms Relating to Modified Cash Settlement:**

| | |
|---|---|
| | Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows: |
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if such acceleration had not occurred). |

11

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the amounts actually paid to Party A with respect to interest, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring in October 2053, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the amounts paid to Party A with respect to principal, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance with the Priority of Payments.

12

5.      **Notice and Account Details:**

Notice and Account Details for          Receiving Bank:
XLCA As Designee of Seller:

                                                                **REDACTED**

                                        Beneficiary:


Notice and Account Details for          Merrill Lynch World Headquarters
the Buyer                               4 World Financial Center
                                        18th Floor
                                        New York, New York 10080
                                        Attention:  Swaps Group

                                                **REDACTED**

                                        Copies to:

                                        Merrill Lynch & Co., Inc.
                                        4 World Financial Center
                                        New York, NY 10080
                                        Attention: Joe Gambino

                                                **REDACTED**

                                        and

                                        GMI Counsel
                                        Merrill Lynch World Headquarters
                                        4 World Financial Center, 12th Floor
                                        New York, NY  10080
                                        Attention:  Swaps Legal


                                                **REDACTED**

6.    **Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously.  In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents; provided that Party A shall satisfy the requirements of Section 10.7(f) of the Indenture so it will be entitled to receive Note Valuation Reports and Monthly Reports.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information, (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding

14

Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means USD 385,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, (i) 100% of the outstanding principal amount of the Class A-1 Notes (as defined in the Indenture) and (ii) the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby, each Hedge Counterparty and the Collateral Manager.

Upon a termination of the Agreement following an Additional Termination Event, (i) no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement, (ii) Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule) and (iii) Party B shall pay Party A any Physical Settlement Amount, Cash Settlement Amount or Modified Cash Settlement Amount on the Delivery Date, Cash Settlement Date or Modified Cash Settlement Date, as applicable, in respect of a Credit Event for which the Conditions to Settlement have been satisfied prior to the Early Termination Date, provided, if Physical Settlement applies, that Party A Delivers to Party B the Deliverable Obligation.

Termination:                          Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate

15

the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the "**Custodian**") then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the "**Secondary Market Insurance Policy**") and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any), (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance, (C) Buyer's and Seller's respective rights and obligations under and in respect of the third and fourth paragraphs of this provision shall survive the termination of this Transaction and (D) the date on which Seller and Buyer satisfy their obligations under this paragraph shall be the "**CR Establishment Date**".

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

16

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

17

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
Name:
Title:

**Authorized Signatory**

By: _____
Name:
Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 172 acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
Name:
Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
Name:
Title:

18

157998v.3

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Acknowledged and agreed by PORTFOLIO CDS TRUST 172 acting through XLCA Admin LLC, not in its individual capacity but solely as trustee, as of the date first above written:

By: _____
    Name:  Mark G. Walsh
    Title:   Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name:  Mark T. Dunsheath
    Title:  Managing Director

18

# Exhibit 1G

# ⟨logo⟩ Merrill Lynch

DATE:                          August 10, 2007

TO:                            PORTFOLIO CDS TRUST 186 acting through XLCA
                               Admin LLC, not in its individual capacity but solely as
                               Trustee

ATTENTION:

FROM:                          MERRILL LYNCH INTERNATIONAL

RE:                            Credit Derivative Transaction relating to Biltmore
                               CDO 2007-1, Ltd. – REFERENCE 07ML103267A

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions
of the Credit Derivative Transaction entered into between us on the Trade Date specified below
(the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA
Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions,
as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives
Definitions"), as published by the International Swaps and Derivatives Association, Inc.
("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the
Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement
(Multicurrency-Cross Border) dated as of August 10, 2007, as amended and supplemented from
time to time (the "Agreement"), between you and us. All provisions contained in the Agreement
govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have
the meanings given to such terms in the Indenture dated as of July 26, 2007 (the "Indenture")
among Biltmore CDO 2007-1, Ltd. (the "Issuer"), Biltmore CDO 2007-1, LLC (the "Co-
Issuer") and LaSalle Bank National Association. In the event of any inconsistency between the
Indenture and this Confirmation, this Confirmation will govern.

The terms of the Transaction to which this Confirmation relates are as follows:

1.      **General Terms:**

        Trade Date:                August 10, 2007

        Effective Date:            July 26, 2007

| Scheduled Termination Date: | The Stated Maturity of the Reference Obligation plus the longest settlement period for Modified Cash Settlement, Cash Settlement, or Physical Settlement, as applicable. |

Termination Date:

The earliest of:
(a)     Scheduled Termination Date;
(b)     the date on which the Outstanding Principal Balance of the Reference Obligation equals zero;
(c)     the Accelerated Maturity Date; or
(d)     the CR Establishment Date (as defined below).

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

Party A Floating Rate Payer:

Merrill Lynch International ("Buyer" or "Party A")

Party B Floating Rate Payer:

Portfolio CDS Trust 186 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company.

Fixed Rate Payer:

Buyer

Calculation Agent:

Buyer

Calculation Agent City:

New York

Business Days:

New York

Business Day Convention:

Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day).

Reference Entities:

Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC.

Reference Obligation:

USD 350,000,000 Class A-2 Second Priority Senior Secured Floating Rate Notes due 2050 issued by the

2

Reference Entities with Regulation S ISIN Number USG11091AB48 and Restricted Global Note CUSIP Number 090287AB9.

The term "USD" shall mean the lawful currency of the United States of America.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| All Guarantees: | Not Applicable |
| Reference Price: | 100% |
| Applicable Percentage: | 100% |

**2.     Fixed Payments:**

Fixed Rate Payer Calculation Amount:

**REDACTED**

Fixed Rate Payer Payment Dates:

The 7th day of each calendar month, commencing in November, 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction.

Fixed Rate:

Fixed Rate Day Count Fraction:

**REDACTED**

**3.     Floating Payments:**

Party A Floating Rate Payment Amount:

**REDACTED**

3

**REDACTED**

Party A Floating Rate
Payment Dates:

Party A shall pay the Additional Amount as soon as reasonably practicable, but in no event later than 3 Business Days after such amounts are received by Party A from Collections, or, if Party A is not a beneficial owner of any part of the Reference Obligation, 3 Business Days after such amounts are received by such beneficial owners from Collections.

"**Additional Amount**" means, with respect to any Party A Floating Rate Payment Date, an amount equal to any amounts paid under the Policy by the Credit Support Provider and, without duplication of the foregoing, all amounts previously paid by Party B or its Credit Support Provider hereunder that have not previously been reimbursed to Party B by Party A by payment of Additional Amounts hereunder, together with (i) any and all default interest, in the case of a step-up in the interest rate payable on the Reference Obligation following a default thereon, paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by either Reference Entity or any other Person under the Indenture, or (ii) in the case of interest accrued on the defaulted payments paid to Party A, or if Party A is not the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such amounts were paid hereunder until reimbursed in full

4

(after as well as before judgment), at a rate of interest equal to LIBOR plus 0.315% minus the Fixed Rate; provided, however, that Party A shall have no obligation to pay any such Additional Amount to Party B if Party B elects Cash Settlement, or if Party B elects Physical Settlement and Party A delivers the Deliverable Obligations accordingly.

"**Collections**" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Applicable Percentage of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Applicable Percentage of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of any Unreimbursed Party A Expenditures.

"**Unreimbursed Party A Expenditures**" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in connection with actions taken by Party A with respect to the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation at the direction of

5

Party B and for which Party A has not been reimbursed on any prior Distribution Date.

To the extent Unreimbursed Party A Expenditures exist as of the date of the Notice of Physical Settlement, following the delivery by Party A of the Deliverable Obligations, if the beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, receives any payment of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A ("Party B Collections"), Party B shall pay to Party A, from such amounts any remaining Unreimbursed Party A Expenditures. The obligation of Party B to reimburse Party A for Unreimbursed Party A Expenditures from Party B Collections shall survive the Physical Settlement Date.

| | |
|---|---|
| Interest Shortfall Cap: | Not Applicable |
| Conditions to Settlement: | **Credit Event Notice** |

Notifying Parties: Buyer or Seller.

Notice of Physical Settlement; provided, however, that if (x) the Seller elects Cash Settlement or Modified Cash Settlement or (y) if Buyer determines in its sole and absolute discretion that Physical Settlement is not possible, Cash Settlement or Modified Cash Settlement (as elected by Seller) will apply in which event Notice of Physical Settlement shall not be a Condition to Settlement.

Each Credit Event Notice shall include: (i) the Interest Shortfall (as defined below) (if any); and/or (ii) the Principal Shortfall (as defined below) (if any).

**Notice of Publicly Available Information:**    Applicable
Public Sources:    The sources listed in Section 3.7 of the Credit Derivative

Definitions, which shall include the Note Valuation Report delivered pursuant to Section 10.6(b) of the Indenture.

Specified Number:     Two; provided, however, that if the public source is the Note Valuation Report delivered pursuant to Section 10.6(b) of the Indenture, the Specified Number shall be one.

The Credit Event Notice and the Notice of Publicly Available Information shall be delivered on a day on which commercial banks and foreign exchange markets are generally open to settle payments in New York.

Credit Event:     The following Credit Events shall apply to this Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives Definitions, "**Failure to Pay**" means: After the expiration of any applicable (or deemed) grace period (after the satisfaction of any conditions precedent to the commencement of such grace period), the failure by the Reference Entity to make, when and where due, any Scheduled Payments on the Reference Obligation.

"**Scheduled Payment**" means a scheduled payment or scheduled distribution of principal pursuant to Section 11.1(a)(ii) of the Indenture or interest pursuant to Section 11.1(a)(i) of the Indenture required to be made with respect to the Reference Obligation, provided that such scheduled payment or scheduled distribution of principal or interest shall be determined without regard to 2.6(j) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

7

Grace Period
Extension:     Not applicable

Payment
Requirement: USD 1,000.

Obligation(s):           For the purposes of the table below;
                         "**Yes**" shall mean that the relevant selection is
                         applicable; and
                         "**No**" shall mean that the relevant selection is not
                         applicable.

| | **Obligation Categories** | | **Obligation Characteristics** |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |
| | | No | Not Domestic Issuance |

Excluded Obligations:    None

**4.    Settlement Terms:**

Settlement Method:       Cash Settlement, Modified Cash Settlement or Physical
                         Settlement, as elected by Seller in Seller's sole and
                         absolute discretion; provided, however, that Seller's
                         election of Physical Settlement will not be effective
                         unless the Buyer, after using commercially reasonable
                         efforts, is able to deliver the Deliverable Obligations to
                         the Seller within the Physical Settlement Period. Buyer
                         shall notify Seller promptly (and in any event within
                         five (5) Business Days) in writing upon becoming aware
                         of its inability or impossibility to deliver the Deliverable
                         Obligations. If Buyer so notifies Seller, Cash Settlement
                         or Modified Cash Settlement shall apply, in the sole
                         discretion of Seller. For the avoidance of doubt,
                         notwithstanding Seller's election of Modified Cash

8

Settlement on any Settlement Date, Seller may elect Cash Settlement or Physical Settlement on any subsequent Settlement Date, in accordance with and subject to the conditions set forth in this paragraph.

Settlement Currency:    USD

**Terms Relating to Physical Settlement:**

Physical Settlement Period:    30 Business Days; provided, if Buyer determines that it is unable to cause Physical Settlement within such Physical Settlement Period, Buyer must provide notice to Seller as provided under "Settlement Method" above.

Portfolio:    The product of the Applicable Percentage and USD 350,000,000 in original principal balance of the Reference Obligation

Deliverable Obligations:    For the purposes of the table below; "**Yes**" shall mean that the relevant selection is applicable; and "**No**" shall mean that the relevant selection is not applicable.

| | Deliverable Obligation Categories | | Deliverable Obligation Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |

9

| | |
|---|---|
| **No** | Not Contingent |
| **No** | Not Domestic Issuance |
| **No** | Assignable Loan |
| **No** | Consent Required Loan |
| **No** | Direct Loan Participation |
| **No** | Qualifying Participation Seller |
| **No** | Transferable |
| **No** | Maximum Maturity |
| **No** | Accelerated or Matured |

Excluded Deliverable Obligations:

Not Applicable

Additional Term of Physical Settlement:

"Deliverable Obligations" shall be comprised of the applicable Reference Obligation(s) and the amount of accrued but unpaid interest on such Reference Obligation(s) as of the Physical Settlement Date.

**Terms Relating to Cash Settlement:**

Valuation Date:

Single Valuation Date: A minimum of 15 Business Days and a maximum of up to 30 Business Days, as determined by the Calculation Agent, from the Event Determination Date.

Quotation Method:

Bid

Quotation Amount:

The product of the Applicable Percentage and the Outstanding Principal Balance.

Quotations:

Exclude Accrued Interest

Cash Settlement Date:

Three (3) Business Days following the calculation of the Final Price.

Cash Settlement Amount:

Notwithstanding anything to the contrary in the 2003

10

Credit Derivatives Definitions:

The greater of (a) the sum of (x) (i) the product of the Applicable Percentage and the Outstanding Principal Balance, multiplied by (ii) the Reference Price minus the Final Price plus (y) any remaining Unreimbursed Party A Expenditures as of the Cash Settlement Date and (b) zero.

Dealers:

At least three Dealers selected by the Calculation Agent, each of which are nationally recognized Dealers and regularly trade in instruments that are similar to the Reference Obligation.

**Terms Relating to Modified Cash Settlement:**

Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows:

Modified Cash Settlement Date:

Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates.

Modified Cash Settlement Amount:

"Modified Cash Settlement Amount" means for each Distribution Date (as defined in the Indenture), an amount equal to the sum of (A) the Interest Shortfall for such Distribution Date, plus (B) if such Distribution Date relates to the Termination Date, the Principal Shortfall, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to the scheduled maturity date on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if such acceleration had not occurred).

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which

11

become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a mandatory redemption, (e) a tax redemption , (f) a failure to meet any overcollateralization test or (g) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date or the Accelerated Maturity Date, the excess, if any, of (i) the interest then payable on the Applicable Percentage of the Reference Obligation over (ii) the amounts actually paid to Party A with respect to interest, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation pursuant to Section 11.1(a)(i) of the Indenture.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring in December 2050, or on the Accelerated Maturity Date, the excess, if any, of (i) the Applicable Percentage of the then Outstanding Principal Balance of the Reference Obligation over (ii) the amounts paid to Party A with respect to principal, or if Party A is not a beneficial owner of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation, to beneficial owners of the Applicable Percentage of such Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance with the Priority of Payments.

12

5.    **Notice and Account Details:**

Notice and Account Details for          Receiving Bank:
XLCA As Designee of Seller:

                                                                          **REDACTED**

                                                        Beneficiary:

Notice and Account Details for          Merrill Lynch World Headquarters
the Buyer                                        4 World Financial Center
                                                        18th Floor
                                                        New York, New York 10080
                                                        Attention: Swaps Group

                                                                          **REDACTED**

                                                        Copies to:

                                                        Merrill Lynch & Co., Inc.
                                                        4 World Financial Center
                                                        New York, NY 10080
                                                        Attention: Joe Gambino

                                                                          **REDACTED**

                                                        and

                                                        GMI Counsel
                                                        Merrill Lynch World Headquarters
                                                        4 World Financial Center, 12th Floor
                                                        New York, NY 10080
                                                        Attention: Swaps Legal

                                                                          **REDACTED**

13

6.    **Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously.  In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents; provided that Party A shall satisfy the requirements of Section 10.6(f) of the Indenture so it will be entitled to receive Note Valuation Reports and Monthly Reports.

Additional Termination Events:

The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information, (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of the beneficial owner of the Applicable Percentage of the Outstanding

14

Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means USD 350,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, (i) 100% of the outstanding principal amount of the Class A-1 Notes (as defined in the Indenture) and (ii) the Reference Obligation that a holder of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation would have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to a supplemental indenture which may not be entered into without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby, each Hedge Counterparty and, pursuant to Section 8.3 of the Indenture, with respect to any supplemental indenture that modifies the rights or obligations of the Collateral Manager in any respect, without the prior written consent of the Collateral Manager.

Upon a termination of the Agreement following an Additional Termination Event, (i) no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement, (ii) Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule) and (iii) Party B shall pay Party A any Physical Settlement Amount, Cash Settlement Amount or Modified Cash Settlement Amount on the Delivery Date, Cash Settlement Date or Modified Cash Settlement Date, as applicable, in respect of a Credit Event for which the Conditions to Settlement have been satisfied prior to the Early Termination Date, provided, if Physical Settlement applies, that Party A Delivers to Party B the

15

Deliverable Obligation.

**Termination:**

Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the "**Custodian**") then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the "**Secondary Market Insurance Policy**") and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any), (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the product of the Applicable Percentage and the Outstanding Principal Balance, (C) Buyer's and Seller's respective rights and obligations under and in respect of the third and fourth paragraphs of this provision shall survive the termination of this Transaction and (D) the date on which Seller and Buyer satisfy their obligations under this paragraph shall be the "**CR Establishment Date**".

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market

16

Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

17

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


Acknowledged and agreed by PORTFOLIO CDS TRUST 186
acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
    Name:    Mark G. Walsh
    Title:    Associate General Counsel


Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name:    Mark T. Dunsheath
    Title:    Managing Director

18

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:
    Title:
              JANNY LIN
              Authorized Signatory

By: _____
    Name:
    Title:

Acknowledged and agreed by PORTFOLIO CDS TRUST 186
acting through XLCA Admin LLC,
not in its individual capacity but solely as trustee,
as of the date first above written:

By: _____
    Name:
    Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name:
    Title:

07ML103267A

USActive 9662164.4

# Exhibit 2A

EXECUTION COPY

Date: August 29, 2007

| To: | Merrill Lynch International<br>2 King Edward Street<br>London EC1A 1HQ | From: | LaCrosse Financial Products, LLC<br>c/o Global Securitization Services,<br>LLC<br>114 West 47th Street, Suite 1715<br>New York, New York 10036 |
|---|---|---|---|
| Attention: | Manager, Fixed Income Settlements | Contact: | Vice President |
| Phone Number: | +44 207 867 3769 | Phone Number: | 212-302-5151 |
| Facsimile Number: | +44 207 867 2004 | Facsimile Number: | 212-302-8767 |

**Re: CREDIT DEFAULT SWAP TRANSACTION** relating to West Trade Funding CDO II, Ltd., West Trade Funding CDO II, LLC Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Notes Due July 2051.

Dear Sir or Madam:

The purpose of this letter agreement (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Default Swap Transaction entered into between us on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (together, the **"2003 Definitions"**), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the 2003 Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms part of, and is subject to, the Single Transaction 1992 ISDA Master Agreement dated as of August 29, 2007, between LaCrosse Financial Products, LLC and Merrill Lynch International as amended and supplemented from time to time (the **"Agreement"**). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not expressly defined herein or in the 2003 Definitions shall have the meanings given to such terms in the Indenture (the **"Indenture"**) dated as of December 7, 2006, among West Trade Funding CDO II, Ltd., West Trade Funding CDO II, LLC, and Wells Fargo Bank, National Association, as Trustee (the **"Trustee"**), copies of which have been separately provided to the parties.

The terms of the particular Transaction to which this Confirmation relates are as follows:

112138v.7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000001

1.    **General Terms:**

| | |
|---|---|
| Trade Date: | August 29, 2007 |
| Effective Date: | August 29, 2007 |
| Scheduled Termination Date: | Stated Maturity |
| Termination Date: | The earliest of (i) the Scheduled Termination Date, (ii) any Optional Termination Date, and (iii) the date on which the Fixed Rate Payer Calculation Amount is reduced to zero. |
| Optional Termination Date: | As defined in Section 6 hereof. |
| Floating Rate Payer: | LaCrosse Financial Products, LLC (the **"Seller"**) |
| Fixed Rate Payer: | Merrill Lynch International (the **"Buyer"**) |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Day: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the 2003 Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | West Trade Funding CDO II, Ltd. |
| Reference Obligation: | USD _____ in original principal amount of the following obligation:   **REDACTED** |

| | |
|---|---|
| Primary Obligor: | West Trade Funding CDO II, Ltd. |
| Class: | Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Notes Due July 2051 (the **"Class A-1 Notes"**) |
| Stated Maturity: | July 4, 2051 |
| Reference Obligation Issue Date: | December 7, 2006 |
| Reference Obligation Payment Dates: | **REDACTED** |

2

| | |
|---|---|
| Coupon: | 1M Libor plus 0.198% |
| CUSIP: | 956316AA1 |
| ISIN: | [●] |
| Ratings (as of the Effective Date): | AAA (S&P)/Aaa (Moody's) |

Section 2.30 of the 2003 Definitions shall not apply to this Transaction.

**Capital Charge Letters**   If the Seller has not received a captial charge letter from Standard & Poor's confirming that the credit assessment of this Transaction is "AAA" and the capital charge is 10.0% on the risk assumed by the Seller in this Transaction, on or before October 29th, 2007, this Transaction may be terminated by the Seller in its sole discretion, without any payment being due and payable in connection therewith by either party, by delivery of written notice to the Buyer, at any time after October 29th, 2007 but no later than November 8th, 2007.

**Reference Obligation Outstanding Amount:**   As of any date, an amount equal to the original principal amount of the Reference Obligation as of the Trade Date as reduced after the Trade Date by amounts paid on or prior to such date to the holders of the Reference Obligation to amortize principal of the Reference Obligation.

**Reference Price:**

**Relevant Proportion:**   **REDACTED**

**Tranche Amount**   The product of the Reference Obligation Outstanding Amount and the Relevant Proportion.

**Loss Threshold Amount**   **REDACTED**

**All Guarantees:**   Not Applicable

2.   **Fixed Payments:**
     Fixed Rate Payer Calculation Amount:

                                    **REDACTED**

3

Fixed Rate:

Fixed Rate Payer Payment
Dates:

Fixed Rate Payer Day Count                    **REDACTED**
Fraction:

Fixed Rate Payer Calculation
Period:

3.    **Floating Payment:**
      Floating Rate Payer Calculation
      Amount:

      Conditions to Settlement:

4

Credit Events:                          **REDACTED**

5

Obligation(s):

**4.**    **Settlement Terms:**
Settlement Method:

Terms    Relating    to    Cash
Settlement:

Cash Settlement Date:

**REDACTED**

Cash Settlement Amount:

Principal Shortfall Amount:

6

**Excess Collections:**

**REDACTED**

For use only in 08CV2893 (SDNY)
**CONFIDENTIAL**

MLI0000007

Escrow:

Policy Payment Trigger Date:

**REDACTED**

5.    **Notice and Account Details:**
       Notice and Account for Payments        **MLI Payment Details:**
       for Buyer:

       **REDACTED**

8

REDACTED

**MLI Notice Details:**

Copy to:

Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements

REDACTED

with copy to:

Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attn: Swaps Legal

REDACTED

with any telephonic notification or confirmation to:

Joseph Gambino,
Vickram Mangalgiri,          REDACTED
Chintan Shah,
any other individual as notified by Buyer in writing to
Seller

Notice for all purposes, including    LaCrosse Financial Products, LLC
delivery of the Trustee Reports    c/o MBIA Insurance Corporation (**"MBIA"**)
and Account details for Seller:    113 King Street
                                   Armonk, New York 10504

REDACTED

Attention: (1) Michael Murtagh and (2) Manager —
Insured Portfolio Management — Attention: CDO
Group

and a copy to:

LaCrosse Financial Securities Products, LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention: Vice President

REDACTED

9

**REDACTED**

6.  **Optional Early Termination:**

Buyer shall have the option to terminate this Transaction at any time by giving notice on the day which is 5 Business Days prior to any Fixed Rate Payer Payment Date (such date, the **"Optional Early Termination Notification Date"**). Upon such notice, the Fixed Rate Payer Payment Date following the Optional Early Termination Notification Date shall be the **"Optional Termination Date"**. If the Optional Termination Date occurs prior to the Fixed Rate Payer Payment Date occurring in January 2011 (the **"Optional Redemption Date"**), Buyer shall pay to Seller on the Optional Termination Date the Makewhole Amount. If the Optional Termination Date occurs on or after the Optional Redemption Date, no amounts shall be due and payable by the Buyer to the Seller in respect of the early termination of the Transaction on such date.

7.  **Makewhole Amount:**

**REDACTED**

8.  **Seller's Right to Elect Physical Settlement:**

10

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000010

**REDACTED**

9.  **Seller's Right to Exercise Voting Rights on Reference Obligation:**

(a)   Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

Additionally, the Buyer will (i) either (x) arrange for copies of all notices, reports, statements and other information received by it from the trustee, collateral manager, paying agent (or similar administrative agent) for the Reference Obligation in respect of the Reference Obligation (cumulatively, the **"Trustee Reports"**) to be delivered to Seller as soon as practicable or (y) provide access to Seller of a website allowing Seller access to Trustee Reports, and (ii) by the close of business on the 30th calendar day after the Effective Date cause to have the Trustee execute the **"Direction Letter"** in the form attached hereto or in such other form as Buyer and Seller may agree upon (such Direction Letter shall be dated not more than 30 calendar days from the date hereof), among Buyer, MBIA Insurance Corporation, the Collateral Manager and the Trustee, an executed copy of which shall be separately provided to the parties hereto. Buyer

11

shall not be required to submit any communication to Seller that has previously been submitted to Seller or MBIA Insurance Corporation by the Trustee as required by the Direction Letter.

(b)    The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below. The Buyer shall not be required, as applicable, to exercise or procure the exercise of rights as directed by Seller:

    (i)    if exercising or procuring the exercise of such rights as so directed by Seller is prohibited by any law, rule, regulation or judicial or administrative order applicable to Buyer (or the entity from whom Buyer has procured such rights) or is prohibited by the Indenture; or

    (ii)    if, unless otherwise consented to in writing by Buyer, exercising such rights would (a) modify the currency, interest rate, breakage costs, facility cancellation fee, decrease the principal amount payable under the Reference Obligation, or (b) modify or extend the due date for payment of interest, breakage costs, facility cancellation fee, or principal of the Reference Obligation.

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(c)    Except as specified below, the foregoing provisions shall not apply to Buyer's action or inaction with respect to any matter where failure to vote or act within a specified time period is deemed to be consent to such matter (each such matter, a **"Deemed Consent Matter"**), which shall instead be governed by the following provisions. As soon as practicable but by no later than five Business Days' after delivery to a holder of the Reference Obligation of a Deemed Consent Matter, Buyer shall contact Seller and, to the extent that a holder of the Reference Obligation has a right to take actions with respect to such matter shall request direction with respect to the Deemed Consent Matter. If the Controlling Class, the Controlling Beneficiary and the Controlling Party actually receives notice of a Deemed Consent Matter in accordance with the terms of the Indenture (including as to any time frames specified therein or as otherwise agreed to by the Controlling Class, the Controlling Beneficiary and the Controlling Party) or if the Controlling Class, the Controlling Beneficiary and the Controlling Party has waived its right to receive any such notice, Buyer shall be deemed to have satisfied its obligation with respect to the provision of such notice to Seller. In the absence of any direction from Seller following Buyer contacting Seller, Buyer shall abstain from taking any action in respect of the Deemed Consent Matter as to which a holder of the Reference Obligation has the right to act with the result that Buyer will under the terms of the Reference Obligation be deemed to have consented to such matter. For the avoidance of doubt, notwithstanding the foregoing, Buyer shall, subject to Section 9(b) hereof, be obligated to follow Seller's direction with respect to any action or inaction that a holder of the

12

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000012

Reference Obligation would have the right to exercise with respect to a Deemed Consent Matter.

13

(d)    Subject to the limitations set forth in Section 9(e) below, if Buyer exercises any rights that it has under the Reference Obligation in a manner not permitted by Section 9(a) above including a failure to act because Buyer has failed to procure such rights as and to the extent required thereunder for any reason, including without limitation, because Buyer has sold or does not own the Reference Obligation, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to section 12 of the Agreement. If Buyer has failed to either deliver to Seller any Trustee Report or provide access to MBIA of any such Trustee Report as and to the extent required hereunder and MBIA has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Trustee Report, and after receipt by Buyer of notice of such failure from Seller, Buyer has failed to cure such breach within 10 Business days thereafter, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 1 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Trustee Report is not delivered to Seller on or before the expiration of a 10 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. Notwithstanding anything herein to the contrary, if Buyer has failed to either deliver to Seller any Trustee Report that requires a Noteholder's consent or vote (a "Voting Notice") or provide access to Seller of any such Voting Notice as and to the extent required pursuant to Section 9(a) and Seller has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Voting Notice, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Voting Notice is not delivered to Seller on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. For the avoidance of doubt, any such exercise to declare an Early Termination Date as provided in the preceding three sentences shall not be an Event of Default under Section 5(a)(ii) of the Agreement.

14

(e)     Notwithstanding Section 9(d) above, if Buyer exercises any rights that it has under the Reference Obligation in a manner that would modify the Indenture to:

(i)     (A) allow another Person to assume the covenants of the issuer and co-issuer thereunder; (B) modify the covenants of the issuer and co-issuer to the benefit of the holders of the Reference Obligation; (C) convey, transfer, assign, mortgage or pledge any property to the Trustee for the benefit of the holders of the Reference Obligation; (D) appoint a successor trustee or modify the terms of the Indenture to facilitate administration of the collateral for the benefit of the holders of the Reference Obligation; (E) correct or amplify the description of the property subject to the lien of the Indenture; (F) modify the restrictions and procedures for the sale and transfer of the collateral in accordance with applicable laws or regulations; (G) correct any provision of the Indenture that (i) is inconsistent with rating agency methodology, (ii) contains a non-material error, or (ii) contains a manifest error; (H) obtain ratings on any of the classes of the notes; (I) accommodate the issuance of additional notes permitted thereunder; (J) make administrative changes or changes required to obtain an exchange listing; (K) avoid tax imposition on the income of the issuer; or (L) modify any hedge agreements entered into by the issuer; and

(ii)    such exercise of rights does not have a material adverse affect upon the Seller;

such exercise of rights by Buyer shall not be an Additional Termination Event and this Transaction may not be terminated by Seller due to such exercise. For the avoidance of doubt, no provision of this Agreement shall relieve Buyer of the obligations set forth in Section 9(a) except as expressly provided for in this Section 9(e).

**10.    Representations:**

Buyer hereby represents to Seller that, to the best of its knowledge, the Ratings of the Reference Obligations set forth in Section 1 are true and correct as of the date hereof.

**11.    Offices:**

Party A is acting through its New York Office for the purposes of this Transaction.

Party B is acting through its New York Office for the purposes of this Transaction.

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000015

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____

Name:    STEPHANIE TAYLOR-CIAVARELLO
Title:    ASSISTANT SECRETARY

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory

By:    _____
       Authorized Signatory

Confirmation Signature Page

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000016

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:     MBIA Insurance Corporation as Attorney-In-Fact


By:     _____
            Name:
            Title:


Confirmed as of the date first written above:


**MERRILL LYNCH INTERNATIONAL**

By:     _____
            Authorized Signatory
            **Authorized Signatory**

By:     _____
            Authorized Signatory


16

O7ML/24049

MLI0000017

# Exhibit 2B

EXECUTION COPY

Date: August 29, 2007

| To: | Merrill Lynch International 2 King Edward Street London EC1A 1HQ | From: | LaCrosse Financial Products, LLC c/o Global Securitization Services, LLC 114 West 47th Street, Suite 1715 New York, New York 10036 |
|---|---|---|---|
| Attention: | Manager, Fixed Income Settlements | Contact: | Vice President |
| Phone Number: | +44 207 867 3769 | Phone Number: | 212-302-5151 |
| Facsimile Number: | +44 207 867 2004 | Facsimile Number: | 212-302-8767 |

**Re: CREDIT DEFAULT SWAP TRANSACTION** relating to Silver Marlin CDO I, Ltd., Silver Marlin CDO I, LLC Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Notes due 2050.

Dear Sir or Madam:

The purpose of this letter agreement (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Default Swap Transaction entered into between us on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (together, the **"2003 Definitions"**), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the 2003 Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms part of, and is subject to, the Single Transaction 1992 ISDA Master Agreement dated as of August 29, 2007, between LaCrosse Financial Products, LLC and Merrill Lynch International as amended and supplemented from time to time (the **"Agreement"**). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not expressly defined herein or in the 2003 Definitions shall have the meanings given to such terms in the Indenture (the **"Indenture"**) dated as of March 29, 2007, among Silver Marlin CDO I, Ltd., Silver Marlin CDO I, LLC, and Wells Fargo Bank, National Association, as Trustee (the **"Trustee"**), copies of which have been separately provided to the parties.

The terms of the particular Transaction to which this Confirmation relates are as follows:

112138v.7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000018

1.  **General Terms:**

Trade Date:                              August 29, 2007

Effective Date:                          August 29, 2007

Scheduled Termination Date:              Stated Maturity

Termination Date:                        The earliest of (i) the Scheduled Termination Date, (ii) any Optional Termination Date, and (iii) the date on which the Fixed Rate Payer Calculation Amount is reduced to zero.

Optional Termination Date:               As defined in Section 6 hereof.

Floating Rate Payer:                     LaCrosse Financial Products, LLC (the "**Seller**")

Fixed Rate Payer:                        Merrill Lynch International (the "**Buyer**")

Calculation Agent:                       Buyer

Calculation Agent City:                  New York

Business Day:                            New York

Business Day Convention:                 Following (which, subject to Sections 1.4 and 1.6 of the 2003 Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day).

Reference Entity:                        Silver Marlin CDO I, Ltd.

Reference Obligation:                    USD          · in original principal amount of the **REDACTED** following obligation:

|                            |                            |
|----------------------------|----------------------------|
| Primary Obligor:           | Silver Marlin CDO I, Ltd.  |
| Class:                     | Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Notes due 2050 (the "**Class A-1 Notes**") |
| Stated Maturity:           | May 7, 2050                |
| Reference Obligation Issue Date: | March 29, 2007       |
| Reference Obligation Payment Dates: |                   |

**REDACTED**

Coupon:

2

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000019

|  |  |
|---|---|
| CUSIP: | 827899AA3 |
| ISIN: | [●] |

| Ratings (as of the Effective Date): | AAA (S&P)/Aaa (Moody's) |
|---|---|

Section 2.30 of the 2003 Definitions shall not apply to this Transaction.

**Capital Charge Letters**

If the Seller has not received a captial charge letter from Standard & Poor's confirming that the credit assessment of this Transaction is "AAA" and the capital charge is 10.0% on the risk assumed by the Seller in this Transaction, on or before October 29th, 2007, this Transaction may be terminated by the Seller in its sole discretion, without any payment being due and payable in connection therewith by either party, by delivery of written notice to the Buyer, at any time after October 29th, 2007 but no later than November 8th, 2007.

**Reference Obligation Outstanding Amount:**

As of any date, an amount equal to the original principal amount of the Reference Obligation as of the Trade Date as reduced after the Trade Date by amounts paid on or prior to such date to the holders of the Reference Obligation to amortize principal of the Reference Obligation.

**Reference Price:**

**Relevant Proportion:**    **REDACTED**

**Tranche Amount**

The product of the Reference Obligation Outstanding Amount and the Relevant Proportion.

**Loss Threshold Amount**    **REDACTED**

**All Guarantees:**    Not Applicable

2.  **Fixed Payments:**
    Fixed Rate Payer Calculation Amount:

**REDACTED**

3

MLI0000020

Fixed Rate:

Fixed Rate Payer Payment
Dates:

*REDACTED*

Fixed Rate Payer Day Count
Fraction:

Fixed Rate Payer Calculation
Period:

3.    **Floating Payment:**
Floating Rate Payer Calculation
Amount:

Conditions to Settlement:

4

Credit Events:

**REDACTED**

5

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000022

Obligation(s):

4.    **Settlement Terms:**
Settlement Method:

Terms    Relating    to    Cash
Settlement:

Cash Settlement Date:

*REDACTED*

Cash Settlement Amount:

Principal Shortfall Amount:

6

Excess Collections:

REDACTED

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000024

Escrow:

Policy Payment Trigger Date:

**REDACTED**

5.    **Notice and Account Details:**

Notice and Account for Payments
for Buyer:                                    **MLI Payment Details:**

**REDACTED**

**MLI Notice Details:**

Copy to:

8

Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements

**REDACTED**

with copy to:

Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attn: Swaps Legal

**REDACTED**

with any telephonic notification or confirmation to:

Joseph Gambino,
Vickram Mangalgiri,      **REDACTED**
Chintan Shah,
any other individual as notified by Buyer in writing to
Seller

Notice for all purposes, including          LaCrosse Financial Products, LLC
delivery of the Trustee Reports             c/o MBIA Insurance Corporation (**"MBIA"**)
and Account details for Seller:             113 King Street
                                            Armonk, New York 10504

**REDACTED**

Attention: (1) Michael Murtagh and (2) Manager —
Insured Portfolio Management — Attention: CDO
Group

and a copy to:

LaCrosse Financial Securities Products, LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention: Vice President

**REDACTED**

9

REDACTED

6.    **Optional Early Termination:**

Buyer shall have the option to terminate this Transaction at any time by giving notice on the day which is 5 Business Days prior to any Fixed Rate Payer Payment Date (such date, the **"Optional Early Termination Notification Date"**). Upon such notice, the Fixed Rate Payer Payment Date following the Optional Early Termination Notification Date shall be the **"Optional Termination Date"**. If the Optional Termination Date occurs prior to the Fixed Rate Payer Payment Date occurring in May 2011 (the **"Optional Redemption Date"**), Buyer shall pay to Seller on the Optional Termination Date the Makewhole Amount. If the Optional Termination Date occurs on or after the Optional Redemption Date, no amounts shall be due and payable by the Buyer to the Seller in respect of the early termination of the Transaction on such date.

7.    **Makewhole Amount:**

REDACTED

8.    **Seller's Right to Elect Physical Settlement:**

REDACTED

10

**REDACTED**

9. **Seller's Right to Exercise Voting Rights on Reference Obligation:**

(a)      Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

     Additionally, the Buyer will (i) either (x) arrange for copies of all notices, reports, statements and other information received by it from the trustee, collateral manager, paying agent (or similar administrative agent) for the Reference Obligation in respect of the Reference Obligation (cumulatively, the **"Trustee Reports"**) to be delivered to Seller as soon as practicable or (y) provide access to Seller of a website allowing Seller access to Trustee Reports, and (ii) by the close of business on the 30th calendar day after the Effective Date cause to have the Trustee execute the **"Direction Letter"** in the form attached hereto or in such other form as Buyer and Seller may agree upon (such Direction Letter shall be dated not more than 30 calendar days from the date hereof), among Buyer, MBIA Insurance Corporation, the Collateral Manager and the Trustee, an executed copy of which shall be separately provided to the parties hereto. Buyer shall not be required to submit any communication to Seller that has previously been submitted to Seller or MBIA Insurance Corporation by the Trustee as required by the Direction Letter.

(b)      The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below. The Buyer shall not be required, as applicable, to exercise or

11

MLI0000028

procure the exercise of rights as directed by Seller:

(i)     if exercising or procuring the exercise of such rights as so directed by Seller is prohibited by any law, rule, regulation or judicial or administrative order applicable to Buyer (or the entity from whom Buyer has procured such rights) or is prohibited by the Indenture; or

(ii)    if, unless otherwise consented to in writing by Buyer, exercising such rights would (a) modify the currency, interest rate, breakage costs, facility cancellation fee, decrease the principal amount payable under the Reference Obligation, or (b) modify or extend the due date for payment of interest, breakage costs, facility cancellation fee, or principal of the Reference Obligation.

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(c)     Except as specified below, the foregoing provisions shall not apply to Buyer's action or inaction with respect to any matter where failure to vote or act within a specified time period is deemed to be consent to such matter (each such matter, a **"Deemed Consent Matter"**), which shall instead be governed by the following provisions. As soon as practicable but by no later than five Business Days' after delivery to a holder of the Reference Obligation of a Deemed Consent Matter, Buyer shall contact Seller and, to the extent that a holder of the Reference Obligation has a right to take actions with respect to such matter shall request direction with respect to the Deemed Consent Matter. If the Controlling Class, the Controlling Beneficiary and the Controlling Party actually receives notice of a Deemed Consent Matter in accordance with the terms of the Indenture (including as to any time frames specified therein or as otherwise agreed to by the Controlling Class, the Controlling Beneficiary and the Controlling Party) or if the Controlling Class, the Controlling Beneficiary and the Controlling Party has waived its right to receive any such notice, Buyer shall be deemed to have satisfied its obligation with respect to the provision of such notice to Seller. In the absence of any direction from Seller following Buyer contacting Seller, Buyer shall abstain from taking any action in respect of the Deemed Consent Matter as to which a holder of the Reference Obligation has the right to act with the result that Buyer will under the terms of the Reference Obligation be deemed to have consented to such matter. For the avoidance of doubt, notwithstanding the foregoing, Buyer shall, subject to Section 9(b) hereof, be obligated to follow Seller's direction with respect to any action or inaction that a holder of the Reference Obligation would have the right to exercise with respect to a Deemed Consent Matter.

12

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000029

(d)      Subject to the limitations set forth in Section 9(e) below, if Buyer exercises any rights that it has under the Reference Obligation in a manner not permitted by Section 9(a) above including a failure to act because Buyer has failed to procure such rights as and to the extent required thereunder for any reason, including without limitation, because Buyer has sold or does not own the Reference Obligation, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to section 12 of the Agreement. If Buyer has failed to either deliver to Seller any Trustee Report or provide access to MBIA of any such Trustee Report as and to the extent required hereunder and MBIA has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Trustee Report, and after receipt by Buyer of notice of such failure from Seller, Buyer has failed to cure such breach within 10 Business days thereafter, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 1 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Trustee Report is not delivered to Seller on or before the expiration of a 10 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. Notwithstanding anything herein to the contrary, if Buyer has failed to either deliver to Seller any Trustee Report that requires a Noteholder's consent or vote (a "Voting Notice") or provide access to Seller of any such Voting Notice as and to the extent required pursuant to Section 9(a) and Seller has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Voting Notice, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Voting Notice is not delivered to Seller on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. For the avoidance of doubt, any such exercise to declare an Early Termination Date as provided in the preceding three sentences shall not be an Event of Default under Section 5(a)(ii) of the Agreement.

13

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000030

(e)    Notwithstanding Section 9(d) above, if Buyer exercises any rights that it has under the Reference Obligation in a manner that would modify the Indenture to:

    (i)    (A) allow another Person to assume the covenants of the issuer and co-issuer thereunder; (B) modify the covenants of the issuer and co-issuer to the benefit of the holders of the Reference Obligation; (C) convey, transfer, assign, mortgage or pledge any property to the Trustee for the benefit of the holders of the Reference Obligation; (D) appoint a successor trustee or modify the terms of the Indenture to facilitate administration of the collateral for the benefit of the holders of the Reference Obligation; (E) correct or amplify the description of the property subject to the lien of the Indenture; (F) modify the restrictions and procedures for the sale and transfer of the collateral in accordance with applicable laws or regulations; (G) correct any provision of the Indenture that (i) is inconsistent with rating agency methodology, (ii) contains a non-material error, or (ii) contains a manifest error; (H) obtain ratings on any of the classes of the notes; (I) accommodate the issuance of additional notes permitted thereunder; (J) make administrative changes or changes required to obtain an exchange listing; (K) avoid tax imposition on the income of the issuer; or (L) modify any hedge agreements entered into by the issuer; and

    (ii)    such exercise of rights does not have a material adverse affect upon the Seller;

such exercise of rights by Buyer shall not be an Additional Termination Event and this Transaction may not be terminated by Seller due to such exercise. For the avoidance of doubt, no provision of this Agreement shall relieve Buyer of the obligations set forth in Section 9(a) except as expressly provided for in this Section 9(e).

**10.    Representations:**

Buyer hereby represents to Seller that, to the best of its knowledge, the Ratings of the Reference Obligations set forth in Section 1 are true and correct as of the date hereof.

**11.    Offices:**

Party A is acting through its New York Office for the purposes of this Transaction.

Party B is acting through its New York Office for the purposes of this Transaction.

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000031

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____
       Name:    STEPHANIE TAYLOR-CIAVARELLO
       Title:    ASSISTANT SECRETARY

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory

By:    _____
       Authorized Signatory

Confirmation Signature Page

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000032

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact


By:    _____
       Name:
       Title:


Confirmed as of the date first written above:


**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory
       Authorized Signatory

By:    _____
       Authorized Signatory

16

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000033

# Exhibit 2C

EXECUTION COPY

Date: August 29, 2007

| To: | Merrill Lynch International 2 King Edward Street London EC1A 1HQ | From: | LaCrosse Financial Products, LLC c/o Global Securitization Services, LLC 114 West 47th Street, Suite 1715 New York, New York 10036 |
| --- | --- | --- | --- |
| Attention: | Manager, Fixed Income Settlements | Contact: | Vice President |
| Phone Number: | +44 207 867 3769 | Phone Number: | 212-302-5151 |
| Facsimile Number: | +44 207 867 2004 | Facsimile Number: | 212-302-8767 |

**Re:  CREDIT DEFAULT SWAP TRANSACTION** relating to Tazlina Funding CDO II, Ltd., Tazlina Funding CDO II, LLC Class A-1 First Priority Senior Floating Rate Delayed Draw Notes Due 2054.

Dear Sir or Madam:

The purpose of this letter agreement (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Default Swap Transaction entered into between us on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (together, the **"2003 Definitions"**), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the 2003 Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms part of, and is subject to, the Single Transaction 1992 ISDA Master Agreement dated as of August 29, 2007, between LaCrosse Financial Products, LLC and Merrill Lynch International as amended and supplemented from time to time (the **"Agreement"**). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not expressly defined herein or in the 2003 Definitions shall have the meanings given to such terms in the Indenture (the **"Indenture"**) dated as of May 10, 2007, among Tazlina Funding CDO II, Ltd., Tazlina Funding CDO II, LLC, and Wells Fargo Bank, National Association, as Trustee (the **"Trustee"**), copies of which have been separately provided to the parties.

The terms of the particular Transaction to which this Confirmation relates are as follows:

112138v.7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000052

1.  **General Terms:**

| | |
|---|---|
| Trade Date: | August 29, 2007 |
| Effective Date: | August 29, 2007 |
| Scheduled Termination Date: | Stated Maturity |
| Termination Date: | The earliest of (i) the Scheduled Termination Date, (ii) any Optional Termination Date, and (iii) the date on which the Fixed Rate Payer Calculation Amount is reduced to zero. |
| Optional Termination Date: | As defined in Section 6 hereof. |
| Floating Rate Payer: | LaCrosse Financial Products, LLC (the "**Seller**") |
| Fixed Rate Payer: | Merrill Lynch International (the "**Buyer**") |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Day: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the 2003 Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Tazlina Funding CDO II, Ltd. |
| Reference Obligation: | USD             in original principal amount of the **REDACTED** following obligation: |

| | |
|---|---|
| Primary Obligor: | Tazlina Funding CDO II, Ltd. |
| Class: | Class A-1 First Priority Senior Floating Rate Delayed Draw Notes Due 2054 (the "**Class A-1 Notes**") |
| Stated Maturity: | November 9, 2054 |
| Reference Obligation Issue Date: | May 10, 2007 |
| Reference Obligation Payment Dates: | **REDACTED** |

Coupon:

2

MLI0000053

|  |  |
|---|---|
| CUSIP: | 878047AA7 |
| ISIN: | [●] |

Ratings (as of the
Effective Date):    AAA (S&P)/Aaa (Moody's)

Section 2.30 of the 2003 Definitions shall not apply to this Transaction.

Capital Charge Letters    If the Seller has not received a captial charge letter from Standard & Poor's confirming that the credit assessment of this Transaction is "AAA" and the capital charge is 10.0% on the risk assumed by the Seller in this Transaction, on or before October 29th, 2007, this Transaction may be terminated by the Seller in its sole discretion, without any payment being due and payable in connection therewith by either party, by delivery of written notice to the Buyer, at any time after October 29th, 2007 but no later than November 8th, 2007.

Reference Obligation
Outstanding Amount:    As of any date, an amount equal to the original principal amount of the Reference Obligation as of the Trade Date as reduced after the Trade Date by amounts paid on or prior to such date to the holders of the Reference Obligation to amortize principal of the Reference Obligation.

Reference Price:

Relevant Proportion:    **REDACTED**

Tranche Amount    The product of the Reference Obligation Outstanding Amount and the Relevant Proportion.

Loss Threshold Amount    **REDACTED**

All Guarantees:    Not Applicable

2.    **Fixed Payments:**

Fixed Rate Payer Calculation
Amount:

**REDACTED**

3

Fixed Rate:

Fixed Rate Payer Payment
Dates:

Fixed Rate Payer Day Count
Fraction:

**REDACTED**

Fixed Rate Payer Calculation
Period:

**3.     Floating Payment:**

Floating Rate Payer Calculation
Amount:

Conditions to Settlement:

4

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Credit Events:

**REDACTED**

5

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Obligation(s):

4.    **Settlement Terms:**
      Settlement Method:

      Terms    Relating    to    Cash
      Settlement:

      Cash Settlement Date:

**REDACTED**

Cash Settlement Amount:

Principal Shortfall Amount:

6

Excess Collections:

**REDACTED**

7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000058

Escrow:

Policy Payment Trigger Date:

**REDACTED**

5.    **Notice and Account Details:**

Notice and Account for Payments
for Buyer:                                    **MLI Payment Details:**

**REDACTED**

**MLI Notice Details:**

Copy to:

8

Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements

**REDACTED**

with copy to:

Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY  10080
Attn:  Swaps Legal

**REDACTED**

with any telephonic notification or confirmation to:

Joseph Gambino,
Vickram Mangalgiri,          **REDACTED**
Chintan Shah,
any other individual as notified by Buyer in writing to
Seller

Notice for all purposes, including
delivery of the Trustee Reports      LaCrosse Financial Products, LLC
and Account details for Seller:      c/o MBIA Insurance Corporation ("**MBIA**")
                                     113 King Street
                                     Armonk, New York 10504

**REDACTED**

Attention: (1) Michael Murtagh and (2) Manager —
Insured Portfolio Management — Attention: CDO
Group

and a copy to:

LaCrosse Financial Securities Products, LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention: Vice President

**REDACTED**

9

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000060

**REDACTED**

6.  **Optional Early Termination:**

    Buyer shall have the option to terminate this Transaction at any time by giving notice on the day which is 5 Business Days prior to any Fixed Rate Payer Payment Date (such date, the **"Optional Early Termination Notification Date"**). Upon such notice, the Fixed Rate Payer Payment Date following the Optional Early Termination Notification Date shall be the **"Optional Termination Date"**. If the Optional Termination Date occurs prior to the Fixed Rate Payer Payment Date occurring in August 2011 (the **"Optional Redemption Date"**), Buyer shall pay to Seller on the Optional Termination Date the Makewhole Amount. If the Optional Termination Date occurs on or after the Optional Redemption Date, no amounts shall be due and payable by the Buyer to the Seller in respect of the early termination of the Transaction on such date.

7.  **Makewhole Amount:**

**REDACTED**

8.  **Seller's Right to Elect Physical Settlement:**

**REDACTED**

REDACTED

9.  **Seller's Right to Exercise Voting Rights on Reference Obligation:**

(a)  Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

Additionally, the Buyer will (i) either (x) arrange for copies of all notices, reports, statements and other information received by it from the trustee, collateral manager, paying agent (or similar administrative agent) for the Reference Obligation in respect of the Reference Obligation (cumulatively, the **"Trustee Reports"**) to be delivered to Seller as soon as practicable or (y) provide access to Seller of a website allowing Seller access to Trustee Reports, and (ii) by the close of business on the 30th calendar day after the Effective Date cause to have the Trustee execute the **"Direction Letter"** in the form attached hereto or in such other form as Buyer and Seller may agree upon (such Direction Letter shall be dated not more than 30 calendar days from the date hereof), among Buyer, MBIA Insurance Corporation, the Collateral Manager and the Trustee, an executed copy of which shall be separately provided to the parties hereto. Buyer shall not be required to submit any communication to Seller that has previously been submitted to Seller or MBIA Insurance Corporation by the Trustee as required by the Direction Letter.

(b)  The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below. The Buyer shall not be required, as applicable, to exercise or

11

procure the exercise of rights as directed by Seller:

(i)    if exercising or procuring the exercise of such rights as so directed by Seller is prohibited by any law, rule, regulation or judicial or administrative order applicable to Buyer (or the entity from whom Buyer has procured such rights) or is prohibited by the Indenture; or

(ii)    if, unless otherwise consented to in writing by Buyer, exercising such rights would (a) modify the currency, interest rate, breakage costs, facility cancellation fee, decrease the principal amount payable under the Reference Obligation, or (b) modify or extend the due date for payment of interest, breakage costs, facility cancellation fee, or principal of the Reference Obligation.

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(c)    Except as specified below, the foregoing provisions shall not apply to Buyer's action or inaction with respect to any matter where failure to vote or act within a specified time period is deemed to be consent to such matter (each such matter, a **"Deemed Consent Matter"**), which shall instead be governed by the following provisions. As soon as practicable but by no later than five Business Days' after delivery to a holder of the Reference Obligation of a Deemed Consent Matter, Buyer shall contact Seller and, to the extent that a holder of the Reference Obligation has a right to take actions with respect to such matter shall request direction with respect to the Deemed Consent Matter. If the Controlling Class, the Controlling Beneficiary and the Controlling Party actually receives notice of a Deemed Consent Matter in accordance with the terms of the Indenture (including as to any time frames specified therein or as otherwise agreed to by the Controlling Class, the Controlling Beneficiary and the Controlling Party) or if the Controlling Class, the Controlling Beneficiary and the Controlling Party has waived its right to receive any such notice, Buyer shall be deemed to have satisfied its obligation with respect to the provision of such notice to Seller. In the absence of any direction from Seller following Buyer contacting Seller, Buyer shall abstain from taking any action in respect of the Deemed Consent Matter as to which a holder of the Reference Obligation has the right to act with the result that Buyer will under the terms of the Reference Obligation be deemed to have consented to such matter. For the avoidance of doubt, notwithstanding the foregoing, Buyer shall, subject to Section 9(b) hereof, be obligated to follow Seller's direction with respect to any action or inaction that a holder of the Reference Obligation would have the right to exercise with respect to a Deemed Consent Matter.

12

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000063

(d)     Subject to the limitations set forth in Section 9(e) below, if Buyer exercises any rights that it has under the Reference Obligation in a manner not permitted by Section 9(a) above including a failure to act because Buyer has failed to procure such rights as and to the extent required thereunder for any reason, including without limitation, because Buyer has sold or does not own the Reference Obligation, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to section 12 of the Agreement. If Buyer has failed to either deliver to Seller any Trustee Report or provide access to MBIA of any such Trustee Report as and to the extent required hereunder and MBIA has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Trustee Report, and after receipt by Buyer of notice of such failure from Seller, Buyer has failed to cure such breach within 10 Business days thereafter, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 1 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Trustee Report is not delivered to Seller on or before the expiration of a 10 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. Notwithstanding anything herein to the contrary, if Buyer has failed to either deliver to Seller any Trustee Report that requires a Noteholder's consent or vote (a "Voting Notice") or provide access to Seller of any such Voting Notice as and to the extent required pursuant to Section 9(a) and Seller has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Voting Notice, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Voting Notice is not delivered to Seller on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. For the avoidance of doubt, any such exercise to declare an Early Termination Date as provided in the preceding three sentences shall not be an Event of Default under Section 5(a)(ii) of the Agreement.

13

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000064

(e) Notwithstanding Section 9(d) above, if Buyer exercises any rights that it has under the Reference Obligation in a manner that would modify the Indenture to:

    (i) (A) allow another Person to assume the covenants of the issuer and co-issuer thereunder; (B) modify the covenants of the issuer and co-issuer to the benefit of the holders of the Reference Obligation; (C) convey, transfer, assign, mortgage or pledge any property to the Trustee for the benefit of the holders of the Reference Obligation; (D) appoint a successor trustee or modify the terms of the Indenture to facilitate administration of the collateral for the benefit of the holders of the Reference Obligation; (E) correct or amplify the description of the property subject to the lien of the Indenture; (F) modify the restrictions and procedures for the sale and transfer of the collateral in accordance with applicable laws or regulations; (G) correct any provision of the Indenture that (i) is inconsistent with rating agency methodology, (ii) contains a non-material error, or (ii) contains a manifest error; (H) obtain ratings on any of the classes of the notes; (I) accommodate the issuance of additional notes permitted thereunder; (J) make administrative changes or changes required to obtain an exchange listing; (K) avoid tax imposition on the income of the issuer; or (L) modify any hedge agreements entered into by the issuer; and

    (ii) such exercise of rights does not have a material adverse affect upon the Seller;

such exercise of rights by Buyer shall not be an Additional Termination Event and this Transaction may not be terminated by Seller due to such exercise. For the avoidance of doubt, no provision of this Agreement shall relieve Buyer of the obligations set forth in Section 9(a) except as expressly provided for in this Section 9(e).

**10.    Representations:**

Buyer hereby represents to Seller that, to the best of its knowledge, the Ratings of the Reference Obligations set forth in Section 1 are true and correct as of the date hereof.

**11.    Offices:**

Party A is acting through its New York Office for the purposes of this Transaction.

Party B is acting through its New York Office for the purposes of this Transaction.

14

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____
       Name:    STEPHANIE TAYLOR-CIAVARELLO
       Title:   ASSISTANT SECRETARY

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory

By:    _____
       Authorized Signatory

Confirmation Signature Page

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:     MBIA Insurance Corporation as Attorney-In-Fact


By:     _____
        Name:
        Title:


Confirmed as of the date first written above:


**MERRILL LYNCH INTERNATIONAL**

By:     _____
        Authorized Signatory
        **Authorized Signatory**

By:     _____
        Authorized Signatory

16

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000067

# Exhibit 2D

EXECUTION COPY

Date: August 29, 2007

| To: | Merrill Lynch International 2 King Edward Street London EC1A 1HQ | From: | LaCrosse Financial Products, LLC c/o Global Securitization Services, LLC 114 West 47th Street, Suite 1715 New York, New York 10036 |
|---|---|---|---|
| Attention: | Manager, Fixed Income Settlements | Contact: | Vice President |
| Phone Number: | +44 207 867 3769 | Phone Number: | 212-302-5151 |
| Facsimile Number: | +44 207 867 2004 | Facsimile Number: | 212-302-8767 |

**Re: CREDIT DEFAULT SWAP TRANSACTION** relating to West Trade Funding CDO III, Ltd., West Trade Funding CDO III, LLC Class A-1 First Priority Senior Floating Rate Delayed Draw Notes Due 2053.

Dear Sir or Madam:

The purpose of this letter agreement (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Default Swap Transaction entered into between us on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (together, the **"2003 Definitions"**), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the 2003 Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms part of, and is subject to, the Single Transaction 1992 ISDA Master Agreement dated as of August 29, 2007, between LaCrosse Financial Products, LLC and Merrill Lynch International as amended and supplemented from time to time (the **"Agreement"**). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not expressly defined herein or in the 2003 Definitions shall have the meanings given to such terms in the Indenture (the **"Indenture"**) dated as of May 24, 2007, among West Trade Funding CDO III, Ltd., West Trade Funding CDO III, LLC, and Wells Fargo Bank, National Association, as Trustee (the **"Trustee"**), copies of which have been separately provided to the parties.

The terms of the particular Transaction to which this Confirmation relates are as follows:

112138v.7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000034

1.    **General Terms:**

Trade Date:                        August 29, 2007

Effective Date:                    August 29, 2007

Scheduled Termination Date:        Stated Maturity

Termination Date:                  The earliest of (i) the Scheduled Termination Date, (ii) any Optional Termination Date, and (iii) the date on which the Fixed Rate Payer Calculation Amount is reduced to zero.

Optional Termination Date:         As defined in Section 6 hereof.

Floating Rate Payer:               LaCrosse Financial Products, LLC (the "**Seller**")

Fixed Rate Payer:                  Merrill Lynch International (the "**Buyer**")

Calculation Agent:                 Buyer

Calculation Agent City:            New York

Business Day:                      New York

Business Day Convention:           Following (which, subject to Sections 1.4 and 1.6 of the 2003 Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day).

Reference Entity:                  West Trade Funding CDO III, Ltd.

Reference Obligation:              USD                  · in original principal amount of **REDACTED** the following obligation:

    Primary Obligor:       West Trade Funding CDO III, Ltd.

    Class:                 Class A-1 First Priority Senior Floating Rate Delayed Draw Notes Due 2053 (the "**Class A-1 Notes**")

    Stated Maturity:       March 4, 2053

    Reference Obligation Issue Date:   May 24, 2007

    Reference Obligation Payment Dates:    **REDACTED**

    Coupon:

2

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000035

CUSIP:             95631QAA7
ISIN:              [●]

Ratings (as of the
Effective Date):   AAA (S&P)/Aaa (Moody's)


Section 2.30 of the 2003 Definitions shall not apply to this Transaction.

Capital Charge Letters | If the Seller has not received a captial charge letter from Standard & Poor's confirming that the credit assessment of this Transaction is "AAA" and the capital charge is 10.0% on the risk assumed by the Seller in this Transaction, on or before October 29th, 2007, this Transaction may be terminated by the Seller in its sole discretion, without any payment being due and payable in connection therewith by either party, by delivery of written notice to the Buyer, at any time after October 29th, 2007 but no later than November 8th, 2007.

Reference Obligation Outstanding Amount: | As of any date, an amount equal to the original principal amount of the Reference Obligation as of the Trade Date as reduced after the Trade Date by amounts paid on or prior to such date to the holders of the Reference Obligation to amortize principal of the Reference Obligation.

Reference Price:

Relevant Proportion:    **REDACTED**


Tranche Amount | The product of the Reference Obligation Outstanding Amount and the Relevant Proportion.

Loss Threshold Amount    **REDACTED**

All Guarantees:    Not Applicable

2.    **Fixed Payments:**
      Fixed Rate Payer Calculation Amount:

                               **REDACTED**

3

Fixed Rate:

Fixed Rate Payer Payment
Dates:

Fixed Rate Payer Day Count
Fraction:

Fixed Rate Payer Calculation                **REDACTED**
Period:

3.      **Floating Payment:**

Floating Rate Payer Calculation
Amount:

Conditions to Settlement:

4

Credit Events:

**REDACTED**

5

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Obligation(s):

4. **Settlement Terms:**
   Settlement Method:

   Terms    Relating    to    Cash
   Settlement:

   Cash Settlement Date:

                                          **REDACTED**

   Cash Settlement Amount:

   Principal Shortfall Amount:

6

Excess Collections:

**REDACTED**

7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Escrow:

Policy Payment Trigger Date:

**REDACTED**

5.    **Notice and Account Details:**

Notice and Account for Payments
for Buyer:                                   **MLI Payment Details:**

                                             **REDACTED**

                                             **MLI Notice Details:**

                                             Copy to:

8

Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn:  Manager, Fixed Income Settlements

**REDACTED**

with copy to:

Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY  10080
Attn:  Swaps Legal

**REDACTED**

with any telephonic notification or confirmation to:

Joseph Gambino,
Vickram Mangalgiri,          **REDACTED**
Chintan Shah,
any other individual as notified by Buyer in writing to
Seller

Notice for all purposes, including
delivery of the Trustee Reports
and Account details for Seller:

LaCrosse Financial Products, LLC
c/o MBIA Insurance Corporation (**"MBIA"**)
113 King Street
Armonk, New York 10504

**REDACTED**

Attention: (1) Michael Murtagh and (2) Manager —
Insured Portfolio Management — Attention: CDO
Group

and a copy to:

LaCrosse Financial Securities Products, LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention: Vice President

**REDACTED**

9

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000042

**REDACTED**

6. **Optional Early Termination:**

Buyer shall have the option to terminate this Transaction at any time by giving notice on the day which is 5 Business Days prior to any Fixed Rate Payer Payment Date (such date, the **"Optional Early Termination Notification Date"**). Upon such notice, the Fixed Rate Payer Payment Date following the Optional Early Termination Notification Date shall be the **"Optional Termination Date"**. If the Optional Termination Date occurs prior to the Fixed Rate Payer Payment Date occurring in June 2011 (the **"Optional Redemption Date"**), Buyer shall pay to Seller on the Optional Termination Date the Makewhole Amount. If the Optional Termination Date occurs on or after the Optional Redemption Date, no amounts shall be due and payable by the Buyer to the Seller in respect of the early termination of the Transaction on such date.

7. **Makewhole Amount:**

**REDACTED**

8. **Seller's Right to Elect Physical Settlement:**

**REDACTED**

10

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000043

9.  **Seller's Right to Exercise Voting Rights on Reference Obligation:**

    (a)    Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

          Additionally, the Buyer will (i) either (x) arrange for copies of all notices, reports, statements and other information received by it from the trustee, collateral manager, paying agent (or similar administrative agent) for the Reference Obligation in respect of the Reference Obligation (cumulatively, the **"Trustee Reports"**) to be delivered to Seller as soon as practicable or (y) provide access to Seller of a website allowing Seller access to Trustee Reports, and (ii) by the close of business on the 30th calendar day after the Effective Date cause to have the Trustee execute the **"Direction Letter"** in the form attached hereto or in such other form as Buyer and Seller may agree upon (such Direction Letter shall be dated not more than 30 calendar days from the date hereof), among Buyer, MBIA Insurance Corporation, the Collateral Manager and the Trustee, an executed copy of which shall be separately provided to the parties hereto. Buyer shall not be required to submit any communication to Seller that has previously been submitted to Seller or MBIA Insurance Corporation by the Trustee as required by the Direction Letter.

    (b)    The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below. The Buyer shall not be required, as applicable, to exercise or

11

procure the exercise of rights as directed by Seller:

(i)    if exercising or procuring the exercise of such rights as so directed by Seller is prohibited by any law, rule, regulation or judicial or administrative order applicable to Buyer (or the entity from whom Buyer has procured such rights) or is prohibited by the Indenture; or

(ii)    if, unless otherwise consented to in writing by Buyer, exercising such rights would (a) modify the currency, interest rate, breakage costs, facility cancellation fee, decrease the principal amount payable under the Reference Obligation, or (b) modify or extend the due date for payment of interest, breakage costs, facility cancellation fee, or principal of the Reference Obligation.

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(c)    Except as specified below, the foregoing provisions shall not apply to Buyer's action or inaction with respect to any matter where failure to vote or act within a specified time period is deemed to be consent to such matter (each such matter, a **"Deemed Consent Matter"**), which shall instead be governed by the following provisions. As soon as practicable but by no later than five Business Days' after delivery to a holder of the Reference Obligation of a Deemed Consent Matter, Buyer shall contact Seller and, to the extent that a holder of the Reference Obligation has a right to take actions with respect to such matter shall request direction with respect to the Deemed Consent Matter. If the Controlling Class, the Controlling Beneficiary and the Controlling Party actually receives notice of a Deemed Consent Matter in accordance with the terms of the Indenture (including as to any time frames specified therein or as otherwise agreed to by the Controlling Class, the Controlling Beneficiary and the Controlling Party) or if the Controlling Class, the Controlling Beneficiary and the Controlling Party has waived its right to receive any such notice, Buyer shall be deemed to have satisfied its obligation with respect to the provision of such notice to Seller. In the absence of any direction from Seller following Buyer contacting Seller, Buyer shall abstain from taking any action in respect of the Deemed Consent Matter as to which a holder of the Reference Obligation has the right to act with the result that Buyer will under the terms of the Reference Obligation be deemed to have consented to such matter. For the avoidance of doubt, notwithstanding the foregoing, Buyer shall, subject to Section 9(b) hereof, be obligated to follow Seller's direction with respect to any action or inaction that a holder of the Reference Obligation would have the right to exercise with respect to a Deemed Consent Matter.

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000045

(d)    Subject to the limitations set forth in Section 9(e) below, if Buyer exercises any rights that it has under the Reference Obligation in a manner not permitted by Section 9(a) above including a failure to act because Buyer has failed to procure such rights as and to the extent required thereunder for any reason, including without limitation, because Buyer has sold or does not own the Reference Obligation, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to section 12 of the Agreement. If Buyer has failed to either deliver to Seller any Trustee Report or provide access to MBIA of any such Trustee Report as and to the extent required hereunder and MBIA has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Trustee Report, and after receipt by Buyer of notice of such failure from Seller, Buyer has failed to cure such breach within 10 Business days thereafter, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 1 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Trustee Report is not delivered to Seller on or before the expiration of a 10 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. Notwithstanding anything herein to the contrary, if Buyer has failed to either deliver to Seller any Trustee Report that requires a Noteholder's consent or vote (a "Voting Notice") or provide access to Seller of any such Voting Notice as and to the extent required pursuant to Section 9(a) and Seller has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Voting Notice, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Voting Notice is not delivered to Seller on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. For the avoidance of doubt, any such exercise to declare an Early Termination Date as provided in the preceding three sentences shall not be an Event of Default under Section 5(a)(ii) of the Agreement.

13

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000046

(e)    Notwithstanding Section 9(d) above, if Buyer exercises any rights that it has under the Reference Obligation in a manner that would modify the Indenture to:

(i)    (A) allow another Person to assume the covenants of the issuer and co-issuer thereunder; (B) modify the covenants of the issuer and co-issuer to the benefit of the holders of the Reference Obligation; (C) convey, transfer, assign, mortgage or pledge any property to the Trustee for the benefit of the holders of the Reference Obligation; (D) appoint a successor trustee or modify the terms of the Indenture to facilitate administration of the collateral for the benefit of the holders of the Reference Obligation; (E) correct or amplify the description of the property subject to the lien of the Indenture; (F) modify the restrictions and procedures for the sale and transfer of the collateral in accordance with applicable laws or regulations; (G) correct any provision of the Indenture that (i) is inconsistent with rating agency methodology, (ii) contains a non-material error, or (ii) contains a manifest error; (H) obtain ratings on any of the classes of the notes; (I) accommodate the issuance of additional notes permitted thereunder; (J) make administrative changes or changes required to obtain an exchange listing; (K) avoid tax imposition on the income of the issuer; or (L) modify any hedge agreements entered into by the issuer; and

(ii)    such exercise of rights does not have a material adverse affect upon the Seller;

such exercise of rights by Buyer shall not be an Additional Termination Event and this Transaction may not be terminated by Seller due to such exercise. For the avoidance of doubt, no provision of this Agreement shall relieve Buyer of the obligations set forth in Section 9(a) except as expressly provided for in this Section 9(e).

**10.    Representations:**

Buyer hereby represents to Seller that, to the best of its knowledge, the Ratings of the Reference Obligations set forth in Section 1 are true and correct as of the date hereof.

**11.    Offices:**

Party A is acting through its New York Office for the purposes of this Transaction.

Party B is acting through its New York Office for the purposes of this Transaction.

14

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000047

15

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000048

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____
          Name:
          Title:


Confirmed as of the date first written above:


**MERRILL LYNCH INTERNATIONAL**

By:    _____
          Authorized Signatory

By:    _____
          Authorized Signatory

16

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:     MBIA Insurance Corporation as Attorney-In-Fact

By:

Name:     STEPHANIE TAYLOR-CIAVARELLO
Title:     ASSISTANT SECRETARY

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:     _____
        Authorized Signatory

By:     _____
        Authorized Signatory

Confirmation Signature Page

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000050

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____
       Name:
       Title:

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory
       **Authorized Signatory**

By:    _____
       Authorized Signatory

16

# Exhibit 2E

EXECUTION COPY

Date: August 29, 2007

| To: | Merrill Lynch International<br>2 King Edward Street<br>London EC1A 1HQ | From: | LaCrosse Financial Products, LLC<br>c/o Global Securitization Services, LLC<br>114 West 47th Street, Suite 1715<br>New York, New York 10036 |
|---|---|---|---|
| Attention: | Manager, Fixed Income Settlements | Contact: | Vice President |
| Phone Number: | +44 207 867 3769 | Phone Number: | 212-302-5151 |
| Facsimile Number: | +44 207 867 2004 | Facsimile Number: | 212-302-8767 |

**Re: CREDIT DEFAULT SWAP TRANSACTION** relating to Robeco High Grade CDO I, Ltd., Robeco High Grade CDO I, LLC Class A-1 First Priority Senior Secured Delayed Draw Floating Rate Notes Due 2053.

Dear Sir or Madam:

The purpose of this letter agreement (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Default Swap Transaction entered into between us on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (together, the **"2003 Definitions"**), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the 2003 Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms part of, and is subject to, the Single Transaction 1992 ISDA Master Agreement dated as of August 29, 2007, between LaCrosse Financial Products, LLC and Merrill Lynch International as amended and supplemented from time to time (the **"Agreement"**). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not expressly defined herein or in the 2003 Definitions shall have the meanings given to such terms in the Indenture (the **"Indenture"**) dated as of June 1, 2007, among Robeco High Grade CDO I, Ltd., Robeco High Grade CDO I, LLC, and LaSalle Bank National Association, as Trustee (the **"Trustee"**), copies of which have been separately provided to the parties.

The terms of the particular Transaction to which this Confirmation relates are as follows:

112138v.7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000068

1.  **General Terms:**

|  |  |
|---|---|
| Trade Date: | August 29, 2007 |
| Effective Date: | August 29, 2007 |
| Scheduled Termination Date: | Stated Maturity |
| Termination Date: | The earliest of (i) the Scheduled Termination Date, (ii) any Optional Termination Date, and (iii) the date on which the Fixed Rate Payer Calculation Amount is reduced to zero. |
| Optional Termination Date: | As defined in Section 6 hereof. |
| Floating Rate Payer: | LaCrosse Financial Products, LLC (the "**Seller**") |
| Fixed Rate Payer: | Merrill Lynch International (the "**Buyer**") |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Day: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the 2003 Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Robeco High Grade CDO I, Ltd. |
| Reference Obligation: | USD                in original principal amount of the **REDACTED** following obligation: |

|  |  |
|---|---|
| Primary Obligor: | Robeco High Grade CDO I, Ltd. |
| Class: | Class A-1 First Priority Senior Secured Delayed Draw Floating Rate Notes Due 2053 (the "**Class A-1 Notes**") |
| Stated Maturity: | October 9, 2053 |
| Reference Obligation Issue Date: | June 1, 2007 |
| Reference Obligation Payment Dates: | **REDACTED** |

2

MLI0000069

Coupon:

CUSIP:              77029QAA5
ISIN:               [•]

Ratings (as of the
Effective Date):    AAA (S&P)/Aaa (Moody's)


Section 2.30 of the 2003 Definitions shall not apply to this Transaction.

Capital Charge Letters    If the Seller has not received a captial charge letter from Standard & Poor's confirming that the credit assessment of this Transaction is "AAA" and the capital charge is 10.0% on the risk assumed by the Seller in this Transaction, on or before October 29th, 2007, this Transaction may be terminated by the Seller in its sole discretion, without any payment being due and payable in connection therewith by either party, by delivery of written notice to the Buyer, at any time after October 29th, 2007 but no later than November 8th, 2007.

Reference Obligation
Outstanding Amount:    As of any date, an amount equal to the original principal amount of the Reference Obligation as of the Trade Date as reduced after the Trade Date by amounts paid on or prior to such date to the holders of the Reference Obligation to amortize principal of the Reference Obligation.

Reference Price:

Relevant Proportion:       **REDACTED**


Tranche Amount    The product of the Reference Obligation Outstanding Amount and the Relevant Proportion.

Loss Threshold Amount    **REDACTED**

All Guarantees:    Not Applicable

2.  **Fixed Payments:**
Fixed Rate Payer Calculation
Amount:

                        **REDACTED**

3

Fixed Rate:

Fixed Rate Payer Payment
Dates:

**REDACTED**

Fixed Rate Payer Day Count
Fraction:

Fixed Rate Payer Calculation
Period:

3.    **Floating Payment:**
      Floating Rate Payer Calculation
      Amount:

      Conditions to Settlement:

4

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000071

Credit Events:

**REDACTED**

5

Obligation(s):

4.  **Settlement Terms:**
    Settlement Method:

    Terms    Relating    to    Cash
    Settlement:

    Cash Settlement Date:

                                                    **REDACTED**

    Cash Settlement Amount:

    Principal Shortfall Amount:

6

Excess Collections:                          **REDACTED**

7

Escrow:

Policy Payment Trigger Date:

**REDACTED**

5.    **Notice and Account Details:**
      Notice and Account for Payments
      for Buyer:                                    **MLI Payment Details:**

**REDACTED**

8

**REDACTED**

**MLI Notice Details:**

Copy to:

Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements

**REDACTED**

with copy to:

Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attn: Swaps Legal

**REDACTED**

with any telephonic notification or confirmation to:

Joseph Gambino,                    **REDACTED**
Vickram Mangalgiri,
Chintan Shah,
any other individual as notified by Buyer in writing to
Seller

Notice for all purposes, including     LaCrosse Financial Products, LLC
delivery of the Trustee Reports       c/o MBIA Insurance Corporation ("**MBIA**")
and Account details for Seller:       113 King Street
                                       Armonk, New York 10504

**REDACTED**

Attention: (1) Michael Murtagh and (2) Manager —
Insured Portfolio Management — Attention: CDO
Group

and a copy to:

LaCrosse Financial Securities Products, LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention: Vice President
**REDACTED**

9

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

**REDACTED**

6.  **Optional Early Termination:**

    Buyer shall have the option to terminate this Transaction at any time by giving notice on the day which is 5 Business Days prior to any Fixed Rate Payer Payment Date (such date, the **"Optional Early Termination Notification Date"**). Upon such notice, the Fixed Rate Payer Payment Date following the Optional Early Termination Notification Date shall be the **"Optional Termination Date"**. If the Optional Termination Date occurs prior to the Fixed Rate Payer Payment Date occurring in July 2010 (the **"Optional Redemption Date"**), Buyer shall pay to Seller on the Optional Termination Date the Makewhole Amount. If the Optional Termination Date occurs on or after the Optional Redemption Date, no amounts shall be due and payable by the Buyer to the Seller in respect of the early termination of the Transaction on such date.

7.  **Makewhole Amount:**

**REDACTED**

8.  **Seller's Right to Elect Physical Settlement:**

10

REDACTED

9.    **Seller's Right to Exercise Voting Rights on Reference Obligation:**

(a)    Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

Additionally, the Buyer will (i) either (x) arrange for copies of all notices, reports, statements and other information received by it from the trustee, collateral manager, paying agent (or similar administrative agent) for the Reference Obligation in respect of the Reference Obligation (cumulatively, the **"Trustee Reports"**) to be delivered to Seller as soon as practicable or (y) provide access to Seller of a website allowing Seller access to Trustee Reports, and (ii) by the close of business on the 30th calendar day after the Effective Date cause to have the Trustee execute the **"Direction Letter"** in the form attached hereto or in such other form as Buyer and Seller may agree upon (such Direction Letter shall be dated not more than 30 calendar days from the date hereof), among Buyer, MBIA Insurance Corporation, the Collateral Manager and the Trustee, an executed copy of which shall be separately provided to the parties hereto. Buyer

11

MLI0000078

shall not be required to submit any communication to Seller that has previously been submitted to Seller or MBIA Insurance Corporation by the Trustee as required by the Direction Letter.

(b)  The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below.  The Buyer shall not be required, as applicable, to exercise or procure the exercise of rights as directed by Seller:

   (i)  if exercising or procuring the exercise of such rights as so directed by Seller is prohibited by any law, rule, regulation or judicial or administrative order applicable to Buyer (or the entity from whom Buyer has procured such rights) or is prohibited by the Indenture; or

   (ii)  if, unless otherwise consented to in writing by Buyer, exercising such rights would (a) modify the currency, interest rate, breakage costs, facility cancellation fee, decrease the principal amount payable under the Reference Obligation, or (b) modify or extend the due date for payment of interest, breakage costs, facility cancellation fee, or principal of the Reference Obligation.

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(c)  Except as specified below, the foregoing provisions shall not apply to Buyer's action or inaction with respect to any matter where failure to vote or act within a specified time period is deemed to be consent to such matter (each such matter, a "**Deemed Consent Matter**"), which shall instead be governed by the following provisions.  As soon as practicable but by no later than five Business Days' after delivery to a holder of the Reference Obligation of a Deemed Consent Matter, Buyer shall contact Seller and, to the extent that a holder of the Reference Obligation has a right to take actions with respect to such matter shall request direction with respect to the Deemed Consent Matter.  If the Controlling Class, the Controlling Beneficiary and the Controlling Party actually receives notice of a Deemed Consent Matter in accordance with the terms of the Indenture (including as to any time frames specified therein or as otherwise agreed to by the Controlling Class, the Controlling Beneficiary and the Controlling Party) or if the Controlling Class, the Controlling Beneficiary and the Controlling Party has waived its right to receive any such notice, Buyer shall be deemed to have satisfied its obligation with respect to the provision of such notice to Seller.  In the absence of any direction from Seller following Buyer contacting Seller, Buyer shall abstain from taking any action in respect of the Deemed Consent Matter as to which a holder of the Reference Obligation has the right to act with the result that Buyer will under the terms of the Reference Obligation be deemed to have consented to such matter.  For the avoidance of doubt, notwithstanding the foregoing, Buyer shall, subject to Section 9(b) hereof, be obligated to follow Seller's direction with respect to any action or inaction that a holder of the

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000079

Reference Obligation would have the right to exercise with respect to a Deemed Consent Matter.

13

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000080

(d)    Subject to the limitations set forth in Section 9(e) below, if Buyer exercises any rights that it has under the Reference Obligation in a manner not permitted by Section 9(a) above including a failure to act because Buyer has failed to procure such rights as and to the extent required thereunder for any reason, including without limitation, because Buyer has sold or does not own the Reference Obligation, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of  a 5 Business Day period following the date such written notice becomes effective pursuant to section 12 of the Agreement.  If Buyer has failed to either deliver to Seller any Trustee Report or provide access to MBIA of any such Trustee Report as and to the extent required hereunder and MBIA has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Trustee Report, and after receipt by Buyer of notice of such failure from Seller, Buyer has failed to cure such breach within 10 Business days thereafter, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 1 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Trustee Report is not delivered to Seller on or before the expiration of  a 10 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement.  Notwithstanding anything herein to the contrary, if Buyer has failed to either deliver to Seller any Trustee Report that requires a Noteholder's consent or vote (a "Voting Notice") or provide access to Seller of any such Voting Notice as and to the extent required pursuant to Section 9(a) and Seller has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Voting Notice, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer  designating an Early Termination Date based on such Additional Termination Event if such Voting Notice is not delivered to Seller on or before the expiration of  a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. For the avoidance of doubt, any such exercise to declare an Early Termination Date as provided in the preceding three sentences shall not be an Event of Default under Section 5(a)(ii) of the Agreement.

14

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000081

(e)   Notwithstanding Section 9(d) above, if Buyer exercises any rights that it has under the Reference Obligation in a manner that would modify the Indenture to:

(i)   (A) allow another Person to assume the covenants of the issuer and co-issuer thereunder; (B) modify the covenants of the issuer and co-issuer to the benefit of the holders of the Reference Obligation; (C) convey, transfer, assign, mortgage or pledge any property to the Trustee for the benefit of the holders of the Reference Obligation; (D) appoint a successor trustee or modify the terms of the Indenture to facilitate administration of the collateral for the benefit of the holders of the Reference Obligation; (E) correct or amplify the description of the property subject to the lien of the Indenture; (F) modify the restrictions and procedures for the sale and transfer of the collateral in accordance with applicable laws or regulations; (G) correct any provision of the Indenture that (i) is inconsistent with rating agency methodology, (ii) contains a non-material error, or (ii) contains a manifest error; (H) obtain ratings on any of the classes of the notes; (I) accommodate the issuance of additional notes permitted thereunder; (J) make administrative changes or changes required to obtain an exchange listing; (K) avoid tax imposition on the income of the issuer; or (L) modify any hedge agreements entered into by the issuer; and

(ii)   such exercise of rights does not have a material adverse affect upon the Seller;

such exercise of rights by Buyer shall not be an Additional Termination Event and this Transaction may not be terminated by Seller due to such exercise. For the avoidance of doubt, no provision of this Agreement shall relieve Buyer of the obligations set forth in Section 9(a) except as expressly provided for in this Section 9(e).

## 10.    Representations:

Buyer hereby represents to Seller that, to the best of its knowledge, the Ratings of the Reference Obligations set forth in Section 1 are true and correct as of the date hereof.

## 11.    Offices:

Party A is acting through its New York Office for the purposes of this Transaction.

Party B is acting through its New York Office for the purposes of this Transaction.

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000082

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____
       Name:    STEPHANIE TAYLOR-CIAVARELLO
       Title:    ASSISTANT SECRETARY

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory

By:    _____
       Authorized Signatory

Confirmation Signature Page

For use only in 08CV2893 (SDNY)
CONFIDENTIAL                                                  MLI0000083

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact

By:    _____
       Name:
       Title:


Confirmed as of the date first written above:


**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory
       **Authorized Signatory**

By:    _____
       Authorized Signatory


16

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

O7ML/24049.

MLI0000084

# Exhibit 2F

EXECUTION COPY

Date: August 29, 2007

| To: | Merrill Lynch International 2 King Edward Street London EC1A 1HQ | From: | LaCrosse Financial Products, LLC c/o Global Securitization Services, LLC 114 West 47th Street, Suite 1715 New York, New York 10036 |
|---|---|---|---|
| Attention: | Manager, Fixed Income Settlements | Contact: | Vice President |
| Phone Number: | +44 207 867 3769 | Phone Number: | 212-302-5151 |
| Facsimile Number: | +44 207 867 2004 | Facsimile Number: | 212-302-8767 |

**Re:   CREDIT DEFAULT SWAP TRANSACTION** relating to Biltmore CDO 2007-1, Ltd., Biltmore CDO 2007-1, LLC Class A-1 First Priority Senior Secured Floating Rate Notes Due 2050.

Dear Sir or Madam:

The purpose of this letter agreement (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Default Swap Transaction entered into between us on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (together, the **"2003 Definitions"**), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the 2003 Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms part of, and is subject to, the Single Transaction 1992 ISDA Master Agreement dated as of August 29, 2007, between LaCrosse Financial Products, LLC and Merrill Lynch International as amended and supplemented from time to time (the **"Agreement"**). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not expressly defined herein or in the 2003 Definitions shall have the meanings given to such terms in the Indenture (the **"Indenture"**) dated as of July 19, 2007, among Biltmore CDO 2007-1, Ltd., Biltmore CDO 2007-1, LLC, and LaSalle Bank National Association, as Trustee (the **"Trustee"**), copies of which have been separately provided to the parties.

The terms of the particular Transaction to which this Confirmation relates are as follows:

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000085

1.  **General Terms:**

| | |
|---|---|
| Trade Date: | August 29, 2007 |
| Effective Date: | August 29, 2007 |
| Scheduled Termination Date: | Stated Maturity |
| Termination Date: | The earliest of (i) the Scheduled Termination Date, (ii) any Optional Termination Date, and (iii) the date on which the Fixed Rate Payer Calculation Amount is reduced to zero. |
| Optional Termination Date: | As defined in Section 6 hereof. |
| Floating Rate Payer: | LaCrosse Financial Products, LLC (the "**Seller**") |
| Fixed Rate Payer: | Merrill Lynch International (the "**Buyer**") |
| Calculation Agent: | Buyer |
| Calculation Agent City: | New York |
| Business Day: | New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the 2003 Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Biltmore CDO 2007-1, Ltd. |
| Reference Obligation: | USD ‹ in original principal amount of the following obligation:     **REDACTED** |

| | |
|---|---|
| Primary Obligor: | Biltmore CDO 2007-1, Ltd. |
| Class: | Class A-1 First Priority Senior Secured Floating Rate Notes Due 2050 (the "**Class A-1 Notes**") |
| Stated Maturity: | November 7, 2050 |
| Reference Obligation Issue Date: | July 19, 2007 |
| Reference Obligation Payment Dates: | **REDACTED** |
| Coupon: | |

2

|  |  |
|---|---|
| CUSIP: | 090287AA1 |
| ISIN: | [●] |

| Ratings (as of the Effective Date): | AAA (S&P)/Aaa (Moody's) |
|---|---|

Section 2.30 of the 2003 Definitions shall not apply to this Transaction.

**Capital Charge Letters**

If the Seller has not received a captial charge letter from Standard & Poor's confirming that the credit assessment of this Transaction is "AAA" and the capital charge is 10.0% on the risk assumed by the Seller in this Transaction, on or before October 29th, 2007, this Transaction may be terminated by the Seller in its sole discretion, without any payment being due and payable in connection therewith by either party, by delivery of written notice to the Buyer, at any time after October 29th, 2007 but no later than November 8th, 2007.

**Reference Obligation Outstanding Amount:**

As of any date, an amount equal to the original principal amount of the Reference Obligation as of the Trade Date as reduced after the Trade Date by amounts paid on or prior to such date to the holders of the Reference Obligation to amortize principal of the Reference Obligation.

**Reference Price:**

**Relevant Proportion:**

**REDACTED**

**Tranche Amount**

The product of the Reference Obligation Outstanding Amount and the Relevant Proportion.

**Loss Threshold Amount**

**REDACTED**

**All Guarantees:**

Not Applicable

2.  **Fixed Payments:**

Fixed Rate Payer Calculation Amount:

**REDACTED**

3

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Fixed Rate:

Fixed Rate Payer Payment
Dates:

**REDACTED**

Fixed Rate Payer Day Count
Fraction:

Fixed Rate Payer Calculation
Period:

3.   **Floating Payment:**
     Floating Rate Payer Calculation
     Amount:

     Conditions to Settlement:

4

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000088

Credit Events:

**REDACTED**

5

Obligation(s):

**4.** **Settlement Terms:**

Settlement Method:

Terms    Relating    to    Cash
Settlement:

Cash Settlement Date:

**REDACTED**

Cash Settlement Amount:

Principal Shortfall Amount:

6

Excess Collections:

**REDACTED**

7

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000091

Escrow:

Policy Payment Trigger Date:

**REDACTED**

**5.    Notice and Account Details:**

Notice and Account for Payments
for Buyer:

**MLI Payment Details:**

**REDACTED**

**MLI Notice Details:**

Copy to:

8

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements

REDACTED

with copy to:

Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attn: Swaps Legal

REDACTED

with any telephonic notification or confirmation to:

Joseph Gambino,
Vickram Mangalgiri,            REDACTED
Chintan Shah,
any other individual as notified by Buyer in writing to
Seller

Notice for all purposes, including
delivery of the Trustee Reports        LaCrosse Financial Products, LLC
and Account details for Seller:       c/o MBIA Insurance Corporation ("MBIA")
                                      113 King Street
                                      Armonk, New York 10504

REDACTED

Attention: (1) Michael Murtagh and (2) Manager —
Insured Portfolio Management — Attention: CDO
Group

and a copy to:

LaCrosse Financial Securities Products, LLC
c/o Global Securitization Services, LLC
445 Broad Hollow Road, Suite 239
Melville, New York 11747
Attention: Vice President

REDACTED

9

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000093

**REDACTED**

6. **Optional Early Termination:**

Buyer shall have the option to terminate this Transaction at any time by giving notice on the day which is 5 Business Days prior to any Fixed Rate Payer Payment Date (such date, the **"Optional Early Termination Notification Date"**). Upon such notice, the Fixed Rate Payer Payment Date following the Optional Early Termination Notification Date shall be the **"Optional Termination Date"**. If the Optional Termination Date occurs prior to the Fixed Rate Payer Payment Date occurring in August 2011 (the **"Optional Redemption Date"**), Buyer shall pay to Seller on the Optional Termination Date the Makewhole Amount. If the Optional Termination Date occurs on or after the Optional Redemption Date, no amounts shall be due and payable by the Buyer to the Seller in respect of the early termination of the Transaction on such date.

7. **Makewhole Amount:**

**REDACTED**

8. **Seller's Right to Elect Physical Settlement:**

**REDACTED**

10

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000094

**REDACTED**

9.    **Seller's Right to Exercise Voting Rights on Reference Obligation:**

(a)    Subject to Section 9(b) and Section 9(e), Buyer will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of the Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

Additionally, the Buyer will (i) either (x) arrange for copies of all notices, reports, statements and other information received by it from the trustee, collateral manager, paying agent (or similar administrative agent) for the Reference Obligation in respect of the Reference Obligation (cumulatively, the **"Trustee Reports"**) to be delivered to Seller as soon as practicable or (y) provide access to Seller of a website allowing Seller access to Trustee Reports, and (ii) by the close of business on the 30th calendar day after the Effective Date cause to have the Trustee execute the **"Direction Letter"** in the form attached hereto or in such other form as Buyer and Seller may agree upon (such Direction Letter shall be dated not more than 30 calendar days from the date hereof), among Buyer, MBIA Insurance Corporation, the Collateral Manager and the Trustee, an executed copy of which shall be separately provided to the parties hereto. Buyer shall not be required to submit any communication to Seller that has previously been submitted to Seller or MBIA Insurance Corporation by the Trustee as required by the Direction Letter.

(b)    The Buyer's obligations under Section 9(a) above are subject to the qualifications set forth below. The Buyer shall not be required, as applicable, to exercise or

11

procure the exercise of rights as directed by Seller:

(i)    if exercising or procuring the exercise of such rights as so directed by Seller is prohibited by any law, rule, regulation or judicial or administrative order applicable to Buyer (or the entity from whom Buyer has procured such rights) or is prohibited by the Indenture; or

(ii)   if, unless otherwise consented to in writing by Buyer, exercising such rights would (a) modify the currency, interest rate, breakage costs, facility cancellation fee, decrease the principal amount payable under the Reference Obligation, or (b) modify or extend the due date for payment of interest, breakage costs, facility cancellation fee, or principal of the Reference Obligation.

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

(c)    Except as specified below, the foregoing provisions shall not apply to Buyer's action or inaction with respect to any matter where failure to vote or act within a specified time period is deemed to be consent to such matter (each such matter, a **"Deemed Consent Matter"**), which shall instead be governed by the following provisions.  As soon as practicable but by no later than five Business Days' after delivery to a holder of the Reference Obligation of a Deemed Consent Matter, Buyer shall contact Seller and, to the extent that a holder of the Reference Obligation has a right to take actions with respect to such matter shall request direction with respect to the Deemed Consent Matter.  If the Controlling Class, the Controlling Beneficiary and the Controlling Party actually receives notice of a Deemed Consent Matter in accordance with the terms of the Indenture (including as to any time frames specified therein or as otherwise agreed to by the Controlling Class, the Controlling Beneficiary and the Controlling Party) or if the Controlling Class, the Controlling Beneficiary and the Controlling Party has waived its right to receive any such notice, Buyer shall be deemed to have satisfied its obligation with respect to the provision of such notice to Seller.  In the absence of any direction from Seller following Buyer contacting Seller, Buyer shall abstain from taking any action in respect of the Deemed Consent Matter as to which a holder of the Reference Obligation has the right to act with the result that Buyer will under the terms of the Reference Obligation be deemed to have consented to such matter.  For the avoidance of doubt, notwithstanding the foregoing, Buyer shall, subject to Section 9(b) hereof, be obligated to follow Seller's direction with respect to any action or inaction that a holder of the Reference Obligation would have the right to exercise with respect to a Deemed Consent Matter.

12

(d)     Subject to the limitations set forth in Section 9(e) below, if Buyer exercises any rights that it has under the Reference Obligation in a manner not permitted by Section 9(a) above including a failure to act because Buyer has failed to procure such rights as and to the extent required thereunder for any reason, including without limitation, because Buyer has sold or does not own the Reference Obligation, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to section 12 of the Agreement. If Buyer has failed to either deliver to Seller any Trustee Report or provide access to MBIA of any such Trustee Report as and to the extent required hereunder and MBIA has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Trustee Report, and after receipt by Buyer of notice of such failure from Seller, Buyer has failed to cure such breach within 10 Business days thereafter, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 1 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Trustee Report is not delivered to Seller on or before the expiration of a 10 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. Notwithstanding anything herein to the contrary, if Buyer has failed to either deliver to Seller any Trustee Report that requires a Noteholder's consent or vote (a "Voting Notice") or provide access to Seller of any such Voting Notice as and to the extent required pursuant to Section 9(a) and Seller has not pursuant to the terms of the Direction Letter, the Indenture or otherwise timely received or been provided access to such Voting Notice, it shall be an Additional Termination Event with Buyer as the sole Affected Party and this Transaction may be terminated by Seller in accordance with the Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event if such Voting Notice is not delivered to Seller on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement. For the avoidance of doubt, any such exercise to declare an Early Termination Date as provided in the preceding three sentences shall not be an Event of Default under Section 5(a)(ii) of the Agreement.

For use only in 08CV2893 (SDNY)
CONFIDENTIAL                                                                    MLI0000097

(e)     Notwithstanding Section 9(d) above, if Buyer exercises any rights that it has under the Reference Obligation in a manner that would modify the Indenture to:

        (i)      (A) allow another Person to assume the covenants of the issuer and co-issuer thereunder; (B) modify the covenants of the issuer and co-issuer to the benefit of the holders of the Reference Obligation; (C) convey, transfer, assign, mortgage or pledge any property to the Trustee for the benefit of the holders of the Reference Obligation; (D) appoint a successor trustee or modify the terms of the Indenture to facilitate administration of the collateral for the benefit of the holders of the Reference Obligation; (E) correct or amplify the description of the property subject to the lien of the Indenture; (F) modify the restrictions and procedures for the sale and transfer of the collateral in accordance with applicable laws or regulations; (G) correct any provision of the Indenture that (i) is inconsistent with rating agency methodology, (ii) contains a non-material error, or (ii) contains a manifest error; (H) obtain ratings on any of the classes of the notes; (I) accommodate the issuance of additional notes permitted thereunder; (J) make administrative changes or changes required to obtain an exchange listing; (K) avoid tax imposition on the income of the issuer; or (L) modify any hedge agreements entered into by the issuer; and

        (ii)     such exercise of rights does not have a material adverse affect upon the Seller;

such exercise of rights by Buyer shall not be an Additional Termination Event and this Transaction may not be terminated by Seller due to such exercise. For the avoidance of doubt, no provision of this Agreement shall relieve Buyer of the obligations set forth in Section 9(a) except as expressly provided for in this Section 9(e).

## 10.    Representations:

Buyer hereby represents to Seller that, to the best of its knowledge, the Ratings of the Reference Obligations set forth in Section 1 are true and correct as of the date hereof.

## 11.    Offices:

Party A is acting through its New York Office for the purposes of this Transaction.

Party B is acting through its New York Office for the purposes of this Transaction.

14

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000098

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:     MBIA Insurance Corporation as Attorney-In-Fact

By:     _____
        Name:    STEPHANIE TAYLOR-CIAVARELLO
        Title:        ASSISTANT SECRETARY

Confirmed as of the date first written above:

**MERRILL LYNCH INTERNATIONAL**

By:     _____
        Authorized Signatory

By:     _____
        Authorized Signatory

Confirmation Signature Page

For use only in 08CV2893 (SDNY)
CONFIDENTIAL

MLI0000099

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us.

Yours sincerely,

**LACROSSE FINANCIAL PRODUCTS, LLC**

By:    MBIA Insurance Corporation as Attorney-In-Fact


By:    _____
       Name:
       Title:


Confirmed as of the date first written above:


**MERRILL LYNCH INTERNATIONAL**

By:    _____
       Authorized Signatory
       **Authorized Signatory**

By:    _____
       Authorized Signatory


16

O7ML/Z4049.

MLI0000100