QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
Peter E. Calamari (*petercalamari@quinnemanuel.com*)
Jonathan E. Pickhardt (*jonpickhardt@quinnemanuel.com*)
Brendan N. Snodgrass (*brendansnodgrass@quinnemanuel.com*)
William B. Adams (*williamadams@quinnemanuel.com*)
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorneys for Defendants and Counterclaimants*
*XL Capital Assurance Inc. and XLCA Admin LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH INTERNATIONAL, <br><br> Plaintiff, <br><br> -against- <br><br> XL CAPITAL ASSURANCE INC., et al., <br><br> Defendants. | 08 CV 2893 (JSR) |
| XL CAPITAL ASSURANCE INC. et al., <br><br> Counterclaimants, <br><br> -against- <br><br> MERRILL LYNCH INTERNATIONAL AND MERRILL LYNCH & CO., <br><br> Counterclaim Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
(A) PLAINTIFF MERRILL LYNCH INTERNATIONAL'S MOTION FOR
SUMMARY JUDGMENT AND (B) COUNTERCLAIM DEFENDANTS
MERRILL LYNCH INTERNATIONAL'S AND MERRILL LYNCH & CO.'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................3

    A.    XLCA Provides Financial Guarantees to Merrill Lynch ..........................3

    B.    XLCA Negotiates for and Obtains Exclusive Control Rights .................4

    C.    MLI Agrees to Exercise "Controlling Class" Rights in Accordance with MBIA's Instructions ..............................................................6

    D.    XLCA Terminates the XL Swaps Due to MLI's Repudiation ..................9

        1.    XLCA terminates six of the XL Swaps based on publicly available information..........................................................................9

        2.    XLCA seeks but MLI fails to provide assurances with respect to MLI's intention to comply with the seventh XL Swap.............................9

    E.    MLI Solicits Voting Instructions from XLCA on the Basis of False Pretenses .......................................................................10

    F.    Procedural History ...............................................................11

ARGUMENT ......................................................................................................12

I.    MLI'S SIX CONTRACTS WITH MBIA CONSTITUTED A REPUDIATION OF ITS OBLIGATIONS TO XLCA ........................................................12

    A.    The Fact That XLCA Has Yet To Give Instructions Is Irrelevant.........15

    B.    The Word "Solely" Must Be Given Meaning.........................................16

    C.    MLI Was Obligated To Follow MBIA's Instructions. ...........................17

II.    MLI'S FAILURE TO RESPOND TO XLCA'S REQUEST FOR ASSURANCES CONSTITUTED A REPUDIATION OF THE JUPITER VI SWAP ...............................19

III.    FACTS REASONABLY LIKELY TO BE DISCLOSED DURING DISCOVERY WOULD FURTHER DEMONSTRATE THAT MERRILL LYNCH IS NOT ENTITLED TO SUMMARY JUDGMENT..................................................22

CONCLUSION...................................................................................................26

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. List Corp. v. U.S. News & World Report, Inc.*,
 75 N.Y.2d 38 (N.Y. 1989) ............................................................................13

*Amnesty Am. v. Town of West Hartford*,
 361 F.3d 113 (2d Cir. 2004)..........................................................................12

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)......................................................................................12

*In re Asia Global Crossing, Ltd.*,
 326 B.R. 240 (Bankr. S.D.N.Y. 2005)..........................................................21

*Bank of New York v. River Terrace Assoc.*,
 23 A.D.3d 308, 309-10 (1st Dep't 2005) ......................................................21

*Barclay Arms Assocs. v. Clemente*,
 98 A.D.2d 892 (3d Dep't 1983) ....................................................................19

*Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*,
 653 F. Supp. 47 (S.D.N.Y. 1985)..................................................................14

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*,
 301 A.D.2d 70 (1st Dep't 2002) ........................................................13, 14, 16

*Consumers Power Co. v. Nuclear Fuel Services, Inc.*,
 509 F. Supp. 201 (W.D.N.Y. 1981) ..............................................................16

*Dialist Co. v. Pulford*,
 43 Md. App. 173 (Md. Ct. Spec. App. 1979) ...............................................15

*Dresser-Rand Co. v. Virtual Automation, Inc.*,
 361 F.3d 831 (5th Cir. 2004) ........................................................................14

*Enron Power Mktg. v. Nevada Power Co.* (*In re: Enron Corp.*),
 No. 03 Civ. 9318 (BSJ), 2004 WL. 2290486 (S.D.N.Y. Oct. 12, 2004) ................21

*Ergonomic Systems Philippines Inc. v. CCS International Ltd.*,
 7 A.D.3d 412, 414 (1st Dep't 2004) ..........................................................13, 14

*Franconia Assocs. v. United States*,
 536 U.S. 129 (2002)..................................................................................13, 24

*Globecon Group, LLC v. Hartford Fire Ins. Co.*,
 434 F.3d 165 (2d Cir. 2006).........................................................................12

*Hellstrom v. United States Dep't of Veterans Affairs,*
   201 F.3d 94 (2d Cir. 2000)............................................................................22

*Huminski v. Corsones,*
   396 F.3d 53 (2d Cir. 2005)............................................................................12

*In re Jay,*
   432 F.3d 323 (5th Cir. 2005) ........................................................................19

*Lucente v. IBM,*
   310 F.3d 243 (2d Cir. 2002)..........................................................................24

*Miller v. Wolpoff & Abrahamson, L.L.P.,*
   321 F.3d 292 (2d Cir. 2003)..........................................................................22

*Norcon Power Partners v. Niagara Mohawk Power Corp.,*
   92 N.Y.2d 458 (N.Y. 1998) ..........................................................13, 20, 21, 24

*Papa Gino's of America, Inc. v. Plaza at Latham Assoc.,*
   135 A.D.2d 74 (3d Dep't 1988) .....................................................................19

*Rachmani Corp. v. 9 East 96th Street Apartment Corp.,*
   211 A.D.2d 262 (1st Dep't 1995) ..................................................................16

*Residential Services Validated Publications v. Carus,*
   2006 WL. 1026669 (E.D.N.Y. April 19, 2006) ...............................................19

*Rubenstein v. Rubenstein,*
   23 N.Y.2d 293 (N.Y. 1968) ..........................................................................19

*RM 14 FK Corp. v. Bank One Trust Co., N.A.,*
   37 A.D.3d 272, 274 (1st Dep't 2007) ............................................................17

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension,*
   7 F.3d 1091 (2d Cir. 1993)............................................................................17

*Schlang v. Bear's Estates Dev. of Smallwood, NY, Inc.,*
   194 A.D.2d 914 (3rd Dep't 1993)..................................................................25

*Scott-Macon Securities, Inc. v. Zoltek Cos.,*
   No. 04Civ2124MBM, 2005 WL. 1138476 (S.D.N.Y. May 11, 2005) ..................21

*Smith v. Long,*
   281 A.D.2d 897 (4th Dep't 2001)..................................................................25

*Streets of London, Inc. v. Londontown Corp.,*
   1997 WL. 151464 (S.D.N.Y. Apr. 1, 1997).....................................................19

*Trebor Sportswear Co. v. Limited Stores, Inc.,*
   865 F.2d 506 (2d Cir. 1989)..........................................................................23

*Williams v. Provident Inv. Counsel, Inc.,*
   279 F. Supp. 2d 894 (N.D. Ohio 2003)...........................................................26

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
   339 F.3d 101 (2d Cir. 2003)......................................................................................15

## **Statutes**

Fed. R. Civ. P. 56(a) ......................................................................................................22

Fed. R. Civ. P. 56(c) ......................................................................................................12

Fed. R. Civ. P. 56(f) .......................................................................................................23

## **Other Authorities**

Restatement (2d) of Contracts § 203(a) ........................................................................17

Restatement (2d) of Contracts § 250 .............................................................................13

Restatement (2d) of Contracts § 251(1)........................................................................20

Restatement (2d) of Contracts § 251(2)........................................................................20

Restatement (2d) of Contracts § 251 cmt. c..................................................................20

Defendants and Counterclaimants XL Capital Assurance Inc. and XLCA Admin LLC, as trustee for Portfolio CDS Trust 138, Portfolio CDS Trust 153, Portfolio CDS Trust 164, Portfolio CDS Trust 165, Portfolio CDS Trust 170, Portfolio CDS Trust 172 and Portfolio CDS Trust 186 (collectively, "XLCA"), respectfully submit this memorandum of law in opposition to the motion for summary judgment of Plaintiff Merrill Lynch International ("MLI") and the motion for partial summary judgment of Counterclaim Defendants MLI and Merrill Lynch & Co., Inc. ("ML&Co.", collectively "Merrill Lynch").

**PRELIMINARY STATEMENT**

At the heart of this case is the basic tenet of contract law that you cannot promise the same indivisible consideration to two different people any more than you can write two checks with only enough money in your account to satisfy one.  As hornbook caselaw teaches — in New York, as in most jurisdictions — the moment a party enters into two conflicting agreements, the second constitutes a repudiation of the first, permitting the first agreement to be terminated on grounds of anticipatory breach.

That is precisely what happened here.  Between January and August 2007, Merrill Lynch and XLCA entered into seven transactions in which XLCA agreed to provide credit protection on approximately $3.1 billion of obligations related to Merrill Lynch collateralized debt obligations ("CDOs").  One of the most important pieces of consideration that XLCA received in return was Merrill Lynch's commitment that it would exercise the CDOs' "Controlling Class" voting rights "*solely* in accordance" with XLCA's written instructions.

Yet, with the ink barely dry on the last of its agreements with XLCA, Merrill Lynch turned around and entered into agreements with MBIA Inc. ("MBIA"), one of XLCA's competitors, in which Merrill Lynch promised to exercise the same Controlling Class voting rights under six of the CDOs "only at the direction" of MBIA.

Merrill Lynch could not satisfy its contractual obligations to XLCA without breaching its agreements with MBIA, and Merrill Lynch understood the serious implications of this conflict.

Joseph Gambino, Merrill Lynch's lead negotiator on both the XLCA and MBIA deals, expressed this exact concern on the MBIA transactions' execution date: "***agreeing to these terms with MBIA would put us at risk of being forced to sacrifice one hedge to keep the other***…."

Upon learning of the irreconcilable conflict that Merrill Lynch had created, XLCA exercised its clear right under New York law to treat Merrill Lynch's commitments to MBIA as a repudiation of its pre-existing obligations to XLCA, and XLCA terminated the six agreements at issue. And, when Merrill Lynch further refused to provide assurances that it had not also repudiated its obligations under the parties' similarly situated seventh agreement, XLCA terminated that agreement as well.

Merrill Lynch now moves for summary judgment to obtain declarations that its contracts with XLCA were improperly terminated, that Merrill Lynch has done nothing to breach those contracts, and that they remain in full force and effect. Summary judgment should be denied for several reasons.

*First*, XLCA's terminations were proper based on the inescapable conflict that is evident from the face of the XLCA and MBIA contracts (and acknowledged in Merrill Lynch's own documents). Moreover, Merrill Lynch's *post hoc* efforts to reconcile its obligations under the two sets of agreements cannot be credited, especially at this stage of the litigation, as they are entirely predicated on attempting to read the term "solely" out of the XLCA agreements, while simultaneously attempting to read non-existent terms permitting Merrill Lynch to ignore MBIA's instructions into the MBIA agreements.

*Second*, with respect to the seventh termination, Merrill Lynch has provided no justification for its refusal to provide assurances in response to XLCA's request; well established New York precedent provides that the failure to provide reasonable assurances is, itself, a repudiation that entitles the non-repudiating party to terminate.

*Third*, in any event, summary judgment in favor of Merrill Lynch would be improper at this stage of the litigation, as discovery is still ongoing and XLCA has not had a full and fair opportunity to identify all of the evidence that will ultimately support its claims and defenses.

BACKGROUND[1]

A.    **XLCA Provides Financial Guarantees to Merrill Lynch**

Between December 2006 and August 2007, XLCA and MLI entered into eight credit default swaps in which XLCA agreed to provide MLI with financial guarantees on notes issued by CDOs structured and underwritten by Merrill Lynch. (ML 56.1 ¶¶ 21-27; Adams Decl. Ex. 9). The last seven of those credit default swaps (the "XL Swaps"), executed between January 25, 2007, and August 10, 2007, are at issue in this lawsuit. (Mem. 4).

In each of the XL Swaps, XLCA agreed to provide MLI with credit protection against any shortfalls in the interest or principal payments due to the noteholders in the second-highest tranche of the particular CDO, which were referred to under the CDO indentures as the "Class A-2 Notes."[2] (*Id.* at 5). The only notes senior to the Class A-2 Notes in those CDO structures were the "Class A-1 Notes." (*E.g.*, Adams Decl. Ex. 10 § 2.2). Merrill Lynch owned both Class A-1 Notes and Class A-2 Notes in each of the seven CDOs at issue. (Mem. 5).

The aggregate notional amount of the Class A-2 Notes that XLCA agreed to guarantee under the XL Swaps was approximately $3.1 billion. (Mem. 4). Under the XL Swaps' terms,

---

[1]    The facts set forth herein are drawn from Merrill Lynch's Memorandum in Support of Summary Judgment ("Mem. __"), its Local Civil Rule 56.1 Statement ("ML 56.1 ¶ __"), and its accompanying declaration of Scott Musoff ("Musoff Decl. ¶ __"); the XL Swap confirmations attached as exhibits 1A-G to the declaration of Joseph Gambino ("XL Confirm. § __"); the MBIA Swap confirmations attached as exhibits 2A-F to the declaration of Joseph Gambino ("MBIA Confirm. § __"); the accompanying declarations of Mark Walsh ("Walsh Decl. ¶ __"), Trude Akersveen ("Akersveen Decl. ¶ __"), Scott Gordon ("Gordon Decl. ¶ __"), Basil A. Imurgia ("Imburgia Decl. ¶ __"), and William B. Adams ("Adams Decl. ¶ __"); and the Declaration Pursuant to Rule 56(f) ("Pickhardt Decl. ¶ __").

[2]    The XL Swaps referenced the Class A-2 Notes issued by the following CDOs: (1) Biltmore CDO 2007-1 Ltd. ("Biltmore"); (2) Jupiter High Grade CDO VI Ltd. ("Jupiter VI"); (3) Robeco High Grade CDO I Ltd. ("Robeco I"); (4) Silver Marlin CDO I Ltd. ("Silver Marlin I"); (5) Tazlina Funding CDO II Ltd. ("Tazlina II"); (6) West Trade Funding CDO II Ltd. ("West Trade II"); and (7) West Trade Funding CDO III Ltd. ("West Trade III"). (Mem. 4 n.3). The eighth CDO credit default swap between XLCA and MLI, which was the first in time, reference notes issued by Ipswich Street CDO Ltd. ("Ipswich"). (*See* Adams Decl. Ex. 9).

XLCA was potentially obligated on the financial guarantees for the life of the Class A-2 Notes, which had a stated maturity of more than **40 years**.  (XL Confirm. § 1).

### B.    XLCA Negotiates for and Obtains Exclusive Control Rights

One of the most important terms of the XL Swaps to XLCA was obtaining exclusive control rights over the CDOs for which it was providing guarantees.  (Akersveen Decl. ¶¶ 8-10; Walsh Decl. ¶¶ 10-11).  In each of the CDO's indentures, as is typical, the most senior class of notes — the Class A-1 Notes — was the "Controlling Class" and possessed the power to control numerous aspects of the CDO.  (Akersveen Decl. ¶ 6; Gordon Decl. ¶ 12).[3]

Had MLI been unwilling to provide XLCA with the exclusive "Controlling Class" rights, XLCA would not have entered into the transactions.  (Walsh Decl. ¶ 11; Akersveen Decl. ¶¶ 8, 10).  As the XLCA Managing Director responsible for negotiating the MLI deals has stated:

> In the context of these transactions with Merrill Lynch, Controlling Class voting rights were crucial.  These voting rights allow XLCA to take actions that would limit its exposure to losses in the event that the underlying assets ever became impaired or XLCA became concerned that the CDO collateral manager was engaged in mismanagement.  For example, with Controlling Class rights, XLCA could act to preserve the CDO collateral by directing that notes be accelerated following an event of default or removing the collateral manager in certain circumstances.

(Akerveen Decl. ¶ 9).  In addition, as the premium that XLCA was to be paid under the XL Swaps each year ranges as low as 1/900th of the total amount of its financial guarantee, even moderate impairment of the CDO collateral could quickly render its deals with MLI highly unprofitable.  (XL Confirm. § 2).  With billions of dollars of its financial guarantees at stake, obligations on those guarantees that could stretch for decades, and only a small amount of

---

[3]    For example, the rights reserved to the "Controlling Class" in the Biltmore CDO included, among others, the right to: (i) direct the CDO trustee to institute proceedings; (ii) approve any agreement with a collateral manager, collateral administrator or bank; (iii) veto the selection of any replacement CDO trustee; and (iv) direct that the CDO collateral manager be removed for cause.  These rights expand in the case of an "Event of Default" to include, among others, terminating the collateral manager without cause, accelerating note maturities and issuing directions to liquidate collateral.  (Adams Decl. Ex. 10 §§ 5.2-5.4, 5.8., 5.9, 5.13, 5.14, 5.17, 6.10,  6.11 and 8.2).

premium in return, it was a "deal breaker" condition for XLCA that it have these unquestionable rights to proactively manage the risks it was assuming. (Akersveen Decl. ¶¶ 8, 10; Walsh Decl. ¶¶ 10-11). As Scott Gordon, a 20-year veteran of the monoline industry will testify, it was industry custom and practice to include these requirements and conditions. (Gordon Decl. ¶¶ 8-12).

The contractual provision reflecting XLCA's and MLI's agreement with respect to XLCA's control rights was also one of the most heavily negotiated parts of the XL Swaps. (Akersveen Decl. ¶ 12; Walsh Decl. ¶ 12). While MLI agreed in principle to provide XLCA with controlling class rights in July 2006, the parties and their outside counsel engaged in extensive negotiations over the next four months to reach agreement on the language that would be used to reflect the scope of those rights.[4] (*Id.*). The result of those negotiations was a provision in each of the seven XL Swaps that provided in relevant part:

> The following event will constitute an Additional Termination Event ...
>
> (ii) **the failure by [MLI] to exercise any Voting Rights** or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principle Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, **solely in accordance with the written instructions of [XLCA]**;

(XL Confirm. § 6).[5] Under the XL Swaps, the occurrence of an Additional Termination Event entitled the non-breaching party to immediately terminate the agreement in full without an opportunity to cure. (*See id.*).

---

[4] These negotiations were undertaken in the context of reaching agreement on the terms of the credit default swap for Ipswich, the deal that predated the seven XL Swaps, and then the same control rights provision was adopted and included within the terms for each of the XL Swaps. (Akersveen Decl. ¶¶ 12-13; Walsh Decl. ¶¶ 12, 14).

[5] Five of the XL Swaps defined "Voting Rights" to include "the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to ... 100% of the outstanding principal amount of the Class A-1 Notes [*i.e.*, the "Controlling Class]." (XL Confirm. § 6). In two of the XL Swaps, the parties agreed that the Controlling Class rights were to be included but the reference to the Class A-1 Notes was mistakenly omitted. (Akersveen Decl. ¶ n.1). XLCA has asserted a claim for reformation that is not at issue in this motion.

### C.    MLI Agrees to Exercise "Controlling Class" Rights in Accordance with MBIA's Instructions

On August 29, 2007 — less than three weeks after executing the last of the XL Swaps — MLI entered into credit default swaps with MBIA (the "MBIA Swaps") in which MLI purchased credit protection from MBIA for the Class A-1 Notes issued by six of the seven CDOs that were the subject of the XL Swaps.[6]  (ML 56.1 ¶¶ 31-36). The notional amount of the notes being guaranteed under the MBIA Swaps was approximately $4.3 billion and, like the XL Swaps, the MBIA Swaps had terms that were scheduled to last potentially for more than 40 years until the maturity date of the notes being guaranteed. (MBIA Confirm. § 1).

Notwithstanding its prior commitments to XLCA, MLI contractually agreed as part of the MBIA Swaps to provide MBIA with the "Controlling Class" rights under each of the six CDOs — the very same rights that MLI had committed to XLCA.  The MBIA Swaps each state:

> [MLI] will, at any time during the period from and including the Effective Date to and including the Termination Date *exercise all voting rights and all other rights of a holder of . . . the Controlling Class . . . only at the direction of [MBIA] given in writing*, and if no such direction is forthcoming, [MLI] shall abstain from exercising any such rights.

(MBIA Confirm. § 9(a) (emphasis added)).  The MBIA Swaps also included a provision disclosing the possibility of MLI entering into other agreements under which it could get contrary instructions from a third party:

> [MBIA] acknowledges that [MLI] may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by [MLI] of credit protection in respect of one or more obligations by the Reference Entity and that [MLI's] obligations under such agreements may, from time to time, conflict with [MLI's] obligation to act in accordance with [MBIA's] instructions regarding the exercise of rights in respect of the Reference Obligation.  [MBIA] agrees that its sole remedy with respect to such a conflict shall be to declare an Additional Termination Event if [MLI] fails to comply with [MBIA's] instruction regarding the exercise of rights as required by this Section 9.

---

[6]   The six CDOs are: Biltmore, Robeco I, Tazlina II, Silver Marlin I, West Trade II, and West Trade III.

(MBIA Confirm. § 9(b)).  Although this disclosure suggests the possibility that MLI may receive conflicting instructions from a third party — presumably, a tacit reference to XLCA — it does not in any way subordinate MBIA's rights to XLCA's.

At the time of entering into the MBIA deals, Merrill Lynch understood that the conflict between MLI's contractual commitments to MBIA and XLCA was fraught with peril.  Joseph Gambino, the primary Merrill Lynch negotiator on both sets of deals, described such concerns in an e-mail on the execution date of the MBIA deals:

> *[W]e are agreeing to exercise our vote as Class A-1 Noteholder, as Controlling Class and as Controlling Party as directed by MBIA* with respect to all but the most administrative matters….  Since we've agreed under our hedge with XL to exercise our vote as Controlling Class as directed by XL, … *agreeing to these terms with MBIA would put us at risk of being forced to sacrifice one hedge to keep the other* if we received conflicting direction from MBIA ….

(Adams Decl. Ex. 1).

It furthermore would have been apparent to Merrill Lynch at the time of entering into the MBIA deals that there was a substantial likelihood of actual conflicts arising between its commitments to XLCA and MBIA.   As Mr. Gordon, a former Managing Director who was heading the Structured Credit Group for Ambac Assurance Corp., one of the two largest monoline insurers, has described:

> [T]he confirmations between ML and MBIA are dated August 29, 2007, a point in time where, in my opinion, the potential for conflict between XLCA and MBIA could not be ignored.  This is because at this time the ABS CDO market had virtually shut down due to the fears of a pending crisis in the sub prime market and the consequences this would bring to ABS CDOs.  In fact, the ratings agencies had already begun downgrading the types of securities that make up ABS CDO collateral and that would ultimately result in many ABS CDOs in the market triggering Events of Default….  [T]wo of the six CDOs that were the subject of the MBIA transactions in fact experienced Events of Default less than six months after MBIA and ML executed the CDSs.

(Gordon Decl. ¶ 17).  Moreover, Merrill Lynch would have understood that inherent differences in the financial treatment of the Class A-1 Notes and the Class A-2 Notes under CDO indentures at issue in this case made it foreseeable that XLCA's and MBIA's voting instructions in the face of an event of default would differ.  (*Id.* ¶ 18).

MLI was nonetheless willing to enter into the MBIA deals because its dismal financial performance in the third quarter of 2007 — which would result in nearly $8 billion in writedowns — had sparked desperate efforts to get as many CDO liabilities as possible off its books by quarter close.[7]  The MBIA deals provided Merrill Lynch with that opportunity, as shown by an e-mail from Mr. Gambino on September 11, 2007, in which he sought to confirm before quarter close "that these [MBIA deals] are being treated as trading book hedges and that we have reduced our exposure dollar-for-dollar." (Adams Decl. Ex. 3).

Merrill Lynch's third quarter 2007 public financial statements are consistent with Mr. Gambino's e-mail indicating that Merrill Lynch took a dollar-for-dollar reduction in credit exposure on the entire notional amount of the MBIA Swaps.  (Imburgia Decl. ¶ 23).  As Basil Imburgia CPA, an accounting expert retained by defendants, has preliminarily concluded, under GAAP, this accounting treatment could only have been predicated on Merrill Lynch's determination that it would honor in full its obligations to follow MBIA's voting instructions:

> Based on its accounting treatment and public disclosures in filings with the Securities and Exchange Commission regarding the CDS with MBIA, MLI intended to honor its commitment to MBIA and the Control Rights were not transferred to MBIA subject to any contingencies.  Merrill's disclosures in MD&A indicate it was effectively hedging its risks on its "super senior" CDO positions.  Merrill did not disclose in its financial statements that the value of these swaps was contingent on the transfer of voting rights.  Likewise, Merrill's financial statements do not disclose contingencies related to the MBIA CDS that would be required under GAAP if such contingencies existed, further evidencing my opinion that Merrill had granted MBIA the A-1 Voting Rights outright.

(*Id.* ¶¶ 28-29).

---

[7]   These desperate efforts included multiple pleas from a Merrill Lynch salesperson to XLCA to provide financial guarantees on additional CDO tranches.  The salesperson contacted XLCA at the beginning of July 2007 with what he described as the "deal of a lifetime" on a number of super senior CDO tranches and then returned again around the end of July 2007 with a schedule of 24 super senior CDO tranches comprised of over $20 billion in notes that he was looking for XLCA to hedge.  XLCA did not enter into any of the proposed transactions. (Akersveen Decl. ¶¶ 14-15).

### D.     XLCA Terminates the XL Swaps Due to MLI's Repudiation

#### 1.     XLCA terminates six of the XL Swaps based on publicly available information

In January 2008, public information first became available indicating that MLI had committed to provide MBIA with the control rights in the six CDOs that are referenced in the MBIA Swaps. This information included, among others, records from Standard & Poor's that listed MBIA as the "Bond Insurance Provider" on six of the CDOs at issue and unequivocal statements by MBIA's Head of Insured Portfolio Investment that MBIA is the "sole controlling party within our [CDO] deals."  (Adams Decl. Exs. 7 and 8).

Based on this information, on February 22, 2008, XLCA issued six notices to MLI terminating the six XL Swaps that were implicated.  (Musoff Decl. Exs. 1A-F).  The terminations were effective that same day, February 22, 2008.

On February 29, 2008, MLI responded to the six termination notices with six corresponding letters, each captioned with a reference to the XL Swap to which it pertained. (Musoff Decl. Exs. 2A-F).  MLI refused to disclose the terms of the MBIA Swaps in the letters but contended that "nothing in any hedging agreement with any other counterparty would preclude [MLI] from exercising Voting Rights in accordance with our contracts with [XLCA]." (*Id.*).  MLI made that statement notwithstanding the fact that the ***only*** way in which MLI could comply with its obligations under the XL Swaps to exercise Voting Rights "solely in accordance with the written instructions of [XLCA]" was to breach its obligations under the MBIA Swaps to exercise those same Voting Rights "only at the direction of [MBIA]."  (*Id.*).

#### 2.     XLCA seeks but MLI fails to provide assurances with respect to MLI's intention to comply with the seventh XL Swap

In light of information indicating that MLI had repudiated six of the XL Swaps, XLCA also sent a letter to MLI on February 22, 2008, seeking assurances from MLI that it had not similarly repudiated its obligations under the seventh XL Swap, which referenced notes issued by Jupiter VI (the "Jupiter VI Swap"), and was identically structured and situated to the other six.  (Musoff Decl. Ex. 1G).  XLCA requested a response within three days and noted that it

would "treat any failure by MLI to provide the requested confirmation within the time requested as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party in repudiation of its contractual commitment to the Trust." (*Id.*).

MLI did not respond to XLCA's request for assurances related to the Jupiter VI Swap. None of MLI's responses to the six termination notices even mentioned the Jupiter VI Swap nor made any representations that MLI intended to comply with its obligations thereunder and no separate response was sent. (*See id.*). In light of MLI's failure to respond, on March 6, 2008 — thirteen days after it had requested MLI's assurances — XLCA issued a notice to MLI terminating the Jupiter VI Swap. (Musoff Decl. Ex. 3). The termination was effective that same day, March 6, 2008.

### E.     MLI Solicits Voting Instructions from XLCA on the Basis of False Pretenses

On March 25, 2008 — consistent with its Controlling Class rights under the MBIA Swaps — MBIA issued instructions to MLI directing it to accelerate the maturity of the notes issued by the Biltmore and Silver Marlin CDOs, which had both hit events of default in February 2008. (Adams Decl. Exs. 5(a)-(b)).

Shortly thereafter, in a letter dated April 1, 2008, MLI formally requested that XLCA provide MLI with an instruction by April 4, 2008 to accelerate the Biltmore CDO (without prejudice to either party's position in the litigation). (Adams Decl. Ex. 4). MLI represented to XLCA that it was "consistent with … [XLCA's] economic interests to immediately deliver a notice of acceleration." (*Id.*). This was not true. In fact, even if XLCA had not already terminated the XL Swaps, immediate acceleration of the Biltmore CDO would have had ***no*** economic impact on XLCA whatsoever since there were no imminent cash distributions under the Biltmore indenture that would have been affected.[8]

---

[8] Under the Biltmore indenture, only quarterly cash distributions are potentially affected by acceleration and no quarterly distribution was imminent as of April 4, 2008. (Adams Decl. Ex. 10 at 200).

In making its request on April 1, MLI did ***not*** disclose that MLI had received instructions to accelerate from MBIA.  (*See id.*).  Nor did MLI disclose the significant financial interest that MLI had in the instruction it was asking XLCA to provide.  Specifically, MLI failed to reveal that it was seeking to engineer for its own financial benefit — through false statements and omissions — the receipt of consistent voting instructions from XLCA and MBIA in order to keep as many of its CDO hedges intact as possible.  (*See id.*).  XLCA refused to provide MLI with the instruction it requested and, with this litigation ongoing, MLI did not exercise the voting rights without XLCA's consent.

On April 4, 2008, MBIA issued notices to MLI terminating both of the MBIA Swaps under which it had issued the instructions on March 25, 2008, claiming that MLI's "failure to deliver the [acceleration] notices required to be delivered pursuant to our instruction" was a "breach" of the MBIA Swaps.  (Adams Decl. Exs. 5(a)-(b)).

On May 6, 2008, Merrill Lynch disclosed in its first quarter 2008 10-Q that a financial guarantor (*i.e.,* MBIA) had terminated two credit default swaps following a conflict in voting instructions received from another financial guarantor (*i.e.,* XLCA).  Merrill Lynch explained that it had "***elected***" not to follow MBIA's instructions because its contracts "***were of lesser value to Merrill Lynch***" than the XLCA contracts.  (Adams Decl. Ex. 6 at 35).  Merrill Lynch further disclosed that it was taking a write off of the fair value of $45 million and an aggregate notional amount of $1.1 billion in connection with the terminated MBIA Swaps.  (*Id.*).

## F.    Procedural History

On March 19, 2008, MLI filed the complaint against XLCA seeking declarations that the XL Swaps are binding and enforceable and that it had not repudiated any of them.  On March 31, 2008, XLCA filed an Answer and Counterclaims seeking (i) declarations that MLI had repudiated the XL Swaps; (ii) damages against MLI for failing to make certain termination payments under the XL Swaps; (iii) damages against Merrill Lynch for failing to make payments under certain guarantees; and (iv) reformation of two of the XL Swaps.

Less than a month after MLI filed its complaint, MLI moved for summary judgment on its seven claims for declaratory relief and, with Merrill Lynch joining, for partial summary judgment on XLCA's first, second, and third counterclaims.

## ARGUMENT

As the moving party, Merrill Lynch bears the burden of demonstrating that it is entitled to summary judgment. *See, e.g.*, *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The relevant standard is well known: the Court may not grant Merrill Lynch's motion unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The Court, however, "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)

## I.    MLI'S SIX CONTRACTS WITH MBIA CONSTITUTED A REPUDIATION OF ITS OBLIGATIONS TO XLCA

It is axiomatic under New York law that a party is not free to enter into conflicting contractual obligations with multiple parties and then simply wait until the time for performance to elect which of its conflicting obligations to fulfill. This principle is embodied in an example from an oft-cited section of the Restatement (Second) of Contracts:

> On April 1, A contracts to sell and B to buy land, delivery of the deed and payment of the price to be on July 30…. A says nothing to B on May 1, but on that date he contracts to sell the land to C. A's making of the contract with C is a repudiation [of A's prior contract with B].

Restatement (2d) of Contracts § 250, *illustration* 5; *see also Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 78 (1st Dep't 2002) (quoting Restatement (2d) § 250 example 5 with approval and holding that entry into a distribution agreement was a repudiation

of prior conflicting sales agreement); *Ergonomic Systems Philippines Inc. v. CCS International Ltd.*, 7 A.D.3d 412, 414 (1st Dep't 2004) (citing Restatement (2d) § 250 with approval and holding that entry into an exclusive distribution contract "effectively repudiated" a prior conflicting exclusive distribution contract); *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002) (citing Restatement (2d) § 250 with approval); *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (N.Y. 1998) ("*Norcon Power II*") (same).

The restriction on entering into conflicting contractual obligations is based on the doctrine of anticipatory breach. Under that doctrine, any "'voluntary affirmative act which renders the obligor unable or apparently unable to perform'" its future obligations under a contract amounts to a repudiation of that contract. *Computer Possibilities*, 301 A.D.2d at 78 (quoting Restatement (2d) of Contracts § 250). One effect of an anticipatory breach is to "relieve[] the non-repudiating party of its obligation of future performance." *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (N.Y. 1989).

In applying this black letter law to this case, the simple and dispositive fact is that MLI's promise to MBIA to exercise voting rights "only at the direction of [MBIA]" irreconcilably conflicts with its prior promise to XLCA that it would exercise the exact same voting rights "***solely*** in accordance with the written instructions of [XLCA]." By entering into the MBIA Swaps, therefore, MLI subjected itself to conflicting contractual obligations that rendered it unable or apparently unable to perform under the XL Swaps. This, in turn, gave rise to XLCA's right to terminate the XL Swaps under the well-settled principle of anticipatory breach.

The First Department's decision in *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70 (1st Dep't 2002), is squarely on point. There, the plaintiff software vendor contracted with the defendant, Mobil Oil, to provide computer software to Mobil Oil franchises at or below a specified price ceiling. *Id.* at 72. Subsequently, and without Mobil Oil's knowledge, the plaintiff entered into a distribution agreement with a third-party in which it transferred the right to set product pricing to that third party. *Id.* at 73-74. Although the third party never raised prices above the specified price ceiling, the First Department held that the

software vendor had repudiated its price cap obligations to Mobil Oil by entering into an agreement under which the right to set pricing had been promised to a third party. *Id.* at 78-79. The court upheld Mobil Oil's termination of its obligations under the contract on grounds of anticipatory breach. *Id.* at 79.

Courts have also held that where a party has committed to provide ***exclusive*** rights under a contract — such as MLI provided to XLCA here — subsequently promising those same rights to another party amounts to a repudiation regardless of whether those rights are ever exercised. For example, in *Ergonomic Systems Philippines Inc. v. CCS International Ltd.*, 7 A.D.3d 412 (1st Dep't 2004), the First Department held that the defendant repudiated an exclusive distribution agreement by entering into an agreement purporting to grant the same exclusive distribution rights to a third party, without regard to whether the third party exercised those rights. *Id.* at 413-14; *see also Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 653 F. Supp. 47, 54 (S.D.N.Y. 1985) (ruling that beer manufacturer's "clandestine" appointment of a second distributor constituted a breach of the first distributor's right of exclusive distribution); *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 846 (5th Cir. 2004) (holding that defendant hardware supplier's "non-exclusive grant [of distribution rights] to [plaintiff] and the contemporaneously-granted exclusive right to [third-party distributor] within the same market do not appear to be reconcilable.").

Similarly, in *Dialist Co. v. Pulford*, 43 Md. App. 173 (Md. Ct. Spec. App. 1979), the defendant granted plaintiff exclusive rights to sell advertising space within certain areas and then assigned portions of the same territory to a third party. The court held that defendant's actions constituted a repudiation of plaintiff's exclusive rights, notwithstanding that plaintiff was not precluded from making sales in the overlapping territory and that the third party made no sales. According to the court:

> [Defendant's] repudiation of the contract's exclusivity feature deprived [plaintiff] of a substantial benefit of his bargain. The value of the contract as an exclusive distributorship would be greater than as a non-exclusive distributorship. ***[Plaintiff], having bargained for an exclusive distributorship, could not reasonably be expected to settle for***

> *something less, or to continue with the arrangement once the important feature of*
> *exclusivity had been repudiated by [defendant].*

*Id.* at 178-79 (emphasis added). Similarly, here, XLCA bargained for exclusive voting rights with respect to the Class A-1 Notes and should not reasonably be expected to settle for something less once MLI repudiated that important part of the parties' bargain. The benefit of XLCA's bargain should be enforced. *See, e.g.*, *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003) (holding that where plaintiff "expressly negotiated" for voting rights that allowed it to "veto certain transactions with which it disagreed," the "only way to render the provision truly viable is to enforce it.").

Rather than deal squarely with the implications of this authority, MLI instead contends, with deceptive brevity, that it is entitled to summary judgment because (i) "[XLCA] never delivered any instructions to MLI to exercise voting rights"; (ii) MLI "has always been and still is clearly able to vote solely in accordance with [XLCA's] instructions"; and (iii) "the express terms of the MBIA Swaps do not preclude MLI from performing under the XL Swaps." (Mem. 2, 15). MLI's positions, however, are based on mischaracterizations of the contractual provisions at issue, as well as misreadings of the applicable legal standards.

## A.    The Fact That XLCA Has Yet To Give Instructions Is Irrelevant

MLI's suggestion that summary judgment is appropriate because "[XLCA] never delivered any instructions to MLI to exercise voting rights" is a red herring. (Mem. 13-14.). XLCA does not contend that MLI has breached its contracts by not following XLCA's instructions. Rather, as its termination letters and counterclaims make clear, XLCA asserts that MLI has repudiated, *i.e.*, *anticipatorily* breached, its obligations to XLCA. Indeed, one of the key principles behind the doctrine of anticipatory breach is that where one party demonstrates its intention not to comply with its future contractual obligations, the other party need not wait for the time for performance to terminate the contract. *See, e.g.*, *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 266 (1st Dep't 1995) ("The principle of anticipatory breach of contract is supported by sound policy considerations. Once a party has indicated an

unequivocal intent to forego performance of his obligations under a contract, there is little to be gained by requiring a party who will be injured to await the actual breach before commencing suit ....").[9]  Thus, that XLCA had not issued any instructions relating to the voting rights with respect to the Class A-1 Notes could not preclude XLCA from terminating the swaps upon learning that MLI had contractually committed those rights to MBIA.[10]

### B.    The Word "Solely" Must Be Given Meaning

MLI's contention that it is "clearly able to vote solely in accordance with [XLCA's] instructions" conspicuously ignores the plain meaning of the term "solely."  The only reasonable interpretation of the term "solely" is that it reflected the parties' intent that XLCA be the single relevant party with respect to MLI's exercise of voting rights.  The provision would still have meaning without term "solely"; therefore canons of contract interpretation require that the term be given effect.  *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("The primary objective in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language they choose to use.").

The only way that MLI could comply with its obligations to act "solely" in accordance with XLCA's instructions would be to never accept nor consider voting instructions from MBIA or any party other than XLCA.  Yet, MLI has not suggested that it could, consistent with its contracts with MBIA, neither accept nor consider MBIA's voting instructions.  And, indeed,

---

[9]    Merrill Lynch overreaches in relying on *Rachmani*. (Mem. 14).  There, the First Department held that the defendant did not breach or repudiate its exclusive sales agreement with plaintiff when it filed an amended offering plan naming a third party as the exclusive selling agent. 211 A.D.2d at 268.  Nothing in that second agreement, however, was inconsistent with plaintiff's right to payment or otherwise indicated that the defendant would not honor its commitment.

[10]    Merrill Lynch mischaracterizes *Consumers Power Co. v. Nuclear Fuel Services, Inc.*, 509 F. Supp. 201 (W.D.N.Y. 1981), as suggesting that conditions precedent to a right of termination must be complied with before a party may claim for anticipatory breach.  *Consumer Powers* did not arise in the context of anticipatory breach and therefore has no application in this case.  Moreover, the proposition for which it is cited is foreclosed by *Computer Possibilities,* in which the court refused to require that the non-repudiating defendant comply with the 30-day cure period for terminations under the parties' agreement before exercising its right to terminate for anticipatory breach.  *See* 301 A.D.2d at 75, 79.

MLI's response to MBIA's instructions to accelerate Biltmore's notes is evidence that MLI, in fact, has **_not_** ignored MBIA's instructions when they have been received.  To the contrary, upon receiving MBIA's instructions, MLI sought to engineer the receipt of consistent instructions from XLCA precisely so that it could exercise the voting rights in accordance with **_both_** MBIA's and XLCA's instructions.  In no sense was that an exercise of voting rights "solely" in accordance with XLCA's instructions.

MLI apparently looks to simply ignore the term "solely" as if it either did not exist or has no meaning.  That, of course, it is not permitted to do.  *RM 14 FK Corp. v. Bank One Trust Co., N.A.*, 37 A.D.3d 272, 274 (1st Dep't 2007) (refusing to adopt interpretation of a contract that would "vitiat[e] the principle that a contract should not be interpreted so as to render any clause meaningless"); *see also* Restatement (2d) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

### C.     MLI Was Obligated To Follow MBIA's Instructions.

Finally, in claiming that "the express terms of the MBIA Swaps do not preclude MLI from performing under the XL Swaps," MLI mischaracterizes its contracts with MBIA.  MLI bases its contention on a strained reading of Section 9(b) of the MBIA Swaps which, as described above, discloses the possibility of MLI having obligations to other parties that may "conflict with [MLI's] obligations to act in accordance with [MBIA's] instructions regarding the exercise of [voting] rights."  This provision, however, does not say what MLI claims it does.

Whereas MLI suggests that the Section 9(b) provision somehow relieves MLI of its contractual obligations to follow MBIA's instructions, in fact, it expressly reaffirms that MLI has an "**_obligation_** to act in accordance with [MBIA's] instructions."  And, whereas MLI suggests that the provision somehow protects MLI's ability to solely follow XLCA's instruction, the provision in no way subordinates MLI's obligations to MBIA to MLI's prior obligations to XLCA.

The binding nature of the MBIA obligations is confirmed by expert testimony. For example, Scott Gordon, having worked on or led transaction teams responsible for **hundreds** of CDOs, has opined that Section 9 is reasonably understood by those within the monoline industry to mean that MLI "shall exercise all voting rights vested in the Class A-1 Notes subject to MBIA's instructions" and that MLI's entry into such agreements with MBIA would "violate the reasonable expectations a monoline with preexisting control rights would have." (Gordon Decl. ¶¶ 2, 16-17). In addition, a former KPMG audit partner and accounting expert, Basil Imburgia, CPA, has expressed the preliminary conclusion, based on his review of Merrill Lynch's financial statements and public disclosures, that "MLI intended to honor its commitment to MBIA and the Control Rights were not transferred to MBIA subject to any contingencies." (Imburgia Decl. ¶ 28).[11]

Moreover, if MLI had truly intended to subordinate MBIA's exercise of voting rights to XLCA's, not only would it have accounted for the MBIA Swaps differently, but the language of the MBIA Swaps would have been different as well. For example, rather than disclosing the possibility of receiving instructions that merely "**conflict** with [MLI's] obligations to ... [MBIA]," the contract would have disclosed the possibility of voting instructions that "**would prevent MLI from complying** with [MLI's] obligations to … [MBIA]."

Thus, at most, MLI's claim that "the express terms of the MBIA Swaps do not preclude MLI from performing under the XL Swaps" effectively means that the MBIA Swaps were intended to be "option" contracts permitting MLI to choose between performing its obligations to MBIA or fulfilling its commitments to XLCA. But, as the New York Court of Appeals has held: "**the law presumes that the primary purpose of a contract, not expressly stated to be an option, is performance of the act promised and not nonperformance.**" *Rubenstein v. Rubenstein*, 23 N.Y.2d 293, 299 (N.Y. 1968); *see also Papa Gino's of America, Inc. v. Plaza at Latham Assoc.*, 135 A.D.2d 74, 76 (3d Dep't 1988) ("The law presumes that the primary purpose

---

[11]  See discussion *supra* p. 8 (citing Imburgia Declaration).

of a contract is performance and not nonperformance."); *Barclay Arms Assocs. v. Clemente*, 98 A.D.2d 892, 893 (3d Dep't 1983) (same). Here, the MBIA Swaps are not "expressly stated to be an option," and the Court therefore should presume their primary purpose was performance.

Furthermore, upon making its contractual commitments to MBIA, it is entirely reasonable for MLI to bear whatever consequences the expected performance of those commitments entails. Indeed, "[w]hen parties enter into a contract the law presumes they intend the consequences of its performance." *See In re Jay*, 432 F.3d 323, 326 (5th Cir. 2005); *see also Residential Services Validated Publications v. Carus*, 2006 WL 1026669 at *6 (E.D.N.Y. April 19, 2006) (citing proposition from *In re Jay* in case applying New York law). In this case, one clear and foreseeable result of MLI's expected performance under the MBIA contracts was that such performance would render MLI unable (or at least apparently unable) to perform under its agreements with XLCA. Having voluntarily made those contractual commitments to MBIA, the law should presume that MLI intended — or at least understood and accepted the risk of — the consequences of its commitments.[12]

## II.    MLI'S FAILURE TO RESPOND TO XLCA'S REQUEST FOR ASSURANCES CONSTITUTED A REPUDIATION OF THE JUPITER VI SWAP

Merrill Lynch is not entitled to summary judgment with respect to the Jupiter VI Swap. Contrary to MLI's contentions, XLCA was entitled to demand adequate assurance of future performance of the Jupiter VI Swap, and MLI's failure to provide such assurances constituted a repudiation of MLI's obligations.

---

[12]    MLI's reliance on *Streets of London, Inc. v. Londontown Corp.*, 1997 WL 151464 (S.D.N.Y. Apr. 1, 1997), is misplaced. There, the Court ruled that the defendant did not repudiate a contract regarding the sale of ties to independent retail stores when its chief executive officer stated that he "'disapproved' of plaintiff's product and directed plaintiff to work with a new designer who would 'revamp the styles.'" *Id.* at *1. Instead of constituting a "flat repudiation of the contract," defendant's actions were a "reinforcement of [its] contractual right to be involved in the oversight of plaintiff's tie designs." *Id.* Here, in contrast, the issue of repudiation turns on MLI secretly entering into an agreement with MBIA that squarely conflicts with its prior obligations to XLCA, and MLI's actions cannot reasonably be interpreted as a "reinforcement" of its contracts with XLCA.

Pursuant to the doctrine of assurances, "where reasonable grounds arise to believe that the obligor will commit a breach by non-performance ... the obligee may demand adequate assurance of due performance...." *Norcon Power Partners*, 92 N.Y.2d at 465-66 (citing Restatement (2d) of Contracts § 251(1)). Additionally, "the obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case." *Id.* at 466 (citing Restatement (2d) of Contracts § 251(2)).

XLCA had a reasonable and objective basis to seek assurances from MLI given its concern that MLI had repudiated its voting rights obligations under the Jupiter VI Swap. At the time of its demand, XLCA possessed reliable information indicating that MLI had repudiated its voting rights obligations under the six other XL Swaps. Not only was the Jupiter VI trade identically structured and situated to those six other trades, but the Class A-1 Notes that the Jupiter VI CDO issued were included with the Class A-1 Notes of the other six trades on a schedule of CDO positions that Merrill Lynch had marketed to potential hedge counterparties (including XLCA) during the third quarter of 2007. (Akersveen Decl. ¶¶ 14-15). It was reasonable, therefore, for XLCA to believe that MLI had hedged its Jupiter VI risk with a third party in exchange for A-1 voting rights, just as it had done with MBIA. *See* Restatement (2d) of Contracts § 251 cmt. c (noting that "even circumstances that do not relate to the particular contract, such as defaults under other contracts," may constitute reasonable grounds for an obligee's belief that a breach will occur); *Enron Power Mktg. v. Nevada Power Co.* (*In re: Enron Corp.*), No. 03 Civ. 9318 (BSJ), 2004 WL 2290486 at *3 (S.D.N.Y. Oct. 12, 2004) (finding a broad range of circumstances may give rise to a party's insecurity supporting demand for assurances).

Moreover, contrary to Merrill Lynch's conclusory assertion, the Jupiter VI Swap is precisely the type of contract for which assurances may be sought under New York law. In *Norcon Power Partners*, the New York Court of Appeals held that the common law right of assurances applies to "long-term commercial contract[s] between corporate entities...which [are]

complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract." *Norcon Power II*, 92 N.Y.2d at 468 (applying doctrine to a 25-year electricity supply contract); *see also In re Asia Global Crossing*, *Ltd.*, 326 B.R. 240 (Bankr. S.D.N.Y. 2005) (applying doctrine to option contract for telecommunications capacity). The Jupiter VI Swap was clearly a "long-term commercial contract" as it involved a 40-year financial guarantee on $525 million of CDO obligations. The Jupiter VI Swap was also plainly "complex" as it was constituted by several detailed, interrelated and heavily negotiated contractual documents that cross-referenced a several hundred page indenture. Finally, the Jupiter VI Swap was also "not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract" as is demonstrated by the radical changes in the market for CDOs that precipitated MLI's desperate decision to enter into the MBIA agreements in derogation of its obligations to XLCA.[13]

Finally, MLI failed to provide XLCA with any assurance, let alone adequate assurance within a reasonable time. After XLCA requested a response within three days, MLI remained silent for **thirteen** days.[14]  This prolonged silence, particularly in light of MLI's responses to XCLA's six other letters during the intervening period, entitled XLCA to treat MLI as having repudiated the Jupiter VI Swap. Consequently, as a matter of law, XLCA's termination of the Jupiter VI Swap on March 6, 2008 was proper and effective.  Summary judgment in MLI's favor with respect to the Jupiter VI Swap should be denied.

---

[13]    Neither of the decisions upon which MLI relies turned upon the issue of whether assurances were available to plaintiff, let alone suggest that XLCA could not demand assurance with respect to the Jupiter VI Swap.  *See Bank of New York v. River Terrace Assoc.*, 23 A.D.3d 308, 309-10 (1st Dep't 2005) (holding that appellant failed to make an adequate demand); *Scott-Macon Securities, Inc. v. Zoltek Cos.*, No. 04Civ2124MBM, 2005 WL 1138476 at *16 (S.D.N.Y. May 11, 2005) (holding that defendant did not have reasonable grounds to demand assurances).

[14]    There is absolutely no factual support for Merrill's assertion that it provided assurances with respect to Jupiter VI on February 29, 2008.

### III.    FACTS REASONABLY LIKELY TO BE DISCLOSED DURING DISCOVERY WOULD FURTHER DEMONSTRATE THAT MERRILL LYNCH IS NOT ENTITLED TO SUMMARY JUDGMENT

XLCA has submitted sufficient evidence for the Court to deny Merrill Lynch's motion outright.  Indeed, if anything, the evidence presented demonstrates that XLCA would be entitled to judgment on *its* claim for a declaration that the XL Swaps were appropriately and effectively terminated.  In any event, Merrill Lynch's motion — filed less than one month after commencing this action and well before the completion of discovery — is premature.

Although Merrill Lynch was permitted to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action," FED. R. CIV. P. 56(a), the Second Circuit has long disfavored summary judgment prior to the completion of discovery:

> [S]ummary judgment should only be granted if '*after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.  Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.

*Miller v. Wolpoff & Abrahamson, L.L.P.*, 321 F.3d 292, 303-04 (2d Cir. 2003) (quoting *Hellstrom v. United States Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)); *see also Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment.") (quoting *Anderson*, 477 U.S. at 250 n.5).

While the parties have been diligently exchanging documents, the parties have not completed document discovery. (Pickhardt Decl. ¶ 3).  In addition, the parties do not anticipate commencing depositions until after the Court renders its decision on this motion. (*Id.* at ¶ 14).  Moreover, at the hearing on May 7, 2008 (the "May 7 Hearing"), the Court ordered that all discovery of MBIA be stayed until after the Court renders its decision on June 10; XLCA has therefore not had the opportunity to take any discovery of MBIA (aside from MBIA's initial production of certain limited transactional documents). (*Id.* at ¶ 6-7).

Federal Rule of Civil Procedure 56(f) expressly permits courts to deny a motion for summary judgment or order a continuance where the nonmoving party shows that "it cannot present facts essential to justify its opposition." In addition, during the May 7 Hearing, the Court expressly ordered that:

> XL's summary judgment papers can assume, rather than having to present actual evidence, can assume that discovery from MBIA would, they believe, have a reasonable chance of showing X, Y or Z, and I will for the limited purposes of this summary judgment motion consider that as the equivalent of evidence so that if I reach that issue and that makes a difference then I will deny the motion.

Therefore, in light of the nascent stage of discovery in this action, and in keeping with Rule 56(f) and this Court's order at the May 7 Hearing, it would be reasonable for purposes of considering XLCA's opposition to summary judgment for the Court to assume that discovery will reveal evidence of the following: (*See id.* at ¶ 12)

- *MLI unequivocally declared that it would follow MBIA's voting instructions notwithstanding its obligations to "solely" follow XLCA's voting instructions.* Such representations are plainly germane to XLCA's contention that MLI repudiated its obligations to XLCA, because a repudiation occurs not only when a party enters into inconsistent contractual obligations, but also "when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Franconia Assocs.*, 536 U.S. 129; *Norcon Power Partners*, 92 N.Y.2d 458).

- *It was the intent of MLI and MBIA when entering into the MBIA Swaps that MLI would comply with its obligations thereunder to exercise voting rights "only at the direction" of MBIA.* Such information would be relevant to the Court's determination of whether MLI's position that the MBIA Swaps "protected, rather than divested, MLI's ability to exercise its voting rights in connection with the CDOs" (Mem. 15) can be credited. In particular, it appears from the face of an e-mail communication produced by MLI that seven representatives of MLI and MBIA held a conference call at 7:15 p.m. on August

29, 2007 specifically for the purpose of discussing the voting rights terms under the MBIA Swaps. (Adams Decl. Ex. 2). The substance of that conference call — which was mere hours before execution of the MBIA Swaps — will be relevant to this Court's consideration of MLI's and MBIA's intentions at the time they entered into their agreements. Information regarding Merrill Lynch's accounting for the MBIA Swaps will also be relevant to understanding MLI's intent. Had Merrill Lynch believed at the time of the MBIA Swaps' execution that they were conditional (because MLI did not expect to follow MBIA's voting instructions) it would have been required to discount the fair value of the MBIA Swaps on Merrill Lynch's financial statements. (Imburgia Decl. ¶ 27).

- *MLI's and MBIA's course of performance under the MBIA Swaps has been consistent with MLI having a binding contractual obligation to follow MBIA's voting instructions*. Such information would similarly be relevant to the Court's consideration of whether MLI's representation in its motion that it never "agreed to exercise voting rights in accordance with [MBIA's] instructions" (Mem. 2) is accurate. In this regard, information related to MBIA's issuance of voting instructions to MLI in March 2008 and MLI's consideration and response thereto will be particularly relevant. Information regarding the recent public statements of MBIA's Head of Insured Portfolio Management that MBIA is the "***sole*** controlling party" within all of its CDO deals and the support therefore will also be highly relevant.

- *MLI entered into or intended to enter into a credit default swap or other agreement with a third party referencing the Class A-1 Notes for the Jupiter VI CDO in which voting rights were or would be accorded to the third party*. Such information would plainly be relevant to the Court's determination of whether, in addition to refusing to provide assurances, MLI has repudiated its obligations to XLCA through actions or statements in regard to the Jupiter VI Swap.

- *Merrill Lynch made misrepresentations or material omissions to XLCA in the context of negotiating the XL Swaps*. Such misrepresentations will be relevant to the Court's

consideration of XLCA's affirmative defense that Merrill Lynch is precluded from recovering "because the alleged [XLCA] CDS's are unenforceable and/or void because of [MLI's] fraud and/or misrepresentation to [XLCA]."  For example, MLI entered into its Biltmore Swap with XLCA only *nineteen days* prior to entering into its Biltmore Swap with MBIA. If, at the time that it contracted with XLCA, MLI had already formed its intention to enter into conflicting obligations with a third party, then MLI's failure to disclose that fact to XLCA was fraud. *Schlang v. Bear's Estates Dev. of Smallwood, NY, Inc.*, 194 A.D.2d 914, 915 (3rd Dep't 1993) (holding that "misstatements of material fact or promises made with a present, albeit undisclosed, intent not to perform" can sustain a claim for fraudulent inducement).

- *MLI was aware that it was XLCA's reasonable expectation in light of the XL Swaps that MLI would not enter into agreements with third parties concerning the exercise of voting rights and that MLI entering into the MBIA Swaps frustrated the benefit of the bargain that XLCA had obtained*.  Such information will be relevant to the Court's consideration of XLCA's affirmative defense that MLI's claims are "barred by the doctrine of unclean hands" and "barred by the doctrine of estoppel."  *Smith v. Long*, 281 A.D.2d 897, 898 (4th Dep't 2001) ("Unclean hands in participating in a course of conduct of deception and deceit is an effective bar to cause of action to enforce the agreement that results from that deception and deceit."); *Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894, 909 (N.D. Ohio 2003) (denying motion to dismiss and granting discovery to allow party discovery relating to its defense of unclean hands).

Scenarios described above are reasonably likely to be found to be true once XLCA has a full opportunity obtain discovery from Merrill Lynch, MBIA and other third parties. Given the strong preference in this Circuit that summary judgment not be granted prior to the close of discovery and the numerous outstanding discovery requests that go directly to the heart of the parties' dispute, Merrill Lynch's motion for summary judgment is decidedly premature.  The Court therefore should deny it and permit the discovery process to run its course.

## Conclusion

For the foregoing reasons, Merrill Lynch's motion for summary judgment should be denied.

Dated:  May 15, 2008
       New York, New York

                        QUINN EMANUEL URQUHART OLIVER &
                        HEDGES, LLP

                        By:_____
                             Peter E. Calamari
                             (petercalamari@quinnemanuel.com)
                             Jonathan E. Pickhardt
                             (jonpickhardt@quinnemanuel.com)
                             Brendan N. Snodgrass
                             (brendansnodgrass@quinnemanuel.com)
                             William B. Adams
                             (williamadams@quinnemanuel.com)

                        51 Madison Avenue, 22nd Floor
                        New York, New York 10010

                        *Attorneys for Defendants and Counterclaimants*
                        *XL Capital Assurance Inc. and XLCA Admin LLC*