UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH INTERNATIONAL,<br><br>Plaintiff,<br><br>-against-<br><br>XL CAPITAL ASSURANCE INC., et al.,<br><br>Defendants.<br><br>XL CAPITAL ASSURANCE INC., et al.,<br><br>Counterclaimants,<br><br>-against-<br><br>MERRILL LYNCH INTERNATIONAL AND MERRILL LYNCH & CO.,<br><br>Counterclaim Defendants. | 08 CV 2893 (JSR)<br><br>**DECLARATION OF<br>TRUDE AKERSVEEN** |

TRUDE AKERSVEEN, under penalty of perjury, declares as follows:

1. I was formerly a Managing Director at XL Capital Assurance Inc. ("XLCA"). I submit this declaration in support of XL Capital Assurance Inc.'s and XL Admin LLC's Opposition to (a) Merrill Lynch International's ("MLI") Motion for Summary Judgment and (b) MLI's and Merrill Lynch & Co.'s (collectively, "Merrill Lynch") Motion for Partial Summary Judgment. I have personal knowledge of the matters herein.

2. I first began working at XLCA in August 2000 in the group responsible for the origination and negotiation of financial guarantees on structured financial products. From the fourth quarter of 2005 until my departure in February 2008, I was the primary person responsible

for the negotiation and execution of XLCA's financial guarantee transactions involving asset-backed security collateralized debt obligations ("CDOs").

3. From the fourth quarter of 2005 until my departure, I was personally involved in all aspects of the evaluation, negotiation and execution of XLCA's agreements to provide financial guarantees on obligations related to CDOs. Among my responsibilities, I selected which CDO transactions would get presented to XLCA's Credit Committee, the body responsible for approving all of XLCA's financial guarantee transactions. I produced or supervised the production of the credit memoranda and provided the recommendations that were submitted to the Credit Committee. Since the fourth quarter of 2005, no proposed CDO transaction was ever presented to the XLCA Credit Committee for approval against my recommendation.

4. In or around June 2006, I began discussions with Merrill Lynch about the possibility of XLCA providing financial guarantees in connection with certain CDO-related obligations held by Merrill Lynch. Merrill Lynch indicated during those discussions that, assuming the parties could settle upon a mutually acceptable framework and set of terms for the initial deals, they expected to seek additional financial guarantees from XLCA on future CDO transactions.

5. Between July 2006 and November 2006, I was involved in the negotiation of the terms and contractual language for several initial deals proposed by Merrill Lynch. Mark Walsh, an attorney in XLCA's legal department, and XLCA's outside legal counsel at Linklaters were also involved in these negotiations.

6. As a condition for XLCA even to consider entering into any of the deals that Merrill Lynch proposed, I insisted that XLCA be provided with exclusive voting and consent rights for the entire "Controlling Class" of noteholders under any of the CDOs that were the

subject of XLCA's guarantees. The "Controlling Class" is generally the most senior outstanding tranche of the CDO's notes, which are usually the Class A-1 Notes. Typically, the holders of the Controlling Class of notes are empowered to control various important aspects of the CDO that other noteholders cannot.

7. While CDO financial guarantors commonly obtain voting and consent rights associated with the notes they insure, XLCA's arrangement with Merrill Lynch was somewhat unique; we insisted on obtaining the voting rights pertaining to the entire Controlling Class of notes (which were the Class A-1 Notes under the indentures) even though the financial guarantees we expected to provide would not cover the entire Controlling Class. In my experience, it is more common for a financial guarantor to receive only the voting rights on the notes that are the subject of their guarantee.

8. If XLCA had not been accorded exclusive voting rights for the entire Controlling Class of notes, I would not have recommended Merrill Lynch's proposed transactions to the Credit Committee. Since I was responsible for deciding which CDO guarantee transactions were submitted for approval, this means that, had Merrill Lynch not agreed to my request, XLCA would not have entered into these transactions.

9. In the context of these transactions with Merrill Lynch, Controlling Class voting rights were crucial. These voting rights allow XLCA to take actions that would limit its exposure to losses in the event that the underlying assets ever became impaired or XLCA became concerned that the CDO collateral manager was engaged in mismanagement. For example, with Controlling Class rights, XLCA could act to preserve the CDO collateral by directing that notes be accelerated following an event of default or removing the collateral manager in certain circumstances.

10.     Obtaining Controlling Class rights was a deal breaker requirement for XLCA's ability to "price" these transactions. Under the initial deals we negotiated with Merrill Lynch, the annual premium that XLCA was to receive was around 15 basis points (or 0.15%) of the notional amount of the notes being guaranteed. Later deals ranged from 11 basis points to 17 basis points. XLCA would never have been able to price these deals at these levels, or indeed at any rational level, without having obtained the Controlling Class rights. These rights were a critical means for XLCA to manage its risk under the deals.

11.     As was typical for this type of arrangement, Merrill Lynch and XLCA structured their financial guarantee agreements as credit default swaps. Merrill Lynch's agreement to provide XLCA with Controlling Class rights was set forth in a part of the credit default swap documentation referred to as the "confirmation." The confirmation also includes the deal's financial terms and many of the other negotiated provisions.

12.     The contractual language reflecting Merrill Lynch's agreement to provide XLCA with the Controlling Class rights was heavily negotiated between the parties between July 2006 and November 2006. In its final form, that language included the requirement that Merrill Lynch would "exercise any Voting Rights ... solely in accordance with the written instructions of [XLCA]." Merrill Lynch agreed that "Voting Rights" would be defined to include the right to direct the voting of the outstanding principal amount of the Class A-1 Notes (*i.e.*, the Controlling Class).[1] It was my understanding from this language and our negotiations that Merrill Lynch agreed that XLCA would have the exclusive right to direct voting for the Controlling Class.

---

[1] Two of the credit default swaps the parties later executed mistakenly omitted this provision. I understand this to be one of the issues raised in this litigation.

13. After Merrill Lynch and XLCA had agreed upon the contractual language governing the Controlling Class rights, this same language was used as the basis for each of the subsequent credit default swaps entered into by the parties. This included the seven transactions that Merrill Lynch and XLCA executed between January 25, 2007 and August 10, 2007 that I understand to be the subject of this litigation. In each of those seven transactions, XLCA guaranteed the Class A-2 Notes of the referenced CDO and was provided with the voting rights, per the terms described above, for both the Class A-2 Notes and the Class A-1 Notes (*i.e.*, the Controlling Class).

14. In or around July 2007, after Merrill Lynch and XLCA had executed six of the seven transactions I understand to be at issue in this litigation, and around the time that XLCA underwrote the seventh, the primary Merrill Lynch salesperson covering XLCA asked me whether XLCA would be willing to consider providing additional CDO financial guarantees to Merrill Lynch. Specifically, he asked if XLCA would provide guarantees on the Class A-1 Notes of the Merrill Lynch CDOs for which XLCA was already guaranteeing the Class A-2 Notes. He described the proposed transactions as the "deal of a lifetime." XLCA decided not to proceed with those transactions.

15. Around the end of July 2007, this same Merrill Lynch salesperson contacted me again to request that XLCA provide Merrill Lynch with additional financial guarantees. This time, he sent me a spreadsheet listing 24 super senior tranches from 23 Merrill Lynch underwritten CDOs for which Merrill Lynch wanted XLCA to provide financial guarantees. The total notional amount of the notes listed on the spreadsheet was over $20 billion.

16. Ultimately, XLCA did not agree to provide Merrill Lynch with any of the financial guarantees it was seeking. However, I understand that MBIA Inc. ("MBIA"), a

competitor of XLCA, did agree to provide Merrill Lynch with financial guarantees for the Class A-1 Notes on at least six of the CDOs that were listed on Merrill Lynch's spreadsheet. Each of those six guarantees related to the same CDOs for which XLCA was already guaranteeing the Class A-2 Notes and had been given the Controlling Class rights.

17. In connection with this litigation, I have been shown copies of the confirmations for six credit default swap agreements that Merrill Lynch and MBIA entered into at the end of August 2007. In particular, I have reviewed Section 9 of those confirmations, which is entitled "Seller's Right to Exercise Voting Rights on Reference Obligation." Merrill Lynch's commitment in that provision to exercise Controlling Class rights "only at the direction" of MBIA is inconsistent with the agreement I negotiated with Merrill Lynch to exclusively exercise Controlling Class rights at XLCA's direction. I never would have expected Merrill Lynch to take any action that might prevent or limit its ability to live up to its commitment to XLCA.

18. Had Merrill Lynch advised us at the time we were negotiating the XLCA transactions that it would subsequently enter into agreements promising the same Controlling Class rights to MBIA, I would have had significant concerns about the uncertainty that such a conflict would introduce into these deals. Further, had I understood that we might not be receiving *exclusive* Controlling Class rights, I believe that all of these concerns would have been sufficient to prevent me from recommending that XLCA enter into these transactions with Merrill Lynch.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 13, 2008.

TRUDE AKERSVEEN