UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH INTERNATIONAL,<br><br>              Plaintiff,<br><br>            -against-<br><br>XL CAPITAL ASSURANCE INC. AND XLCA ADMIN LLC, AS TRUSTEE FOR PORTFOLIO CDS TRUST 138, PORTFOLIO CDS TRUST 153, PORTFOLIO CDS TRUST 164, PORTFOLIO CDS 165, PORTFOLIO CDS TRUST 170, PORTFOLIO CDS TRUST 172 AND PORTFOLIO CDS TRUST 186,<br><br>              Defendants. | 08 CV 2893 (JSR)<br><br>**DECLARATION OF MARK WALSH** |
| XL CAPITAL ASSURANCE INC. AND XLCA ADMIN LLC, AS TRUSTEE FOR PORTFOLIO CDS TRUST 138, PORTFOLIO CDS TRUST 153, PORTFOLIO CDS TRUST 164, PORTFOLIO CDS 165, PORTFOLIO CDS TRUST 170, PORTFOLIO CDS TRUST 172 AND PORTFOLIO CDS TRUST 186<br><br>            Counterclaimants,<br><br>           -against-<br><br>MERRILL LYNCH INTERNATIONAL AND MERRILL LYNCH & CO.,<br><br>           Counterclaim Defendants. | |

MARK WALSH, under penalty of perjury, declares as follows:

1. I was employed by defendant XL Capital Assurance Inc. ("XLCA") from January 2005 through August 2007, as an attorney in XLCA's in house legal department. One of

1

my responsibilities was to support the group that originated XLCA's business providing financial guarantees on notes issued by collateralized debt obligations ("CDOs").

2. Prior to joining XLCA, I was employed from 2004 to 2005 by Morgan Stanley on the equity derivatives desk as a Vice President and from 2001 to 2004 by Weil, Gotshal & Manges as an associate primarily working on corporate structured finance matters.

3. I am currently counsel at McKee Nelson LLP practicing in the areas of corporate securitizations and structured finance.

4. I submit this declaration in support of defendants' opposition to the motions for summary judgment filed by Merrill Lynch International ("MLI") and Merrill Lynch & Co. ("ML&Co.", collectively, "Merrill Lynch"). I have personal knowledge of the matters set forth herein, unless otherwise indicated.

5. In approximately June 2006, Merrill Lynch approached XLCA, seeking credit protection on obligations that were to be held by Merrill Lynch in connection with various types of securities, including notes issued by CDOs.

6. I understood, based on my discussions with Merrill Lynch, that if Merrill Lynch and XLCA could reach agreement on the terms of the credit protection, Merrill Lynch intended to seek credit protection on similar terms from XLCA in the future in connection with other CDOs.

7. Between July 2006 and November 2006, Merrill Lynch and XLCA negotiated the first contracts reflecting the credit protection sought by Merrill Lynch. These contracts were in the form of credit default swaps.

8. A credit default swap ("CDS") is primarily memorialized by three documents: (i) an industry form ISDA Master Agreement; (ii) a schedule to the Master

Agreement setting forth certain general negotiated terms; and (iii) a confirmation which sets forth the financial and other specific terms for the transaction.

9. Trude Akersveen, who was in XLCA's CDO group, and I were primarily responsible on behalf of XLCA for negotiating the terms of the initial CDSs with Merrill Lynch.

10. One of the terms that we insisted upon in negotiations with Merrill Lynch was that XLCA be provided with the ability to direct how Merrill Lynch would exercise voting or consent rights with respect to the CDO notes for which Merrill Lynch was a noteholder and for which XLCA would be providing credit protection and, for several of the CDSs, the voting or consent rights relating to a more senior class of CDO notes to the class on which XLCA was providing credit protection. These voting rights generally permitted the holders of these classes of notes to direct a number of important rights under the CDO indenture, including rights related to removing the trustee or collateral manager, directing certain trustee actions, and accelerating the CDO's notes or liquidating collateral if the CDO ever encounters an event of default.

11. These rights were extremely important to XLCA because they allowed XLCA to take necessary actions to limit its exposure to losses if the CDO's collateral ever became impaired or there were concerns about mismanagement by the CDO's trustee or collateral manager. For these reasons, generally, XLCA would not have been willing to enter into the CDSs with Merrill Lynch if Merrill Lynch had been unwilling to give XLCA the power to direct the exercise of the voting rights under the CDSs.

12. Merrill Lynch's agreement to provide XLCA with the voting rights was reflected in Section 6 of the CDS confirmation, under the provision entitled "Additional Termination Events." This provision was one of the most heavily negotiated between the parties and was the subject of many drafts over the course of four months between July 2006 and

November 2006. In those negotiations, Merrill Lynch sought to decrease the scope of rights that XLCA would receive under the provision while XLCA sought to expand the scope of rights that it would receive.

13. Around the end of November 2006, the parties reached agreement on the Additional Termination Events provision which included the following language:

> The following event will constitute an Additional Termination Event ...
>
> (ii) the failure by [MLI] to exercise any Voting Rights or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of [XLCA];

14. After reaching agreement with Merrill Lynch on the voting rights language reflected in Paragraph 13 above, the same language was then copied for use in future CDS contracts between XLCA and Merrill Lynch. These CDS contracts included the seven CDS contracts executed between MLI and XLCS between January 25, 2007 and August 10, 2007 that I understand to be at issue in this litigation.

15. It was my belief at the time of negotiating these terms with Merrill Lynch and remains my belief today that the intent of the parties in executing CDS agreements containing the language reflected in Paragraph 13 was that Merrill Lynch was committing to exercise the voting rights (other than the specific rights retained to Merrill Lynch under the CDS agreements) solely at XLCA's direction or the CDS would be subject to termination at the option of XLCA.

16. I have recently reviewed one of the six CDS confirmations that MLI entered into with MBIA on August 29, 2007, specifically noting the terms in Section 9, entitled "Seller's Right to Exercise Voting Rights on Reference Obligation." It is my belief that, if I had been advised by MLI that it was MLI's intent to enter into agreements, such as those with

MBIA, to follow the voting instructions of a third party, I would have been concerned about the increased likelihood of the occurrence of a termination event under the CDS and I do not believe that XLCA would have been willing to enter into the CDS agreements with Merrill Lynch on the same terms that it did.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2008

_____
Mark Walsh