UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH INTERNATIONAL,<br><br>Plaintiff,<br><br>-against-<br><br>XL CAPITAL ASSURANCE INC. AND XLCA ADMIN LLC, AS TRUSTEE FOR PORTFOLIO CDS TRUST 138, PORTFOLIO CDS TRUST 153, PORTFOLIO CDS TRUST 164, PORTFOLIO CDS 165, PORTFOLIO CDS TRUST 170, PORTFOLIO CDS TRUST 172 AND PORTFOLIO CDS TRUST 186,<br><br>Defendants. | 08 CV 2893<br><br>**DECLARATION OF**<br>**SCOTT GORDON** |
| XL CAPITAL ASSURANCE INC. AND XLCA ADMIN LLC, AS TRUSTEE FOR PORTFOLIO CDS TRUST 138, PORTFOLIO CDS TRUST 153, PORTFOLIO CDS TRUST 164, PORTFOLIO CDS 165, PORTFOLIO CDS TRUST 170, PORTFOLIO CDS TRUST 172 AND PORTFOLIO CDS TRUST 186,<br><br>Counterclaimants,<br><br>-against-<br><br>MERRILL LYNCH INTERNATIONAL AND MERRILL LYNCH & CO.,<br><br>Counterclaim Defendants. | |

SCOTT GORDON, under penalty of perjury, declares as follows:

  1. For the last 22 years I have run the global CDO platforms for two monoline financial guarantee companies. From 1986-1999 I was Managing Director of the Asset Finance Group at Financial Security Assurance ("FSA"). In 1999 I was hired by Ambac Assurance Corp and until January, 2008 I was Managing Director, Structured Credit Group. At

1

both companies I was responsible for underwriting CDOs on a global basis. At Ambac I managed a 10 person CDO team and (as at FSA) was responsible for sponsoring all CDOs that Ambac (and FSA) underwrote.

2. I structured the first CDO to ever be insured by a monoline company in 1988. Of the first 14 CDOs ever rated by Moody's, I was the lead transactor on all 11 that were insured. Since that time my professional life has been immersed in and closely associated with CDOs; I have worked on or led transaction teams responsible for hundreds of CDOs, including more than two dozen ABS CDOs. All together the aggregate notional amount of these CDOs total well in excess of $100 billion.

3. At Ambac I was also a permanent voting member of the Senior Credit Committee. This Committee had approval authority for most all Structured Product transactions (ex CDOs), meaning that I read, reviewed and opined on hundreds of different structured transactions seeking credit approval from Ambac.

4. While at both Ambac and FSA I spoke at dozens of professional CDO related conferences, both in the U.S. and throughout Europe, as both moderator and panelist. During the course of this time I also became a member of the American Securitization Forum's CDO Program Advisory Committee.

5. I have an MBA in Finance from NYU and hold Series 7 and 63 licenses. My curriculum vitae is attached hereto as Exhibit 1.

6. I have been retained by XL Capital Assurance Inc. and XLCA Admin LLC (collectively, "XLCA") to provide expert witness advice regarding custom and practice within the monoline financial guarantee industry, including in regards to CDO voting rights. This declaration includes my preliminary opinions based upon documents and information provided to me. I am also expecting to prepare an expert report in this matter and to be available

to provide testimony at deposition and trial. I understand that discovery has not yet been completed and my views may be impacted by additional documents or information that are provided to me.

7. In connection with providing this declaration, I have reviewed the following documentation;

    (i) XLCA Confirmations for West Trade II, Silver Marlin, Tazlina, West Trade III, Robeco, Jupiter, and Biltmore;

    (ii) MBIA Confirmations for West Trade II, Silver Marlin, Tazlina, West Trade III, Robeco, and Biltmore;

    (iii) Event of Default notices for Silver Marlin and Biltmore; and

    (iv) Indentures for Silver Marlin and Biltmore

8. Monoline financial guarantee companies take credit risk by issuing financial guarantee insurance policies or by writing credit default swaps ("CDS"). Unlike many risk taking organizations, once a monoline assumes the credit risk, they can not remove themselves from the risk by "trading out of the position." They may reinsure, but insurance from a monoline is unconditional and irrevocable. For this reason there are a number of basic underwriting principles that monolines adhere to when providing insurance or writing protection. First and foremost, transactions are structured to be remote from risk of loss. Historically, monolines, unlike banks and other financial intermediaries, have not viewed themselves as risk taking organizations, and their business model is very different as a result.

9. The second basic principle that monolines adhere to is that they will always want to be in a control position so that if a risk does go bad they and they alone control the work-out and application of available remedies. It is standard operating procedure to only enter in to transactions in which the material rights are held solely by the monoline. In my

experience I do not recall ever entering into a CDO transaction where I did not have ownership of the applicable control rights. Also, it is my experience that monolines always negotiate those rights so that upon an Event of Default they could protect against and mitigate loss potential by having all remedies available. These remedies would include the right to declare an Event of Default, accelerate the notes, liquidate the collateral, work-out the collateral and replace the collateral manager, among other things.

10. By way of further background, CDO liabilities are tranched, meaning that the senior most class of notes (Class A Notes) rank senior in priority to all the other note classes. Likewise, the next most senior class of notes (Class B Notes) are senior in priority to the remaining note classes (and junior in priority to the Class A Notes), and so on.

11. The pass-through of cash flow to the noteholders is dictated by Article 11 in a CDO Indenture. Article 11 is commonly referred to as the Priority of Payments, or "the Waterfall", and is the section which directs the Trustee how to distribute, or pass through (subject to a host of tests and conditions) principal and interest received from the collateral to the Noteholders. In a CDO, cash flow is typically passed through sequentially (not pro rata), with the senior most class receiving the first dollars of cash flow (after various expense items) before any other class. If the transaction is set up to pass through principal on a pro rata basis, as is the case in some of the transactions noted above, there are a series of performance criteria that must be adhered to or the Waterfall will permanently switch to one of sequential payment.

12. Because the Class A Notes are senior in the capital structure and have first claim to the cash flows, they are the most risk remote and carry the highest ratings from the rating agencies (Moody's and Standard and Poors). It is also this risk layer that monolines typically write protection on, although some, like XLCA, bifurcated the Class A notes into two tranches (Class A-1 and Class A-2) and assumed the credit risk profile of the Class A-2 Notes.

In this case the Class A-2 Notes rank junior in priority to the Class A-1 Notes. Because monolines generally underwrite to take the risk of the senior most class(es), they protect their position relative to all the other classes upon an Event of Default through ownership of the control rights. It would be counter to the principals of CDO underwriting for a monoline to allow a class other than itself to have such control rights, or to share in such rights. Otherwise, that class could act/vote counter to the interests of the monoline. Once a series of Notes have been redeemed in full (ie the Class A Notes), it is common for the control rights to then pass to the next most senior tranche (ie the Class B Notes) and so on down the line.

13. While I cannot recall ever taking on the risk of a tranche junior to the most senior class while at Ambac or FSA, there were some competitors like XLCA that, as in the transactions noted above, were comfortable with this risk from a credit basis. However, it would not be uncommon in my experience for those monolines to preserve ownership of the control rights in an asset-backed security ("ABS") CDO senior to all other noteholders, much like XLCA has done in the transactions reviewed.

14. In my review of the CDS Confirmations between XLCA and Merrill Lynch International ("ML") I focused on Section 6 and the Additional Termination Events. In this section the parties state to whom the voting rights of the Class A-1 Notes (the senior most class) are vested. It is noted that in the Indentures I reviewed, the Controlling Class is defined to be a majority of the Class A-1 Notes (the Requisite Percentage) and is the Class to whom the rights and remedies upon an Event of Default are vested. Based on my experience and my own interpretation of the language in the confirmations, I believe that all parties to the agreement would understand the language to mean that control rights of this class would be exercised only at the direction of XLCA.[1]

---

[1] It is noted that in two of the seven confirmations between XLCA and ML (Silver Marlin and West Trade Funding CDO II) the language on these points is different than in the

15. Based on industry protocol and my review of the documentation, I also believe that a monoline would reasonably expect that ML would not promise the same control rights to another party, or do anything in respect of voting rights that would be contrary to XLCA's best interest (unless ML was willing to accept the potential consequences of an Additional Termination Event). It is also my experience that two parties with potentially disparate interests (two Note classes of different priorities) would not agree to share (or cede) control rights with (to) the other party.

16. In my review of the CDS Confirmations between MBIA and Merrill Lynch I focused on Section 9 and the exercise of voting rights. Based on my review, it would appear that ML has represented that it shall exercise all voting rights vested in the Class A-1 Notes subject to MBIA's instructions and that failure by ML to follow such instruction would allow MBIA to terminate the credit protection it has sold to ML.

17. By granting MBIA these rights, these agreements between MBIA and ML would, in my experience, violate the reasonable expectations a monoline with preexisting control rights would have. While these provisions can be considered unusual under any circumstances, it is noted that the confirmations between ML and MBIA are dated August 29, 2007, a point in time where, in my opinion, the potential for conflict between XCLA and MBIA could not be ignored. This is because at this time the ABS CDO market had virtually shut down due to the fears of a pending crisis in the sub prime market and the consequences this would bring to ABS CDOs. In fact, the ratings agencies had already begun downgrading the types of securities that make up ABS CDO collateral and that would ultimately result in many ABS CDOs in the market triggering Events of Default. At Ambac, for example, we had discontinued taking on ABS CDO

---

other confirmations. However, I have been instructed by counsel for XLCA to assume for purposes of this declaration that these two confirmations are similar to the other five and that they are to be interpreted identically. Therefore, for purposes of this declaration I have assumed that Section 6 of all 7 transactions work the same.

risk approximately 2 months earlier because of concerns about an overheated mortgage market and fears of transaction downgrades. I also note that two of the six CDOs that were the subject of the MBIA transactions in fact experienced Events of Default less than six months after MBIA and ML executed the CDSs.

18. It would have been reasonable for ML to anticipate that an Event of Default for the CDOs at issue here could result in ML receiving different voting instructions from MBIA and XLCA. For example, in reviewing the indenture for the Silver Marlin CDO, which hit an Event of Default on February 20, 2008, the A-2 Class is shut off from receiving any interest or principal payments upon an Event of Default and declaration of an acceleration by the Controlling Class. In this circumstance the Class A-2 Noteholders will not receive cash flow until the Class A-1 Notes are redeemed in full whether the receipt of cash flow is from amortization of the underlying collateral, or as a result of the liquidation of collateral. Consequently, the interests of the two classes could be expected to differ significantly, creating inherent conflict between the two classes and reasonably foreseeable inconsistent voting instructions. In my opinion it is this type of conflict that XLCA appears to have been seeking to avoid in the CDS confirmations it entered into with ML.

I declare under penalty of perjury that the foregoing is true and correct. Executed May 15, 2008.

_____
Scott Gordon

# SCOTT D. GORDON

20 Ferndale Road  
Short Hills, N.J. 07078

917 374 0961 (m)  
sgordon@hotmail.com

## EXPERIENCE

**AMBAC ASSURANCE CORPORATION** - New York, NY                           1999-2008  
*Managing Director and Global Head*  
*Structured Credit Products*

- Generated in excess of $1 billion of present value revenues by managing a $70 billion portfolio containing almost 200 outstanding transactions. Consistently met/exceeded revenue targets.
- Managed a 10 person team in NY and London responsible for the origination, underwriting, pricing, structuring, negotiating and closing of all CDO related products, regulatory capital driven solutions, structured repackagings, corporate bespoke and synthetic securitizations, and 12B-1 fee, principal protected and other fund managed products. Transaction execution both in the cash and non cash (synthetic) markets.
- Created and managed Ambac's Secondary Desk to repackage and/or wrap undervalued CDOs and ABS in the secondary market (2002-2005). Led to present value revenue generation in excess of $100 million.
- Led Ambac's entry in and development of domestic whole business securitizations (1999-2003).
- Led the 2002 ABS "Deal of the Year" (Arby's franchise receivables).
- Directed teams that work extensively with internal and external analytic, legal and surveillance professionals.

*Senior Credit Committee*                                                  2004-2008  
*Permanent Voting Member*  
Committee responsible for all International, Corporate, Whole Business, Future Flow, Structured Insurance, Structured Leasing, Utility, Aircraft, and certain Project Finance and Infrastructure transactions.

**FINANCIAL SECURITY ASSURANCE, INC** – New York, NY                      1986-1999  
*Managing Director*  
*Structured Finance Group*

- Led and managed FSA's CDO group, which through 1999 was the leading insurer of CDOs.
- Managed all ABCP conduit transactions and provided second loss policies to various bank sponsored ABCP programs. Developed extensive expertise structuring receivable facilities. Vaulted FSA to second in market share by 1999.
- Closed Euro based ABS securitization and receivable facility financings through 1997, including the underwriting, structuring and closing of:
  - A structured investment vehicle for a bank affiliate
  - The first European MTN trade receivable transaction (Cremonini, an Italian food company)
  - The first two French CDOs (Serial and GIAC)
  - An ABCP funded trade receivable program for a French auto parts manufacturer (Valfond)
  - A recourse reduction program for a Swedish insurance company (FPG)
  - The first Asian (Hong Kong) ABS: a credit card transaction for Manhattan Credit Card
- Underwrote consumer asset backed transactions, primarily auto receivable related. Conducted numerous servicer diligences (1986-1990).

MORGAN GUARANTY TRUST COMPANY – New York, NY                                   1983-1986
*Assistant Vice President*
*Financial Institutions*
Primary credit analyst for U.S. banks, finance, leasing companies, GSEs and UK, Dutch and Spanish banks.
- Generated fees by preparing rating agency presentations, fairness opinions and strategic planning:
  - Represented the first Spanish bank to ever obtain a short term rating from Moody's and S&P
  - Advised a major Southeast bank as to a long term strategic capital plan that ultimately led to its acquisition
  - Identified for the M&A department target banks and assessed probable market values of potential acquisition candidates

MOODY'S INVESTORS SERVICE - New York, NY                                        1982-1983
*Research Associate*
*Financial Institutions*
- Provided research support to analysts rating U.S. commercial banks.
- Tracked financial performance and wrote credit summaries.

## EDUCATION

NEW YORK UNIVERSITY Leonard N. Stern School of Business- New York, NY
M.B.A. in Finance, 1983, Deans List

THE COLLEGE OF WOOSTER - Wooster, Ohio
B.A. in Economics, 1979
Independent Study project: Credit Rationing in the Commercial Banking System
Semester Abroad: Bogotá, Colombia

MORGAN GUARANTY TRUST COMPANY
Graduated from the bank's credit training program; Placed in top 20%

## OTHER

MEMBER: American Securitization Forum's CDO Program Advisory Committee. Provide input on ideas and speakers for ASF sponsored conferences containing Structured Credit content.

CONFERENCE SPEAKER: I am an active and frequent speaker at industry conferences, having acted both as panelist and moderator at well over 30 conferences throughout the U.S. and Europe.

INTERNAL PRESENTATIONS: 12 times a year I presented to Ambac's professional staff an analysis of current economic and political trends, and how they impact current equity, fixed income, interest rate and/or FX markets.

LICENSES: Series 7 and 63