UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MERRILL LYNCH INTERNATIONAL,

    Plaintiff,

-against-

XL CAPITAL ASSRUANCE INC. AND
XLCA ADMIN LLC, AS TRUSTEE FOR
PORTFOLIO CDS TRUST 138, PORTFOLOIO
CDS TRUST 153, PROTFOLIO CDS TRUST
164, PORTFOLIO CDS TRUST 165,
PORTFOLIO CDS TRUST 170, PORTFOLIO
CDS TRUST 172 AND PORTFOLIO CDS
TRUST 186

    Defendants.

: 08 CV 2893

---

XL CAPITAL ASSRUANCE INC. AND
XLCA ADMIN LLC, AS TRUSTEE FOR
PORTFOLIO CDS TRUST 138, PORTFOLOIO
CDS TRUST 153, PROTFOLIO CDS TRUST
164, PORTFOLIO CDS TRUST 165,
PORTFOLIO CDS TRUST 170, PORTFOLIO
CDS TRUST 172 AND PORTFOLIO CDS
TRUST 186

    Counterclaimants,

-against-

MERRILL LYNCH INTERNATIONAL AND
MERRILL LYNCH & CO.

    Counterclaim Defendants.

# AFFIDAVIT OF
# BASIL A. IMBURGIA, CPA, IN CONNECTION WITH XLCA'S
# OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
# JUDGMENT

May 14, 2008

**Basil A. Imburgia**, under penalty of perjury, declares as follows:

1.      I am a Senior Managing Director in the Forensic and Litigation Services practice of FTI Consulting, Inc. ("FTI") which maintains offices at 3 Times Square, New York, New York 10036. FTI has been retained by Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Counsel") on behalf of XL Capital Assurance Inc. ("XLCA"). FTI is a multi-disciplined consulting firm with leading practices in financial and litigation consulting services. FTI performs financial accounting investigations, and provides advice and expert testimony with respect to accounting matters, securities matters and damages issues.

2.      I am licensed as a Certified Public Accountant and a Certified Fraud Examiner. My expertise includes providing auditing and forensic accounting analysis to attorneys in accounting investigations and litigated, arbitrated and mediated matters. I frequently act as a neutral arbiter in purchase price disputes involving interpretations of generally accepted accounting principles. Matters I have addressed have concerned structured finance disputes, banking litigation, brokerage litigation, complex damages analysis and fair presentation of audited financial statements.

3.      I have over 20 years of public accounting experience. Prior to FTI, I was a partner at KPMG LLP ("KPMG"). Prior to KPMG, I was a partner at PricewaterhouseCoopers where I worked on financial statement audits as well as dispute matters. I have been involved with audits of large banks and broker dealers and I have extensive experience reviewing and analyzing financial statements.

4.  I am a member of the American Institute of Certified Public Accountants ("AICPA") and the New York State Society of Certified Public Accountants ("NYSSCPA"). In 2000 and 2001, I was Chairman of the NYSSCPA Litigation Services Committee. I am presently a member of the AICPA Taskforce on Merger & Acquisition Disputes.

5.  I have taught numerous courses in auditing and forensic accounting concepts, most recently as an instructor of "Financial Statements in the Courtroom" on behalf of the National Judicial Conference and "Understanding Notes to Financial Statements" and "Conducting Due Diligence" on behalf of the Practicing Law Institute. The National Judicial Conference conducts training for Federal and State court judges and is an organization affiliated with the American Bar Association.

6.  My Curriculum Vitae, which is enclosed as **Exhibit A**, further describes my professional credentials, including my testimonial experience.

7.  FTI has been retained to provide an expert report in this captioned litigation expressing my professional opinions in regards to the accounting treatment and disclosures Merrill Lynch & Co. ("Merrill") made for certain credit default swaps Merrill Lynch International ("MLI"), a Merrill subsidiary, entered into with MBIA, Inc. ("MBIA") (the "MBIA CDS").[1]

8.  I understand that Counsel is still seeking fact discovery. I expect to complete my expert report upon the completion of fact discovery and I will be available to testify at deposition and trial. This affidavit is submitted at the request of XLCA in connection with its opposition to plaintiffs' motion for summary judgment. Herein, I present my preliminary findings based on my review of available information, including Merrill's public disclosures made regarding the MBIA CDS and the MBIA CDS

---

[1] A credit default swap ("CDS" or "swap") is a common contractual arrangement used in the securities and banking industries to provide the buyer under the arrangement, in these cases MLI, with protection upon the occurrence of specified credit events affecting an obligation referenced in the contract. The six credit default swaps at issue are the West Trade II Swap, the Silver Marlin I Swap, the Tazlina II Swap, the West Trade III Swap, the Robeco I Swap, and the Biltmore Swap.

agreements. Additional discovery may further inform my opinions. Consequently, I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

9. A collateralized debt obligation ("CDO") is a type of asset-backed security and structured credit product. CDOs are typically constructed from a pool of bonds, loans or other assets ("collateral"). Noteholders may hedge their exposure to risk in interruptions in principal and interest payments or defaults (i.e., "credit risk") in the underlying CDO collateral by entering into various types of risk mitigation transactions with financial guarantors. One such risk mitigation transaction is a credit default swap or CDS. In a CDS in which a CDO is the underlying referenced note, the financial guarantor assumes the credit risk on a specified CDO note in exchange for a premium paid by the party seeking credit protection.

10. In the third quarter of 2007, MLI entered into the MBIA CDS in which MLI provided MBIA with the contractual right to exercise the voting and consent rights (the "Control Rights") pertaining to the CDO notes that were the subject of the swaps (the "A-1 Notes").

11. I, together with FTI staff working under my direction and supervision, was asked by Counsel to evaluate financial statements and other disclosures made by Merrill about the MBIA CDS to determine if such disclosures revealed whether or not Merrill's agreement to grant the Control Rights to MBIA was granted outright, that is, without condition or whether it was subject to certain conditions or events. I have considered certain documents produced in this litigation, publicly available information, and relevant generally accepted accounting principles ("GAAP"), generally accepted auditing standards ("GAAS") and Securities and Exchange Commission ("SEC") literature. A listing of the documents that I considered is attached as Exhibit B.

12. Additional information from Merrill and their auditors, Deloitte & Touche LLP ("Deloitte") would further inform my opinions, including Merrill's accounting books

and records reflecting the accounting treatment of the MBIA CDS transactions and related support, communications between Merrill and Deloitte regarding accounting for the XLCA and MBIA CDS transactions and Deloitte's working papers relating to its review of Merrill's Management Discussion and Analysis ("MD&A") sections included in its third quarter 2007 Form 10-Q and 2007 Form 10-K and audit of the XLCA and MBIA CDS transactions.

A.      **Summary of Preliminary Opinions**

13.     If Merrill did not transfer the Control Rights outright to MBIA (that is, if Merrill's transfer of these rights to MBIA were conditional or subject to certain conditions or events) in connection with the MBIA CDS transactions, then, under GAAP, Merrill's valuation of the MBIA CDS transaction would have had to reflect this conditional transfer and disclose the contingent nature of the transfer in its financial statements for the third quarter of 2007, the period in which Merrill entered the MBIA CDS.

14.     Merrill's own disclosures (and lack of disclosures) in its Form 10-Q for the period ending September 28, 2007 filed with the SEC (the "2007 3Q") support the view that MLI granted MBIA the Control Rights to MBIA outright without any conditions.

15.     Merrill disclosed in its MD&A of the 2007 3Q the aggregate amount of credit default swaps it entered into during the quarter, presumably including the MBIA CDS, to hedge the credit risk related to its CDO positions, and does not indicate that the effectiveness of these CDS hedges are contingent based on the conditional transfer of the Control Rights.

16.     If the risk reduction value of the credit swaps had been contingent based on the conditional transfer of the Control Rights to MBIA, then a contingency disclosure would have been required under Statement of Financial Accounting Standards No. 5,

"*Accounting for Contingencies*" ("SFAS 5"). Merrill's financial statements do not disclose contingencies related to the CDOs.

17. Because of the potential impact on fair value, Statement of Financial Accounting Standards No. 157, "*Fair Value Measurement*" ("SFAS 157") requires that any such contingency be considered as part of the valuation of the contracts. Merrill's disclosure provides no indication that a contingency existed that would have had an effect on these valuations.

18. Generally accepted accounting principles require that Merrill present the MBIA CDS in its balance sheet at fair value. In accordance with SFAS 157, the valuation should reflect the amount a market participant would be willing to pay for the MBIA CDS. Merrill's accounting books and records, therefore, could provide further evidence regarding the condition of the MBIA CDS for presentation in the 2007 3Q, demonstrating that the Control Rights were granted outright.

19. Deloitte would have reviewed the 2007 3Q MD&A and financial statements in conjunction with Merrill's filing of these statements with the SEC.

20. Because of the foregoing, the Deloitte review work papers, communications with Merrill and Merrill's books and records relating to the MBIA CDS transactions would further inform my opinions.

B. **Merrill's Disclosures**

21. In the third quarter of 2007, MLI entered into the MBIA CDS with the following terms:

| Effective Date | Reference CDO | Reference Obligation | Relevant Proportion | MBIA CDS | Class | S&P Rating |
|---|---|---|---|---|---|---|
| 8/29/2007 | West Trade Funding CDO II, Ltd. | $900,000,000 | | | Class A-1 | AAA |
| 8/29/2007 | Tazlina Funding CDO II, Ltd. | $900,000,000 | | | Class A-1 | AAA |
| 8/29/2007 | Silver Marlin CDO I, Ltd. | $625,000,000 | | REDACTED | Class A-1 | AAA |
| 8/29/2007 | Robeco High Grade CDO I, Ltd. | $550,000,000 | | | Class A-1 | AAA |
| 8/29/2007 | West Trade Funding CDO III, Ltd. | $1,500,000,000 | | | Class A-1 | AAA |
| 8/29/2007 | Biltmore CDO 2007-1, Ltd. | $500,000,000 | | | Class A-1 | AAA |
| | | $4,975,000,000 | | $4,275,000,000 | | |

22. Merrill disclosed in its Form 10-Q for the period ending September 28, 2007 that it entered into credit default swaps to hedge the credit risk related to its "super senior" CDO positions.[2] While not specifically identified by name, Merrill noted that its counterparties in these hedge transactions were monoline financial guarantors (such as MBIA). Through entry of these credit default swaps that were "matched to specific CDO securities" Merrill disclosed a reduction in its net exposure to high-grade CDOs of approximately $11.9 billion. It is reasonable to infer that this amount includes the $4.3 billion of MBIA CDS. See Exhibit C.

23. In discussing its credit risk management strategy, Merrill's disclosure implies a dollar-for-dollar reduction in credit exposure for each dollar of credit default swap notional value. The disclosure does not indicate that the risk reduction value of the credit swaps was contingent based on a conditional transfer of the Control Rights to its counterparties. Accordingly, there is no indication that Merrill had any intention of not honoring its transfer of the Control Rights to MBIA. If Merrill had such intentions, it should have noted that the risk mitigation value of the credit default swaps would be lower due to Merrill's failure to transfer the Control Rights outright.

24. In contrast to its third quarter 2007 Form 10-Q disclosures, in its Form 10-K for the period ending December 28, 2007, Merrill's MD&A discloses a summary of CDO net exposures (presumably including the XLCA CDS) and notes "[t]hese hedges are

---

[2] Merrill Lynch & Co., Inc. September 28, 2007 Form 10-Q, page 76.

affected by a variety of factors that impact the degree of their effectiveness, including ...control rights."[3] Merrill makes no similar qualifying statement in its 2007 3Q.

### C. Accounting Implications of Failing to Disclose Significant Contingencies

25. Merrill does not disclose any true credit risk reduction value of the credit default swaps relative to the CDOs in the MD&A section of the 2007 3Q. While numbers disclosed in MD&A are not audited, variations from GAAP should be justifiable and explained.[4] The fact that there was no disclosure of any contingent impact on the value of the MBIA CDS related to the Control Rights, strongly suggests under various GAAP literature including Statement of Financial Accounting Standards No. 5, *"Accounting for Contingencies"* and Statement of Financial Accounting Standards No. 157, *"Fair Value Measurement"* that Merrill transferred the Control Rights to MBIA unconditionally.

26. The accounting guidance in SFAS 5 reflects the importance of disclosing significant contingencies. SFAS 5 indicates "If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred."[5] Merrill's financial statements do not disclose contingencies related to the CDOs.

27. Under SFAS 157, a "Level 3" financial asset is an asset "whose values are based on prices or valuation techniques that require inputs that are both unobservable and

---

[3] Merrill Lynch & Co., Inc. December 28, 2007 Form 10-K, page 37.

[4] Merrill Lynch's management is responsible for drafting its own MD&A. Deloitte, as Merrill Lynch's audit firm, would be responsible for reviewing the MD&A and ensuring that it was not inconsistent with information in the audited financial statements and footnote disclosures. Although Deloitte had no obligation to audit the MD&A, they should have considered whether the content of the MD&A was materially inconsistent with the information, or the manner of its presentation, appearing in the financial statements.

[5] Paragraph 8 of SFAS 5 indicates that the potential loss relating to a contingency should be accrued if the loss is both probable and estimable.

significant to the overall fair value measurement. These inputs reflect management's own assumptions *about the assumptions a market participant would use in pricing the asset or liability.*"[6] [emphasis added] In its disclosure about SFAS No.157, Merrill noted its "Level 3 contractual agreements (assets) primarily include long-dated equity derivatives of $4.6 billion *and derivatives on U.S. sub-prime residential mortgage related and ABS CDO positions, primarily in the form of credit default swaps of $3.8 billion.*"[7] [emphasis added] Because of the potential impact on fair value, a market participant would consider a counterparty's contingent ability to cancel a credit default swap in determining the fair value of such a contract, yet Merrill's disclosure provides no indication that this contingency had any effect on the contract value.

### D.    Conclusion

28.    Based on its accounting treatments and public disclosures in filings with the Securities and Exchange Commission regarding the CDS with MBIA, MLI intended to honor its commitment to MBIA and the Control Rights were not transferred to MBIA subject to any contingencies. Merrill's disclosures in MD&A indicate it was effectively hedging its risks on its "super senior" CDO positions. Merrill did not disclose in its financial statements that the value of these swaps was contingent on the transfer of voting rights.

29.    Likewise, Merrill's financial statements do not disclose contingencies related to the MBIA CDS that would be required under GAAP if such contingencies existed, further evidencing my opinion that Merrill had granted MBIA the A-1 Voting Rights outright.

30.    My opinions are based upon information available to me as of the date of this Affidavit. It is possible that additional information may affect my opinions herein. Relevant documents such as (1) Merrill accounting books and records, (2) Deloitte's

---

[6] Merrill Lynch & Co., Inc. September 28, 2007 Form 10-Q, page 27.

[7] Merrill Lynch & Co., Inc. September 28, 2007 Form 10-Q, page 28.

review work papers, (3) communications between Deloitte and Merrill and relating to the MBIA CDS transactions would further inform my opinions. I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2008 in
New York, NY

*Basil Imburgia*

Basil Imburgia

## Index of Exhibits

A. Basil Imburgia - Curriculum Vitae

B. Documents Considered

C. Merrill Lynch & Co., Inc. September 28, 2007 Form 10-Q, page 76 [Page 76 from Merrill Lynch, Inc. Form 10-Q for the quarterly period ended September 28, 2007 including table providing a summary of changes in AAA-rated super senior CDO net exposures and other information included in Management's Discussion and Analysis.]