UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH INTERNATIONAL,<br><br>Plaintiff,<br><br>-against-<br><br>XL CAPITAL ASSURANCE INC., et al.,<br><br>Defendants. | 08 CV 2893 (JSR)<br><br><br><br>**DECLARATION OF<br>WILLIAM B. ADAMS** |
| XL CAPITAL ASSURANCE INC., et al.,<br><br>Counterclaimants,<br><br>-against-<br><br>MERRILL LYNCH INTERNATIONAL AND<br>MERRILL LYNCH & CO.,<br><br>Counterclaim Defendants. | |

WILLIAM B. ADAMS, under penalty of perjury, declares as follows:

1.      I am a member of the Bar of this Court and an associate in the firm Quinn Emanuel Urquhart Oliver & Hedges LLP, attorneys for Defendants and Counterclaimants XL Capital Assurance Inc. and XLCA Admin LLC, et al., (together, "XLCA").  I submit this declaration in support of XLCA's Memorandum in Opposition to (a) Plaintiff's Motion for Summary Judgment and (b) Counterclaim Defendants' Motion for Partial Summary Judgment, and to transmit true and correct copies of the following documents:

Exhibit:

1.    E-mail correspondence dated August 29, 2007 at 11:37 AM from Joseph Gambino regarding "MBIA Hedge."

2.    E-mail correspondence dated August 30, 2007 at 12:17 AM from Anthony H. Schouten regarding "Big Boy Rider."

3.    E-mail correspondence dated September 11, 2007 at 2:06 PM from Joseph Gambino regarding "FW: CDS protection from MBIA."

4.    Letter dated April 1, 2008 from MLI to XLCA regarding "Biltmore CDO 2007-1, LTD Notice of Event of Default."

5.    Letters dated April 4, 2008 from MBIA to MLI:

    a.    Letter dated April 4, 2008 regarding "Notice of Early Termination of Credit Default Swap Transaction relating to Biltmore CDO 2007-1."

    b.    Letter dated April 4, 2008 regarding "Notice of Early Termination of Credit Default Swap Transaction relating to Silver Marlin CDO 1."

6.    Excerpts from Quarterly Report on Form 10-Q of Merrill Lynch & Co., Inc., for the quarterly period ended March 28, 2008.

7.    Excerpts from "MBI - Q4 2007 MBIA Inc. Earnings Conference Call" (Final Transcript), dated January 31, 2008.

8.    Standard & Poor's "Ratings Direct" statements dated February 21, 2008 relating to: (1) Biltmore CDO 2007-1 Ltd; (2) Robeco High Grade CDO I Ltd; (3) Tazlina Funding CDO II Ltd; (4) West Trade Funding CDO III Ltd; (5) Silver Marlin CDO I Ltd; and (6) West Trade Funding CDO II Ltd.

9.    Confirmation for the agreement between MLI, Portfolio CDS Trust 129 and XL Capital Assurance Inc. relating to Class A-1 Notes issued by Ipswich Street CDO, Ltd. and Ipswich Street CDO, LLC.

10.    Excerpts from the Indenture among Biltmore CDO 2007-1, Ltd., Biltmore CDO 2007-1, LLC and LaSalle Bank National Association, dated as of July 26, 2007.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15, 2008.

WILLIAM B. ADAMS

| | |
|---|---|
| **From:** | Gambino, Joseph (GMI - NY SWAPS) |
| **Sent:** | Wednesday, August 29, 2007 11:37 AM |
| **To:** | Gambino, Joseph (GMI - NY SWAPS) |
| **Subject:** | MBIA hedge |

Harin and David,

I've reviewed the revised draft of the confirm drafted by MBIA and the sole open point is the issue of voting rights.

Thanks to David's gentle persuasion, they have included a material adverse effect standard, however it is limited in scope to Section 8.1-type changes. The net result of the revised agreement is that we are agreeing to exercise our vote as Class A-1 Noteholder, as Controlling Class and as Controlling Party as directed by MBIA with respect to all but the most administrative matters.  Any failure to do so constitutes an ATE of the transaction where ML is the sole affected party.

Since we've agreed under our hedge with XL to exercise our vote as Controlling Class as directed by XL, with the failure to do so constituting an ATE, agreeing to these terms with MBIA would put us at risk of being forced to sacrifice one hedge to keep the other if we received conflicting direction from MBIA and

To highlight the obvious, in almost any scenario other than where

CONFIDENTIAL                                                                 MLI0160681

| | |
|---|---|
| **From:** | Schouten, Anthony H. [aschouten@stroock.com] |
| **Sent:** | Thursday, August 30, 2007 12:17 AM |
| **To:** | Schouten, Anthony H.; Dickerson, Deanna; Gambino, Joseph (GMI - NY SWAPS); Rench, Matthew |
| **Cc:** | Van Dusen, Nick (OGC); David.Crowle@mbia.com; Andruschak, Keith M.; Stern, Jeffrey |
| **Subject:** | Big Boy Rider |

We looked at this one last time and believe the following formulation should address all concerns (sorry for the spam on this issue):

"Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation. The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9."

---

**From:** Schouten, Anthony H.
**Sent:** Wednesday, August 29, 2007 7:21 PM
**To:** Dickerson, Deanna; Gambino, Joseph (GMI - NY SWAPS); Rench, Matthew
**Cc:** Van Dusen, Nick (OGC); David.Crowle@mbia.com; Andruschak, Keith M.
**Subject:** RE: Swap Comments

Thanks.  I am on.

---

**From:** Dickerson, Deanna [mailto:deanna.dickerson@linklaters.com]
**Sent:** Wednesday, August 29, 2007 7:19 PM
**To:** Schouten, Anthony H.; Gambino, Joseph (GMI - NY SWAPS); Rench, Matthew
**Cc:** Van Dusen, Nick (OGC); David.Crowle@mbia.com; Andruschak, Keith M.
**Subject:** RE: Swap Comments

U.S. Domestic: 1 866 258 0959
International: 1 303 346 4165
Conference room number: *9002516* (as indicated please dial * before and after the conference room number).

---

**From:** Schouten, Anthony H. [mailto:aschouten@stroock.com]
**Sent:** August 29, 2007 7:18 PM
**To:** Gambino, Joseph (GMI - NY SWAPS); Dickerson, Deanna; Rench, Matthew
**Cc:** Van Dusen, Nick (OGC); David.Crowle@mbia.com; Andruschak, Keith M.
**Subject:** RE: Swap Comments

Spoke to soon.  I can't find the dial in info.

---

**From:** Gambino, Joseph (GMI - NY SWAPS) [mailto:Joseph_Gambino@ml.com]
**Sent:** Wednesday, August 29, 2007 7:16 PM
**To:** deanna.dickerson@linklaters.com; Schouten, Anthony H.; matthew.rench@linklaters.com
**Cc:** Van Dusen, Nick (OGC); Stern, Jeffrey; David.Crowle@mbia.com
**Subject:** Re: Swap Comments

I'll be on in 5. Haven't heard from Strook

-----Original Message-----
From: Dickerson, Deanna <deanna.dickerson@linklaters.com>

4/26/2008

     MLI0160845

To: Gambino, Joseph (GMI - NY SWAPS); aschouten@stroock.com <aschouten@stroock.com>; Rench, Matthew <matthew.rench@linklaters.com>
CC: Van Dusen, Nick (OGC); jstern@stroock.com <jstern@stroock.com>; Crowle, David <David.Crowle@mbia.com>
Sent: Wed Aug 29 19:15:17 2007
Subject: RE: Swap Comments

Is Stroock available at 7:15?

___

From: Gambino, Joseph (GMI - NY SWAPS) [mailto:Joseph_Gambino@ml.com]
Sent: August 29, 2007 7:01 PM
To: Dickerson, Deanna; aschouten@stroock.com; Rench, Matthew
Cc: Van Dusen, Nick (OGC); jstern@stroock.com
Subject: Re: Swap Comments

Works for me

-----Original Message-----
From: Dickerson, Deanna <deanna.dickerson@linklaters.com>
To: Schouten, Anthony H. <aschouten@stroock.com>; Rench, Matthew <matthew.rench@linklaters.com>
CC: Van Dusen, Nick (OGC); Gambino, Joseph (GMI - NY SWAPS); Stern, Jeffrey <jstern@stroock.com>
Sent: Wed Aug 29 18:54:29 2007
Subject: RE: Swap Comments

Looks like MBIA is available at 7:15.  Would that work for everyone instead of 8:45?

-----Original Message-----
From: Schouten, Anthony H. [mailto:aschouten@stroock.com]
Sent: August 29, 2007 4:26 PM
To: Rench, Matthew; Rodriguez, Otto; Dickerson, Deanna
Cc: Van Dusen, Nick (OGC); Gambino, Joseph (GMI - NY SWAPS); Stern, Jeffrey
Subject: Swap Comments

Please see the attached.

Below is the rider referred to  in the markup.

Rider 13:

Seller acknowledges that Buyer may have entered into (or in the future may enter into) one or more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation.  The parties agree that the existence of such agreements shall not be the basis of an Event of Default under Section 5 of the Agreement or otherwise affect the validity of the Transaction.  Notwithstanding the foregoing Seller's acknowledgement of such other agreements shall be without prejudice to Seller's right to declare an Additional Termination Event in respect of the Transaction due to Buyer's failure to exercise rights in respect of the Reference Obligation in accordance with Seller's instructions and the other terms of Section 9 of the Confirmation.


Anthony Schouten
Stroock & Stroock & Lavan LLP
180 Maiden Lane
NY, NY 10038

Phone: 212 806 5516
Fax: 212 806 2516


4/26/2008

CONFIDENTIAL                                                                 MLI0160846

===============================================================
===============================================================
IRS Circular 230 Disclosure: To ensure compliance with requirements
imposed by the IRS in Circular 230, we inform you that any tax advice
contained in this communication (including any attachment that does not
explicitly state otherwise) is not intended or written to be used, and
cannot be used, for the purpose of (i) avoiding penalties under the
Internal Revenue Code or (ii) promoting, marketing or recommending to
another party any transaction or matter addressed herein.
===============================================================
===============================================================

---

This communication, issued by Linklaters LLP or one of its affiliated firms or other entities carrying on business under or including the name 'Linklaters' (together "Linklaters"), is confidential and may be privileged or otherwise protected by work product immunity. If you have received it by mistake please let us know by reply and then delete it from your system; you should not copy it or disclose its contents to anyone. All messages sent to and from Linklaters may be monitored to ensure compliance with internal policies and to protect our business. Emails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, lost or destroyed, or contain viruses. Anyone who communicates with us by email is taken to accept these risks.
Linklaters LLP is a limited liability partnership registered in England and Wales with registered number OC326345. It is regulated by the Law Society of England and Wales. The term partner in relation to Linklaters LLP is used to refer to a member of Linklaters LLP or an employee or consultant of Linklaters LLP or any of its affiliated firms or entities with equivalent standing and qualifications. A list of the names of the members of Linklaters LLP together with a list of those non-members who are designated as partners and their professional qualifications is open to inspection at its registered office, One Silk Street, London EC2Y 8HQ or on www.linklaters.com, and such persons are either solicitors, registered foreign lawyers or European lawyers.
Linklaters LLP has taken over the greater part of the practice of Linklaters the general partnership. For information about this conversion, including any transfer of your information, and other important information on our regulatory position, please refer to www.linklaters.com/regulation.

---

This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Unless specifically indicated, this message is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Merrill Lynch. Subject to applicable law, Merrill Lynch may monitor, review and retain e-communications (EC) traveling through its networks/systems. The laws of the country of each sender/recipient may impact the handling of EC, and EC may be archived, supervised and produced in countries other than the country in which you are located. This message cannot be guaranteed to be secure or error-free. This message is subject to terms available at the following link: http://www.ml.com/e-communications_terms/. By messaging with Merrill Lynch you consent to the foregoing.

---

===============================================================
IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that any tax advice contained in this communication (including any attachment that does not explicitly state otherwise) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
===============================================================

===============================================================
IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that any tax advice contained in this communication (including any attachment that does not explicitly state otherwise) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter

4/26/2008

addressed herein.

====================================================================================

CONFIDENTIAL     MLI0160848

| | |
|---|---|
| **From:** | Gambino, Joseph (GMI - NY SWAPS) |
| **Sent:** | Tuesday, September 11, 2007 6:01 PM |
| **To:** | De Silva, Harin (GMI - NY SWAPS) |
| **Cc:** | Shah, Chintan (GMI- NY MORTGAGES); Mangalgiri, Vickram (GMI) |
| **Subject:** | FW: CDS protection from MBIA |

With whom should I confirm that these are being treated as trading book hedges and that we have reduced our exposure dollar-for-dollar?

-----Original Message-----

| | |
|---|---|
| **From:** | Roney, Cynthia (Corp Credit - NY) |
| **Sent:** | Tuesday, September 11, 2007 1:58 PM |
| **To:** | Gambino, Joseph (GMI - NY SWAPS); Hider, Timothy E. (GMI - NY SPS) |
| **Cc:** | Moffitt, David (GMI - NY SPS) |
| **Subject:** | RE: CDS protection from MBIA |

Thank you very much for your prompt response. What is the accounting treatment? Have we reduced our exposure? Who would know this?

-----Original Message-----

| | |
|---|---|
| **From:** | Gambino, Joseph (GMI - NY SWAPS) |
| **Sent:** | Tuesday, September 11, 2007 1:51 PM |
| **To:** | Roney, Cynthia (Corp Credit - NY); Hider, Timothy E. (GMI - NY SPS) |
| **Cc:** | Moffitt, David (GMI - NY SPS) |
| **Subject:** | RE: CDS protection from MBIA |

They were all executed.

-----Original Message-----

| | |
|---|---|
| **From:** | Roney, Cynthia (Corp Credit - NY) |
| **Sent:** | Tuesday, September 11, 2007 1:50 PM |
| **To:** | Gambino, Joseph (GMI - NY SWAPS); Hider, Timothy E. (GMI - NY SPS) |
| **Cc:** | Moffitt, David (GMI - NY SPS) |
| **Subject:** | RE: CDS protection from MBIA |

Can you confirm that this was executed?

-----Original Message-----

| | |
|---|---|
| **From:** | Gambino, Joseph (GMI - NY SWAPS) |
| **Sent:** | Tuesday, August 28, 2007 11:56 AM |
| **To:** | Hider, Timothy E. (GMI - NY SPS); Roney, Cynthia (Corp Credit - NY) |
| **Cc:** | Moffitt, David (GMI - NY SPS) |
| **Subject:** | RE: CDS protection from MBIA |

All of the positions we are hedging are cash positions. Thanks Tim.

-----Original Message-----

| | |
|---|---|
| **From:** | Hider, Timothy E. (GMI - NY SPS) |
| **Sent:** | Tuesday, August 28, 2007 11:42 AM |
| **To:** | Roney, Cynthia (Corp Credit - NY) |
| **Cc:** | Moffitt, David (GMI - NY SPS); Gambino, Joseph (GMI - NY SWAPS) |
| **Subject:** | RE: CDS protection from MBIA |

Cynthia - please see the details below. ML Buys/MBIA (Lacrosse Financial Products, LLC) Sells on the following names. The premium will be **REDACTED**

Kindly let me know if you have any questions.

Joe - please let Cynthia know which part of our exposure we are reducing. Is it the synthetic side or cash funded side? Thanks!

1

CONFIDENTIAL

| Deal | Deal Size | Attach | Detach | MBIA Tranche Size | | Attach | Detach | Actual Capital Struct Size | Class | C |
|------|-----------|--------|--------|-------------------|--|--------|--------|----------------------------|-------|---|
| Bernoulli II | 1,500,000,000 | 50% | 100% | | | | 100% | 750,000,000 | A1A | 0: |
| Biltmore | 1,000,000,000 | 50% | 100% | | | | 100% | 500,000,000 | A1 | 0! |
| Robeco | 100,000,000 | 50% | 100% | | | | 100% | 550,000,000 | A1 | 7: |
| Silver Marlin | 1,250,000,000 | 50% | 100% | REDACTED | | | 100% | 625,000,000 | A1 | 8: |
| Tazlina II | 1,500,000,000 | 50% | 100% | | | | 100% | 900,000,000 | A1 | 8: |
| West Trade II | 1,500,000,000 | 50% | 100% | | | | 100% | 900,000,000 | A1 | 9: |
| West Trade III | 2,500,000,000 | 50% | 100% | | | | 100% | 1,500,000,000 | A1 | 9: |
| Totals | 9,350,000,000 | | | 5,175,000,000 | | | | 5,725,000,000 | | |

| From: | Roney, Cynthia (Corp Credit - NY) |
|-------|-----------------------------------|
| Sent: | Tuesday, August 28, 2007 10:36 AM |
| To: | Hider, Timothy E. (GMI - NY SPS) |
| Subject: | CDS protection from MBIA |

Dear Tim: I understand that we purchased CDS from MBIA on seven different super senior positions. Can you please give me a breakdown?

Thanks, Cynthia

Cynthia A. Roney, CFA
Credit Risk Management
Merrill Lynch & Co.
Ph: 212 449-7834
Cell: 917 328-6423

CONFIDENTIAL    MLI0103941

April 1, 2008

XL Capital Assurance Inc.
XLCA Admin LLC
1221 Avenue of the Americas
New York, New York  10020

RE:    Biltmore CDO 2007-1, LTD Notice of Event of
Default

Dear Sirs:

        Reference is made to (i) certain 1992 Multicurrency-Cross Border
ISDA Master Agreement (the "Master Agreement") and the Schedule thereto (the
"Schedule"), each dated as of August 10, 2007, and the confirmation thereunder
(the "Confirmation" and, together with the Master Agreement and the Schedule,
the "Agreement") dated August 10, 2007 each between Portfolio CDS Trust 186,
a grantor trust guaranteed by XL Capital Assurance Inc. (the "Seller") and Merrill
Lynch International ("MLI") (the "Buyer") and (ii) that certain indenture among
Biltmore CDO 2007-1, Ltd., Biltmore CDO 2007-1 LLC and LaSalle Bank,
National Association, dated as of July 26, 2007 (the "Indenture").  Capitalized
terms used but not defined herein shall have the meanings assigned to such terms
in the Indenture or, if not defined therein, the Agreement.

        You are in receipt of the Notice of Default, dated February 7,
2008, declaring an Indenture Event of Default pursuant to Section 5.1(i) of the
Indenture.  As John McGreevy discussed with you on March 28, 2008, we believe
it is consistent with both Buyer and Seller's economic interests to immediately
deliver a notice of acceleration (the "Notice of Acceleration") pursuant to Section
5.2(a) of the Indenture.  In order for a notice of acceleration to be effective prior
to the next Distribution Date, we would need to instruct the Trustee by April 4,
2008.  Please let us know if we can issue a notice of acceleration before that date.

XL Capital Assurance Inc.
XLCA Admin LLC
April 1, 2008
Page 2


In the absence of such instructions, we will not be able to instruct the Trustee and will be forced to forgo the opportunity to accelerate.  We will accept your instructions without prejudice to any positions by the parties in the ongoing litigation (Merrill Lynch International v. XL Capital Assurance Inc., 08 CV 2893 (JSR)).


Sincerely,
Merrill Lynch International



Merrill Lynch International
Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements
Phone: +44 20 7867 3769
Facsimile: +44 20 7867 2004

Merrill Lynch & Co., Inc.
Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attn: Swaps Legal
Phone: +1 212 449-1936
Facsimile: +1 212 449-6993

VIA COURIER, FACSIMILE AND REGISTERED MAIL

April 4, 2008

**Re: Notice of Early Termination of Credit Default Swap Transaction relating to Biltmore CDO 2007-1**

We refer to that certain 1992 Multicurrency–Cross Border ISDA Master Agreement (the "**Master Agreement**") and the Schedule thereto (the "**Schedule**"), each dated as of August 29, 2007, and the confirmation thereunder (the "**Confirmation**" and, together with the Master Agreement and the Schedule, the "**Agreement**") dated August 29, 2007, each between LaCrosse Financial Products, LLC (the "**Seller**") and Merrill Lynch International (the "**Buyer**"). All capitalized terms not otherwise defined in this notice shall have the meanings assigned to them in the Agreement.

We hereby give notice that Buyer's failure to deliver the notices required to be delivered pursuant to our Instruction to Exercise Voting Rights Pursuant to the Agreement dated March 25, 2008, previously sent to you more than six Business Days ago by facsimile and registered mail, as required under Clause 9(a) of the Confirmation, constitutes the exercise of rights that Buyer has under the Reference Obligation in a manner not permitted by Clause 9(a) of the Confirmation. Buyer is therefore in breach of Clause 9(a). An Additional Termination Event has therefore occurred under Clause 9(d) of the Confirmation, and the Additional Termination Event is still continuing.

Pursuant to Clause 9(d), Buyer is the sole Affected Party with respect to the Additional Termination Event and the Transaction may be terminated by Seller in accordance with the

A09256163

CONFIDENTIAL                                                                                    MLI0011531

Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement.

Pursuant to Section 6(b) (*Right to Terminate Following Termination Event*) of the Master Agreement, Seller hereby designates Tuesday, April 15, 2008, being a date not more than 20 days from the date of this letter, and a date that is after the expiration of a 5 Business Day period following the date this notice becomes effective pursuant to Section 12 of the Agreement, as the Early Termination Date in respect of all outstanding Transactions.

In accordance with Section 12(a) (*Effectiveness*) of the Master Agreement, this notice is being sent by courier during normal business hours and will be deemed effective on Monday, April 7, 2008.

This notice shall be governed by and construed in accordance with New York law.

Seller reserves all rights and remedies provided to it in the Agreement or otherwise.

Sincerely,

LaCrosse Financial Products, LLC
By: MBIA Insurance Corporation as Attorney-In-Fact

By: _____
Name:
Title   Michael Murtagh
        Director
        MBIA Insurance Corporation

A09256163



Merrill Lynch International
Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Attn: Manager, Fixed Income Settlements
Phone: +44 20 7867 3769
Facsimile: +44 20 7867 2004

Merrill Lynch & Co., Inc.
Global Markets and Investment Banking Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attn: Swaps Legal
Phone: +1 212 449-1936
Facsimile: +1 212 449-6993

VIA COURIER, FACSIMILE AND REGISTERED MAIL

April 4, 2008

**Re: Notice of Early Termination of Credit Default Swap Transaction relating to Silver Marlin CDO 1**

We refer to that certain 1992 Multicurrency–Cross Border ISDA Master Agreement (the "**Master Agreement**") and the Schedule thereto (the "**Schedule**"), each dated as of August 29, 2007, and the confirmation thereunder (the "**Confirmation**" and, together with the Master Agreement and the Schedule, the "**Agreement**") dated August 29, 2007, each between LaCrosse Financial Products, LLC (the "**Seller**") and Merrill Lynch International (the "**Buyer**"). All capitalized terms not otherwise defined in this notice shall have the meanings assigned to them in the Agreement.

We hereby give notice that Buyer's failure to deliver the notices required to be delivered pursuant to our Instruction to Exercise Voting Rights Pursuant to the Agreement dated March 25, 2008, previously sent to you more than six Business Days ago by facsimile and registered mail, as required under Clause 9(a) of the Confirmation, constitutes the exercise of rights that Buyer has under the Reference Obligation in a manner not permitted by Clause 9(a) of the Confirmation. Buyer is therefore in breach of Clause 9(a). An Additional Termination Event has therefore occurred under Clause 9(d) of the Confirmation, and the Additional Termination Event is still continuing.

Pursuant to Clause 9(d), Buyer is the sole Affected Party with respect to the Additional Termination Event and the Transaction may be terminated by Seller in accordance with the

A09256134

MLI0011533

Agreement upon 5 Business Days' prior written notice from Seller to Buyer designating an Early Termination Date based on such Additional Termination Event, if such action by Buyer or failure to act is not remedied on or before the expiration of a 5 Business Day period following the date such written notice becomes effective pursuant to Section 12 of the Agreement.

Pursuant to Section 6(b) (*Right to Terminate Following Termination Event*) of the Master Agreement, Seller hereby designates Tuesday, April 15, 2008, being a date not more than 20 days from the date of this letter, and a date that is after the expiration of a 5 Business Day period following the date this notice becomes effective pursuant to Section 12 of the Agreement, as the Early Termination Date in respect of all outstanding Transactions.

In accordance with Section 12(a) (*Effectiveness*) of the Master Agreement, this notice is being sent by courier during normal business hours and will be deemed effective on Monday, April 7, 2008.

This notice shall be governed by and construed in accordance with New York law.

Seller reserves all rights and remedies provided to it in the Agreement or otherwise.


Sincerely,

LaCrosse Financial Products, LLC
By:  MBIA Insurance Corporation as Attorney-In-Fact

By:
Name:
Title

Michael Murtagh
Director
MBIA Insurance Corporation

A09256134

                                    MLI0011534

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

#### FORM 10-Q

(Mark One)

X    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 28, 2008**

**OR**

___    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 1-7182**

#### MERRILL LYNCH & CO., INC.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-2740599** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **4 World Financial Center, New York, New York** | **10080** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(212) 449-1000**

Registrant's telephone number, including area code:

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

X    YES    ___    NO

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated Filer  X Accelerated Filer  ___  Non-Accelerated Filer  ___  Smaller Reporting Company  ___

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
___    YES    X    NO

#### APPLICABLE ONLY TO CORPORATE ISSUERS:

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

982,799,330 shares of Common Stock and 2,532,482 Exchangeable Shares as of the close of business on April 28, 2008. The Exchangeable Shares, which were issued by Merrill Lynch & Co., Canada Ltd. in connection with the merger with Midland Walwyn Inc., are exchangeable at any time into Common Stock on a one-for-one basis and entitle holders to dividend, voting, and other rights equivalent to Common Stock.

**Trading Risk Management**

Trading activities subject Merrill Lynch to market and credit risks. These risks are managed in accordance with established risk management policies and procedures. Specifically, the independent risk and control groups work to ensure that these risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. Refer to Note 3 of the 2007 Annual Report for further information on trading risk management.

Concentration of Risk to the Mortgage Markets

At March 28, 2008, Merrill Lynch had sizeable exposure to the mortgage market through securities, derivatives, loans and loan commitments. This included:
- Net exposure of $44.1 billion in residential mortgage-related positions, excluding Merrill Lynch's U.S. banks investment securities portfolio;
- Net exposure of $6.7 billion in super senior U.S. ABS CDOs and related secondary trading exposures;
- Net exposure of $19.8 billion in Merrill Lynch's U.S. banks investment securities portfolio; and
- Net exposure of $21.3 billion in commercial real estate related positions.

Valuation of these exposures will continue to be impacted by external market factors including default rates, rating agency actions, and the prices at which observable market transactions occur. Merrill Lynch's ability to mitigate its risk by selling or hedging its exposures is also limited by the market environment. Merrill Lynch's future results may continue to be materially impacted by the valuation adjustments applied to these positions.

Concentration of Risk to Financial Guarantors

To economically hedge certain U.S. super senior ABS CDOs and U.S. sub-prime mortgage positions, Merrill Lynch entered into credit derivatives with various counterparties, including financial guarantors. At March 28, 2008, Merrill Lynch's short exposure from credit default swaps with financial guarantors to economically hedge certain U.S. super senior ABS CDOs was $10.9 billion, which represented credit default swaps with a notional amount of $18.8 billion that have been adjusted for mark-to-market gains of $7.8 billion. The fair value of these credit default swaps at March 28, 2008 was $3.0 billion, after taking into account $4.8 billion of credit valuation adjustments related to certain financial guarantors. Merrill Lynch also has credit derivatives with financial guarantors on other referenced assets. The fair value of these credit derivatives at March 28, 2008 was $5.1 billion, after taking into account a $1.4 billion credit valuation adjustment.

In April 2008, CDS on senior tranches of two super senior ABS CDOs were terminated because, following defaults on the underlying ABS CDOs, the financial guarantor on the CDS for the senior tranches provided different voting instructions to Merrill Lynch than the financial guarantor on the CDS for the junior tranches. Merrill Lynch elected not to follow the instructions of the CDS counterparty on the senior tranches (which were of lesser value to Merrill Lynch) and, as a result, the two CDS contracts on the senior tranches were terminated. The terminated CDS contracts had a fair value of $45 million and an aggregate notional amount of $1.1 billion, and the write-offs of the fair value and notional amounts of the CDS contracts were taken in the first quarter of 2008. There are four other CDS contracts in which two different guarantors guarantee the senior and junior tranches of super senior ABS CDOs and in which it is, therefore, possible that at some future date Merrill Lynch may receive consistent or inconsistent instructions from the guarantors of the different tranches. The fair value and notional amount of these four CDSs on senior tranches of super senior ABS CDOs was $149 million and $3.1 billion, respectively, as of March 28, 2008.

FINAL TRANSCRIPT

| Jan. 31. 2008 / 11:00AM, MBI - Q4 2007 MBIA Inc. Earnings Conference Call |

## CORPORATE PARTICIPANTS

**Greg Diamond**
*MBIA, Inc. - Director IR*

**Gary Dunton**
*MBIA, Inc. - Chairman, President & CEO*

**Chuck Chaplin**
*MBIA, Inc. - Vice Chairman & CFO*

**Cliff Corso**
*MBIA, Inc. - CIO*

**Mitch Sonkin**
*MBIA, Inc. - Head of Insured Portfolio Investment*

## PRESENTATION

### Operator

Good morning, and welcome to MBIA's conference call and webcast to discuss its fourth quarter and year 2007 earnings and other topics. During today's entire event all callers will be placed in a listen-only mode. After the Company's prepared remarks there will be a question-and-answer session. (OPERATOR INSTRUCTIONS). It is now my pleasure to turn the floor over to your host, Mr. Greg Diamond, director of Investor Relations for MBIA. Sir, you may begin.

---

**Greg Diamond** - *MBIA, Inc. - Director IR*

Thank you very much, Melissa. Welcome to MBIA's webcast and conference call on our 2007 earnings and other topics. The presentation for this webcast titled 2007 fourth quarter earnings conference call presentation is available on MBIA's website as well as via the webcast website. We will be turning the pages for those of you participating via the webcast but we'll refer to page numbers so that everyone will be better able to follow along.

The information for the recorded replay of this event is available on MBIA's website in the fourth quarter earnings release that we distributed earlier today. As Melissa mentioned, the questions for today's event should be submitted in writing, and we will be accepting your questions during this broadcast. At this time we have already received well over two hundred questions in advance. I will provide more commentary about the question-and-answer segment when we get to that session.

However, I will make one final comment about it upfront. Our intention is to address as many questions as possible. We've compiled all of the questions and those questions where our prepared remarks and earnings release disclosures are responsive will not be used in the Q&A session. We've also consolidated alike questions into single questions; in other words we won't be responding to each of the 200 plus questions one at a time, but many or all of them will be addressed today. As such this will be a rather extended event.

Please sit back and enjoy. The MBIA team is assembled for today's event, and each are named on the cover of the presentation. They are Gary Dunton, Chairman, CEO and President; Chuck Chaplin, Vice Chairman and CFO; Cliff Corso, Chief Investment Officer; Mitch Sonkin, head of our Insured Portfolio Management. This same team will be responding to the questions later in the broadcast. I am not going to read our Safe Harbor disclosure statement, but I will ask you to do so, please. We will leave it up during Gary's opening remarks. With that commentary, please begin.

---


© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jan. 31. 2008 / 11:00AM, MBI - Q4 2007 MBIA Inc. Earnings Conference Call |
| --- |

**Greg Diamond** - *MBIA, Inc. - Director IR*

Minal Mehta of Pallatine Partners asks, based on MBIA's current CDS spread, the credit markets are pricing in a liquidity event or regulator intervention that is going to cause an imminent default. Can you please very clearly and concisely state your position on this? Under what scenario would MBIA file for bankruptcy?

---

**Chuck Chaplin** - *MBIA, Inc. - Vice Chairman & CFO*

There is no scenario that we can identify that would result in MBIA becoming insolvent, having a liquidity event or being intervened with by the regulators and experiencing a default of any kind.

---

**Greg Diamond** - *MBIA, Inc. - Director IR*

Okay, Mitch. What about your risk profile on the CDOs? Isn't that more problematic for you?

---

**Mitch Sonkin** - *MBIA, Inc. - Head of Insured Portfolio Investment*

Our overall business strategy is to participate in the most senior layer of the CDO capital structure while creating a balanced book of business across multiple underlying asset classes, including investment-grade corporates, high yield loans, ABS, RMBS, CMBS and emerging markets. Post 1999, MBIA focused on insuring first, funded CDOs having minimal AA shadow ratings by both Moody's and S&P, although most all funded CDOs done by MBIA in the last five years have been at a minimum AAA level.

And second, synthetic CDOs at the super AAA level by virtue of a rated AAA tranche subordinate to MBIA or by virtue of an attachment point that is a multiple of the AAA requirement imposed by the rating agencies. In all cases, MBIA cannot be accelerated against, and we maintain the right as I said before, as controlling party with our deals, to accelerate at our sole discretion.

Acceleration is an additional cash diversion remedy for us, which redirects cash away from the subordinate tranches and funnels it to accelerate amortization of our senior exposure. And again, acceleration is distinct from liquidation of the collateral pool which we also direct upon certain events of the pool as sole controlling party within our deals. The risk is in the performance and the market, but not in our position.

---

**Greg Diamond** - *MBIA, Inc. - Director IR*

This question is on loss coverage. What is your loss coverage on the HELOCs and closed-end seconds?

---

**Mitch Sonkin** - *MBIA, Inc. - Head of Insured Portfolio Investment*

The loss coverage varied across the transactions, but we can generally say that the transactions were sized to cover losses in the 5% to 11% range. Weighted average FICO scores in our '06 and '07 HELOCs were 706 and 702, respectively. Our weighted average FICO for our closed-end second borrowers in '06 and '07 were 719 and 710, respectively.

Clearly very prime in appearance, and with regard to our closed-end second portfolio, not what one would expect for a CDS transaction. Our current reserve list is comprised of 12 HELOCs and 2 closed-end second deals. The common theme amongst those transactions are high initial delinquencies where only a small percentage of the loans roll back to current status. The high role rates for the severely delinquent buckets and ultimate charge-offs by the issuer have severely restricted the ability of the credit enhancement mechanism in these deals to cover current period losses.

---

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**The McGraw·Hill Companies**

# STANDARD &POOR'S    RatingsDirect®

## *Ratings

## Biltmore CDO 2007-1 Ltd

Biltmore CDO 2007-1 Ltd

### Profile

| | |
|---|---|
| **Sector:** | Structured Finance |
| **Subsector:** | Collateralized Debt Obligations |
| **Primary Participant:** | Merrill Lynch & Co. Inc. |
| **Collateral:** | CDO Cash Flow CDO Of ABS |
| **Domicile of Assets:** | United States(100%) |
| **Closing Date:** | 26-Jul-2007 |
| **Credit Analyst:** | Bruce Zhao, New York, (1) 212-438-1240 |
| **Surveillance Analyst:** | Stephen Anderberg, New York, (1) 212-438-8991 |

### Participants

| | |
|---|---|
| **Bond Insurance Provider:** | MBIA Insurance Corp. Dependent:<br>Rating: AAA/Watch Neg/-- |
| **Co-Issuer:** | Biltmore CDO 2007-1 LLC Dependent: |
| **Collateral Manager:** | ING Clarion Capital LLC |
| **Underwriter:** | Merrill Lynch & Co. Inc. |

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Dates are effective dates of ratings and publication in New York. Owing to the securities law regulations, there may be a delay in the updating of this page compared to the information on the What's New Page. RatingsDirect does not publish ratings history prior to January 1, 1990.

Privacy Notice

Copyright © 2008 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.



The McGraw-Hill Companies

STANDARD &POOR'S          RatingsDirect®

## *Ratings

# Robeco High Grade CDO I Ltd

Robeco High Grade CDO I Ltd

### Profile

| | |
|---|---|
| **Sector:** | Structured Finance |
| **Subsector:** | Collateralized Debt Obligations |
| **Collateral:** | CDO Cash Flow CDO Of ABS |
| **Domicile of Assets:** | United States(100%) |
| **Closing Date:** | 01-Jun-2007 |
| **Credit Analyst:** | John O'Brien, CFA, New York, (1) 212-438-2560 |
| **Surveillance Analyst:** | Stephen Anderberg, New York, (1) 212-438-8991 |

### Participants

| | |
|---|---|
| **Bond Insurance Provider:** | MBIA Insurance Corp. Dependent: Rating: AAA/Watch Neg/-- |
| **Co-Issuer:** | Robeco High Grade CDO I LLC Dependent: |
| **Collateral Manager:** | Robeco Investment Management |
| **Trustee:** | LaSalle Bank N.A. |
| **Underwriter:** | Merrill Lynch Pierce Fenner & Smith |

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Dates are effective dates of ratings and publication in New York. Owing to the securities law regulations, there may be a delay in the updating of this page compared to the information on the What's New Page. RatingsDirect does not publish ratings history prior to January 1, 1990.

Privacy Notice

Copyright © 2008 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.



The McGraw-Hill Companies

STANDARD
&POOR'S        RatingsDirect®

## \*Ratings

# Tazlina Funding CDO II Ltd

Tazlina Funding CDO II Ltd

### Profile

| | |
|---|---|
| **Sector:** | Structured Finance |
| **Subsector:** | Collateralized Debt Obligations |
| **Primary Participant:** | Terwin Money Management |
| **Collateral:** | CDO Cash Flow CDO Of ABS |
| **Domicile of Assets:** | United States(100%) |
| **Closing Date:** | 10-May-2007 |
| **Credit Analyst:** | Natalia Bruslanova, CFA, New York, (1) 212-438-2109 |
| **Surveillance Analyst:** | Stephen Anderberg, New York, (1) 212-438-8991 |

### Participants

| | |
|---|---|
| **Bond Insurance Provider:** | MBIA Insurance Corp. Dependent: Rating: AAA/Watch Neg/-- |
| **Co-Issuer:** | Tazlina Funding CDO II LLC Dependent: |
| **Collateral Manager:** | Terwin Money Management |
| **Trustee:** | Wells Fargo Bank Northwest, NA |
| **Underwriter:** | Merrill Lynch & Co. Inc. |

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Dates are effective dates of ratings and publication in New York. Owing to the securities law regulations, there may be a delay in the updating of this page compared to the information on the What's New Page. RatingsDirect does not publish ratings history prior to January 1, 1990.

Privacy Notice

Copyright © 2008 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.



## *Ratings

## West Trade Funding CDO III Ltd

West Trade Funding CDO III Ltd

### Profile

| | |
|---|---|
| **Sector:** | Structured Finance |
| **Subsector:** | Collateralized Debt Obligations |
| **Primary Participant:** | NIR Capital Management LLC |
| **Collateral:** | CDO Cash Flow CDO Of ABS |
| **Domicile of Assets:** | United States(100%) |
| **Closing Date:** | 25-May-2007 |
| **Credit Analyst:** | Bruce Zhao, New York, (1) 212-438-1240 |
| **Surveillance Analyst:** | Stephen Anderberg, New York, (1) 212-438-8991 |

### Participants

| | |
|---|---|
| **Bond Insurance Provider:** | MBIA Insurance Corp. Dependent: Rating: AAA/Watch Neg/-- |
| **Co-Issuer:** | West Trade Funding CDO III LLC Dependent: |
| **Collateral Manager:** | NIR Capital Management LLC |
| **Indenture Trustee:** | Wells Fargo Bank Northwest, NA |
| **Underwriter:** | Merrill Lynch & Co. Inc. |

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Dates are effective dates of ratings and publication in New York. Owing to the securities law regulations, there may be a delay in the updating of this page compared to the information on the What's New Page. RatingsDirect does not publish ratings history prior to January 1, 1990.

Privacy Notice

Copyright © 2008 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.



# *Ratings

# Silver Marlin CDO I Ltd

Silver Marlin CDO I Ltd

### Profile

| | |
|---|---|
| **Sector:** | Structured Finance |
| **Subsector:** | Collateralized Debt Obligations |
| **Primary Participant:** | Sailfish Capital Partners LLC |
| **Collateral:** | CDO Cash Flow CDO Of ABS |
| **Domicile of Assets:** | United States(100%) |
| **Closing Date:** | 29-Mar-2007 |
| **Credit Analyst:** | Robert Chiriani, New York, (1) 212-438-1271 |
| **Surveillance Analyst:** | Stephen Anderberg, New York, (1) 212-438-8991 |

### Participants

| | |
|---|---|
| **Arranger:** | Merrill Lynch & Co. Inc. |
| **Bond Insurance Provider:** | MBIA Insurance Corp. Dependent:<br>Rating: AAA/Watch Neg/-- |
| **Co-Issuer:** | Silver Marlin CDO I LLC Dependent: |
| **Collateral Manager:** | Sailfish Capital Partners LLC |
| **Trustee:** | Wells Fargo Bank Northwest, NA |

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Dates are effective dates of ratings and publication in New York. Owing to the securities law regulations, there may be a delay in the updating of this page compared to the information on the What's New Page. RatingsDirect does not publish ratings history prior to January 1, 1990.

Privacy Notice
Copyright © 2008 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.



## *Ratings

# West Trade Funding II CDO Ltd

West Trade Funding II CDO Ltd

#### Profile

| | |
|---|---|
| **Sector:** | Structured Finance |
| **Subsector:** | Collateralized Debt Obligations |
| **Collateral:** | CDO Cash Flow CDO Of ABS |
| **Domicile of Assets:** | United States(100%) |
| **Closing Date:** | 07-Dec-2006 |
| **Credit Analyst:** | Bruce Zhao, New York, (1) 212-438-1240 |
| **Surveillance Analyst:** | Stephen Anderberg, New York, (1) 212-438-8991 |

#### Participants

| | |
|---|---|
| **Bond Insurance Provider:** | MBIA Insurance Corp. Dependent: Rating: AAA/Watch Neg/-- |
| **Co-Issuer:** | West Trade Funding II CDO LLC Dependent: |
| **Collateral Manager:** | NIR Capital Management LLC |
| **Indenture Trustee:** | Wells Fargo Bank Northwest, NA |
| **Underwriter:** | Merrill Lynch & Co. Inc. |

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Dates are effective dates of ratings and publication in New York. Owing to the securities law regulations, there may be a delay in the updating of this page compared to the information on the What's New Page. RatingsDirect does not publish ratings history prior to January 1, 1990.

Privacy Notice

Copyright © 2008 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights Reserved.

*Execution Version*

# ⚘ Merrill Lynch

DATE:                          December 14, 2006

TO:                            PORTFOLIO CDS TRUST 129 acting through XLCA
                               Admin LLC, not in its individual capacity but solely as
                               Trustee

ATTENTION:

FROM:                          MERRILL LYNCH INTERNATIONAL

RE:                            Credit Derivative Transaction relating to Ipswich Street
                               CDO – REFERENCE 06ML55278A

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to such Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") is incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement (Multicurrency-Cross Border) dated as of December 14, 2006, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

Capitalized terms used but not defined herein or in the Credit Derivatives Definitions shall have the meanings given to such terms in the Indenture dated June 27, 2006 among Ipswich Street CDO, Ltd. (the "Issuer"), Ipswich Street CDO, LLC (the "Co-Issuer") and JPMorgan Chase Bank, National Association (the "Indenture").

The terms of the Transaction to which this Confirmation relates are as follows:

**General Terms:**

    Trade Date:                    December 14, 2006

    Effective Date:                December 14, 2006

    Scheduled Termination Date:    The scheduled maturity date of the Reference
                                              Obligation plus the longest settlement period for

Modified Cash Settlement.

Termination Date:            The earlier of:

(a)   Scheduled Termination Date; or
(b)   the date on which the Outstanding Principal Balance of the Reference Obligation equals zero; or
(c)   the Accelerated Maturity Date.

"Outstanding Principal Balance" means, with respect to the Reference Obligation, the aggregate unpaid principal amount of such Reference Obligation from time to time, which amount shall be determined without regard to Section 2.6(i) of the Indenture to the extent that such Section has the effect of reducing or extinguishing any amount in respect of principal of the Reference Obligation as a result of there being insufficient proceeds of the Collateral (upon exhaustion of the Collateral available to be applied in accordance with the Priority of Payments).

Party A Floating Rate Payer:     Merrill Lynch International ("Buyer" or "Party A")

Party B Floating Rate Payer:     Portfolio CDS Trust 129 (the "Seller" or "Party B"), a grantor trust guaranteed by XL Capital Assurance Inc. ("XLCA"), a New York stock insurance company.

Fixed Rate Payer:            Buyer

Calculation Agent:           Buyer

Calculation Agent City:      New York

Business Days:               New York

Business Day Convention:     Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day).

Reference Entities:          Ipswich Street CDO, Ltd. and Ipswich Street CDO, LLC

Reference Obligation:        USD 1,530,000,000 Class A-1 First Priority Senior Secured Floating Rate Delayed Draw Note Due 2046 issued by Ipswich Street CDO, Ltd. and Ipswich Street CDO, LLC with Regulation S Common Code

- 2 -

025814266, Regulation S Global CUSIP Number G4936YAA7 and Restricted Global Note CUSIP Number 46265BAA6.

The term "USD" shall mean the lawful currency of the United States of America.

Section 2.30 of the Credit Derivatives Definitions shall not apply to this Transaction.

|  |  |
|---|---|
| All Guarantees | Not Applicable |
| Reference Price: | 100% |
| Relevant Proportion: | 7/18 |

2.  **Fixed Payments:**

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | With respect to the Fixed Rate Payer Calculation Period, an amount equal to the average of the product of (x) the Relevant Proportion and (y) the Outstanding Principal Balance of the Reference Obligation on each day during the Fixed Rate Payer Calculation Period. |
| Fixed Rate Payer Payment Dates: | The 4th day of every calendar month, commencing in January 2007 and ending on the earlier to occur of the Termination Date and the last Event Determination Date to occur under this Transaction. |
| Fixed Rate: | 0.15 per cent |
| Fixed Rate Day Count Fraction: | Actual/360 |

3.  **Floating Payments:**

| | |
|---|---|
| Party A Floating Rate Payment Amount: | Party A shall pay to Party B on each Party A Floating Rate Payment Date an amount equal to any accrued and unpaid Additional Amount; provided, however, that (i) Party A shall not be obligated to pay any Additional Amount to Party B hereunder if, after giving effect to such payment, such payment would result in or have the same economic effect as a Failure to Pay; and (ii) Party A's obligation to pay Additional Amounts on any Party A Floating Rate Payment Date shall be limited to (A) amounts received by Party A as Collections, or (B) if Party A is not the beneficial owner of the Relevant Proportion of the Outstanding Principal Balance of the Reference Obligation, an |

- 3 -

amount equal to the aggregate amounts received by the beneficial owners of all of such Reference Obligation as Collections.

Party A agrees that any and all Collections received by it at any time when there are outstanding Additional Amounts due hereunder shall be received and held for the benefit of Party B.

Party A Floating Rate Payment Dates:

Party A shall pay the Additional Amount as soon as reasonably practicable, but in no event later than 3 Business Days after such amounts are received by Party A from Collections, or if Party A is not the beneficial owner of the Relevant Proportion of the Reference Obligation, 3 Business Days after such amounts are received by such beneficial owners from Collections.

"**Additional Amount**" means, with respect to any Party A Floating Rate Payment Date, an amount equal to any amounts paid under the Policy by the Credit Support Provider and, without duplication of the foregoing, all amounts previously paid by Party B or its Credit Support Provider hereunder that have not previously been reimbursed to Party B by Party A by payment of Additional Amounts hereunder, together with (i) any and all default interest, in the case of a step-up in the interest rate payable on the Reference Obligation following a default thereon, paid to Party A, or if Party A is not the beneficial owner of the Relevant Proportion of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Relevant Proportion of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, or (ii) in the case of interest accrued on the defaulted payments paid to Party A, or if Party A is not the beneficial owner of the Relevant Proportion of the Outstanding Principal Balance of the Reference Obligation, the beneficial owners of the Relevant Proportion of such Reference Obligation, with respect to the Reference Obligation by the Issuer, the Co-Issuer or any other Person under the Indenture, interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unpaid amounts representing interest), from the date such amounts were paid hereunder until reimbursed in

- 4 -

full (after as well as before judgment), at a rate of interest equal to the Note Interest Rate for the Class A-1 Notes *minus* (y) the Fixed Rate.

"**Collections**" means, with respect to any Party A Floating Rate Payment Date occurring after a Credit Event has occurred and prior to the Party A Floating Rate Payment Date when all Additional Amounts have been paid in full, any and all payments of interest, principal or any other amount from whatever source with respect to the Reference Obligation made by the Issuer, the Co-Issuer or any other Person under the Indenture to Party A, or if Party A is not a beneficial owner of the Relevant Proportion of the Outstanding Principal Balance of the Relevant Proportion of the Reference Obligation, the beneficial owners of the Relevant Proportion of such Reference Obligation, including, without limitation, any amounts received by Party A, or if Party A is not a beneficial owner of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Relevant Proportion of such Reference Obligation, in respect of any and all out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A, or if Party A is not a beneficial owner of the Relevant Proportion of the Outstanding Principal Balance of the Reference Obligation, a beneficial owner of the Relevant Proportion of such Reference Obligation; provided, however, that Collections shall be decreased to the extent of (x) the then Outstanding Senior Shortfall Amount and (y) any Unreimbursed Party A Expenditures.

"**Unreimbursed Party A Expenditures**" means, with respect to any Distribution Date, any out-of-pocket liabilities (including penalties), obligations, losses, damages, actions, suits, demands, claims, judgments, taxes, costs, expenses or disbursements of any kind or nature whatsoever suffered or incurred by Party A in connection with actions taken by Party A with respect to the Relevant Proportion of the Reference Obligation at the direction of Party B and for which Party A has not been reimbursed on any prior Distribution Date.

**"Outstanding Senior Shortfall Amount"** means an amount, which shall not be less than zero, equal to the aggregate of all Senior Shortfall Amounts from Distribution Dates prior to the date of calculation, including interest thereon accruing at the rate at which interest accrues on unpaid Interest Distribution Amounts under the Indenture, less Collections applied thereto (pursuant to the proviso to the definition of "Collections") prior to such date of calculation.

**"Senior Shortfall Amount"** means, for any Distribution Date, an amount equal to the Interest Shortfall (as defined below) less the Interest Cap Amount.

| | | |
|---|---|---|
| Party B Floating Rate Payer Calculation Amount: | An amount equal to the Cash Settlement Amount. | |
| Conditions to Settlement: | **Credit Event Notice** | Notifying Parties:  Buyer or Seller which notice shall include (i) the Interest Shortfall (as defined below) (if any) and (ii) the Principal Shortfall (as defined below) (if any). |
| | **Notice of Publicly Available Information:** | Applicable |
| | Public Sources: | The sources listed in Section 3.7 of the Credit Derivative Definitions, which shall include the Note Valuation Report delivered to the Trustee pursuant to Section 10.7(b) of the Indenture. |
| | Specified Number: | Two; provided, however, that if the public source is the Note Valuation Report by the Reference Entity delivered to the Trustee pursuant to Section 10.7(b) of the Indenture, the Specified Number shall be |

- 6 -

one.

The Credit Event Notice and the Notice of Publicly
Available Information shall be delivered on a day on
which commercial banks and foreign exchange
markets are generally open to settle payments in New
York.

Credit Event:

The following Credit Events shall apply to this
Transaction:

Failure to Pay

Notwithstanding Section 4.5 of the Credit Derivatives
Definitions, **"Failure to Pay"** means: After the
expiration of any applicable (or deemed) grace period
(after the satisfaction of any conditions precedent to
the commencement of such grace period), the failure
by the Reference Entity to make, when and where due,
any Scheduled Payments on the Reference Obligation.

**"Scheduled Payment"** means a scheduled payment or
scheduled distribution of principal pursuant to Section
11.1(a)(ii)(1) of the Indenture or interest pursuant to
Section 11.1(a)(i)(5) of the Indenture required to be
made with respect to the Reference Obligation,
provided that such scheduled payment or scheduled
distribution of principal or interest shall be determined
without regard to Section 2.6(i) of the Indenture to the
extent that such Section has the effect of reducing or
extinguishing any amount in respect of the Reference
Obligation as a result of there being insufficient
proceeds of the Collateral (upon exhaustion of the
Collateral available to be applied in accordance with
the Priority of Payments).

Grace Period Extension:  Not applicable

Payment Requirement:    USD 1,000.

Obligation(s)

For the purposes of the table below;
**"Yes"** shall mean that the relevant selection is
applicable; and
**"No"** shall mean that the relevant selection is not
applicable.

**Obligation**                    **Obligation**

- 7 -

| | Categories | | Characteristics |
|---|---|---|---|
| No | Payment | No | Not Subordinated |
| No | Borrowed Money | No | Specified Currency – Standard Specified Currencies |
| Yes | Reference Obligation(s) Only | No | Not Sovereign Lender |
| No | Bond | No | Not Domestic Currency |
| No | Loan | No | Not Domestic Law |
| No | Bond or Loan | No | Listed |
| | | No | Not Domestic Issuance |

| | |
|---|---|
| Excluded Obligations: | None |

**4.    Settlement Terms:**

| | |
|---|---|
| Settlement Method: | Modified Cash Settlement. |
| Settlement Currency: | USD |

**Terms Relating to Modified Cash Settlement:**

Notwithstanding anything contained in Article VII of the Credit Derivatives Definitions, for purposes of this Transaction, terms relating to Modified Cash Settlement shall be determined as follows:

| | |
|---|---|
| Modified Cash Settlement Date: | Three (3) Business Days following the calculation of the Modified Cash Settlement Amount; provided, however, that notwithstanding the Credit Derivatives Definitions, there may be multiple Modified Cash Settlement Dates. |
| Modified Cash Settlement Amount: | "Modified Cash Settlement Amount" means for each Distribution Date, an amount equal to the sum of (A) the excess (if any) of (i) the Interest Shortfall for such Distribution Date over (ii) the Interest Threshold Amount for such Distribution Date; provided, however, that such amount shall not exceed the Interest Cap Amount for such Distribution Date, plus |

- 8 -

(B) if such Distribution Date relates to either the Accelerated Maturity Date or the Distribution Date occurring in August 2046, excess (if any) of (i) the Principal Shortfall over (ii) the Principal Threshold Amount; provided, however, that such amount shall not exceed the Principal Cap Amount, in each case in accordance with the original terms of the Indenture and the Reference Obligation, as the same may be amended or modified with the written consent of XLCA, but without regard to any amendment or modification that has not been consented to in writing by XLCA (it being understood that if the principal of the Reference Obligation becomes payable at any time prior to August 2046 on any date that is not the Accelerated Maturity Date, the Modified Cash Settlement Amount shall continue to be calculated on each scheduled Distribution Date as if such acceleration had not occurred).

Payments on the Reference Obligation due on any date other than the Accelerated Maturity Date which become due on an accelerated basis as a result of (a) a default by the Issuer, (b) the occurrence of an Event of Default under the Indenture, (c) an optional redemption in whole by the Issuer, (d) a tax redemption, (e) a failure to meet any interest coverage test or overcollateralization test, or (f) any other cause do not constitute a "Modified Cash Settlement Amount."

In addition, "Modified Cash Settlement Amount" shall not include (i) any amounts due in respect of the Reference Obligation attributable to any increase in interest rate, penalty or other sum payable by the Reference Entity by reason of any default or event of default in respect of the Reference Obligation or (ii) any amount in respect of any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder of the Reference Obligation.

"**Interest Shortfall**" means, with respect to any Distribution Date and on the Accelerated Maturity Date, the excess, if any, of (i) the Interest Distribution Amount then payable on the Reference Obligation over (ii) the Interest Proceeds actually paid to the holder of the Reference Obligation pursuant to Section

- 9 -

11.1(a)(i)(5) of the Indenture.

"**Interest Threshold Amount**" means, for any Distribution Date, an amount equal to the product of (i) 1/18 and (ii) the Interest Distribution Amount for such Distribution Date.

"**Interest Cap Amount**" means, for any Distribution Date, an amount equal to the product of (i) 7/18 and (ii) the Interest Distribution Amount for such Distribution Date.

"**Principal Shortfall**" means, with respect to the Distribution Date occurring in August, 2046 and on the Accelerated Maturity Date, the excess, if any, of (i) the then Aggregate Outstanding Amount of the Reference Obligation over (ii) the Principal Proceeds paid to the holder of the Reference Obligation.

"**Principal Threshold Amount**" means, as of either the Accelerated Maturity Date or the Distribution Date occurring in August 2046, an amount equal to the product of (i) 1/18 and (ii) the Aggregate Outstanding Amount of the Reference Obligation.

"**Principal Cap Amount**" means, for any Distribution Date, an amount equal to the product of (i) 7/18 and (ii) the Aggregate Outstanding Amount of the Reference Obligation.

"**Accelerated Maturity Date**" means the date on which the Collateral has been liquidated and all proceeds thereof have been distributed in accordance with the Priority of Payments.

5.    **Notice and Account Details:**

Notice and Account Details for XLCA As Designee of Seller:

| | |
|---|---|
| Receiving Bank: | Bank of America NA<br>777 Main Street<br>Hartford, CT 06115-2001<br>ABA – 026009593<br>Reference: Policy No. CA03462A |
| Beneficiary: | XL Capital Assurance Inc.<br>1221 Avenue of the Americas<br>New York, NY 10020-1001<br>Account Number 94278-35841 |

- 10 -

Notice and Account Details for the Buyer

Merrill Lynch World Headquarters
4 World Financial Center, 18th Floor
New York, New York 10080
Attention: Swaps Group
Telephone Number.: 212-449-7403
Facsimile Number. 646-805-0218

Copies to:

Merrill Lynch & Co., Inc.
250 Vesey Street
North Tower
NY, NY 10080
Attention:
Telephone Number: 1 212 449 4965
Fax Number: 1 212 449 3087

And

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12th Floor
New York, NY 10080
Attention: Swaps Legal
Facsimile Number: 212-449-6993

DEUTSCHE BANK TRUST COMPANY
AMERICAS NEW YORK, NY (FED ABA:
021001033)

FAO: MERRILL LYNCH CAPITAL SERVICES,
INC.

ACCOUNT NUMBER: 00-882277

6.    **Additional Transaction Terms**

Delivery of Required Information:

Party A shall instruct the Trustee to (i) provide Party B with access to a website containing the Required Information (as defined below) or (ii) deliver all Required Information to Party A and Party B simultaneously. In the event that Party B does not receive the Required Information directly from the Trustee, Party B may provide Party A with notice requesting the non-received Required Information. Party A, upon receiving such notice of non-receipt from Party B, agrees to provide Party B with copies of

- 11 -

the Required Information, to the extent such Required Information has been received by Holders of the Reference Obligation, within twenty (20) Business Days of notice thereof from Party B.

"Required Information" means all reports, notices and other information actually furnished to investors in the Covered Securities under the Covered Securities Transaction Documents.

Additional Termination Events:    The following event will constitute an Additional Termination Event, with Party A as the Affected Party:

As to Party A, (i) to the extent that any Required Information which was received by Holders of the Reference Obligation was not provided by the Trustee to Party B, any failure to furnish or make available to Party B such Required Information within twenty (20) Business Days of notice thereof from Party B pursuant to "Delivery of Required Information" above; provided, however, that Party A shall be deemed to be in compliance with this provision so long as it provides Party B with access to a website containing such Required Information (ii) the failure by Party A to exercise any Voting Rights or to cause one or more beneficial owners of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, other than the Retained Rights, solely in accordance with the written instructions of Party B or (iii) the exercise by Party A or the direction by Party A of any beneficial owner of any portion of the Outstanding Principal Balance of the Reference Obligation to exercise any Retained Rights without the written consent of Party B.

"Covered Securities" means $1,530,000,000 in original principal amount of the Reference Obligation.

"Covered Securities Transaction Documents" means the transaction documents relating to the Covered Securities.

As used herein, "Voting Rights" mean the right to vote or direct the voting of, or to give or withhold instructions or consents with respect to, the Reference Obligation that holders of 100% of the Outstanding Principal Balance of the Reference Obligation would

- 12 -

have. "Retained Rights" mean the Voting Rights, as set out in Section 8.2 of the Indenture, relating to an amendment to the Indenture for which the consent of 100% of the Holders of the Reference Obligation is required.

Upon a termination of the Agreement following an Additional Termination Event, no payments on early termination will be made by either Party A or Party B pursuant to Section 6(e) of the Agreement and Party A shall pay Party B the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount (as defined in the Schedule).

Termination:

Provided that Seller has a custodial receipt program at such time, Buyer shall have the option, upon 10 Business Days notice, to request that Seller terminate the Transaction and create a custodial receipt representing an interest in the Reference Obligation and the Secondary Market Insurance Policy (as defined below). Such custodial receipt shall be created in the following manner:

Provided that Seller has a custodial receipt program at such time, if Buyer notifies Seller of its election to create a custodial receipt (A) Seller, shall (i) establish custodial arrangements with the custodian (the "**Custodian**") then involved in Seller's custodial receipt program (if any) with respect to the Reference Obligation, (ii) issue a financial guarantee in favor of the Custodian in substantially the same form as other financial guarantees issued with respect to Seller's custodial receipt program at such time (if any) (the "**Secondary Market Insurance Policy**") and (iii) cause the Custodian to deliver a custodial receipt to Buyer or Buyer's designee in substantially the same form as other custodial receipts issued with respect to Seller's custodial receipt program at such time (if any) and (B) Buyer shall deliver or cause the delivery of the Reference Obligation to the Custodian in an outstanding principal balance equal to the amount with respect to which the custodial receipt is to be issued by Seller subject to the foregoing and no greater than the Outstanding Principal Balance.

Buyer and Seller acknowledge and agree that (A) the annual premium to be paid by the insured under such

- 13 -

Secondary Market Insurance Policy will be the same as the annual total of Fixed Amounts payable by Party A hereunder and (B) XLCA shall provide for delivery of legal opinions to Buyer by XLCA's in-house counsel covering the enforceability of the Secondary Market Insurance Policy (and any endorsements or side letters relating thereto) against XLCA and the other matters covered by XLCA's in-house counsel opinion delivered to the Buyer in connection with the Policy.

Buyer shall bear all costs incurred by it and Seller in connection with the issue of the custodial receipt and the Secondary Market Insurance Policy, including but not limited to all fees and charges customarily payable by a holder of a custodial receipt with respect to Seller's then existing custodial receipt program.

[Signature Page Follows]

NYK 1064973-4.076353.0012

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:    AUTHORIZED SIGNATORY
    Title:

By: _____
    Name:
    Title:

Acknowledged and agreed by PORTFOLIO CDS
TRUST 129 acting through XLCA Admin LLC,
not in its individual capacity but solely as Trustee,
as of the date first above written:

By: _____
    Name:
    Title:

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
    Name:
    Title:

- 15 -

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing this Confirmation and returning it to us.

Yours sincerely,

MERRILL LYNCH INTERNATIONAL

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Acknowledged and agreed by PORTFOLIO CDS TRUST 129 acting through XLCA Admin LLC, not in its individual capacity but solely as Trustee, as of the date first above written:

By: _____
    Name: Mark G. Walsh
    Title:  Associate General Counsel

Acknowledged by XL CAPITAL ASSURANCE INC.

By: _____
Name: Sohail A. Rasul
Title:  Senior Managing Director

- 15 -

**EXECUTION COPY**

BILTMORE CDO 2007-1, LTD.,
as Issuer

BILTMORE CDO 2007-1, LLC,
as Co-Issuer

and

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

---

# INDENTURE

---

Dated as of July 26, 2007

"**Definitive Indenture Secured Note**"), which may be either a Regulation S Definitive Indenture Secured Note or a Restricted Definitive Indenture Secured Note, with such legends as may be applicable thereto, which shall be duly executed by the Issuer and the Co-Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.

(d)    The Co-Issuers in issuing the Indenture Secured Notes may use "CUSIP" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP" or "private placement" numbers of the Indenture Secured Notes in notices of redemption and related materials as a convenience to Indenture Secured Noteholders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Indenture Secured Notes or as contained in any notice of redemption and related materials. In connection therewith, the Trustee shall, on any Business Day after the first Monthly Distribution Date, direct DTC to exchange such "CUSIP" numbers for a single "CUSIP" number in respect of the Aggregate Outstanding Amount of the Class A-2 Notes.

Section 2.2    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations. (a) As provided under the terms of the Indenture Secured Notes, the aggregate principal amount of Indenture Secured Notes which may be issued under this Indenture may not exceed U.S.$988,000,000, excluding Indenture Secured Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Indenture Secured Notes pursuant to Section 2.4, 2.5 or 8.5 hereof.

(b)    As provided under the terms of the Indenture Secured Notes, the Indenture Secured Notes shall be divided into seven Classes having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

| Designation | Aggregate Original Principal Amount | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1 Notes | U.S.$500,000,000 | One-month LIBOR + 0.20% | December 2050 Monthly Distribution Date |
| Class A-2 Notes | U.S.$350,000,000 | One-month LIBOR + 0.315% | December 2050 Monthly Distribution Date |
| Class A-3 Notes | U.S.$50,000,000 | Three-month LIBOR + 0.65% | December 2050 Monthly Distribution Date |
| Class A-4 Notes | U.S.$55,000,000 | Three-month LIBOR + 0.80% | December 2050 Monthly Distribution Date |
| Class B Notes | U.S.$20,000,000 | Three-month LIBOR + 1.00% | December 2050 Monthly Distribution Date |
| Class C Notes | U.S.$5,000,000 | Three-month LIBOR + 1.25% | December 2050 Monthly Distribution Date |
| Class D Notes | U.S.$8,000,000 | Three-month LIBOR + 3.00% | December 2050 Monthly Distribution Date |

The Notes will be issuable in a minimum denomination of U.S.$250,000 and will be offered only in such minimum denomination or an integral multiple of U.S.$1,000 in excess thereof; *provided* that, after issuance, (x) a Note may fail to be in compliance with the minimum denomination requirement as a result of the repayment of principal thereof in accordance with the Priority of Payments and (y) Class D Notes or Class E Notes may fail to be in an amount

which is an integral multiple of U.S.$1,000 due to the addition to the principal amount thereof of Class D Deferred Interest Amount or Class E Deferred Interest Amount, respectively.

(c)    As provided under the terms of the Indenture Secured Notes, interest shall accrue on the Aggregate Outstanding Amount of each Class of Indenture Secured Notes (determined as of the first day of each applicable Interest Period and after giving effect to any redemption or other payment of principal occurring on such day) (i) in the case of the initial Interest Period, (A) with respect to the Class A-1 Notes and Class A-2 Notes, for the period from and including the Closing Date to but excluding the first applicable Monthly Distribution Date and (B) with respect to all other Classes of Indenture Secured Notes, for the period from and including the Closing Date to but excluding the first applicable Quarterly Distribution Date and (ii) thereafter, for the period from and including the Quarterly Distribution Date (or, in the case of the Class A-1 Notes and Class A-2 Notes, the next succeeding Monthly Distribution Date) immediately following the immediately preceding Interest Period, to but excluding the next succeeding Quarterly Distribution Date (or, in the case of the Class A-1 Notes and Class A-2 Notes, the next succeeding Monthly Distribution Date), until such Indenture Secured Notes are paid in full and shall be payable quarterly in arrears on each Quarterly Distribution Date (or, in the case of the Class A-1 Notes and Class A-2 Notes, monthly in arrears on each Monthly Distribution Date).  To the extent lawful and enforceable, interest shall accrue on Defaulted Interest in respect of any Indenture Secured Note at the Note Interest Rate applicable to such Indenture Secured Note until such Defaulted Interest is paid in full.

Interest on the Indenture Secured Notes, interest on Defaulted Interest in respect thereof will be computed on the basis of a 360-day year and the actual number of days elapsed. Interest will cease to accrue on each Indenture Secured Note or, in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity, unless payment of principal is improperly withheld or unless default is otherwise made with respect to such payments.

(d)    The Indenture Secured Notes shall be redeemable as provided in <u>Articles IX</u> and <u>XII</u>.

(e)    The Depositary for the Global Indenture Secured Notes shall initially be DTC.

(f)    The Indenture Secured Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Indenture Secured Notes as evidenced by their execution of such Indenture Secured Notes.

(g)    All of the Indenture Secured Notes will be issued on the Closing Date.

Section 2.3    <u>Execution, Authentication, Delivery and Dating</u>. (a) The Indenture Secured Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers.  The signatures of such Authorized Officers on the Indenture Secured Notes may be manual or facsimile (including in counterparts).

(b)    Indenture Secured Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Indenture Secured Notes or did not hold such offices at the date of issuance of such Indenture Secured Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver Indenture Secured Notes executed by the Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Indenture Secured Notes as provided in this Indenture and not otherwise.

(d)    Each Indenture Secured Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Indenture Secured Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)    Indenture Secured Notes issued upon transfer, exchange or replacement of other Indenture Secured Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Indenture Secured Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Indenture Secured Notes so transferred, exchanged or replaced. In the event that any Indenture Secured Note is divided into more than one Indenture Secured Note in accordance with this Article II, the original principal amount of such Indenture Secured Note shall be proportionately divided among the Indenture Secured Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Indenture Secured Notes.

(f)    No Indenture Secured Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Indenture Secured Note a certificate of authentication (the "**Certificate of Authentication**"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Indenture Secured Note shall be conclusive evidence, and the only evidence, that such Indenture Secured Note has been duly authenticated and delivered hereunder.

Section 2.4    Registration, Transfer and Exchange of Indenture Secured Notes.

(a)    Registration of Indenture Secured Notes. The Trustee is hereby appointed as the registrar of the Notes (the "**Indenture Secured Note Registrar**"). The Trustee is hereby appointed as a Transfer Agent with respect to the Indenture Secured Notes. The Indenture Secured Note Registrar shall keep, on behalf of the Issuer, a register (the "**Indenture Secured Note Register**") for the Classes of Indenture Secured Notes for which it is the Indenture Secured Note Registrar in its Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Indenture Secured Note Registrar shall provide for the registration of and the registration of transfers of Indenture Secured Notes. Upon any resignation or removal of the Indenture Secured Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of the Indenture Secured Note Registrar. The

if applicable, the Indenture Secured Noteholders, as the case may be, under Sections 2.6, 4.2, 5.4(d), 5.9, 5.18, 6.7, 6.8, 7.1 and 7.3 hereof shall survive.

Section 4.2    Application of Trust Cash.  All Cash deposited with the Trustee pursuant to Section 4.1 hereof for the payment of principal of and interest on the Indenture Secured Notes, and amounts payable pursuant to the Hedge Agreements, the Administration Agreement, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement, the Fiscal Agency Agreement and the Collateral Management Agreement shall be held in trust by the Trustee on behalf of the Issuer and applied by it in accordance with the provisions of the Indenture Secured Notes, the Preference Share Paying Agency Agreement, the Fiscal Agency Agreement and this Indenture, in each case subject to the Priority of Payments, for the payment either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the respective amounts in respect of which such Cash has been deposited with the Trustee; but such Cash need not be segregated from other funds held by the Trustee except to the extent required herein or required by law.

Section 4.3    Repayment of Cash Held by Paying Agent.  In connection with the satisfaction and discharge of this Indenture with respect to the Indenture Secured Notes, all Cash then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Cash.

## ARTICLE V

## EVENTS OF DEFAULT; REMEDIES

Section 5.1    Events of Default.  "**Indenture Event of Default,**" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment of any accrued interest (i) on any Class A-1 Note, Class A-2 Note, Class A-3 Note or Class A-4 Note when the same becomes due and payable, (ii) on any Class B Note when the same becomes due and payable, (iii) on any Class C Note when the same becomes due and payable or (iv) if there are no Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class B Notes or Class C Notes Outstanding, on any Class D Note when the same becomes due and payable, in each case which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent or a Paying Agent with respect to the Class E Notes) or the Indenture Secured Note Registrar, such default continues for a period of five Business Days);

(b)    a default in the payment of principal of any Indenture Secured Note when the same becomes due and payable at its Stated Maturity or Redemption Date (and, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the

Administrator, a Paying Agent (other than the Preference Share Paying Agent or a Paying Agent with respect to the Class E Notes) or the Indenture Secured Note Registrar, such default continues for a period of five Business Days);

(c)    the failure on any Distribution Date to disburse amounts in excess of U.S.$500 available in the Interest Collection Account or Principal Collection Account in accordance with the order of priority set forth under Section 11.1 hereof (other than a default in payment described in clause (a) or (b) of this Section 5.1), which failure continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent or a Paying Agent with respect to the Class E Notes) or the Indenture Secured Note Registrar, such default continues for a period of five Business Days) after any of the Issuer, the Co-Issuer or the Collateral Manager has actual knowledge thereof or after notice thereof (x) to the Issuer and the Collateral Manager by the Trustee, (y) to the Issuer and the Trustee by the Collateral Manager or (z) to the Issuer, the Collateral Manager and the Trustee by the holders of at least 25% in Aggregate Outstanding Amount of Notes of the Controlling Class or by a Hedge Counterparty, in each case specifying such default or breach and requiring it to be remedied and stating that it is a "notice of default" under this Indenture;

(d)    either of the Co-Issuers or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(e)    a default in the performance, or breach, of any other covenant or other agreement (it being understood that a failure to satisfy a Collateral Quality Test, an Overcollateralization Test, the Class A Sequential Pay Test, the Standard & Poor's CDO Monitor Test or the Eligibility Criteria is not a default or breach) of the Issuer or the Co-Issuer under this Indenture or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proves to be incorrect in any material respect when made (which breach, violation, default or incorrect representation or warranty is reasonably expected to have a material and adverse effect on the interest of any of the Indenture Secured Noteholders) and the continuation of such default, breach or incorrectness for a period of 45 consecutive days (or, if such default, breach or incorrectness has an adverse effect on the validity, perfection or priority of the security interest granted hereunder or thereunder, 30 consecutive days) after any of the Issuer, the Co-Issuer or the Collateral Manager has actual knowledge thereof or after notice thereof (x) to the Issuer and the Collateral Manager by the Trustee, (y) to the Issuer and the Trustee by the Collateral Manager or (z) to the Issuer, the Collateral Manager and the Trustee by the Holders of at least 25% in Aggregate Outstanding Amount of Notes of the Controlling Class or by any Hedge Counterparty, in each case specifying such default or breach and requiring it to be remedied and stating that it is a "notice of default" under this Indenture;

(f)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) winding up, liquidation, reorganization or other relief in respect of the Issuer or the Co-Issuer or their respective debts, or of a substantial part of their respective assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or the Co-Issuer or for a substantial part of their respective assets, and, in any such

case, such proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or the Issuer or its assets shall become subject to any event that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(g)    the Issuer or the Co-Issuer shall (i) voluntarily commence any proceeding or file any petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 5.1(f) hereof, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or the Co-Issuer or for a substantial part of their respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or the Issuer shall cause or become subject to any event with respect to the Issuer that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(h)    one or more final judgments being rendered against either of the Co-Issuers that exceed, in the aggregate, U.S.$1,000,000 and which remain unstayed, undischarged and unsatisfied for 30 days after such judgment(s) becomes nonappealable, unless adequate funds have been reserved or set aside for the payment thereof; or

(i)    so long as there is a Controlling Beneficiary, the failure of the Class A Sequential Pay Ratio to be equal to or greater than 100% on any Measurement Date.

If either of the Co-Issuers shall obtain knowledge or have reason to believe that an Indenture Event of Default shall have occurred and be continuing, the Issuer or the Co-Issuer, as the case may be, shall promptly notify the Trustee, the Fiscal Agent, the Noteholders, the Controlling Beneficiary, each Hedge Counterparty, the Collateral Manager, the Preference Share Paying Agent and each Rating Agency in writing of such Indenture Event of Default.

Section 5.2    Acceleration of Maturity; Rescission and Annulment.    (a) If an Indenture Event of Default occurs and is continuing (A) other than an Indenture Event of Default specified in Section 5.1(f), 5.1(g) or 5.1(i) hereof, (i) the Trustee shall at the direction of the Holders of a Majority of Notes of the Controlling Class, by notice to the Co-Issuers or (ii) Holders of a Majority of Notes of the Controlling Class, by notice to the Co-Issuers and the Trustee and (B) with respect to an Indenture Event of Default pursuant to Section 5.1(i) hereof, Holders of a Majority of the Controlling Class (and so long as any Class A Notes are the Controlling Class, with all such Class A Notes voting together as a single Class), by notice to the Co-Issuers and the Trustee, may in each case (1) declare the principal of and accrued and unpaid interest on all of the Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable and (2) terminate the Fixed Rate Reinvestment Period. Notwithstanding the foregoing, if an Indenture Event of Default specified in Section 5.1(a) or 5.1(b) hereof occurs and is continuing solely with respect to a default in the payment of any principal of or interest on Notes of a Class other than the Controlling Class, neither the Trustee nor the Holders of such non-Controlling Class shall have the right to declare

such principal and other amounts to be immediately due and payable. If an Indenture Event of Default specified in Section 5.1(f) or 5.1(g) hereof occurs, (A) all unpaid principal, together with all accrued and unpaid interest of all the Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder and (B) the Fixed Rate Reinvestment Period shall terminate automatically. If any Indenture Event of Default occurs during the Fixed Rate Reinvestment Period, the Fixed Rate Reinvestment Period shall automatically terminate without any declaration or other action on the part of the Trustee or any Noteholder.

(b)      At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Cash due has been obtained by the Trustee as hereinafter provided in this Article V, a Majority of the Controlling Class, by written notice to the Co-Issuers and the Trustee, may rescind and annul such declaration and its consequences if:

(i)      the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)      all overdue installments of principal of and interest on the Indenture Secured Notes (including interest upon the Deferred Interest Amounts),

(B)      all accrued and unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(C)      any accrued and unpaid amounts (including termination payments, if any) payable by the Issuer pursuant to any Hedge Agreements; and

(ii)      the Trustee has determined that all Events of Default of which a Trust Officer has actual knowledge, other than the nonpayment of the principal of or interest on the Indenture Secured Notes that have become due solely by such acceleration, have been cured and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination or waived as provided in Section 5.14 hereof; and

(iii)      any Hedge Agreement in effect immediately prior to the declaration of such acceleration shall remain in effect or, if such Hedge Agreement shall have become subject to early termination after the declaration of such acceleration, the Issuer shall have entered into a replacement Hedge Agreement for a terminated Hedge Agreement pursuant to Section 16.1 hereof.

At any such time as the Trustee shall rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5 hereof; *provided* that, if such preservation of the Collateral is rescinded pursuant to Section 5.5 hereof, the Indenture Secured Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this Section 5.2(b) hereof.

No such rescission and annulment shall affect any subsequent Default or impair any right consequent thereon.

(c)    The Issuer shall not terminate any Hedge Agreement in effect immediately prior to a declaration of acceleration unless the liquidation of the Collateral has begun and such declaration is no longer capable of being rescinded or annulled.

Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee. The Co-Issuers covenant that if a Default shall occur in respect of (a) the payment of any principal of or interest on any Class A-1 Note, (b) the payment of principal of or interest on any Class A-2 Note (but with respect to interest, only after the Class A-1 Notes and all interest accrued thereon have been paid in full), (c) the payment of principal of or interest, if any, on any Class A-3 Note (but with respect to interest, only after the Class A-1 Notes and Class A-2 Notes and all interest accrued thereon have been paid in full), (d) the payment of principal of or interest, if any, on any Class A-4 Note (but with respect to interest, only after the Class A-1 Notes, Class A-2 Notes and Class A-3 Notes and all interest accrued thereon have been paid in full), (e) the payment of principal of or interest, if any, on any Class B Note (but with respect to interest, only after the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes and Class A-4 Notes and all interest accrued thereon have been paid in full), (f) the payment of principal of or interest, if any, on any Class C Note (but with respect to interest, only after the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes and Class B Notes and all interest accrued thereon have been paid in full) or (g) the payment of principal of or interest, if any, on any Class D Note (but with respect to interest, only after the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class B Notes and Class C Notes and all interest accrued thereon have been paid in full), the Co-Issuers will upon demand by the Trustee or any affected Indenture Secured Noteholder, pay to the Trustee, for the benefit of the Holder of such Indenture Secured Note, the whole amount, if any, then due and payable on such Indenture Secured Note for principal and interest with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Indenture Secured Noteholder and their respective agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may, and shall, upon the direction by a Majority of the Controlling Class, prosecute such Proceeding to judgment or final decree, and may enforce the same against the Co-Issuers or any other obligor upon the Indenture Secured Notes and collect the Cash adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Indenture Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as shall be deemed most effectual (if no direction by a Majority of the Controlling Class is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific

enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Indenture Secured Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Indenture Secured Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Indenture Secured Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3 hereof, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)      to file and prove a claim or claims for the whole amount of principal, interest owing and unpaid in respect of the Indenture Secured Notes upon direction by a Majority of the Controlling Class, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of the Indenture Secured Noteholders allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Indenture Secured Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b)      unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Indenture Secured Notes, upon the direction of such Holders, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c)      to collect and receive any Cash or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Indenture Secured Noteholders and of the Trustee on behalf of the Indenture Secured Noteholders and the Trustee; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Indenture Secured Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Indenture Secured Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Indenture Secured Noteholder, any plan of reorganization, arrangement, adjustment or composition affecting the Indenture Secured Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Indenture Secured Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders of the Indenture Secured Notes, the Trustee shall be held to represent, subject to Section 6.17 hereof, all the Secured Parties, if applicable, pursuant to Section 6.17.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 hereof except in accordance with Section 5.5(a) hereof.

Section 5.4    Remedies. (a) If an Indenture Event of Default shall have occurred and be continuing, and the Indenture Secured Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may after notice to the Indenture Secured Noteholders, the Fiscal Agent, the Preference Share Paying Agent, the Collateral Manager, the Rating Agencies and the Hedge Counterparties, and shall, upon direction by a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)     institute Proceedings for the collection of all amounts then payable on the Indenture Secured Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any Cash adjudged due;

(ii)    sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 hereof;

(iii)   institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC (whether or not the UCC applies to the affected Collateral) and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)     exercise any other rights and remedies that may be available at law or in equity;

*provided* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 hereof except in accordance with Section 5.5(a) hereof.

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 hereof and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest on all the Indenture Secured Notes to be redeemed, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)     If an Indenture Event of Default as described in Section 5.1(e) hereof shall have occurred and be continuing, the Trustee may, and at the request of the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Indenture Event of Default under such Section, and enforce any equitable decree or order arising from such proceeding; *provided* that if the Trustee shall receive conflicting or inconsistent requests from two or more groups of Holders of the Notes of the Controlling Class, each representing not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the Controlling Class, notwithstanding any other provisions of this Indenture.

(c)     Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, any Indenture Secured Noteholder or Indenture Secured Noteholders may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of Cash by the Trustee, or by the Officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee and the Indenture Secured Noteholders, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)     Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Indenture Secured Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction. Nothing in this Section 5.4 hereof shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or

commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) subject to the limitations contained in this Section 5.4 hereof, from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding. This provision shall survive termination of this Indenture.

Section 5.5    Preservation of Collateral.    (a) If an Indenture Event of Default shall have occurred and be continuing when any Class of Indenture Secured Notes is Outstanding, the Trustee shall not terminate any Hedge Agreement (unless the Issuer shall have entered into a replacement Hedge Agreement for a terminated Hedge Agreement pursuant to Section 16.1 hereof) and shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Indenture Secured Notes in accordance with the Priority of Payments and the provisions of Articles X, XII and XIII unless the Notes have been declared immediately due and payable (and such declaration has not been rescinded) and:

(i)    the Trustee determines that the anticipated net proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due and unpaid on the Indenture Secured Notes for principal and interest (including the Deferred Interest Amounts, Defaulted Interest and interest on Defaulted Interest, if any), and to pay due and unpaid Administrative Expenses and the Trustee Fee, all amounts due to the Hedge Counterparties (including any termination payment and any accrued interest thereon, assuming, for this purpose, that any Hedge Agreement has been terminated by reason of an event of default or termination event thereunder with respect to the Issuer), and any accrued and unpaid Management Fees;

(ii)    the Holders of at least 66⅔% of the Aggregate Outstanding Amount of each Class of Notes and each Hedge Counterparty (unless no early termination payment (other than Unpaid Amounts) would be owing by the Issuer to such Hedge Counterparty upon the termination thereof by reason of an event of default or termination event under the relevant Hedge Agreement with respect to the Issuer), subject to the provisions hereof, direct the sale and liquidation of the Collateral; or

(iii)    so long as there is a Controlling Beneficiary, the Controlling Beneficiary directs the sale and liquidation of the Collateral if (A) an Event of Default has occurred and is continuing pursuant to Section 5.1(a) in respect of the Class A Notes or (B) an Event of Default has occurred and is continuing pursuant to Section 5.1(i) and, in the case of clause (B), the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Class A Notes (voting as a single Class) consent to such direction;

For purposes of clause (ii) of the preceding sentence, if a Hedge Counterparty shall fail to vote to direct the sale and liquidation of the Collateral within three Business Days after written notice from the Issuer or the Trustee requesting a vote pursuant to such clause (ii), such Hedge Counterparty shall not be entitled to participate in the vote requested by such notice. The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer, the Hedge Counterparties, the Collateral Manager and the Holders of the Notes.

So long as such Indenture Event of Default is continuing, any such retention pursuant to this Section may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

If either of the conditions set forth in clause (i) or clause (ii) above is satisfied, the Trustee will liquidate the Collateral and terminate each Hedge Agreement and, on the sixth Business Day (the "**Accelerated Maturity Date**") following the Business Day (which shall be the Determination Date for such Accelerated Maturity Date) on which the Trustee notifies the Issuer, the Collateral Manager, each Hedge Counterparty and each Rating Agency that such liquidation is completed, apply the proceeds of such liquidation in accordance with the Priority of Payments. The Accelerated Maturity Date will be treated as a Quarterly Distribution Date, and distributions on such date will be made in accordance with the Priority of Payments.

(b)     Nothing contained in Section 5.5(a) hereof shall be construed to require the Trustee to preserve the Collateral securing the Indenture Secured Notes if prohibited by applicable law.

(c)     In determining whether the condition specified in Section 5.5(a)(i) hereof exists, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers, as specified by the Collateral Manager in writing, which are Independent from each other and the Collateral Manager, at the time making a market in such securities and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security or, in the case of Synthetic Securities, shall request the Synthetic Security Counterparty to determine the net termination or assignment payment in accordance with the procedures on the Synthetic Security, and in the case of a Defeased Synthetic Security, the Trustee shall determine the amount that will be released from the related Synthetic Security Counterparty Account. For purposes of making the determinations required pursuant to Section 5.5(a)(i) hereof, the Trustee shall apply the standards set forth in Section 9.2(a) hereof. In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Pledged Securities and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) hereof exists, the Trustee may, but shall not be required to, retain, consult with, and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Indenture Secured Noteholders, the Collateral Manager, the Hedge Counterparties and the Co-Issuers a report prepared by such investment bank or accountant stating the results of any determination required pursuant to Section 5.5(a)(i) hereof as soon as reasonably practicable after making such determination. The Trustee shall make the determinations required by Section 5.5(a)(i) hereof within 30 days after an Indenture Event of Default and at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i) hereof. In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i) hereof (which may be made in consultation with an investment bank or accountant), the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture. In determining whether the Holders of the requisite Aggregate Outstanding Amount of any Class of Indenture Secured Notes have given any direction or notice or have agreed pursuant to Section 5.5(a) hereof, any Holder of an Indenture Secured Note of a Class who is also a Holder of Indenture

Secured Notes of another Class or any Affiliate of any such Holder shall be counted as a Holder of each such Indenture Secured Note for all purposes.

(d)    If an Indenture Event of Default shall have occurred and be continuing at a time when no Indenture Secured Note is Outstanding, the Trustee shall retain the Collateral securing the Indenture Secured Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Indenture Secured Notes in accordance with the Priority of Payments and the provisions of Article X and Article XII unless a Majority of Class E Notes or, if no Class E Notes are Outstanding, a Majority-in-Interest of Preference Shareholders direct the sale and liquidation of the Collateral.

Section 5.6    Trustee May Enforce Claims without Possession of Indenture Secured Notes.    All rights of action and claims under this Indenture or the Indenture Secured Notes may be prosecuted and enforced by the Trustee without the possession of any of the Indenture Secured Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7 hereof.

Section 5.7    Application of Cash Collected.    Any Cash collected by the Trustee with respect to the Indenture Secured Notes pursuant to this Article V and any Cash that may then be held or thereafter received by the Trustee with respect to the Indenture Secured Notes hereunder shall be applied subject to Section 13.1 hereof and in accordance with the provisions of (and subject to the limitations in) Section 11.1 hereof, at the date or dates fixed by the Trustee, *provided* that (a) subject to clause (b), no such date may be fixed by the Trustee unless the Trustee has given the Hedge Counterparties no less than six Business Days' prior written notice of such date, which notice shall set forth in reasonable detail the expected applications of Cash on such date and (b) no failure by the Trustee to deliver the notice required pursuant to the foregoing clause (a) will affect the application of Interest Proceeds and Principal Proceeds in accordance with the Priority of Payments on the next succeeding Distribution Date.

Section 5.8    Limitation on Suits.    No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of an Indenture Event of Default;

(b)    except as otherwise provided in Section 5.9 hereof, the Holders of at least 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c)    such Holder or Holders have offered to the Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(e)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class;

it being understood and intended that no one or more Holders of Indenture Secured Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Indenture Secured Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Indenture Secured Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Indenture Secured Notes of the same Class subject to and in accordance with Section 13.1 hereof and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests (each with indemnity provisions) from two or more groups of Holders of the Notes of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the Controlling Class, notwithstanding any other provisions of this Indenture.

Section 5.9    Unconditional Rights of Indenture Secured Noteholders to Receive Principal and Interest. (a) Notwithstanding any other provision in this Indenture (other than Section 2.6(i)) hereof, the Holder of any Indenture Secured Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Indenture Secured Note as such principal and interest become due and payable in accordance with Section 13.1 hereof and the Priority of Payments and, subject to the provisions of Section 5.8 hereof, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b)    If collections in respect of the Collateral are insufficient to make payments due in respect of the Indenture Secured Notes, no other assets will be available for payment of the deficiency following realization of the Collateral and application of the proceeds thereof in accordance with Section 13.1 hereof and the Priority of Payments, and the obligations of the Co-Issuers to pay any deficiency shall thereupon be extinguished and shall not thereafter revive.

Section 5.10    Restoration of Rights and Remedies.    If the Trustee or any Indenture Secured Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Indenture Secured Noteholder, then and in every such case the Co-Issuers, the Trustee and the Indenture Secured Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Secured Parties shall continue as though no such Proceeding had been instituted.

Section 5.11    Rights and Remedies Cumulative.    No right or remedy herein conferred upon or reserved to the Trustee or to the Indenture Secured Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise. The assertion or employment of

any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12    Delay or Omission Not Waiver.    No delay or omission of the Trustee or of any Indenture Secured Noteholder to exercise any right or remedy accruing upon any Indenture Event of Default shall impair any such right or remedy or constitute a waiver of any such Indenture Event of Default or an acquiescence therein.    Every right and remedy given by this Article V or by law to the Trustee or to the Indenture Secured Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Indenture Secured Noteholders, as the case may be.

Section 5.13    Control by Controlling Class.    Notwithstanding any other provision of this Indenture (but subject to the proviso in the definition of "Outstanding" in Section 1.1 hereof), a Majority of the Controlling Class shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee; *provided* that:

(a)    such direction shall not conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that, subject to Section 6.1 hereof, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received satisfactory indemnity against such liability as set forth below);

(c)    the Trustee shall have been provided with indemnity satisfactory to it; and

(d)    any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5 hereof.

Section 5.14    Waiver of Past Defaults.    Prior to the time a judgment or decree for payment of the Cash due has been obtained by the Trustee, as provided in this Article V, a Majority of the Controlling Class, acting together with the Hedge Counterparties, may on behalf of the Holders of all the Notes waive any past Default and its consequences (including rescinding the acceleration of the Notes), except a Default:

(a)    in the payment of the principal of any Note or in the payment of interest (including Defaulted Interest and interest on Defaulted Interest) on the Notes; or

(b)    in respect of a covenant or provision hereof that under Section 8.2 hereof cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note affected thereby; or

(c)    arising under Section 5.1(f) or 5.1(g) hereof.

In the case of any such waiver, (i) the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no

such waiver shall extend to any subsequent or other Default or impair any right consequent thereto, and (ii) the Trustee shall promptly give written notice of any such waiver to each Holder of Notes and the Fiscal Agent. The Rating Agencies shall be notified by the Issuer of any such waiver.

Upon any such waiver, such Default shall cease to exist, and any Indenture Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15    Undertaking for Costs.    All parties to this Indenture agree, and each Holder of any Indenture Secured Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee or any Indenture Secured Noteholder, or group of Indenture Secured Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Indenture Secured Noteholder for the enforcement of the payment of the principal of or interest on any Indenture Secured Note on or after the Stated Maturity expressed in such Indenture Secured Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16    Waiver of Stay or Extension Laws.    The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force (including filing a voluntary petition under Chapter 11 of the Bankruptcy Code and by the voluntary commencement of a proceeding or the filing of a petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect), which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17    Sale of Collateral.    (a) The power to effect any sale, assignment or termination (a "**Sale**") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid. The Trustee may, upon notice to the Indenture Secured Noteholders and the Hedge Counterparties, and shall, upon direction of a Majority of the Controlling Class from time to time postpone any Sale by announcement made at the time and place of such Sale; *provided* that if the Sale is rescheduled for a date more than 10 Business Days after the date of the determination by an investment bank appointed by the

Trustee pursuant to Section 5.5 hereof, such Sale shall not occur unless and until an investment bank has again made the determination required by Section 5.5 hereof. The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; *provided* that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7 hereof.

(b)     The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 hereof. The Indenture Secured Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Indenture Secured Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Collateral consists of securities not registered under the Securities Act ("**Unregistered Securities**"), the Trustee shall seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of a Majority of the Controlling Class, seek a no-action position from the United States Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities (the costs of which, in each case, shall be reimbursable to the Trustee pursuant to Section 6.8 hereof). In no event will the Trustee be required to register Unregistered Securities under the Securities Act.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Cash.

Section 5.18    Action on the Indenture Secured Notes. The Trustee's right to seek and recover judgment on the Indenture Secured Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer or the Co-Issuer.

business under the laws of the United States or of any State thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$250,000,000, subject to supervision or examination by federal or state banking authority, satisfying the Financial Institution Ratings Requirement and having an office within the United States. If such entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of such entity shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.9, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

Section 6.10    Resignation and Removal; Appointment of Successor.    (a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Section 6.10 hereof shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11 hereof.

(b)    The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Co-Issuers, the Indenture Secured Noteholders, the Hedge Counterparties, each Rating Agency, the Collateral Manager, the Fiscal Agent and the Preference Share Paying Agent. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor trustee or trustees, together with a copy to each Indenture Secured Noteholder; *provided* that such successor Trustee shall be appointed only upon the written consent of a Majority of each Class and the Initial Hedge Counterparty or, at any time when an Indenture Event of Default shall have occurred and be continuing, by a Majority of the Controlling Class and the Initial Hedge Counterparty. If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder of a Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    Subject to Section 6.10(a) hereof, the Trustee may be removed at any time on 10 days' prior written notice by Act of Holders of at least 66⅔% of the Aggregate Outstanding Amount of Indenture Secured Notes of each Class or, at any time when an Indenture Event of Default shall have occurred and be continuing, by Act of Holders of at least 66⅔% of the Aggregate Outstanding Amount of Notes of the Controlling Class, delivered to the Trustee and to the Co-Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.9 hereof and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be

appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation; or

(iii)    the Trustee shall commence a voluntary case under any federal or state banking or bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator or other similar official for the Trustee or for any substantial part of the Trustee's property, or shall make any assignment for the benefit of its creditors or shall fail generally to pay, or shall admit in writing its inability to pay, its debts as such debts become due or shall take any corporate action in furtherance of any of the foregoing,

then, in any such case (subject to <u>Section 6.10(a)</u> hereof), (A) the Co-Issuers, by Issuer Order, may remove the Trustee or (B) subject to <u>Section 5.15</u> hereof, the Trustee or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee; *provided* that such successor Trustee shall be appointed only upon the written consent of a Majority of each Class and the Initial Hedge Counterparty or, at any time when an Event of Default shall have occurred and be continuing, by a Majority of the Controlling Class and the Initial Hedge Counterparty. If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class delivered to the Issuer and the retiring Trustee. The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers. If no successor Trustee shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, subject to <u>Section 5.15</u> hereof, any Holder or the resigning or removed Trustee may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)    The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to each Rating Agency, the Collateral Manager, each Hedge Counterparty and the Holders as their names and addresses appear in the Indenture Secured Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

If the Trustee shall resign or be removed, the Trustee shall also resign or be removed as Paying Agent, Calculation Agent, Registrar and any other capacity in which the Trustee is then acting pursuant to this Indenture, the Preference Share Paying Agency

Agreement, the Fiscal Agency Agreement, the Collateral Administration Agreement and the Account Control Agreement.

Section 6.11   Acceptance of Appointment by Successor.   Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee (with copies to each Hedge Counterparty and the Holders of the Notes of the Controlling Class) an instrument accepting such appointment. Upon delivery of the required instruments (subject to the next following paragraph), the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee, but, on request of the Co-Issuers or a Majority of any Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges, fees, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee. Upon receipt by the retiring Trustee of such instrument of acceptance, such retiring Trustee shall immediately and duly assign, transfer and deliver to such successor Trustee all property and Cash held by such retiring Trustee hereunder. Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless (a) at the time of such acceptance such successor shall (i) have long term debt rated at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and (ii) be qualified and eligible under this Article VI and (b) the Rating Condition with respect to the appointment of such successor Trustee shall have been satisfied. No appointment of a successor Trustee shall become effective if a Majority of the Controlling Class objects to such appointment; and no appointment of a successor Trustee shall become effective until the date 10 days after notice of such appointment has been given to each Indenture Secured Noteholder. Any successor Trustee shall be deemed to have made the representations set forth in Section 6.15 hereof as of the effective date of the appointment of such successor Trustee.

Section 6.12   Merger, Conversion, Consolidation or Succession to Business of Trustee.  Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; *provided* that such Person shall be otherwise qualified and eligible under this Article VI, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Indenture Secured Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Indenture Secured Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Indenture Secured Notes.

Section 6.13   Co-Trustees.  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as

Section 8.2    <u>Supplemental Indentures with Consent of Noteholders</u>.  With the consent of (x) the Controlling Beneficiary, (y) the Holders of not less than a Majority of each Class of Notes materially and adversely affected thereby and a Majority-in-Interest of Preference Shareholders (if materially and adversely affected thereby), and (z) each Hedge Counterparty (to the extent required under the related Hedge Agreement) by Act of said Noteholders or by written consent of the Class E Noteholders and the Preference Shareholders (which consent shall be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained, on which the Trustee is entitled to conclusively rely) delivered to the Trustee and the Co-Issuers), the Trustee and Co-Issuers may, subject to <u>Section 8.3</u> hereof, enter into one or more indentures supplemental hereto to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes of such Class, the Preference Shares or the Hedge Counterparties, as the case may be, under this Indenture; *provided* that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall be entered into, without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby, each Preference Shareholder adversely affected thereby (which consent shall be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained) and each Hedge Counterparty (to the extent required pursuant to the terms of the relevant Hedge Agreement) if such supplemental indenture proposes to:

(a)    change the Stated Maturity of the principal of or the due date of any installment of interest on any Note, reduce the principal amount thereof or the Note Interest Rate thereon, or the Redemption Price with respect thereto, or change the earliest date on which the Issuer may redeem any Note, change the Priority of Payments to affect the application of proceeds of any Collateral to the payment of principal of or interest on the Notes or distributions on the Preference Shares or change any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date) or changes the date on which any distribution in respect of the Preference Shares is payable;

(b)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or the percentage of holders of Preference Shares (as applicable) whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder or their consequences provided for in this Indenture or to request that the Trustee preserve the Collateral pledged under this Indenture or rescind the Trustee's election to preserve the Collateral or to sell or liquidate the Collateral pursuant to this Indenture;

(c)    materially impair or materially adversely affect the Collateral except as otherwise expressly permitted in this Indenture;

(d)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral other than the security interest granted to the Synthetic Security Counterparty over the Synthetic Security Counterparty Account or terminate such lien on any property at any time subject thereto (other than in connection with the sale or exchange thereof in accordance with, or as otherwise permitted by, this Indenture) or

deprive the Holder of any Indenture Secured Note of the security afforded by the lien of this Indenture except, in each of the foregoing cases, as otherwise permitted by this Indenture;

(e)     modify any of the provisions of this Section 8.2, except to increase any percentage of Aggregate Outstanding Amount of Holders of each Class or the percentage of holders of Preference Shares (as applicable) whose consent is required for any action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(f)     modify the definition of the term "Outstanding," the definition of the term "Indenture Event of Default," "Fiscal Agency Agreement Event of Default" or Section 11.1 or Section 13.1 hereof;

(g)     increase the permitted minimum denominations of any Class of Notes;

(h)     modify any of the provisions of this Indenture in such a manner as to affect directly the calculation of the amount of any payment of interest on or principal of any Note or the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein or to adversely affect the rights of the Preference Shareholders to the benefit of any provisions for the redemption of the Preference Shares contained herein; or

(i)     amend the "non-petition" or "limited recourse" provisions of this Indenture or the Notes;

*provided* that nothing in clauses (a) through (i) above is intended to apply to a supplemental indenture otherwise permitted by this Indenture that may affect indirectly the amount available for application under the Priority of Payments.

The Trustee may not enter into any supplemental indenture unless the Rating Condition with respect to Standard & Poor's shall have been satisfied with respect to such supplemental indenture, or consent from each adversely affected Holder of Notes is obtained.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Controlling Beneficiary, the Fiscal Agent, the Preference Share Paying Agent, the Collateral Manager, each Hedge Counterparty, the Irish Paying Agent (if and for so long as any Class of Notes is listed on the Irish Stock Exchange) and each Rating Agency a copy of such proposed supplemental indenture (or a description of the substance thereof with a copy of such proposed supplemental indenture to be provided upon request) and shall request that the Rating Condition with respect to Standard & Poor's with respect to such supplemental indenture be satisfied. If any Class of Notes is then rated by any Rating Agency, the Trustee shall not enter into any such supplemental indenture if, with regard to such supplemental

indenture, the Rating Condition with respect to Standard & Poor's has not been satisfied, unless each Holder of Notes of each Class whose rating will be reduced or withdrawn has, after notice that the proposed supplemental indenture would result in such reduction or withdrawal of the rating of the Class of Notes held by such Holder, consented to such supplemental indenture. Unless notified by a Majority of any Class of Notes or by a Majority-in-Interest of Preference Shareholders that such Class of Notes or the Preference Shares, as the case may be, will be materially and adversely affected by such change or by a Hedge Counterparty that its consent is required under the Hedge Agreement the Trustee shall be entitled to receive and conclusively rely upon an officer's certificate of the Issuer (or the Collateral Manager on its behalf) and an Opinion of Counsel, provided by and at the expense of the Issuer, stating whether or not such Class of Notes or the Preference Shares would be materially and adversely affected by such change (after giving notice of such change to the Holders of the Notes, the Preference Shares and each Hedge Counterparty) and whether or not any Hedge Counterparty's consent is required under the Hedge Agreement. Such determination shall be conclusive and binding on all present and future Holders. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3 hereof and an Officer's Certificate delivered by the Collateral Manager.

It shall not be necessary for any Act of Indenture Secured Noteholders or any consent of Class E Noteholders or Preference Shareholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Indenture Secured Noteholders, the Fiscal Agent (for forwarding to the Class E Noteholders), the Preference Share Paying Agent (for forwarding to the Preference Shareholders), the Collateral Manager, each Hedge Counterparty, the Irish Paying Agent (so long as any Notes are listed on the Irish Stock Exchange), the Channel Islands Stock Exchange (so long as any Preference Shares are listed thereon) and each Rating Agency a copy thereof. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.3    Execution of Supplemental Indentures.  In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying in good faith upon an Opinion of Counsel, provided by and at the expense of the Issuer, stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise. The Trustee shall not enter into any supplemental indenture (including a supplemental indenture entered into pursuant to Section 8.1 or 8.2 hereof) that (i) modifies the rights or obligations of the Controlling Beneficiary in any respect, (ii) modifies the definition of "Specified Type", (iii) modifies the definition of "Special Purpose Vehicle Jurisdiction" without the prior written consent of the Controlling Beneficiary or (iv) that modifies the rights or obligations of the Collateral Manager in any respect without the prior

purposes, the Notes shall be treated as indebtedness of the Issuer and not as indebtedness of the Trustee, the Indenture, or any other entity, or in any asset or assets. It is the further intention of the parties hereto, and each Noteholder by acceptance of its Note agrees, that (i) for U.S. federal, state and local tax purposes, the Indenture shall be treated as a mere security device for the enforcement of the Indenture Secured Noteholders' rights under the Indenture Secured Notes, (ii) for U.S. federal, state and local tax purposes, the Collateral shall be treated as legally and beneficially owned by the Issuer, except following Default, as provided in Article V, and (iii) the Trustee shall be the agent of the Issuer as provided herein except following a Default or as otherwise specifically provided herein.

Section 10.11 <u>Maintenance of Financial Institution Ratings Requirement</u>. If any financial institution providing services under this Indenture that is required by the terms hereof to satisfy the Financial Institution Ratings Requirement ceases to so satisfy the Financial Institution Ratings Requirement with respect to Standard & Poor's, such financial institution shall either (A) assignment its rights and obligations under this Indenture to another financial institution that satisfies the Financial Institution Ratings Requirement, (B) obtain a guarantee from a guarantor that satisfies the Financial Institution Ratings Requirement (with such form of guarantee satisfying Standard & Poor's then-current criteria with respect to guarantees) or (C) establish a reserve in such amount and in such manner satisfying the Rating Condition with respect to Standard & Poor's.

## ARTICLE XI

## APPLICATION OF CASH

Section 11.1 <u>Disbursements of Cash from Payment Account</u>. (a) Notwithstanding any other provision in this Indenture, but subject to the other clauses of this Article XI and Section 13.1 hereof, on each Distribution Date and on the Accelerated Maturity Date, the Trustee (on behalf of the Issuer) shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(f) hereof as follows and for application by the Trustee in accordance with the following priorities (the "**Priority of Payments**"):

(i) On each Distribution Date and on the Accelerated Maturity Date, Interest Proceeds with respect to the related Due Period will be applied in the order of priority (the "**Interest Proceeds Waterfall**") set forth below:

(1) if such Distribution Date is a Monthly Distribution Date, to the payment of taxes and filing and registration fees owed by the Co-Issuers, if any;

(2) if such Distribution Date is a Monthly Distribution Date, (a) *first*, to the payment to the Bank of the accrued and unpaid Trustee Fee; (b) *second*, to the payment to the Administrator of the accrued and unpaid fees under the Administration Agreement; (c) *third*, to the payment to the Bank of accrued and unpaid Trustee Expenses (other than amounts payable pursuant to subclause (e) below) under this Indenture, the Collateral Administration Agreement, the Preference Share Paying

Agency Agreement, the Account Control Agreement and the Fiscal Agency Agreement (and, if an Event of Default has occurred and is continuing under this Indenture or the Fiscal Agency Agreement, payment to the Trustee of accrued and unpaid expenses (including amounts payable pursuant to the indemnity)), (d) *fourth*, to the payment of Rating Agency Expenses; (e) *fifth*, to the Trustee of Trustee Expenses constituting indemnities; (f) *sixth*, to the payment of accrued and unpaid Other Administrative Expenses then due and payable; *provided* that all payments made pursuant to subclauses (b) through (f) of this clause (2) do not exceed on such Monthly Distribution Date and the prior eleven Monthly Distribution Dates U.S.$200,000 in the aggregate; and (g) *seventh*, if the balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$50,000, for deposit to the Expense Account of an amount equal to the least of (x) the amount by which U.S.$50,000 exceeds the aggregate amount of payments made under subclauses (b) through (f) of this clause (2) on such Monthly Distribution Date and the prior eleven Monthly Distribution Dates, (y) such amount as would have caused the balance of all Eligible Investments and Cash in the Expense Account immediately after such deposit to equal U.S.$50,000 or (z) such lesser amount as the Collateral Manager shall specify in a notice to the Trustee;

(3)    if such Distribution Date is a Monthly Distribution Date, to the payment to the Collateral Manager of accrued and unpaid Management Fee;

(4)    if such Distribution Date is a Monthly Distribution Date, to the payment of all amounts scheduled to be paid to any Hedge Counterparty pursuant to the applicable Hedge Agreement, together with any termination payments (and any accrued interest thereon) payable by the Issuer pursuant to the applicable Hedge Agreement, other than any Deferred Termination Payment;

(5)    if such Distribution Date is a Monthly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class A-1 Notes;

(6)    if such Distribution Date is a Monthly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class A-2 Notes;

(7)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class A-3 Notes;

(8)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class A-4 Notes;

(9)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class B Notes;

(10)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class C Notes;

(11)    if such Distribution Date is a Quarterly Distribution Date, if the Class A/B/C Overcollateralization Test is not satisfied on the related Determination Date and if any Class A-1 Note, Class A-2 Note, Class A-3 Note, Class A-4 Note, Class B Note or Class C Note remains outstanding, to the payment of principal of *first*, the Class A-1 Notes, *second*, the Class A-2 Notes, *third*, the Class A-3 Notes, *fourth*, the Class A-4 Notes, *fifth*, the Class B Notes and *sixth*, the Class C Notes, in each case, until the Class A/B/C Overcollateralization Test is satisfied or until such Notes have been paid in full (whichever occurs first);

(12)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class D Notes;

(13)    if such Distribution Date is a Quarterly Distribution Date, if the Class D Overcollateralization Test is not satisfied on the related Determination Date and if any of the Class D Notes remain outstanding, to the payment of principal of the Class D Notes until the Class D Overcollateralization Test is satisfied or until the Class D Notes have been paid in full (whichever occurs first);

(14)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Class D Deferred Interest Amount (in reduction of the Aggregate Outstanding Amount of the Class D Notes);

(15)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class E Notes;

(16)    if such Distribution Date is a Quarterly Distribution Date, if the Class E Overcollateralization Test is not satisfied on the related Determination Date and if any the Class E Notes remains outstanding, to the payment of principal of the Class E Notes until the Class E Overcollateralization Test is satisfied or until the Class E Notes have been paid in full (whichever occurs first);

(17)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Class E Deferred Interest Amount (in reduction of the Aggregate Outstanding Amount of the Class E Notes);

(18)    if such Distribution Date is a Quarterly Distribution Date, to the payment of accrued and unpaid Subordinated Management Fee to the Collateral Manager;

(19)    if such Distribution Date is a Quarterly Distribution Date, 15% of any undistributed Interest Proceeds to the payment of principal of the Class E Notes, until the Class E Notes have been paid in full;

(20)    if such Distribution Date is a Quarterly Distribution Date, to the payment of *first*, each Hedge Counterparty of all Deferred Termination Payments payable by the Issuer pursuant to each Hedge Agreement and to the payment to any Synthetic Security Counterparty of any Defaulted Synthetic Termination Payments payable by the Issuer pursuant to any Synthetic Security, *pro rata* (based on the amount due) among each of the Hedge Counterparties and any Synthetic Security Counterparties to which such payments are payable, *second*, accrued and unpaid Trustee Fees and Trustee Expenses, *third*, accrued and unpaid Administrative Expenses, in each case in the priority of and to the extent not paid pursuant to clause (2) above (whether as the result of the limitations on amounts set forth therein or otherwise) and, *fourth*, to the Expense Account, such amount as would have caused the balance of all Eligible Investments and cash in the Expense Account immediately after such deposit to equal U.S.$50,000; and

(21)    if such Distribution Date is a Quarterly Distribution Date, to the Preference Share Paying Agent for distribution to the Preference Shareholders as a dividend on the Preference Shares or as a payment on redemption or repurchase of the Preference Shares, in each case, as provided in the Preference Share Documents.

If such Distribution Date is a Monthly Distribution Date, after payment of the Interest Distribution Amount with respect to the Class A-2 Notes, all remaining amounts shall be credited to the Monthly Interest Reserve Account for application to the Payment Account on the next Quarterly Distribution Date.

(ii)    On each Distribution Date and on the Accelerated Maturity Date, Principal Proceeds, with respect to the related Due Period will be distributed in the order of priority (the "**Principal Proceeds Waterfall**") set forth below:

(1)    to the payment of the amounts referred to in clauses (1) to (10) of the Interest Proceeds Waterfall in the same order of priority specified therein (and subject to any cap specified therein), but only to the extent not paid in full thereunder; *provided, however*, that if such

Distribution Date is other than a Quarterly Distribution Date, only amounts payable under clauses (1) and (6) of the Interest Proceeds Waterfall will be paid under this clause (1);

(2)    if such Distribution Date is a Quarterly Distribution Date, after giving effect to any application of Interest Proceeds, if any Overcollateralization Test is not satisfied on the related Determination Date and if any Class A-1 Note, Class A-2 Note, Class A-3 Note, Class A-4 Note, Class B Note or Class C Note remains outstanding, to the payment of principal of *first*, the Class A-1 Notes, *second*, the Class A-2 Notes, *third*, the Class A-3 Notes, *fourth*, the Class A-4 Notes, *fifth*, the Class B Notes and *sixth*, the Class C Notes, in each case, until each Overcollateralization Test is satisfied or until such Notes have been paid in full (whichever occurs first);

(3)    for each Distribution Date which occurs during a Sequential Pay Period, (a) if such Distribution Date is a Monthly Distribution Date other than a Quarterly Distribution Date, to pay, *first*, principal of the Class A-1 Notes until paid in full, *second*, principal of the Class A-2 Notes until paid in full and, *third*, for deposit into the Principal Collection Account for application on the next Quarterly Distribution Date (but, for the avoidance of doubt, not on any subsequent Monthly Distribution Date occurring prior to the next Quarterly Distribution Date) pursuant to the Principal Proceeds Waterfall to pay principal of each Class of Notes, and (b) if such Distribution Date is a Quarterly Distribution Date, to pay principal of, *first*, the Class A-1 Notes, *second*, the Class A-2 Notes, *third*, the Class A-3 Notes, *fourth*, the Class A-4 Notes, *fifth*, the Class B Notes and *sixth*, the Class C Notes, in each case until such Class has been paid in full;

(4)    for each Distribution Date which occurs during a Pro Rata Pay Period, (a) if such Distribution Date is a Monthly Distribution Date other than a Quarterly Distribution Date, to pay, *first*, principal of the Class A-1 Notes and the Class A-2 Notes, *pro rata*, in accordance with their Aggregate Outstanding Amounts in an aggregate amount up to, with respect to the Class A-1 Notes, the Class A-1 Pro Rata Principal Payment Cap and, with respect to the Class A-2 Notes, the Class A-2 Pro Rata Principal Payment Cap and *second*, for deposit into the Principal Collection Account for application on the next Quarterly Distribution Date (but, for the avoidance of doubt, not on any subsequent Monthly Distribution Date occurring prior to the next Quarterly Distribution Date) pursuant to the Principal Proceeds Waterfall to pay principal of each Class of Notes, and (b) if such Distribution Date is a Quarterly Distribution Date, to pay principal of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes, *pro rata*, in accordance with their Aggregate Outstanding Amounts

in an aggregate amount up to the Class A/B/C Pro Rata Principal Payment Cap;

(5)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class D Notes, but only to the extent not paid in full pursuant to clause (12) of the Interest Proceeds Waterfall;

(6)    if such Distribution Date is a Quarterly Distribution Date, after giving effect to any application of Interest Proceeds and Principal Proceeds under clauses (1) through (5), if the Class D Overcollateralization Test or the Class E Overcollateralization Test is not satisfied on the related Determination Date and each of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes have been paid in full, to the payment of principal of the Class D Notes until each of the Class D Overcollateralization Test and the Class E Overcollateralization Test is satisfied or until such Notes have been paid in full (whichever occurs first);

(7)    if such Distribution Date is a Quarterly Distribution Date that occurs during the Sequential Pay Period, to the payment of the Aggregate Outstanding Amount of the Class D Notes until the Class D Notes have been paid in full;

(8)    if such Distribution Date is a Quarterly Distribution Date that occurs during a Pro Rata Pay Period, to the payment of the principal of the Class D Notes in an aggregate amount up to the Class D Pro Rata Principal Payment Cap for such Quarterly Distribution Date;

(9)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class E Notes, but only to the extent not paid in full pursuant to clause (15) of the Interest Proceeds Waterfall;

(10)    if such Distribution Date is a Quarterly Distribution Date, to the payment of the Aggregate Outstanding Amount of the Class E Notes until the Class E Notes have been paid in full;

(11)    if such Distribution Date is a Quarterly Distribution Date, to the payment of amounts referred to in clauses (18) and (20) of the Interest Proceeds Waterfall in the same order of priority specified therein, but only to the extent not paid thereunder; and

(12)    if such Distribution Date is a Quarterly Distribution Date, to the Preference Share Paying Agent for distribution to the Preference Shareholders as a dividend on the Preference Shares or as a payment on

redemption or repurchase of the Preference Shares, in each case, as provided in the Preference Share Documents.

(b)    Not later than 12:00 p.m., New York City time, on or before the Business Day preceding each Distribution Date, the Issuer shall, pursuant to Section 10.2(f) hereof, remit or cause to be remitted to the Trustee for deposit in the Payment Account an amount of Cash sufficient to pay the amounts described in Section 11.1(a) required to be paid on such Distribution Date.

(c)    If, on any Distribution Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by the statements furnished by the Issuer pursuant to Section 10.7(a) and Section 10.7(b) hereof, the Trustee, on behalf of the Issuer, shall make the disbursements called for in the order and according to the priority set forth under Section 11.1(a) hereof, subject to Section 13.1 hereof, to the extent funds are available therefor.

(d)    Except as otherwise expressly provided in this Section 11.1, if on any Distribution Date the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required under any clause of the Interest Proceeds Waterfall or the Principal Proceeds Waterfall to different Persons, the Trustee shall make the disbursements called for by such clause ratably in accordance with the respective amounts of such disbursements in such clause then due and payable to the extent funds are available therefor.

(e)    Any amounts to be paid to the Class E Notes pursuant to the Interest Proceeds Waterfall and the Principal Proceeds Waterfall shall be released from the lien of this Indenture and paid to the Fiscal Agent for distribution pursuant to the Fiscal Agency Agreement. On the Redemption Date, the Stated Maturity, the Accelerated Maturity Date or any Post-Acceleration Distribution Date, in the event that after the application of Principal Proceeds and the application of Interest Proceeds under clauses (1) through (14) of the Interest Proceeds Waterfall the principal amount of the Indenture Secured Notes has not been paid in full, any amount distributable under clauses (15) through (17) of the Interest Proceeds Waterfall shall be applied first to pay such principal (in order of seniority) of the Indenture Secured Notes prior to making any distribution to the Fiscal Agent for distribution to the Class E Notes.

(f)    Any amounts to be paid to the Preference Share Paying Agent pursuant to clause (21) of the Interest Proceeds Waterfall or clause (12) of the Principal Proceeds Waterfall shall be released from the lien of this Indenture.  Notwithstanding the foregoing, on the Redemption Date, the Stated Maturity, the Accelerated Maturity Date or any Post-Acceleration Distribution Date, in the event that after the application of Principal Proceeds and the application of Interest Proceeds under clauses (1) through (20) of the Interest Proceeds Waterfall the principal amount of the Notes has not been paid in full, any amount distributable under clause (21) of the Interest Proceeds Waterfall shall be applied first to pay such principal (in order of seniority) of the Notes prior to making any distribution to the Preference Share Paying Agent.

(g)    Upon prior written notice delivered to the Trustee at least one Business Day prior to any Determination Date, the Collateral Manager may, in its sole discretion, elect to

defer payment to it of any Management Fee which would otherwise be payable to it on such Monthly Distribution Date. Any Management Fee deferred pursuant to this Section 11.1(g) will be paid on the next succeeding Monthly Distribution Date to the extent funds are available for such purpose in accordance with the Priority of Payments and shall accrue no interest.

(h)     A Sequential Pay Period will commence, and a Pro Rata Pay Period will terminate, on the same Distribution Date if as a result of the distribution of Principal Proceeds to be distributed on such date (as per the Note Valuation Report) the Net Outstanding Portfolio Collateral Balance will be reduced to less than 50% of the Net Outstanding Portfolio Collateral Balance on the Closing Date. A payment of principal on any Class D Notes or Class E Notes shall be applied, first, to pay any Deferred Interest Amount for such Class of Notes.

(i)     If the Notes have not been redeemed prior to the Stated Maturity, the Issuer shall make a Sale of all of the Collateral Debt Securities and all Eligible Investments then standing to the credit of the Accounts (other than the Hedge Counterparty Collateral Account, any Synthetic Security Issuer Account and any Synthetic Security Counterparty Account) and sell or liquidate all other Collateral, and all net proceeds from such liquidation and all available cash will be applied to the payment (in the order of priorities set forth in Section 11.1(a)) of all (i) fees, (ii) expenses (including the amounts due to each Hedge Counterparty) and (iii) principal of and interest (including the Deferred Interest Amounts, Defaulted Interest and interest on Defaulted Interest, if any) on the Notes.

Section 11.2    Securities Accounts. Each Account shall remain at all times with a financial institution organized and doing business under the laws of the United States or any State thereof, authorized under such laws to exercise corporate trust powers and having a combined capital and surplus of at least U.S.$250,000,000, that satisfies the Financial Institution Ratings Requirement and is subject to supervision or examination by federal or state authority.

All Cash held by, or deposited with, the Trustee in any Account (other than the Custodial Account or any Hedge Counterparty Collateral Account) pursuant to the provisions of this Indenture, and not invested in Collateral Debt Securities or Eligible Investments as herein provided, shall be deposited in one or more accounts, maintained at a financial institution described in the preceding paragraph, to be held in trust for the benefit of the Indenture Secured Noteholders. Except with respect to amounts on deposit in the Payment Account, to the extent Cash deposited in an account exceeds amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and is not fully collateralized by direct obligations of the United States, such excess shall be invested in Eligible Investments (pursuant to and as provided in Sections 10.2 and 10.4 hereof).

## ARTICLE XII

## PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES; SUBSTITUTION

Section 12.1    Sale of Collateral Debt Securities; Substitution. (a) Except as otherwise expressly permitted or required by this Indenture, the Issuer will not sell or otherwise dispose of any Collateral Debt Security (including termination or assignment of Synthetic