```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
MERRILL LYNCH INTERNATIONAL,            :
                                        :
        Plaintiff-                      :    08 Civ. 2893 (JSR)
        Counterclaim-Defendant,         :
                                        :    OPINION AND ORDER
MERRILL LYNCH & CO.,                    :
                                        :
        Counterclaim Defendant,         :
                                        :
            -v-                         :
                                        :
XL CAPITAL ASSURANCE INC., XLCA ADMIN   :
LLC,                                    :
                                        :
        Defendants-Counterclaimants.    :
---------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff Merrill Lynch International ("MLI") seeks declarations from this Court that defendant XL Capital Assurance Inc. ("XLCA"), a bond insurer, remains bound by seven credit default swaps – worth, in the aggregate, roughly $3.1 billion – into which the parties entered last year. The subject of these swaps are seven collateralized debt obligations ("CDOs"), a type of structured credit product, often backed by residential mortgages, that is seen by many as contributing to the recent deterioration in the credit markets. Several months ago, XLCA purported to terminate the swaps on the ground that MLI's subsequent contracts with another bond insurer concerning some of the same CDOs amounted to a repudiation of MLI's obligations to XLCA. MLI moved for summary judgment, arguing that it was apparent from the face of MLI's contracts with both insurers that MLI had not anticipatorily breached its contracts with XLCA. MLI's motion also sought summary judgment dismissing all but the fourth of

XLCA's four counterclaims. On June 10, the Court issued an order granting MLI's motion in all respects. This Opinion sets forth the reasons for that ruling and directs the parties to arrange for all further proceedings on the sole remaining counterclaim.

The pertinent facts, either undisputed or, where disputed, taken most favorably to the non-moving party (XLCA), are as follows:

Between January 25, 2007 and August 10, 2007, MLI, a subsidiary of counterclaim defendant Merrill Lynch, Inc., and XLCA, a subsidiary of Security Capital Assurance Ltd. ("SCA"), entered into seven credit default swaps (the "XLCA swaps"). See Merrill Lynch International's and Merrill Lynch & Co., Inc.'s Statement Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶¶ 21-27.[1] The XLCA swaps went by the names West Trade II, Silver Marlin, Tazlina, West Trade III, Jupiter, Robecco, and Biltmore. Id. ¶¶ 21-27.

A credit default swap is an arrangement similar to an insurance contract. The buyer of protection (here, MLI) pays a periodic fee, like an insurance premium, to the seller of protection (here, XLCA), in exchange for compensation in the event that the insured security experiences default. See International Swaps and Derivatives Association, Inc.'s "Product Descriptions and Frequently Asked Questions" ¶ 24, Ex. 7 to Declaration of Scott Musoff ("Musoff Decl."). In the credit default swaps at issue here, the insured

---

[1] In each swap, the counterparty to MLI was a trust created expressly for the purposes of the transaction. Defendant XLCA Admin, also a subsidiary of SCA, served as trustee for each of the seven trusts. Pl. 56.1 ¶ 5.

securities (also called "reference entities" or "reference obligations") were certain notes entitling MLI to payments from seven collateralized debt obligations, or CDOs.

A CDO is a security for which cash flows are generated by an underlying pool of debt instruments such as bonds, notes or loans (called the collateral); these often are ultimately secured by or derived from residential mortgages. Counterclaims ¶ 22. The right to receive payments from a CDO is divided into layers, called "tranches," that correspond to the noteholders' respective seniority in receiving payments from the CDO's cash flows. See id. ¶ 23. These tranches range from the highly-rated "super senior" or AAA tranches, which have first priority in receiving payments of interest and principal flowing from the collateral, to lower-rated "mezzanine" or BB tranches, to unrated equity tranches, which have the lowest priority. See id. Generally, the most senior class of notes constitutes the "controlling class," such that holders of those notes possess the power to control numerous aspects of the CDO. Declaration of Trude Akersveen, former Managing Director at XLCA ("Akersveen Decl.") ¶ 6. For example, in the Biltmore CDO, the rights reserved to the controlling class include, among others, the right to direct the CDO trustee to institute proceedings, approve any agreement with a collateral manager, collateral administrator or bank, veto the selection of any replacement CDO trustee, and direct that the CDO collateral manager be removed for cause. See Indenture for Biltmore CDO ¶¶ 5.2-5.4, 5.8-5.9, 5.13-5.14, 5.17, Ex. 10 to

Declaration of William B. Adams ("Adams Decl."). In the event of default, the controlling class's rights expand to include, among others, the right to terminate the collateral manager without cause, accelerate note maturities, and issue directions to liquidate collateral. Id. ¶¶ 6.10-6.11, 8.2.

In the CDOs at issue here, MLI owned both the A-1 and A-2 "super senior" tranches, but through the swaps MLI purchased insurance from XLCA on the A-2 tranche only. CC ¶ 27. In a typical credit default swap arrangement, the financial guarantor of the CDO receives only the voting rights associated with the particular tranche of notes being insured. Akersveen Decl. ¶ 6. In the MLI/XLCA swaps, however, XLCA negotiated for and obtained exclusive "controlling class" rights – i.e., rights associated with the A-1 tranche – despite the fact that it was insuring only the A-2 notes. Id. The following provision, which appeared in the confirmation for each of the swaps, expressed this arrangement:

> The following event will constitute an Additional Termination Event . . . :
> . . . (ii) <u>the failure by Party A [MLI] to exercise any Voting Rights</u> or to cause one or more beneficial owners of the Applicable Percentage of the Outstanding Principal Balance of the Reference Obligation to exercise any Voting Rights, or than the Retained Rights, <u>solely in accordance with the written instructions of Party B [XLCA]</u> . . . .

Confirmation for West Trade II ("XL Swap Confirmation") ¶ 6 (emphasis added), Ex. 1(A) to Declaration of Joseph Gambino ("Gambino Decl."). Five of the seven swaps define "Voting Rights" as "the right to vote or direct the voting of, or to give or withhold instructions or

consents with respect to," both the A-1 notes and the A-2 notes.[2] Id.

On August 29, 2007, MLI entered into six new credit default swaps (the "MBIA swaps") with non-parties LaCrosse Financial Products, LLC, the seller of protection, and MBIA Insurance Corporation ("MBIA"), the financial guarantor. The subject of the swaps were the A-1 notes of six of the seven CDOs that were the subject of the XLCA swaps (all but Jupiter). With respect to voting rights, Section 9(a) of the MBIA swaps provided:

> Subject to Section 9(b) and Section 9(e), Buyer [MLI] will, at any time during the period from and including the Effective Date to and including the Termination Date exercise all voting rights and all other rights of a holder of The Reference Obligation, the Controlling Class, the Controlling Beneficiary and the Controlling Party with respect to the Reference Obligation Outstanding Amount multiplied by the Relevant Proportion only at the direction of Seller [MBIA] given in writing, and if no such direction is forthcoming, Buyer shall abstain from exercising any such rights.

Confirmation for West Trade II ("MBIA Swap Confirmation") ¶ 9(a) (emphasis added), Ex. 2(A) to Gambino Decl. Section 9(b) of the MBIA swaps provided, in turn, that "[t]he Buyer's obligations under Section 9(a) above are subject to [certain] qualifications," including:

---

[2] Two of the swaps, however, define "Voting Rights" only with respect to the A-2 notes. See Confirmation for West Trade II ¶ 6, Ex. 1(A) to Gambino Decl.; Confirmation for Silver Marlin ¶ 6, Ex. 1(B) to Gambino Decl. XLCA claims that the reference to the A-1 voting rights was omitted solely "[b]y error of the scrivener and mutual mistake of the parties." Counterclaims ¶ 151. XCLA's fourth counterclaim seeks reformation of this aspect of those two contracts, but that counterclaim is not at issue in the instant motion.

5

> Seller acknowledges that Buyer may have entered into (or in the future may enter into) one of more agreements with respect to a purchase by Buyer of credit protection in respect of one or more obligations issued by the Reference Entity and that Buyer's obligations under such agreements may, from time to time, conflict with Buyer's obligation to act in accordance with Seller's instructions regarding the exercise of rights in respect of the Reference Obligation.  The Seller agrees that its sole remedy with respect to such conflict shall be to declare an Additional Termination Event if Buyer fails to comply with Seller's instruction regarding the exercise of rights as required by this Section 9.

Id. ¶ 9(b).

On February 22, 2008, XLCA sent MLI six termination notices corresponding to the six CDOs that were the subjects of the MBIA swaps.  Exs. 1(A)-(F) to Musoff Decl.  In the notices, XLCA explained that it had become aware of publicly available information indicating that MLI had committed to exercise the Class A-1 voting rights for the six CDOs in the MBIA swaps according to MBIA's instructions.  Specifically, XLCA noted that Standard and Poor's listed MBIA as the "Bond Insurance Provider" on those six CDOs, and that MBIA's Head of Insured Portfolio Investment had stated publically that MBIA is the "'sole controlling party within our [CDO] deals.'"  Id.  In light of this information, XLCA continued, it concluded that MLI had "repudiated its contractual obligations" under the six swaps, thereby triggering an "Additional Termination Event" and entitling XLCA to exercise its termination rights.  Id.

With respect to the seventh CDO, Jupiter, which was not the subject of any swaps with MBIA, XLCA sent a seventh notice on the same day.  Ex. 1(G) to Musoff Decl.  This notice stated: "In light of MLI's repudiation of its voting right obligations with respect to

6

other transactions, XLCA hereby requests that MLI confirm that it did not, at any time, enter into any understanding or agreement to follow the instructions of any third party with respect to the voting of any or all of the Class A-2 Notes or Class A-1 Notes issued pursuant to the Jupiter VI Indenture." Id. XLCA requested that MLI provide this confirmation within three days of the date of the notice.

On February 29, MLI sent six responses to the six February 22 termination notices, stating that MLI had "neither failed to exercise Voting Rights as directed by [XLCA] nor exercised any Retained Rights without the consent of [XLCA]," and that, consequently, it believed XLCA's termination notices to be "ineffective and without force." Exs. 2(A)-(F) to Musoff Decl. The notices further stated:

> With respect to the assumptions and conjecture in your letter concerning contracts we may have with MBIA, while we cannot comment on the substance of any trade with a counterparty other than you, please be advised that nothing in any hedging agreement with any other counterparty would preclude Merrill Lynch International from exercising Voting Rights in accordance with our contracts with you.

Id. MLI did not send any separate response specifically addressed to the Jupiter CDO.

On March 6, XLCA sent MLI another notice relating to Jupiter, in which it stated that "XLCA has not received the requested confirmation and deems MLI's silence as evidence of its having accorded Voting Rights under the Jupiter VI Transaction to a third party." Ex. 3 to Musoff Decl. The notice expressed XLCA's conclusion that MLI had repudiated the Jupiter contract and that XLCA therefore was exercising its termination rights with respect to that

7

contract. Id. The following day, XLCA, through counsel, responded to MLI's February notices on the other six swaps, asserting that XLCA's terminations had a basis in law. Ex. 4 to Musoff Decl.

By letter dated March 10 and captioned with a subject heading listing all seven swaps (including Jupiter), MLI replied that "MLI can now and will at all times going forward exercise Voting Rights in accordance with the express terms of our contracts" and that MLI "has not entered into any contract that divests [MLI] of its ability to ensure compliance with [its contracts with XLCA] in the future." Ex. 5 to Musoff Decl. (internal quotation marks omitted).

MLI then commenced this action, on March 19, 2008, asking this Court to declare that XLCA remains bound by the seven swaps and that its termination notices are without effect. XLCA responded with four counterclaims. MLI then moved for summary judgment in its favor. In response, XLCA conceded that MLI had not yet breached the swaps, since it was undisputed that XLCA had not provided any written instructions as to voting rights. See Pl. Mem. at 13-14; Memorandum of Law in Opposition to (A) Plaintiff Merrill Lynch International's Motion for Summary Judgment and (B) Counterclaim Defendants Merrill Lynch International's and Merrill Lynch & Co.'s Motion for Partial Summary Judgment, at 15. XLCA nonetheless opposed MLI's summary judgment motion on the ground that MLI had anticipatorily breached, or repudiated, six of the contracts by entering into the swaps with MBIA, and that it had failed to provide adequate assurances of its intent to perform under the seventh contract.

Under New York common law, "[a] party's repudiation, or

8

anticipatory breach, of its future obligations under a bilateral contract . . . may take the form either of 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach," or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 747 N.Y.S.2d 468, 474-75 (1st Dep't 2002) (quoting Restatement (Second) of Contracts § 250; other quotation marks omitted).[3] "[A] wrongful repudiation of the contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach." Am. List Corp. v. U.S. News & World Report, Inc., 75 N.Y.2d 38, 44 (1989).

XLCA contends that when MLI contractually promised MBIA to exercise voting rights "only at the direction of [MBIA]," MBIA Swap Confirmation ¶ 9(a), that promise rendered MLI "unable or apparently unable" to perform under its contract with XLCA, which promised to exercise those same voting rights "solely in accordance with the

---

[3] Similarly, Article 2 of the New York Uniform Commercial Code ("U.C.C."), which is instructive even if not directly applicable here because it applies only to contracts for the sale of goods, provides that "[r]epudiation includes language that a reasonable person would interpret to mean that the other party will not or cannot make a performance still due under the contract or voluntary, affirmative conduct that would appear to a reasonable person to make a future performance by the other party impossible." N.Y. U.C.C. § 2-610(2); see also id. cmt. 1 ("[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.").

written instructions of [XLCA]," XL Swap Confirmation ¶ 6.  XLCA accordingly invokes the repudiation doctrine, arguing that it need not wait until the moment of performance – when it tenders a demand to MLI to vote the controlling class rights in accordance with XLCA's instructions – in order to sue for breach.

XLCA's position, however, does not square with the plain language either of the XLCA swaps or of the MBIA swaps.  As to the former, MLI's contract with XLCA does not, as XLCA represents, grant controlling class voting rights unconditionally to XLCA.  The contract sets up a logical exchange between the parties – XLCA grants MLI protection in the case of default, and MLI grants XLCA control (via the exercise of voting rights) over certain factors affecting the risk of default – but if MLI chooses not to cede control, i.e., refuses to vote in accordance with XLCA's wishes, it thereby relinquishes XLCA's protection.  Specifically, the contract provides that MLI's failure to follow XLCA's instructions triggers an "Additional Termination Event," as a result of which MLI not only loses insurance coverage but also is required to provide XLCA with certain make-whole payments.[4]

This reading of the contract is dictated by its express language and makes perfect sense in light of the deal's overall structure.  The XLCA credit default swaps were somewhat unusual in

---

[4] See XL Swap Confirmation ¶ 6, Ex. 1(A) to Gambino Decl. (providing that "upon termination of the agreement following an Additional Termination Event," MLI shall pay XLCA "the Accrued Fixed and Additional Amounts and the Termination Make-Whole Amount" as defined in other documents).

that they gave XLCA control not only over the A-2 tranche, which XLCA was insuring, but also over the more senior A-1 tranche. This arrangement gave XLCA an extra measure of protection against losses, but also left MLI "on the hook," so to speak, for the A-1 tranche. When it came time to vote, therefore, MLI (or, if MLI had sold the A-1 notes, as the provision explicitly contemplated,[5] whatever entity was then the beneficial owner) necessarily would be faced with a choice: to follow XLCA's instructions and retain coverage, or give up the coverage in order to protect itself in some better way with respect to the A-1 tranche.[6]

As to the MBIA swaps, the plain text of those contracts expressly qualified MLI's obligations to obey MBIA's instructions where doing so would conflict with MLI's obligations due to other

---

[5] See XL Swap Confirmation ¶ 6, Ex. 1(A) to Gambino Decl. (providing for additional termination event if MLI or "one or more beneficial owners of the Applicable Percentage [100%] of the Outstanding Principal Balance of the Reference Obligation" fails to exercise any voting rights "solely in accordance with the written instructions of" XLCA).

[6] XLCA argues that this interpretation improperly converts the swaps into "options contracts," citing Rubinstein v. Rubinstein, 23 N.Y.2d 293, 299 (1968), for the proposition that "[g]enerally, the law presumes that the primary purpose of a contract, not expressly stated to be an option, is performance of the act promised and not nonperformance." While Rubinstein addressed a wholly different question than the one at issue here – viz., whether a party could seek specific performance where the contract contained a liquidated damages clause – the opinion sagely advised that the parties' intentions with respect to that question should be "deduced from the whole instrument and the circumstances." Id. at 298. Here, the whole instrument and the circumstances indicate that the parties planned for the eventuality that MLI would not follow XLCA's instructions, and that, should that situation come to pass, XLCA should avail itself of the remedies set forth in the contract.

11

agreements. See MBIA Swap Confirmation § 9(a) (providing that the requirement that MLI "exercise all voting rights . . . only at the direction of [MBIA]" is "[s]ubject to Section 9(b)"); id. § 9(b) (providing that if MLI does not obey MBIA's instructions because they conflict with other obligations, MBIA merely is entitled to declare an "Additional Termination Event"). It is true that, as XLCA notes, nothing in the MBIA agreement purports to subordinate MBIA's claim to control of the voting rights to similar claims accorded to other parties (such as XLCA); however, the lack of a similar provision in the XLCA swaps suggests, if anything, that MLI intended to abide by its agreement with XLCA in case of conflict.[7]

Given these aspects of both contractual relationships, the cases on which XLCA relies are inapposite. In Computer Possibilities Unlimited, for example, the plaintiff first contracted to accord defendant the exclusive right to control plaintiff's pricing, then entered a subsequent contract committing that same exclusive right to a third party. 747 N.Y.S.2d 468, 474-75. The second contract "divested [the plaintiff] of any direct control over the prices charged," making it "impossible" for the plaintiff to perform its

---

[7] Indeed, that precise situation occurred following the instigation of this litigation. On March 25, 2008, MBIA issued instructions to MLI directing it to accelerate the maturity of the notes issued by the Biltmore and Silver Marlin CDOs. See Exs. 5(A)-(B) to Adams Decl. In a letter dated April 1, MLI formally requested that XLCA provide MLI with an instruction by April 4 to accelerate the Biltmore CDO (without prejudice to either party's position in the litigation). See Ex. 4 to Adams Decl. XLCA did not provide the requested instruction, see Def. Mem. at 11, and on April 4, MBIA issued notices to MLI terminating the MBIA swaps on which it had issued instructions on March 25, see Exs. 5(A)-(B) to Adams Decl.

12

obligation. Id. at 475. Here, by contrast, MLI fully retained the ability to abide by XLCA's voting instructions. While doing so might trigger a termination event in MLI's other agreements (the MBIA swaps),[8] the choice to trigger the termination event remains MLI's.

In re Asia Global Crossing, Ltd., 326 B.R. 240, aff'd on reh'g, 332 B.R. 520 (Bankr. S.D.N.Y. 2005), on which XLCA also relies, likewise focuses on whether the allegedly repudiating party "lost control of the ability to satisfy" the contract. 332 B.R. at 528. In that case, the Bankruptcy Court concluded that the debtor's mere motion to sell all of its assets to another corporation did not "prevent it" from living up to its prior contractual commitment, because the sale could not be consummated until it received Court approval; until such approval was granted, the debtor could have "withdraw[n] the application and abandon[ed] the contract." Id. Here, no court (nor unconditional contract) has taken from MLI "control [over its] ability to satisfy" the XLCA swaps.

Finally, cases involving grants of exclusive rights to two

---

[8] The Court uses the word "might" deliberately to acknowledge the theoretical possibility of converging instructions, i.e., that both XLCA and MBIA would request that the controlling class rights be exercised in an identical way. However, the Court agrees with XLCA that, at least in the present economic conditions, the interests of the most senior noteholders of the CDOs would likely conflict with the interests of the noteholders further down the line. For example, when a CDO experiences an event of default, the controlling class has the option to declare an acceleration, which entitles only the noteholders in that class, and not the less senior noteholders, to receive any cash flow until the most senior notes are redeemed in full. See Def. Mem. at 7; Declaration of Scott Gordon ("Gordon Decl.") ¶ 18. Consequently, the interests of the two classes could be expected to differ significantly. See Gordon Decl. ¶ 18.

separate entities do not govern here, because, as explained above, neither the XL swaps nor the MBIA swaps granted exclusive rights unconditionally.[9]

Ultimately, the legal question the Court must answer is whether MLI, by entering the six swaps with MBIA, disabled itself from complying with its obligations to XLCA with respect to the underlying six CDOs. Based on the plain language of the XLCA swaps, as well as the plain language of the MBIA swaps, the answer is that it did not.[10] Consequently, XLCA had no grounds on which to issue the six February 22, 2008 termination notices with respect to those six swaps.[11]

---

[9] For the same reason, XLCA's reliance on illustration 5 to section 250 of the Restatement (Second) of Contracts, involving repudiation of an unconditional sale of real property, is not on point here.

[10] XLCA has presented the Court with a variety of extrinsic evidence pertaining to, for example, comments made in email exchanges among MLI employees, MLI's financial performance, and statements made on MLI's financial disclosures; XLCA also proposes a host of other evidence that it would hope to obtain through further discovery. It is axiomatic, however, that where contract language is unambiguous, the Court should not consult extrinsic evidence. See, e.g., Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) ("In New York . . . if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." (citation and internal quotation marks omitted)).

[11] The Court expresses no opinion as to whether MLI's conduct with respect to these swaps was standard in the industry or whether, by putting itself in a position to select between two insurance protections at the time of performance, it in any way violated the expectations of XLCA or MBIA. See Gordon Decl. ¶ 17 (suggesting that, in declarant's experience, "the agreements between MBIA and ML would . . . violate the reasonable expectations a monoline [insurer] with preexisting control rights would have").

14

Nor did XLCA have a valid basis on which to terminate the seventh swap, Jupiter, roughly two weeks later. XLCA claims that it was entitled to terminate Jupiter because, after MLI's conduct with respect to the other six swaps allegedly gave XLCA reason to doubt MLI's intent to perform under Jupiter, XLCA sought assurance from MLI, and then did not receive adequate assurance within a reasonable time. This argument fails most obviously because it is premised on an erroneous view that MLI's conduct with respect to the other six swaps was a reasonable basis for XLCA to fear nonperformance. In addition, it suffers from numerous other failings.

To begin with, it is far from clear that the doctrine of adequate assurance applies at all in this situation. New York's Uniform Commercial Code provides that, with respect only to contracts for the sale of goods, a party may "in writing demand adequate assurance of due performance" when "reasonable grounds for insecurity arise with respect to the performance of" the other party, and until he receives such assurance, suspend his own performance. N.Y. U.C.C. § 2-609. But the New York Court of Appeals has extended the doctrine beyond the U.C.C. context only in limited circumstances, viz., where it found the contract at issue to be closely analogous to one for the sale of goods. See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 468 (1998). The Court finds a credit default swap to have very little in common with a sale of goods, and hence concludes that New York would not extend the doctrine of adequate assurance to the instant situation.

Moreover, even if the adequate assurance doctrine were

15

applicable, and even if the Court were further convinced that XLCA was warranted in requesting assurances here - despite the fact that XLCA had no evidence that Jupiter was involved in a swap with MBIA or any other third party - the assurances that MLI provided to XLCA were sufficient and were offered within a reasonable time frame.  On February 22, 2008, the same day it sent six termination notices with respect to the other six swaps, XLCA sent MLI a letter requesting that MLI assure XLCA of MLI's continued performance under Jupiter within a mere three days.  One week later, MLI responded to the six termination notices, assuring XLCA that it was in no way precluded from abiding by its contracts with XLCA.  It is true that these letters did not address Jupiter specifically; however, if XLCA's basis for concern with respect to Jupiter was that it suspected Jupiter might also be the subject of an second swap, MLI's assurances that no other arrangement jeopardized its ability to perform even under those six swaps should have, logically speaking, assuaged XLCA's concerns with respect to Jupiter as well.

In any event, in reply to further correspondence from XLCA purporting to terminate Jupiter, MLI wrote on March 10 that "MLI can now and will at all times going forward exercise Voting Rights in accordance with the express terms of our contracts," referring expressly to all seven swaps.  This explicit assurance, sent only seventeen days after XLCA's request, was well within the thirty-day cap set by the U.C.C. in the sale of goods context, see N.Y. U.C.C. § 2-609(4), and the Court finds as a matter of law that the duration was reasonable under the circumstances.

16

In conclusion, the Court agrees with MLI that XLCA's termination of all seven swaps was without legal basis, and that the contracts remain in effect. Accordingly, the Court, by Order dated June 10, 2008, granted MLI's motion for summary judgment, awarding MLI judgment in its favor on all its claims and dismissing with prejudice XLCA's first, second, and third counterclaims, which are essentially the mirror image of plaintiff's claims. As far as the Court is aware, the only remaining claim in this case is XLCA's fourth counterclaim, which asks for reformation of two of the swaps. Counsel for the parties are hereby ordered to jointly call Chambers on July 21, 2008, at 5 p.m., to set a schedule for future proceedings with respect to that counterclaim.

SO ORDERED.

Dated: New York, NY
       July 15, 2008

_____
JED S. RAKOFF, U.S.D.J.